# EXHIBIT 1
# Part 2
# Documents 142-147

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT C

06/01/2021                              **Complete Child Report**

## Child Data

Child:        **BEAL, ARRIEONA A**                                    Dob: 8/28/2001

Jurisdiction:  Milwaukee

Steller ID:  158919              Medicaid ID:                    Other Program ID:

Address:    4281 N Teutonia Ave, Milwaukee, WI 53209-6751        Last Update: 3/16/2011

Sex:      Female                Race: Black or African American    Ethnic: Unknown

Risk:

Guardian:  BEAL, ELINDA                  Phone:    4146108428

## Child Memos

Date: 8/14/2002
DERNIEL BEAL

## Case Data

Case Manager:    INACTIVE,CLPPP                        Case Manager ID: 1948686

Case Status:    Closed          Date Opened:    8/22/2002        Date Closed: 5/11/2004

Guardian SSN:    0            Relationship to Child:   Mother (Natural)    Alternate Phone: 4146108428

Provider ID:    7278          Provider Name:    SINAI PEDIATRIC CLINIC#

PbB Confirmed?    Yes  Confirmed Date:    12/3/2002    Confirmed Level: 20.00    Last Update:    3/16/2011

Closed Reason:  Closure Criteria Met            Other Med Prob.:          Medicaid ID:

## Case Memos

No case related clinical memos were found for this child

## Events

| Event | Referral Date | Begin/Due Date | Comp Date | Result Code | Comment |
|---|---|---|---|---|---|
| *PB PHN - HOME VISIT/INITIAL | 8/22/2002 | 8/23/2002 | 8/23/2002 | | |
| *PB HSA - HOME VISIT/INITIAL | 8/23/2002 | 8/23/2002 | 9/6/2002 | Complete | |
| *PB HSA - LEAD INFO PACKET | 8/23/2002 | 8/23/2002 | 9/6/2002 | Complete | |
| *LEAD RECORDS REQUESTED | 8/27/2002 | 8/28/2002 | 8/28/2002 | Complete | |
| *TELEPHONE VISIT | 9/5/2002 | 9/5/2002 | 9/5/2002 | | |
| *PB CM TEAM - DENVER II | 9/6/2002 | 9/6/2002 | 9/6/2002 | Partial or Emergency | |
| *LEAD CM TEAM ENV ASSESSMENT | 9/6/2002 | 9/6/2002 | 9/6/2002 | Complete | |
| *PB HSA - HOME VISIT/INITIAL | 9/6/2002 | 9/6/2002 | 9/6/2002 | No hazard remediation work performed | |
| *TELEPHONE VISIT | 11/27/2002 | 11/27/2002 | 11/27/2002 | Not Home | |

06/01/2021                          **Complete Child Report**                          .

| | | | | |
|---|---|---|---|---|
| *PB PHN - HOME VISIT/INITIAL | 11/27/2002 | 11/27/2002 | 11/27/2002 | |
| *TELEPHONE VISIT | 12/2/2002 | 12/2/2002 | 12/2/2002 | |
| *TELEPHONE VISIT | 3/27/2003 | 3/27/2003 | 3/27/2003 | Not Home |
| *PB PHN - HOME VISIT/INITIAL | 3/27/2003 | 3/27/2003 | 3/27/2003 | |
| *TELEPHONE VISIT | 4/2/2003 | 4/2/2003 | 4/2/2003 | |
| *PB PHN - CASE MGMT- CASE CLOSED | 8/29/2003 | 8/29/2003 | 8/29/2003 | |
| *LEAD RECORDS REQUESTED | 7/25/2006 | 7/28/2006 | 9/23/2006 | Complete |
| *LEAD RECORDS REQUESTED | 11/29/2006 | 12/4/2006 | 12/12/2006 | Complete |
| *LEAD RECORDS REQUESTED | 11/28/2007 | 11/28/2007 | 12/10/2007 | Complete |
| *LEAD RECORDS REQUESTED | 1/21/2010 | 1/21/2010 | 1/21/2010 | Complete |
| *LEAD RECORDS REQUESTED | 3/16/2011 | 3/16/2011 | 3/16/2011 | Not Home |
| *LEAD RECORDS REQUESTED | 6/13/2011 | 6/13/2011 | 6/13/2011 | Complete |
| *LEAD RECORDS REQUESTED | 11/7/2011 | 11/7/2011 | 11/7/2011 | Complete |

**Blood Tests**

06/01/2021                                **Complete Child Report**

| Sample Date | Sample Type | PbB Result | Conf | Other TestType | Other Result | Unit Type | Provider Name |
|---|---|---|---|---|---|---|---|
| 11/30/2009 | Venous | = 4.00 | Yes | No test peformed | | µg/dL | ISAAC COGGS HERITAGE HC |
| 12/5/2007 | Venous | = 4.00 | Yes | No test peformed | | µg/dL | DYNACARE-VILLARD# |
| 4/26/2004 | Venous | = 10.00 | Yes | No test peformed | | µg/dL | MEDICAL SCIENCE LAB* |
| 10/28/2003 | Venous | = 15.00 | Yes | No test peformed | | µg/dL | SINAI PEDIATRIC CLINIC# |
| 12/3/2002 | Venous | = 20.00 | Yes | No test peformed | | µg/dL | SINAI PEDIATRIC CLINIC# |
| 8/14/2002 | Capillary | = 23.00 | No | No test peformed | | µg/dL | WIC-KEENAN HC* |
| 8/14/2002 | Capillary | = 13.20 | No | Hemoglobin | | µg/dL | WIC-KEENAN HC* |
| 8/14/2002 | Capillary | = 23.00 | No | No test peformed | | µg/dL | WIC-KEENAN HC* |
| 8/14/2002 | Capillary | = 13.20 | No | Hemoglobin | | µg/dL | WIC-KEENAN HC* |
| 8/14/2002 | Capillary | = 23.00 | No | No test peformed | | µg/dL | WIC-KEENAN HC* |
| 8/14/2002 | Capillary | = 13.20 | No | Hemoglobin | | µg/dL | WIC-KEENAN HC* |

**Address History**

| Last Occupied | First Occupied | Type Address | Address |
|---|---|---|---|
| | 11/30/2009 | Primary Home | 4281 N Teutonia Ave, Milwaukee, WI 53209-6751 |
| 4/26/2004 | 8/14/2002 | Primary Home | 1017 N 29th St Apt/Ste#  , Milwaukee, WI 53208-3205 |
| 11/27/2007 | 4/26/2004 | Primary Home | 8950 N 86TH St, Milwaukee , WI 53224 |
| 11/30/2009 | 11/27/2007 | Primary Home | 9160 N JOYCE Ave, Milwaukee , WI 53224 |

**Siblings**

| Name | Dob | HHLPSS ID | Address |
|---|---|---|---|

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT D

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...          file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276     Document 143     Filed 03-02-2022     Page 2 of 25

**994 F.3d 791 (2  21)**

## Glenn BURTON, Jr., Ravon Owens, and Cesar Sifuentes, Plaintiffs-Appellees,

### v.

## E.I. DU PONT DE NEMOURS AND COMPANY, INC., The Sherwin-Williams Company, and Armstrong Containers, Inc., Defendants-Appellants.

Nos. 20-1774, 20-1776, 20-1777, 20-1780, 20-1781, 20-1782, 20-1783, 20-1784 & 20-1785.

**United States Court of Appeals, Seventh Circuit.**

Argued December 9, 2020.
Decided April 15, 2021.
Rehearing and Rehearing En Banc Denied May 12, 2021.

Appeals from the United States District Court for the Eastern District of Wisconsin, Nos. 07-CV-0303, 07-CV-0441, 10-CV-0075, Lynn Adelman, *Judge.*

Frederick C. Baker, Attorney, Motley & Rice, Mount Pleasant, SC, Fidelma L. Fitzpatrick, Attorney, Motley & Rice LLC, Providence, RI, Mark R. Miller, Attorney, Wexler Wallace LLP, Chicago, IL, for Plaintiffs-Appellees.

Paul E. Benson, Attorney, Michael Best & Friedrich LLP, Milwaukee, WI, Brian David Schmalzbach, Eric Samuel Fleming, Joy C. Fuhr, Attorneys, McGuireWoods LLP, Richmond, VA, for Defendant-Appellant E.I. du Pont de Nemours and Company, Inc.

Robert P. Alpert, Eric Larson, Jeffrey K. Douglass, Attorneys, Morris, Manning & Martin LLP, Atlanta, GA, Timothy A. Bascom, Attorney, Bascom, Budish & Ceman, S.C. Germantown, WI, for Defendant-Appellant Armstrong Containers Inc.

Leon F. DeJulius, Jr., Esq., Attorney, Jones Day, New York, NY, Charles H. Moellenberg, Jr., Anderson Bailey, Attorneys, Jones Day, Pittsburgh, PA, Jeffrey K. Spoerk, Attorney, Quarles & Brady LLP, Milwaukee, WI, for Defendant-Appellant Sherwin Williams Company.

Eric G. Lasker, Shannon N. Proctor, Attorneys, Hollingsworth LLP, Washington, DC, for Amicus Curiae American Coatings Association.

Cory L. Andrews, Attorney, Washington Legal Foundation, Washington, DC, for Amicus Curiae Washington Legal Foundation.

Philip S. Goldberg, Attorney, Shook, Hardy & Bacon LLP, Washington, DC, for Amicus Curiae Wisconsin Manufacturers & Commerce, National Association of Manufacturers, and Coalition for Litigation Justice, Inc.

802 Alan J. Lazarus, Attorney, Faegre Drinker Biddle & Reath LLP, San Francisco, CA, David Brian Sudzus, Attorney, Faegre Drinker Biddle & Reath, LLP, *802 Chicago, IL, for Amicus Curiae Product Liability Advisory Council, Incorporated.

Before WOOD, SCUDDER, and ST. EVE, Circuit Judges.

801 *801 ST. EVE, Circuit Judge.

These sprawling toxic-tort cases take us into the weeds of Wisconsin products liability law. The product at issue is white lead carbonate—a dry white powder historically used as the "pigment" in many lead-based paints. Paint has two essential components: the pigment, which hides and protects the painted surface, and the liquid "vehicle," which allows the pigment to be spread across the surface. Over time a consensus developed that lead-based paints were toxic and posed especially great dangers to young children, who were prone to chewing paint flakes or putting scattered lead dust into their mouths during critical stages of brain development. These dangers led the federal government to ban lead-

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...        file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276        Document 143        Filed 03-02-2022        Page 3 of 25

based paint for residential use in 1978. Wisconsin followed suit two years later. Even after these bans, however, lead-based paint remained on the walls of many homes throughout the United States.

The plaintiffs in these consolidated cases are three young men who grew up in Milwaukee homes that had lead-based paint on the walls. They were diagnosed with lead poisoning as young children in the 1990s or early 2000s. Years later, they filed these lawsuits against several manufacturers of white lead carbonate, seeking compensation for brain damage and other injuries resulting from their ingestion of lead paint particles. The plaintiffs identified the paint pigment in their childhood homes as white lead carbonate, but they could not identify the specific company responsible for manufacturing the white lead carbonate that they ingested. To overcome this failure of proof, they relied on _Thomas e rel. Gramling v. Mallett_, 285 Wis.2d 236, 701 N.W.2d 523 (2005), in which the Wisconsin Supreme Court adopted a "risk-contribution" theory of liability for plaintiffs suing manufacturers of white lead carbonate. The risk-contribution theory modifies the ordinary rule in tort law that a plaintiff must prove that a specific defendant's conduct caused his injury. It instead seeks to apportion liability among the "pool of defendants" who could have caused the injury.

After years of pretrial litigation, the plaintiffs went to trial against five manufacturers of white lead carbonate. The jury found three of the manufacturers liable and awarded the plaintiffs $2 million each. The three defendants found liable (E.I. du Pont de Nemours and Company, Inc., the Sherwin-Williams Company, and Armstrong Containers, Inc.) now appeal. They challenge a long list of the district court's pretrial, trial, and post-trial rulings. We see no error in many of these rulings, and we commend the district court for its thoughtful attention and diligent effort throughout this complex case. Nonetheless, we hold that the court committed three significant legal errors about the scope of Wisconsin products liability law. These errors shaped the trial and impermissibly expanded the defendants' potential liability. Along with a separate error in the admission of certain expert testimony, they compel us to reverse the judgments and remand for further proceedings.

# I. Background

803

Wisconsin's risk-contribution theory is at the heart of this appeal.[1] In this section we trace the development of the risk-contribution theory to provide context for the plaintiffs' lawsuits. We then describe the *803 facts and procedural history giving rise to this appeal.

## A. Legal Background

### 1. Collins

The risk-contribution theory has its origins in _Collins v. Eli Lilly Co._, 116 Wis.2d 166, 342 N.W.2d 37 (1984). In that case, Therese Collins's mother took diethylstilbestrol (DES) while pregnant with Collins in 1957-58. DES was a miscarriage-prevention drug that was on the market from 1947 to 1971. In 1971, medical research established a possible statistical link between DES and the later development of vaginal cancer in children exposed to DES in utero. After developing vaginal cancer in 1977, Collins sued various drug companies that had produced or marketed DES while her mother was pregnant.

Under traditional tort law, Collins faced an "insurmountable obstacle": she could not identify which drug company had produced or marketed the DES that her mother had taken. _Id._ at 45. She could not do so because DES was a "fungible drug produced with a chemically identical formula." _Id._ at 44. Moreover, hundreds of different companies had produced or marketed DES. And, owing to the passage of time, records and evidence pertaining to drug companies' production or marketing of DES and Collins's mother's prescription were largely unavailable.

The Wisconsin Supreme Court was "faced with a choice of either fashioning a method of recovery for the DES case which will deviate from traditional notions of tort law, or permitting possibly negligent defendants to escape liability to an innocent, injured plaintiff." _Id._ at 45. While acknowledging that "DES cases pose difficult problems," the court concluded that, "as between the plaintiff, who probably is not at fault, and the defendants, who may have provided the product which caused the injury, the interests of justice and fundamental fairness demand that the latter should bear the cost of injury." _Id._ at 49. Relying on its authority under the Wisconsin Constitution to fashion an adequate remedy, _see_ Wis.

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 4 of 25

Const. art. I,  9, the court proceeded to adopt a risk-contribution theory of recovery for DES plaintiffs, adding that "this method of recovery could apply in situations which are factually similar to the DES cases." _Collins_, 342 N.W.2d at 49. The rationale for the risk-contribution theory was that the defendant drug companies had, at the very least, "contributed to the _risk_ of injury to the public" by producing or marketing a drug that turned out to have harmful side effects. _Id._ Moreover, the "possibly responsible" drug companies were in a better position than the "innocent plaintiff" to absorb the cost of, and protect against, injuries from DES. _Id._ at 49-50.

As for how the risk-contribution theory would apply: a plaintiff would need to sue at least one defendant and prove "that the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries; that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff." _Id._ at 50. While a plaintiff only had to sue one defendant, there were incentives to sue as many as possible, and named defendants were free to implead other drug companies as third-party defendants.

The court made clear that the risk-contribution theory was available for both negligence and strict liability claims. A plaintiff proceeding on either theory would have to prove the traditional elements of the claim, with one exception. Instead of proving that a defendant drug company *804 caused the plaintiff's injuries, the plaintiff would only have to prove that the defendant "produced or marketed the type of DES taken by the plaintiff's mother." _Id._ at 51.

If a plaintiff succeeded in making this prima facie showing, the burden would shift to the defendant to prove "that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES." _Id._ at 52. To prevail on these defenses, a defendant would have to prove that "the DES it produced or marketed could not have reached the plaintiff's mother." _Id._

The goal of this burden-shifting procedure was to create "a pool of defendants which it can reasonably be assumed could have caused the plaintiff's injuries." _Id._ at 52. The court acknowledged that the risk-contribution theory could result in liability for innocent defendants, but it accepted this possibility as "the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law." _Id._

Finally, the court added that the doctrine of comparative negligence would permit the jury to equitably "apportion liability among the defendants that have been unable to exculpate themselves." _Id._ at 53. In allocating liability, the jury could consider various factors, including: whether a defendant tested DES for safety and efficacy or took steps to protect or warn the public; the defendant's role in securing government approval of DES; the defendant's market share in the relevant area; and whether the defendant produced or marketed DES even after it knew the relevant risks. _Id._ at 54.

## 2. T  omas

In _Thomas,_ the Wisconsin Supreme Court considered whether to extend _Collins_'s risk-contribution theory to white lead carbonate pigment. 701 N.W.2d at 523. Steven Thomas suffered lead poisoning as a young child after he ingested lead paint particles in two of his childhood homes. Years later, Thomas sued his former landlords and several manufacturers of white lead carbonate seeking compensation for his injuries, which included brain damage and a heightened risk of future medical complications.

From a legal standpoint, Thomas was in the same boat as Collins: he could not identify which company had manufactured the white lead carbonate that he had ingested as a child, given the "generic nature" of white lead carbonate, the large number of producers, and the lack of available records and evidence. _Id._ at 532. As such, he sought to hold the pigment manufacturers liable under _Collins_'s risk-contribution theory. The lower courts rejected Thomas's proposed extension of _Collins_ because Thomas was not without a remedy—he could, and did, recover from his landlords.

The Wisconsin Supreme Court reversed, holding that Thomas's case was similar enough to Collins's case to warrant application of the risk-contribution theory. _Id._ at 557. As in _Collins,_ the pigment manufacturers contributed to the risk of injury to the public by producing or marketing a harmful product. They were also better positioned to absorb the costs of the injuries. And, like Collins, Thomas could not identify "the precise manufacturer of the white lead carbonate that caused his injuries." _Id._ at 559. On this point, the court rejected the manufacturers' argument that white lead carbonate

urton v. EI du Pont de Nemours and Co., Inc., 994    . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276    Document 143    Filed 03-02-2022    Page 5 of 25

—which came in three different chemical formulas—was not fungibility. It held that chemical identity was not necessary for fungibility. The court reasoned that a product could be "fungible" *805 in three different senses: (1) functionally interchangeable; (2) physically indistinguishable; or (3) uniform in risk level. *Id.* at 560-61. The court concluded that, when viewing the factual record in the light most favorable to Thomas, white lead carbonate was fungible in all three senses.

The court proceeded to reject the manufacturers' other arguments as to why *Collins* should not apply. First, the "drastically larger" window of liability—potentially several decades or more, depending on when a house was built—was not a reason to let the pigment manufacturers off the hook. "[T]he Pigment Manufacturers' argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long." *Id.* at 562. Next, the court rejected the argument that *Collins* should not apply because lead poisoning had multiple potential causes and did not produce a "signature injury." While it agreed with the argument's premises, the court reasoned that these were issues for the jury. *Id.* at 563. Finally, the court rejected the argument that *Collins* should not apply because the pigment manufacturers were not in exclusive control of the risk that their product created:

> [A]s doctors were the ones who prescribed the dosage of DES, so too were the paint manufacturers that mixed the amount of white lead carbonate in the paint. However, the paint did not alter the toxicity of the white lead carbonate anymore than the pharmacist did by filling a prescription. To the contrary, at best, the paint manufacturers actually diluted the white lead carbonate's toxicity. In other words, the inherent dangerousness of the white lead carbonate pigment existed the moment the Pigment Manufacturers created it.

> *Id.*

The Wisconsin Supreme Court then set forth the elements of both negligence and strict liability claims for white lead carbonate plaintiffs. As in *Collins,* Thomas's burden was relaxed "only with respect to establishing the specific type of DES the plaintiff's mother took, which, in this case, translates into the specific type of white lead carbonate Thomas ingested." *Id.* Thomas only had to "prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the houses' existence." *Id.* at 564. If Thomas could make out a prima facie case, the burden would shift to the defendant to prove "that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located." *Id.* Unlike in *Collins,* moreover, the pigment manufacturers might have additional defenses, "including that lead poisoning could stem from any number of substances (since lead itself is ubiquitous) and that it is difficult to know whether Thomas's injuries stem from lead poisoning as they are not signature injuries." *Id.* at 564-65.

Two Justices dissented, expressing dismay that the pigment manufacturers could be "held liable for a product they may or may not have produced, which may or may not have caused the plaintiff's injuries, based on conduct that may have occurred over 100 years ago when some of the defendants were not even part of the relevant market." *Id.* at 567-68 (Wilcox, J., dissenting); *see also id.* at 590 (Prosser, J., dissenting) ("[T]his court has now created a remedy for lead paint poisoning so sweeping and draconian that it will be nearly impossible for paint companies to defend themselves or, frankly, for plaintiffs to lose.").

## 3.   odo

806    In *Thomas,* the Wisconsin Supreme Court made clear that it was not reaching *806 the merits of Thomas's claim, but only deciding whether he was eligible to rely on the risk-contribution theory. *See id.* at 528-29 nn.2 & 4. A few years after *Thomas,* the court had occasion to consider the merits of a white lead carbonate claim. *See Godoy e  rel. Gramling v. E.I. du Pont de Nemours & Co.*, 319 Wis.2d 91, 768 N.W.2d 674 (2009). Like Thomas, Ruben Baez Godoy sustained lead poisoning after he ingested white lead carbonate in his childhood home. Proceeding under *Thomas,* Godoy sued several manufacturers of white lead carbonate, asserting both negligence and strict liability claims. His legal theory was that white lead carbonate was defectively designed.

As an initial matter, the court rejected Godoy's argument that the product in question was actually "residential paint pigment." *Id.* at 682. For one thing, Godoy's complaint focused exclusively on "white lead carbonate." *Id.* Plaintiffs in

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276        Document 143        Filed 03-02-2022        Page 6 of 25

products liability cases, the court explained, "must—at minimum—identify the product alleged to be defective." *Id.* "Doing so puts the defendant on notice and allows the defendant to begin building a defense." *Id.* More fundamentally, the product at issue could not be residential paint pigment because the risk-contribution theory applied only to "fungible and identically defective" products. *Id.* In *Thomas,* that product was white lead carbonate pigment. The court made clear that it had never applied the risk contribution theory to "residential paint pigment," or to "paint containing white lead carbonate." *Id.* at 683 & n.10.

On the merits, the court rejected Godoy's argument that white lead carbonate was defectively designed. The court explained that Wisconsin courts had "discussed three categories of product defects—manufacturing defects, design defects, and defects based on a failure to adequately warn." *Id.* at 683. Godoy's negligence and strict liability claims rested on a design defect, meaning "the design itself is the cause of the unreasonable danger." *Id.* at 683-84. Godoy's theory of design defect was that the presence of lead rendered white lead carbonate defectively designed. The court disagreed: "A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself. Without lead, there can be no white lead carbonate pigment." *Id.* at 685. Although Godoy's negligence and strict liability claims were "separate avenues of recovery," they both failed on this ground. *See id.* at 681 n.7.

## 4. Wisconsin Statute   89 . 46 &  i  son

In 2011, the Wisconsin legislature passed Wis. Stat.   895.046, which effectively overruled *Thomas* while preserving *Collins.* The statute reinstates ordinary causation principles in all products liability cases, while carving out a narrow exception for plaintiffs like *Collins* who have no other remedy and whose injuries stem from a "complete[ly] integrated product" produced in "chemically and physically identical" forms and sold in generic packaging.   895.046(4). In 2013, the legislature amended   895.046 to make it retroactive. *See*   895.046(2). The statute "assures that businesses may conduct activities in this state without fear of being sued for indefinite claims of harm from products which businesses may never have manufactured, distributed, sold, or promoted, or which were made and sold decades ago." 895.046(1g). To that end, the statute also includes certain time limits and joinder requirements.   895.046 (4)(b), (5).

807    *807 In *Gibson v. American Cyanamid Co.,* 760 F.3d 600 (7th Cir. 2014), we considered whether applying   895.046 retroactively to extinguish already pending white lead carbonate claims would violate the Wisconsin Constitution's due process guarantee. Applying the Wisconsin Supreme Court's two-step framework, we held that it would. *Id.* at 609. First, Gibson had "a `vested right' in his claims under *Thomas*'s risk-contribution theory." *Id.* Second,   895.046 lacked a rational basis because the private interest at stake outweighed the public interest that the statute promoted. *Id.* at 609-10. At both steps of the analysis, we held that Wisconsin Supreme Court precedent "dictate[d]" our conclusions. *Id.* (citing *Matthies v. Positive Safety Mfg. Co.,* 244 Wis.2d 720, 628 N.W.2d 842, 861 (2001) (holding unconstitutional the retroactive application of a statute extinguishing the right to recover on a common law negligence claim under an unmodified doctrine of joint and several liability); *Martin by Scoptur v. Richards,* 192 Wis.2d 156, 531 N.W.2d 70, 93 (1995) (holding unconstitutional the retroactive application of a statute extinguishing the right to recover an unlimited amount of non-economic damages)). We went on to hold that *Thomas* did not violate the Federal Constitution. *Gibson,* 760 F.3d at 627.

Following our decision in *Gibson,* the Wisconsin Supreme Court split 3-3 (with one Justice not participating) on the first issue we addressed in *Gibson:* whether retroactively applying   895.046 to white lead carbonate claims would violate the Wisconsin Constitution's due process guarantee. *Clark e   rel. Gramling v. Am. Cyanamid Co.,* 367 Wis.2d 540, 877 N.W.2d 117 (2016).

## B. Factual and Procedural Background

This legal background sets the stage for this case. The net effect of *Thomas,*   895.046, and *Gibson* was a six-year window (2005-2011) in which plaintiffs in Wisconsin could rely on the risk-contribution theory to sue white lead carbonate manufacturers for injuries arising from their ingestion of white lead carbonate as children. Approximately 170 such lawsuits were filed. The three plaintiffs here were the first to go to trial. The parties selected their cases as "bellwethers" for the other cases, which remain pending before the district court.

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...      file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276        Document 143        Filed 03-02-2022        Page 7 of 25

## 1. The Plaintiffs Claims

The sad sequence of events leading to the plaintiffs' claims will by now look familiar. As young children in the 1990s or early 2000s, Glenn Burton, Jr., Ravon Owens, and Cesar Sifuentes lived in Milwaukee homes (built between 1899 and 1922) that had paint containing white lead carbonate. While they were young children, the plaintiffs had elevated blood lead levels ranging from 31 (Burton) to 48 (Sifuentes) to 53 (Owens) micrograms per deciliter at their peak. For context, Wisconsin currently defines lead poisoning as "a level of lead in the blood of 5 or more micrograms per [deciliter] of blood." Wis. Stat.  254.11(9). (This number has steadily decreased over time.) Sifuentes and Owens were hospitalized and received chelation therapy to reduce their blood lead levels.

Relying on Wisconsin's risk-contribution theory, the plaintiffs—who could not identify the manufacturer of the white lead carbonate in their childhood homes—sued six white lead carbonate manufacturers for both negligence and strict liability, seeking to hold them liable for brain damage and other injuries resulting from their ingestion of white lead carbonate as young children. The plaintiffs filed their lawsuits separately, but the district court consolidated them for trial.

808      *808 **2. The Defendants Production of White Lead Carbonate**

Only three of the defendants below are parties to this appeal: DuPont, Sherwin-Williams, and Armstrong. The plaintiffs sued Armstrong in its capacity as successor-in-interest to the John R. MacGregor Lead Company. The three defendants below who are not parties to this appeal are: American Cyanamid Company, NL Industries, Inc. (formerly known as the National Lead Company), and the Atlantic Richfield Company. As explained below, the district court dismissed American Cyanamid for lack of personal jurisdiction, National Lead settled, and the jury found Atlantic Richfield not liable.

DuPont, Sherwin-Williams, and Armstrong each manufactured white lead carbonate for a period in the twentieth century. DuPont manufactured white lead carbonate at a factory in Philadelphia from 1917 to 1924. It incorporated its white lead carbonate into its own paint products, which included ready-mixed paint and white lead-in-oil—a paste commonly sold to "master painters" who combined it with other ingredients to make their own paint. During this period, DuPont sold some of its ready-mixed paint products in Milwaukee through a wholesaler. After it stopped making white lead carbonate in 1924, DuPont continued making and selling paint products containing white lead carbonate manufactured by other companies until 1966. From 1925 to 1946, National Lead manufactured white lead-in-oil for DuPont. As part of this arrangement, DuPont supplied National Lead with the ingredients and specifications for manufacturing white lead-in-oil. DuPont then sold the finished white leadin-oil under its own brand name.

Sherwin-Williams manufactured white lead carbonate from 1910 to 1947 and used its white lead carbonate as an ingredient in its own paint products. Sherwin-Williams had a presence in the Milwaukee market during this time. Apart from its own white lead carbonate manufacturing, Sherwin-Williams sold products containing other companies' white lead carbonate pigment from 1880 to 1969. In 1955, Sherwin-Williams began including warnings about the dangers of ingesting lead on some of its lead-based paints.

MacGregor (Armstrong's predecessor-in-interest) manufactured white lead carbonate at a plant in Chicago from 1938 to 1971. MacGregor used its white lead carbonate as an ingredient in its "Scotch Laddie" line of paint. Scotch Laddie paint appeared in advertisements and telephone directories in Milwaukee between 1957 and 1971. MacGregor also sold its white lead carbonate to other paint manufacturers for use in their paint products.

## 3. Pretrial Rulings

809      The district court made three significant pretrial rulings that shaped the trial. First, the court granted summary judgment to Sherwin-Williams and Armstrong on the plaintiffs' negligent failure-to-warn claims. The court reasoned that the plaintiffs' caregivers already knew that lead pigment was dangerous and needed no further warning. The court pointed out that Sherwin-Williams and other paint manufacturers started issuing product warnings in 1955—long before the plaintiffs were exposed in the 1990s or early 2000s. Meanwhile federal, state, and local governments began warning of the risks of lead-based paint in homes in the 1970s. The plaintiffs' caregivers even testified at their depositions that they knew, before the plaintiffs' exposure to lead-based paint, that children should not eat paint chips because of the risk of

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 8 of 25

lead exposure. For these reasons, the defendants had no duty to warn as a matter of law. Still, the court ruled that *809 the plaintiffs could pursue negligence claims "based on the general duty of ordinary care."

Second, the court largely denied Sherwin-Williams's and Armstrong's motions for summary judgment on the plaintiffs' strict liability failure-to-warn claims. The court began by distinguishing between duty to warn in the negligence and strict liability contexts, reasoning that negligence requires a duty to warn the plaintiff whereas strict liability requires a duty to warn the "ordinary consumer" who purchased or used white lead carbonate or paint containing white lead carbonate when the defendants put those products on the market. The court found a genuine issue of material fact as to whether the defendants had a duty to warn these ordinary consumers. At the same time, the court ruled as a matter of law that the defendants had no duty to warn in their capacity as pigment manufacturers who merely sold pigment to other companies or master painters. The court explained: "It makes little sense for the [white lead carbonate] manufacturer to owe a duty to warn the consumer at the moment that the pigment is delivered to the paint manufacturer, because the [white lead carbonate] manufacturer has no effective means of communicating that warning." The court thus granted summary judgment to the defendants on the plaintiffs' strict liability failure-to-warn claims to the extent that the defendants supplied white lead carbonate to other companies.

Third, less than six weeks before trial, the court denied DuPont's motion to exclude evidence of its post-1924 contracts to purchase white lead-in-oil from National Lead. It also denied Sherwin-Williams's motion to exclude evidence of its production or promotion of paint products containing another company's white lead carbonate. The court reasoned that *Thomas* contemplated liability for producing or "marketing" white lead carbonate and selling products that contained another company's white lead carbonate amounted to "marketing" white lead carbonate. The defendants moved for reconsideration, arguing that the court's ruling contradicted *Thomas, Godoy,* the plaintiffs' longstanding theory of the case, and the court's prior rulings. In the alternative, they moved to continue trial and reopen discovery so that they could prepare a defense according to this broader theory of liability. The court denied these motions, reasoning that *Thomas* put them on notice that they could be liable for marketing paint products containing another company's white lead carbonate.

The court also made several other relevant pretrial rulings: It granted summary judgment to the plaintiffs on the issues of whether white lead carbonate was "fungible" and whether Armstrong was the successor-in-interest to MacGregor. It denied summary judgment to Sherwin-Williams and Armstrong on the issue of whether    895.046 barred the plaintiffs' claims. It denied the defendants' motion to exclude the testimony of two of the plaintiffs' experts: Dr. Idit Trope and Dr. James Besunder. And it denied Sherwin-Williams's motion to exclude evidence and arguments about its constitutionally protected product advertisements and association with industry groups.

810    National Lead settled before trial. This was a significant development because, as the district court explained, "[p]laintiffs and defendants alike understand National Lead to have been a leading manufacturer of [white lead carbonate] pigment with a significant presence in the Milwaukee market during the first half of the Twentieth Century." National Lead settled pursuant to a "*Pierringer* release," according to which "a tort plaintiff settles *810 with a tortfeasor, reserves its right to pursue claims against other joint tortfeasors, and agrees to indemnify the settling tortfeasor for any claims for contribution that non-settling tortfeasors might bring against the settling tortfeasor." Bruner Corp. v. R.A. Bruner Co., 133 F.3d 491, 494 (7th Cir. 1998) (citing Pierringer v. Hoger, 21 Wis.2d 182, 124 N.W.2d 106 (1963)).

On its own initiative, and over the defendants' objections, the court bifurcated the trial into two phases: a liability phase and an apportionment phase. Relying on *Collins,* the court explained that phase one would yield a "pool of defendants" that could have caused the plaintiffs' injuries. Phase one would also determine the plaintiffs' overall damages. Phase two would focus on allocating the damages based on equitable factors like market share and the defendants' respective roles in the industry. *See Collins,* 342 N.W.2d at 52-53. The court then made the related decision to exclude evidence of National Lead's market share and role in the Milwaukee market from phase one, finding that such evidence would be confusing, irrelevant, and prejudicial. As the court explained, "National Lead's unusual position as a settled defendant whose liability and proportional responsibility remained live issues presented significant legal and evidentiary issues." While National Lead's large market share in Milwaukee was relevant to the allocation of damages, it was irrelevant to whether other defendants were present in the Milwaukee market. Meanwhile, it would be all too easy for other defendants to point the finger at National Lead during the liability phase in hopes of exculpating themselves entirely.

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276    Document 143    Filed 03-02-2022    Page 9 of 25

## 4. Trial

The cases proceeded to trial against the remaining five defendants. The plaintiffs went to trial on the two claims that had survived summary judgment: ordinary negligence and strict liability failure-to-warn. To prove their claims, the plaintiffs presented evidence of the dangers of lead-based paint to young children; awareness and recognition of these dangers among the medical and scientific communities, the paint industry, and the defendants specifically; the defendants' continued production, marketing, promotion, and advertisement of white lead carbonate and products containing white lead carbonate; and the plaintiffs' childhood ingestion of white lead carbonate and subsequent injuries.

To prove their injuries, the plaintiffs relied largely on the expert testimony of Dr. Trope and Dr. Besunder. Dr. Trope, a neuropsychologist, performed neuropsychological evaluations on each plaintiff and concluded that each had neuropsychological impairments indicating brain damage. She explained that a neuropsychological evaluation gauges brain function by testing various "domains" such as cognitive ability, language functioning, visual motor functioning, memory, attention and concentration, and executive functions like judgment, organization, conceptualization, and information processing. She testified that abnormally large discrepancies across the plaintiffs' functional domains led her to conclude that each plaintiff had brain damage. On cross-examination, Dr. Trope testified that the plaintiffs' history of lead poisoning was a substantial contributing factor to their neuropsychological dysfunction. The plaintiffs objected during this cross-examination that they had not offered Dr. Trope to prove causation.

Dr. Besunder, a pediatric critical care physician and toxicologist who treats children with lead poisoning, testified to the fact, source, and extent of each of the plaintiffs' injuries. Dr. Besunder did not personally evaluate any of the plaintiffs. *811 Instead, he relied on Dr. Trope's neuropsychological evaluations and general epidemiological studies on the effects of lead poisoning in children. Relying on the neuropsychological evaluations, Dr. Besunder testified that each of the plaintiffs had brain damage. Like Dr. Trope, Dr. Besunder based this conclusion on "significant deviations" in the plaintiffs' functional domains. Dr. Besunder further testified that lead poisoning caused plaintiffs' brain damage. He explained that the plaintiffs' functional deficits were consistent with patterns of brain damage in lead-poisoned children documented by the medical and scientific literature. He testified that he had reviewed the plaintiffs' medical records to rule out other potential causes of their brain damage.

Finally, Dr. Besunder attempted to quantify the plaintiffs' brain damage. He testified that each of the plaintiffs had lost at least 10 IQ points due to lead poisoning. He explained that "several studies" had "attempted to quantitate the impact of lead levels up to approximately 20 to 30 micrograms per deciliter" and "all those studies have very similar results, that by the time your leads level is approaching the 25 to 30 range that child has lost approximately 10 IQ points." He testified that children with blood lead levels above 30 would have lost additional IQ points, but he stuck with the "conservative estimate of 10 IQ points" because "the medical literature will only allow me to give an approximate quantitative estimate for lead levels up to 30." He explained that the studies he relied on controlled for alternative causes. He conceded, however, that he had not published his methodology for quantifying IQ loss and that he did not have a baseline IQ for the plaintiffs.

The defendants' primary line of defense at trial was "chemical exculpation." Each of the defendants called experts to testify to differences in the chemical composition of the paint samples taken from the plaintiffs' childhood homes and the defendants' residential paint formulas.

At the close of evidence, the court dismissed American Cyanamid for lack of personal jurisdiction. The court submitted the plaintiffs' case against the other four defendants to the jury. The jury found DuPont, Sherwin-Williams, and Armstrong liable on both claims. It awarded $2 million in damages to each of the plaintiffs. The jury found Atlantic Richfield not liable. The trial never reached phase two—where the jury would have apportioned the damages among the defendants—because the three defendants found liable chose to settle, assigning 12.5 of fault to National Lead and splitting the rest among themselves on a joint and several basis.

## . Post-Trial Rulings

The defendants filed various post-trial motions. They each moved for judgment notwithstanding the verdict, arguing that Wisconsin's judicial public policy factors precluded their liability. *See Fandrey e rel. Connell v. Am. Family Mut. Ins. Co.*,

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...          file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 10 of 25

272 Wis.2d 46, 680 N.W.2d 345, 350 (2004). They also moved for a new trial, challenging the court's pretrial legal rulings, the sufficiency of the evidence, and the court's decision to bifurcate the trial. Sherwin-Williams and Armstrong moved for judgment as a matter of law on similar grounds.

The court denied the defendants' post-trial motions, with one exception: it agreed to remit Burton's damages award from $2 million to $800,000 because Dr. Besunder admitted during trial that, of the 10 IQ points that Burton lost due to lead poisoning, he lost six of them before he moved to the home that he focused on at trial.

The defendants now appeal.

812

## *812 II. Discussion

The defendants raise a host of challenges on appeal. We focus primarily on three foundational issues concerning the scope of Wisconsin products liability law and the defendants' corresponding potential for liability. First, all three defendants argue that the district court improperly extended *Thomas* by allowing the jury to find them liable in their capacity as paint manufacturers, rather than white lead carbonate manufacturers. Second, Sherwin-Williams argues that the court erroneously allowed the jury to find it liable on the negligence claims without proof of a product defect. Third, Sherwin-Williams and Armstrong contend that the court erroneously allowed the jury to find them liable on the strict liability claims in the absence of a duty to warn or any proof that the lack of a warning caused the plaintiffs' injuries. Our review of Wisconsin law convinces us that the defendants are correct on all three counts. We see no merit in the defendants' remaining challenges, with one exception: we hold that the court abused its discretion in admitting Dr. Besunder's testimony about the plaintiffs' IQ loss.

# A. The Risk-Contribution Theory

We begin with the defendants' challenge to the court's application of the risk-contribution theory. The defendants argue that the district court improperly extended *Thomas* by allowing the plaintiffs to hold them liable in their capacity as manufacturers of finished paint products, and not just in their capacity as manufacturers of white lead carbonate.

The district court denied the defendants' motions in limine on this point, ruling that the plaintiffs could introduce evidence of the defendants' production or sale of paint containing another company's white lead carbonate. The court stood by its pretrial ruling when denying the defendants' motions for a new trial. We review both rulings for abuse of discretion. *Turubchuk v. S. Ill. Asphalt Co., Inc.*, 958 F.3d 541, 548-49 (7th Cir. 2020). An evidentiary ruling that rests on a legal error is, by definition, an abuse of discretion. *United States v. Chaparro*, 956 F.3d 462, 474 (7th Cir. 2020). We will grant a new trial only if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (quoting *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 636 (7th Cir. 1996)). Evidentiary errors warrant a new trial "if the evidentiary errors had `a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice.'" *Fields v. City of Chi.*, 981 F.3d 534, 544 (7th Cir. 2020) (quoting *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009)).

As set forth above, each of the defendants was both a white lead carbonate manufacturer and a manufacturer of finished paint products at various points in the twentieth century. They maintain that the risk-contribution theory applies to them only in their capacity as manufacturers of white lead carbonate. We agree; the Wisconsin Supreme Court has expressly limited the risk-contribution theory to manufacturers of white lead carbonate.

# 1. Scope of T omas

In *Thomas,* the court invariably referred to the defendants as "pigment manufacturers." The court used this term when setting forth the elements of Thomas's cause of action. *Thomas*, 701 N.W.2d at 564. At one point, the court even drew a critical distinction between "pigment manufacturers" and "paint manufacturers." The pigment manufacturers in *Thomas*

813    had argued *813 that they should not be liable because they "were not in exclusive control of the risk their product created ..." *Id.* at 563. In other words, the pigment manufacturers attempted to shift the blame to paint manufacturers—

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...     file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276     Document 143     Filed 03-02-2022     Page 11 of 25

the companies that sold lead-based paints directly to consumers. The court rejected this argument. In doing so it analogized paint manufacturers to DES prescribers: while paint manufacturers mixed white lead carbonate into paint, they "did not alter the toxicity of the white lead carbonate anymore than the pharmacist did by filling a prescription." *Id.* If anything, "the paint manufacturers *actually diluted* the white lead carbonate's toxicity." *Id.* (emphasis added). "[T]he inherent dangerousness of the white lead carbonate pigment existed the moment the *Pigment Manufacturers* created it." *Id.* (emphasis added).

We noted the significance of this passage in *Gibson.* In rejecting the argument that *Thomas* had discriminated against out-of-state corporations by imposing the risk-contribution theory against out-of-state pigment manufacturers but not instate paint makers and retailers, we commented: "This argument makes an inferential leap too far, and also ignores *Thomas*'s discussion of pigment manufacturers' greater culpability, when compared to paint makers and retailers." *Gibson,* 760 F.3d at 627 n.11 (describing *Thomas* as holding that "if anything, paint makers and retailers reduced the risk of harm by diluting the lead pigment").

Finally, *Godoy* confirmed that the risk-contribution theory applies only to white lead carbonate pigment. The lower court had "mistakenly stated" that the product in *Thomas* was "paint containing white lead carbonate." *Godoy,* 768 N.W.2d at 682 n.10. The Wisconsin Supreme Court was clear: "This statement misconstrues our holding in *Thomas.*" *Id.* Similarly, the court rejected Godoy's argument that the risk-contribution theory could apply to "residential paint pigment." *Id.* at 683.

In short, the Wisconsin Supreme Court has held that the risk-contribution theory applies to *white lead carbonate manufacturers* to the extent that they manufacture *white lead carbonate.* Applying risk contribution to paint manufacturers or finished paint products would extend *Thomas* beyond its bounds. *See Thomas,* 701 N.W.2d at 570 (Wilcox, J., dissenting) ("It is important to emphasize that the industry defendants are being sued in their capacity as manufacturers of white lead carbonate and not the finished product, paint.").

Admittedly, distinguishing between pigment manufacturers and paint manufacturers—and between pigment and paint—can be confusing because pigment does not reach residential consumers unless paint manufacturers sell them a finished paint product. Moreover, many companies, including the defendants here, historically manufactured both pigment and finished paint products. Still, the Wisconsin Supreme Court has made clear that such companies are liable under the risk-contribution theory only in their capacity as manufacturers of white lead carbonate pigment. As a practical matter, this means that a paint manufacturer cannot be liable under the risk-contribution theory for selling a finished product that contains another company's white lead carbonate. Only the manufacturer of the white lead carbonate can be liable.

Sherwin-Williams and Armstrong blur the issue by arguing that they cannot be held liable as paint manufacturers even if they sold paint containing their own white lead carbonate. This argument is technically correct but inconsequential. Under *Thomas,* a company that manufactures white lead carbonate can be liable under the risk-contribution theory if its
814 *814 white lead carbonate could have injured the plaintiff. 701 N.W.2d at 565. It does not matter how the white lead carbonate reached the plaintiff—whether through the same company's paint or another company's paint. *See id.* at 563 (rejecting the pigment manufacturers' argument that they could not be liable because paint manufacturers altered their products before they reached the residential consumers). Either way, risk contribution applies because the company manufactured white lead carbonate that could have injured the plaintiff. To the extent that Sherwin-Williams and Armstrong suggest that a company can avoid liability entirely under the risk-contribution theory by fully integrating its products and only selling white lead carbonate as an ingredient in its own paints, that argument is nonsensical and has no basis in *Thomas.*

The district court based its more expansive reading of *Thomas* on the Wisconsin Supreme Court's use of the word "marketed." As the district court saw it, a company that sells lead-based paint is "marketing" lead pigment, even if it is not "producing" it. Thus, the court reasoned, a paint manufacturer could be liable for selling paint containing another company's white lead carbonate. We disagree. For one thing, this is a strained interpretation of "marketing" in this context. A bookseller does not "market" paper, even though paper is a component of books. More fundamentally, *Thomas* foreclosed this broad conception of "marketing" because it drew a distinction between pigment manufacturers and paint manufacturers and limited its holding to the former. If selling a finished product qualified as "marketing" one of the product's ingredients, a company that had never manufactured pigment could be liable under *Thomas.* Yet *Thomas*

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 12 of 25

carefully limited its holding to "pigment manufacturers," and *Godoy* reinforced that limitation. *Thomas*'s reference to "marketing" must be read in context. *Thomas* speaks of "pigment manufacturers" that produce or market white lead carbonate. *Thomas*, 701 N.W.2d at 564. It must be the "pigment manufacturers" doing the producing or marketing—not paint manufacturers or anyone else.

For these reasons, we hold that the district court extended—and did not merely apply—the holding of *Thomas*. We further hold that the court's extension of *Thomas* was a legal error. The plaintiffs do not dispute that the key feature of DES and white lead carbonate—fungibility—does not carry over to paint, so the core rationale of *Collins* and *Thomas* is inapplicable to paint and paint manufacturers. *See Godoy*, 768 N.W.2d at 682-83. Apart from that, Wis. Stat.   895.046 forbade the district court's extension of *Thomas*. To be sure, *Gibson* holds that   895.046 may not retroactively extinguish the cause of action that *Thomas* recognized. But the plaintiffs' claims in this case went beyond *Thomas*. The plaintiffs had a vested right to *Thomas*; they did not have a vested right to extend *Thomas*.

## 2. Prejudice

The court's error requires a new trial because it significantly expanded the scope of the defendants' potential liability and the evidence at trial. It also deprived the defendants of the opportunity to build an appropriate defense. *See Godoy*, 768 N.W.2d at 682-83. For years, the defendants had litigated under the (valid) assumption that they were liable only in their capacity as pigment manufacturers. Less than six weeks before trial, however, the defendants learned for the first time that they were also subject to liability as manufacturers of paint products containing white lead carbonate. The court's last-minute, legally incorrect ruling left them scrambling to adapt their defenses to the *815 plaintiffs' newly enlarged theory of liability.

Consider the prejudice to DuPont. DuPont manufactured white lead carbonate for a narrow seven-year period (1917 to 1924). The court's erroneous legal ruling enlarged DuPont's potential window of liability from that seven-year period to a nearly fifty-year period (1917 to 1966) during which DuPont manufactured paint products containing white lead carbonate.[2]

In keeping with the court's pretrial ruling, the plaintiffs introduced evidence of DuPont's post-1924 knowledge and conduct and asked the jury to find DuPont liable for its actions through 1966. They also seized on weaknesses in DuPont's primary defense that resulted directly from the court's erroneous ruling. Through no fault of its own, DuPont was unprepared to rebut these attacks. The court's late-stage ruling meant that DuPont had to expand its chemical-exculpation defense to cover all the paint formulas that DuPont had used during the additional 42 years (1924 to 1966) that were now on the table. At trial, however, the court precluded DuPont's paint-chemistry expert from opining on any of DuPont's post-1924 paint formulas because DuPont had not disclosed any of these opinions before trial. The plaintiffs took full advantage of this gap in DuPont's defense during closing arguments. They argued that DuPont's chemical-exculpation defense failed because its expert "came into this courtroom and offered opinions on the years 1917 to 1924" when "you saw that chart that indicated that they made white lead carbonate products up until 1966."

The prejudice was similar for Sherwin-Williams, whose window of liability expanded from a 37-year period in the first half of the twentieth century (1910 to 1947) to a 90-year period (1880 to 1969) during which it produced or marketed paint products containing white lead carbonate.

Armstrong is in a unique position because its predecessor-in-interest MacGregor was both a pigment manufacturer and a paint manufacturer at all relevant times. While it is still possible that the court's error prejudiced Armstrong, Armstrong has made no attempt on appeal to explain how that is so. In the end, we need not resolve this issue because, as we explain below, Armstrong (like Sherwin-Williams) is entitled to relief on other grounds. DuPont is the only defendant that rests its case on this issue. Given the prejudice we have described, DuPont is entitled to a new trial on both claims that went to trial.

## 3.   i  son & Fungibility

We reject the defendants' other challenges to the court's application of the risk-contribution theory. First, Sherwin-

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...          file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276          Document 143          Filed 03-02-2022          Page 13 of 25

Williams and Armstrong ask us to overrule *Gibson*. They claim that subsequent developments in the law have undermined *Gibson*'s analysis. The district court denied the defendants' motion for summary judgment on this point. We review that ruling de novo, viewing the evidence in the light most favorable to the non-moving party. *Turubchuk*, 958 F.3d at 548; *see also* *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 719 (7th Cir. 2003) (explaining that even after a trial we may review an earlier denial of summary judgment if the motion for summary judgment raised legal, and not factual, issues).

816      We decline to revisit *Gibson*. When we weigh in on an unsettled issue of state law, our conclusion binds us until the *816 state's supreme court says otherwise. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029-30 (7th Cir. 2004). The Wisconsin Supreme Court has not said otherwise. In fact, it recently split 3-3 on the very question that we addressed in *Gibson*. *Clark*, 877 N.W.2d 117. It would be hard to imagine better evidence that an issue of state law remains unsettled. Moreover, the cases upon which we relied in *Gibson* remain good law. *See* *Matthies*, 628 N.W.2d at 861; *Martin*, 531 N.W.2d at 93. The defendants suggest that *Lands' End, Inc. v. City of Dodgeville*, 370 Wis.2d 500, 881 N.W.2d 702 (2016), rejected the balancing analysis that *Gibson* drew from *Matthies* and *Martin*. But *Lands' End* did not overrule or undermine either case. Only the concurrence questioned the "balancing test" that they applied. *Id.* at 733 (Ziegler, J., concurring). The defendants also cite *Bank Markazi v. Peterson*,         U.S.         , 136 S. Ct. 1310, 194 L.Ed.2d 463 (2016), but that separation of powers case did not change Wisconsin law.

Second, Armstrong argues that the district court erred in ruling before trial that white lead carbonate was fungible as a matter of law. It maintains that fungibility was a question for the jury. The court resolved this issue at summary judgment, so again our review is de novo, though we review the court's denial of a new trial on this basis for abuse of discretion. *Turubchuk*, 958 F.3d at 548; *see also* *Chemetall*, 320 F.3d at 719.

We easily reject Armstrong's contention that fungibility is a fact question for the jury to resolve. If fungibility were a fact question, then *Thomas* would not have held that white lead carbonate was fungible; it would have held instead that there was a fact issue as to fungibility that precluded summary judgment for the pigment manufacturers. Yet the court held, on the record before it, that "white lead carbonate is fungible"—not merely that the pigment manufacturers were not entitled to summary judgment. *Thomas*, 701 N.W.2d at 561. That holding would make no sense if only the jury could decide fungibility.

The role of fungibility in the risk-contribution theory further confirms that it is a legal issue for the court. Fungibility is a prerequisite to applying the risk-contribution theory. The Wisconsin Supreme Court considers it when deciding whether a plaintiff lacks an adequate remedy at law, such that the Wisconsin Constitution authorizes the court to develop one. *See* *Collins*, 342 N.W.2d at 44-45; *Thomas*, 701 N.W.2d at 559-562. Judges, not juries, decide whether the plaintiff has a cause of action, and what that cause of action looks like. *See* Paul F. Kirgis, *The Right to a Jury Decision on Questions of Fact Under the Seventh Amendment,* 64 Ohio St. L.J. 1125, 1162 (2003) ("[T]he judge *always* has the exclusive authority to decide which questions should be asked."). As a practical matter, it would be rather bizarre if the parties had to go to trial just to figure out what legal theory could pursue. We acknowledge that Wisconsin's civil jury instructions list fungibility as an element of a risk-contribution claim. Wis. JI—Civil 3295. Like the district court, we conclude that the jury instructions rest on an incorrect reading of *Collins* and *Thomas.*

The harder question is whether *Thomas* established the fungibility of white lead carbonate for future cases. The Wisconsin Supreme Court has sent mixed signals on this question. *Collins* stated flatly that DES was fungible, without regard to the facts of the case. 342 N.W.2d at 44. *Thomas,* by contrast, tied its fungibility determination to the facts of the case, implying that its determination may not necessarily extend to future cases. 701 N.W.2d at 559 n.47, 561.

817      *Godoy,* meanwhile, proclaimed *817 that *Thomas* had established the fungibility of white lead carbonate pigment as a matter of law: "In *Thomas,* we concluded that for the purposes of risk-contribution, white lead carbonate pigment is fungible, and all manufacturers of white lead carbonate pigment could be held jointly and severally liable for injuries caused by the product." *Godoy*, 768 N.W.2d at 683.

We need not resolve this issue because, even if fungibility of white lead carbonate hinges on the facts of a particular case, Armstrong has not shown that the white lead carbonate in the plaintiffs' homes was not fungible under any definition that *Thomas* considered. Armstrong states, in conclusory fashion, that it presented evidence in the district court that different types of white lead carbonate have different chemical compositions and physical properties that permit their identification and alter their risk level. But *Thomas* rejected the argument that fungibility requires chemical

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...        file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276        Document 143        Filed 03-02-2022        Page 14 of 25

identity. 701 N.W.2d at 559. Even if Armstrong presented evidence that the physical properties of white lead carbonate vary, it does not explain what those variances are or why they make manufacturer identification any easier. As such, the court properly resolved fungibility at summary judgment.

## B. Negligence

## 1. Product Defect

Moving on, Sherwin-Williams alone argues that the district court erred in ruling that the jury could find it negligent in the absence of a product defect. In its view, the court's grant of summary judgment to the defendants on the plaintiffs' negligent failure-to-warn claims should have been the end of the plaintiffs' negligence claims, given that failure to warn was the only product defect that the plaintiffs alleged.

The district court denied Sherwin-Williams's motion for judgment as a matter of law on this point, ruling that Sherwin-Williams could face liability "based on the general duty of ordinary care" even if its products were not defective. We review the court's ruling de novo. *Turubchuk*, 958 F.3d at 548. Judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In applying this standard, we view the evidence in the light most favorable to the verdict. *Turubchuk*, 958 F.3d at 548.

In *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court adopted the products liability rule of the Restatement (Second) of Torts 402A (1965). *Id.* at 63. Section 402A supplies the elements of a strict products liability claim, but its rule "is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." Restatement (Second) of Torts 402A cmt. a; *Godoy*, 768 N.W.2d at 681 n.7.

In recent years, many states have adopted the Third Restatement's formulation of a products liability claim, which "eschewed the doctrinal labels `strict liability' and `negligence'" and "defined the categories functionally, according to their required elements of proof." *Godoy*, 768 N.W.2d at 681; *see also* Restatement (Third) of Torts: Products Liability 2 cmt. n (1998). In 2011, the Wisconsin legislature adopted the Third Restatement's rule, but only for strict liability claims. *See* Wis. Stat. 895.047. The plaintiffs here filed suit before 2011, so the parties agree that 895.047 does not apply to their claims.

818     *Godoy* explains the basic differences between strict liability and negligence *818 under Wisconsin products liability law. Strict liability and negligence are "separate avenues of recovery" with "substantively different" elements. *Godoy*, 768 N.W.2d at 681 n.7. Strict liability "focuses on the nature of the defendant's product, whereas liability in negligence `hinges in large part on the defendant's conduct under circumstances involving a foreseeable risk of harm.'" *Id.* (quoting *Green v. Smith & Nephew AHP, Inc.*, 245 Wis.2d 772, 629 N.W.2d 727, 745 (2001)); *see also Morden v. Cont'l AG*, 235 Wis.2d 325, 611 N.W.2d 659, 673 (2000); *Greiten v. LaDow*, 70 Wis.2d 589, 235 N.W.2d 677, 683-86 (1975) (controlling opinion of Heffernan, J.).

Despite these differences, the two claims have at least one thing in common: "Both causes of action require a plaintiff to prove that the product causing injury was `defective.'" *Godoy*, 768 N.W.2d at 681 n.7 (citing Wis. JI-Civil 3200); *accord Morden*, 611 N.W.2d at 673 ("The coexistence of the two theories [i.e., negligence and strict liability] has sparked confusion and criticism because both rely on an underlying product defect."). As for what constitutes a product defect, *Godoy* explains that "Wisconsin cases have discussed three categories of product defects—manufacturing defects, design defects, and defects based on a failure to adequately warn." 768 N.W.2d at 683. Thus, a negligence claim must be predicated on one of those three categories of product defects. *See id.* at 681 n.7, 683.

We have acknowledged, as *Morden* did, that distinguishing between strict liability claims and negligence claims in the products liability context can be confusing. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 603 (7th Cir. 2000); *Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 467 (7th Cir. 1984). Indeed, Wisconsin's continued distinction between the two claims has generated significant criticism. *Morden*, 611 N.W.2d at 673; *Sharp e  rel. Gordon v. Case Corp.*, 227 Wis.2d 1, 595 N.W.2d 380, 388 (1999) (summarizing criticism but declining to overrule precedent); Restatement (Third) of Torts: Products Liability 2 cmt. n (discussing the "mischief caused by dual instructions on both negligence and strict liability").

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...     file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276     Document 143     Filed 03-02-2022     Page 15 of 25

We need not wade into this debate. We do note, however, that the claims' shared requirement of a product defect has been at the heart of the criticism. _Morden_, 611 N.W.2d at 673; _see Sharp_, 595 N.W.2d at 388; Restatement (Third) of Torts: Products Liability 2 cmt. n.

Requiring a product defect for negligence claims makes sense because otherwise a defendant might be found negligent merely for making and selling a potentially dangerous product. "It is boilerplate law that, merely because a product or an operation is not as safe as possible, because there are better methods of manufacture or performing an operation does not lead to the conclusion that the method employed was undertaken with a lack of ordinary care or the product was defective." _Greiten_, 235 N.W.2d at 685 (controlling opinion of Heffernan, J.); _see also Collins v. Ridge Tool Co._, 520 F.2d 591, 594 (7th Cir. 1975) ("[A] manufacturer is under no duty to produce accident or fool-proof products. Neither is the manufacturer an insurer that its product is incapable of producing injury.") (citation omitted). Allowing a claim of negligence without a product defect, as the district court did here, allows a jury to find the defendant negligent in the absence of any actual negligence, whether in the design, manufacture, or marketing of a product. There is a name for this type of liability—it is called strict liability, not negligence. _See_ Restatement (Second) of Torts 402A(2)(a) (allowing liability even if "the seller has exercised *819 all possible care in the preparation and sale of his product").

819

The district court's theory was that the defendants could be found negligent because they continued to sell white lead carbonate pigment for residential uses while knowing the dangers that it posed to homeowners and their children. It found support for this broad theory of liability in Judge Learned Hand's famous BSee _United States v. Carroll Towing Co._, 159 F.2d 169, 173-74 (2d Cir. 1947). The court reasoned that the jury could find Sherwin-Williams negligent if the burden (B) of discontinuing the production and sale of white lead carbonate pigment for residential uses was outweighed by the probability (P) that children might ingest it and suffer a serious injury or loss (L) as a result.

_Carroll Towing_ cannot do the heavy lifting that the district court required of it. To begin, Wisconsin law governs this diversity case. We do not fault the court for looking to a foundational federal case to help elucidate the principles underpinning Wisconsin negligence law. But the court should not have relied on _Carroll Towing_ to create a pathway to liability that Wisconsin courts had foreclosed. In any event, _Carroll Towing_ does not support the court's theory of liability. _Carroll Towing_ was not a products liability case, and it certainly did not hold that a company could be found negligent merely for marketing a dangerous product. Critically, _Carroll Towing_ involved a negligent act: the defendant there was liable because it left a barge unattended. Here there is no negligent act to speak of, apart from Sherwin-Williams's sale of a potentially dangerous product. Given these distinctions, the court should not have transposed the B

The plaintiffs resist this conclusion, but they do not cite any Wisconsin cases (nor have we found any) holding that a defendant can be negligent in the absence of a product defect. Rather, they resort to the general proposition that negligence focuses on the defendant's conduct whereas strict liability focuses on the condition of the product. That is true enough, but it does not obviate the need for a product defect. Rather, it means that "under a negligence theory, a plaintiff will not prevail by showing _only_ that a product was defective." _Morden_, 611 N.W.2d at 673 (emphasis added).

The plaintiffs also suggest that, even if Wisconsin products liability law ordinarily requires a product defect, _Thomas_ chose not to impose this requirement in the risk-contribution context. We find no support for this argument in _Thomas_. As we have said, _Thomas_ did not reach the merits; it considered only whether risk contribution could apply. Moreover, Thomas's claim _did_ rely on a product defect —failure to warn. _See Thomas_, 701 N.W.2d at 528 n. 2 (declining to reach defendants' arguments about failure to warn); _id._ at 569 n.2 (Wilcox, J., dissenting) ("The claims before this court are predicated on the defendants' failure to warn of the dangers of their product."); _Godoy_, 768 N.W.2d at 683 ("_Thomas_ was based on failure to warn claims."). Even if _Thomas_ were susceptible to the plaintiffs' reading of it, _Godoy_ forecloses that reading by providing that negligence claims in the risk-contribution context require a product defect.

820

The absence of a product defect forecloses recovery on the plaintiffs' negligence claims. The plaintiffs concede, as they must, that their negligence claims do not rest on a product defect. The district *820 court held at summary judgment that the plaintiffs could not proceed on a negligent failure-to-warn theory. And the plaintiffs have never asserted a design defect or manufacturing defect. As _Godoy_ makes clear, those are the only types of product defects that Wisconsin courts have recognized. With no product defect, there can be no negligence liability. This means that Sherwin-Williams is entitled to judgment as a matter of law on the plaintiffs' negligence claims.

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...     file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276    Document 143    Filed 03-02-2022    Page 16 of 25

## 2. Duty & Causation

We reject Sherwin-Williams's other attacks on the negligence verdict. Apart from the lack of a product defect, Sherwin-Williams objects to the district court's duty analysis and its jury instruction on causation. Duty and causation are essential elements of a negligence claim under the risk-contribution theory (as they are in tort law generally). *Thomas*, 701 N.W.2d at 564.

The court's duty analysis was sound. Under *Thomas*, a plaintiff must prove that "the Pigment Manufacturers' conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to [the plaintiff]." *Id.* Setting aside the district court's failure to require a product defect, which impacts "breach," the court did not err in concluding that Sherwin-Williams had a "legally recognized duty" to the plaintiffs. *Thomas* altered the causation standard, but it did not modify the duty of ordinary care. *See id.* at 563 (noting that Thomas's burden was relaxed "only with respect to establishing ... the specific type of white lead carbonate [he] ingested"). In Wisconsin, "one has a duty to exercise ordinary care under the circumstances." *Hoida, Inc. v. M & I Midstate Bank*, 291 Wis.2d 283, 717 N.W.2d 17, 28 (2006). "Ordinary care involves the concept of foreseeability, in that a reasonable person exercising ordinary care would have foreseen injury as a consequence of his act." *Id.* at 29. "Whether a duty exists under the circumstances, and the scope of any such duty, are questions of law...." *Brenner v. Amerisure Mut. Ins. Co.*, 374 Wis.2d 578, 893 N.W.2d 193, 198 (2017).

Here, the court ruled that "the defendants owed a duty to exercise ordinary care in manufacturing and marketing" white lead carbonate for residential application because the risks it posed to children were foreseeable. Contrary to Sherwin-Williams's arguments, the court did not predicate its ruling on a general duty to the world at large. Sherwin-Williams is also wrong to suggest that the court's finding of a duty of ordinary care conflicted with its finding that Sherwin-Williams had no duty to warn the plaintiffs. The duty to warn is just one potential manifestation of the duty of ordinary care. *See* Wis. JI—Civil 3200; *see also Morden*, 611 N.W.2d at 673-75. In some circumstances, the duty of ordinary care requires a warning. Here, the district court found that Sherwin-Williams had no duty to warn for purposes of the plaintiffs' negligence claims. Even so, it correctly recognized that Sherwin-Williams might still have a duty to take other actions to prevent foreseeable harms. (Again, a separate question is whether Sherwin-Williams *breached* that duty. *See Morden*, 611 N.W.2d at 675-76.)

Nor, if we assume contrary to fact that the negligence claim should have gone to the jury, did the court err in instructing the jury on causation. "We review jury instructions de novo to determine whether, taken as a whole, they correctly and completely informed the jury of the applicable law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). The court

821   instructed the jury to decide whether the white lead carbonate that the plaintiffs *821 ingested caused their injuries. Sherwin-Williams contends that the proper question was whether its *negligence* caused the injuries.

The court's jury instruction correctly stated the law. The second element of a negligence claim under the risk-contribution theory requires the plaintiff to prove "[t]hat the white lead carbonate caused his injuries." *Thomas*, 701 N.W.2d at 564. That is precisely what the court here told the jury to decide. Granted, *Thomas*'s articulation of the causation element of a negligence claim conflicts with ordinary negligence law, which requires a causal link between a defendant's negligence and the plaintiff's injury. *Fondell v. Lucky Stores, Inc.*, 85 Wis.2d 220, 270 N.W.2d 205, 209 (1978). But the whole point of *Thomas* was to modify ordinary causation principles. We cannot accept Sherwin-Williams's suggestion that *Thomas* was simply sloppy with its language. *Thomas* was setting forth the elements of a novel cause of action for white lead carbonate plaintiffs. We find it hard to believe that the court was sloppy in carrying out that task. Indeed, we know that *Thomas*'s statements about causation were not an accident because one of the dissents criticized the very language about which Sherwin-Williams now complains. *Thomas*, 701 N.W.2d at 591 (Prosser, J., dissenting). The district court lifted its causation instruction straight from *Thomas*. That was not error.

## C. Strict Liability

Sherwin-Williams and Armstrong both challenge the strict liability verdict. They say (1) the district court erred in ruling that they could have a duty to warn for purposes of strict liability but not negligence; and (2) that the plaintiffs failed to prove that any failure to warn caused their injuries. The district court rejected the first argument at summary judgment

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...     file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276     Document 143     Filed 03-02-2022     Page 17 of 25

and again when denying the defendants' motion for judgment as a matter of law. Our review is therefore de novo. <u>Turubchuk</u>, 958 F.3d at 548; *see also* <u>Chemetall</u>, 320 F.3d at 719. The court rejected the second argument when denying the defendants' motion for a new trial. We review that ruling for abuse of discretion. <u>Turubchuk</u>, 958 F.3d at 548.

*Thomas* set forth the elements of a prima facie case of strict liability in white lead carbonate cases. To prevail at trial, the plaintiffs had to prove:

> (1) That the white lead carbonate was defective when it left the possession or control of the pigment manufacturers;

> (2) That it was unreasonably dangerous to the user or consumer;

> (3) That the defect was a cause of [the plaintiffs'] injuries or damages;

> (4) That the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer; and,

> (5) That the product was one which the company expected to reach the user or consumer without substantial change in the condition it was when sold.

<u>Thomas</u>, 701 N.W.2d at 564. The defendants' challenge focuses on the first and third elements: defect and causation.

## 1. Product Defect

We begin with product defect. Unlike their negligence claims, the plaintiffs predicated their strict liability claims on a product defect—failure to warn. Although the district court had ruled at summary judgment that the defendants had no duty to warn the plaintiffs for purposes of the negligence claim, it distinguished the duty *822 to warn in the strict liability context. Whereas negligence required a duty to warn the plaintiffs, strict liability required a duty to warn the "ordinary users and consumers" who purchased or used the defendants' products when the defendants sold them—decades before they reached the plaintiffs. The court found a genuine issue of material fact as to whether these "ordinary users or consumers" would have needed a warning about the dangers of lead-based paint, given that the dangers were less widely known in the early to mid-twentieth century.

A properly designed and manufactured product may still be defective if "an intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction." <u>Godoy</u>, 768 N.W.2d at 684. Importantly, warnings are necessary only when a product's dangers are hidden. In a negligence action, a manufacturer is not liable unless it "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." <u>Strasser v. Transtech Mobile Fleet Serv., Inc.</u>, 236 Wis.2d 435, 613 N.W.2d 142, 155 (2000) (quoting Restatement (Second) of Torts    388 (1965)). Similarly, in a strict liability action, "manufacturers have an obligation to warn consumers about *the hidden* dangers of their products." <u>Godoy</u>, 768 N.W.2d at 685 n.15 (emphasis added) (citing Restatement (Second) of Torts    402A cmts. h, i).

The Wisconsin Supreme Court has not addressed the difference, if any, between the duty to warn for negligence and strict liability claims, but we and other courts applying Wisconsin law have treated them as materially identical. *See, e.g.,* <u>Flaminio</u>, 733 F.2d at 467 (holding that the difference between negligent and strict liability duty-to-warn claims, "if any," was "so small" that the district court's failure to give separate instructions on them was harmless); <u>Gracyalny v. Westinghouse Elec. Corp.</u>, 723 F.2d 1311, 1317 n.11 (7th Cir. 1983) ("[I]n duty to warn cases, emphasis upon the nature and scope of the warning has led to a convergence of the functional identities of strict products liability and negligence."); <u>Mohr v. St. Paul Fire & Marine Ins. Co.</u>, 269 Wis.2d 302, 674 N.W.2d 576, 590 n.10 (Wis. Ct. App. 2004) ("[T]he proof requirements for an inadequate warning on a strict product liability claim are the same as for breach of the duty to warn on a negligence claim."); <u>Tanner v. Shoupe</u>, 228 Wis.2d 357, 596 N.W.2d 805, 811 n.3 (Wis. Ct. App. 1999); <u>Lemmermann v. Blue Cross Blue Shield of Wis.</u>, 713 F. Supp. 2d 791, 810 (E.D. Wis. 2010); <u>Nigh v. Dow Chem. Co.</u>, 634 F. Supp. 1513, 1517 (W.D. Wis. 1986).

It makes sense that the duty to warn would be the same for both types of claims because failure to warn is a type of

product defect and defect is a shared requirement for negligence and strict liability claims. *Godoy,* 768 N.W.2d at 681 n.7; *Morden,* 611 N.W.2d at 673. If there is any substantive difference between negligent and strict liability failure-to-warn claims, it likely stems from the second requirement of a strict liability claim: that the defect render the product unreasonably dangerous. *See Morden,* 611 N.W.2d at 673 ("In a negligence action, by contrast, it is not necessary to show that the condition of the product reached the level of unreasonable dangerousness."); *Sharp,* 595 N.W.2d at 388.

The district court rooted its divergent approach in *Thomas,* which requires, as the first element of a strict liability claim, that the "white lead carbonate was defective *when it left the possession or control of the pigment manufacturers.*" 701 N.W.2d at 564 (emphasis added). From this language, the court inferred that the *823 duty to warn in strict liability hinges on whether the dangers of white lead carbonate were hidden to the consumers of residential paint products who existed when the defendants released their products into the market.

We grant that, under *Thomas,* the absence of a warning must have existed when the white lead carbonate left the possession or control of the pigment manufacturer. Still, the *necessity* of a warning should depend on what the ultimate consumer (i.e., the plaintiffs or their caregivers) knew, rather than what consumers in general knew at the time the manufacturer released the product into the market. *See* Restatement (Second) of Torts 402A cmt. g ("The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the *ultimate consumer,* which will be unreasonably dangerous to him.") (emphasis added); *Morden,* 611 N.W.2d at 673 ("It is sufficient [in strict liability] for the plaintiff to show that the product *reached him* in a dangerously defective condition." (emphasis added) (quoting *Greiten,* 235 N.W.2d at 684) (controlling opinion of Heffernan, J.))). The purpose behind the requirement that a product be defective when it leaves the hands of a manufacturer is to protect the manufacturer from liability for later-arising defects: "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." Restatement (Second) of Torts 402A cmt. g. It is not to untether the duty to warn from the ultimate consumer. The focus must always remain on the ultimate consumer. *See id.*

In shifting the focus away from the plaintiffs and toward "ordinary consumers" living decades earlier, the district court seems to have relied on the "consumer-contemplation" test. *See* Restatement (Second) of Torts 402A cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."); *Green,* 629 N.W.2d at 739. Even if that test was relevant to duty to warn, it focuses on ordinary consumers *in the plaintiffs' situation. See Insolia,* 216 F.3d at 600 ("[W]hat the ordinary consumer contemplated about the dangers of smoking should be evaluated at the time the plaintiffs began smoking."). If any "ordinary consumers" were relevant, it was those who consumed residential paint when the plaintiffs (or their caregivers) did. It was not the broad and amorphous category of individuals who consumed residential paint at any time when the defendants were manufacturing white lead carbonate —i.e., during large chunks of the twentieth century.

For these reasons, the court legally erred in finding that the defendants had a duty to warn for purposes of strict liability after ruling at summary judgment that they had no duty to warn the plaintiffs on their negligence claims. The plaintiffs have not appealed the court's ruling that the defendants had no duty to warn for purposes of the negligence claims. This ruling compels judgment as a matter of law for Sherwin-Williams and Armstrong on the strict liability claims.

## 2. Causation

We turn next to causation. Before trial, the court ruled that each plaintiff had to prove "that the presence of inadequately warned-about [white lead carbonate] on the market during the existence of the residence where the plaintiff ingested [white lead carbonate] was a substantial factor in causing the plaintiff's injury." It *824 acknowledged that proving such a "tenuous connection" would be "a tall order." But it rejected the defendants' argument that the plaintiffs had to present expert testimony to prove causation; in the court's view, inferring causation did "not require specialized technical, scientific or medical knowledge," but could "be made on the basis of common understandings of human behavior."

Consistent with this ruling, the court instructed the jury to decide whether the plaintiffs had proven that "the allegedly defective warnings were a cause of the plaintiffs' injuries." To answer "yes," the jury had to find that "the sale of white lead carbonate with inadequate warnings was a substantial factor in causing the plaintiffs' injury." For example, the jury

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...    file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276    Document 143    Filed 03-02-2022    Page 19 of 25

could "consider whether the persons responsible for selecting and applying paint in the plaintiffs' homes throughout the buildings' existence would have heeded warnings about the risk of childhood lead exposure if such warnings had been issued."

It turns out that this causation standard was indeed a "tall order" for the plaintiffs. It is essentially undisputed that the plaintiffs presented no evidence at trial that the supposed defect—failure to warn—caused their injuries. In closing arguments, the plaintiffs appealed to the jurors' "common sense," arguing that "moms and dads back in the `20s and `30s and `40s and `50s" would never have purchased paint containing white lead carbonate if they had known the risks it posed to their children. But the only evidence they relied on was testimony that consumers in the first half of the twentieth century were unaware of the risks of white lead carbonate. They introduced no evidence of whether adequate warnings would have altered consumer behavior —much less prevented their injuries.

The defendants brought this failure of proof to the district court's attention in their motions for a new trial. The plaintiffs did not respond to these arguments for a new trial. Even so, the court denied the defendants' motions, and in doing so it departed from its earlier theory of causation. Implicitly acknowledging the plaintiff's total failure of proof on this element, the court explained that the plaintiffs did *not* have to show that "appropriate warnings would have changed consumer behavior;" rather, they only had to show "that the dangers posed by [white lead carbonate] were outside the contemplation of the ordinary consumer," at which point it became the *defendants'* burden to prove that their warnings "were sufficient to render safe [the] otherwise dangerously defective product." On appeal, the plaintiffs have again failed to respond to the defendants' causation arguments.

The court was correct the first time: the plaintiffs had to prove that the product defect—i.e., failure to warn— caused their injuries. *See Thomas*, 701 N.W.2d at 564 (requiring proof "[t]hat the defect was a cause of Thomas's injuries or damages"); *accord Godoy*, 768 N.W.2d at 681 n.7. The court's post-trial ruling improperly collapsed the second and third elements of a strict liability claim and shifted the burden to the defendants. In *Green*, the Wisconsin Supreme Court advised that a defendant could show that its product was not "unreasonably dangerous" by proving "that the product include[d] a warning or directions that effectively alert[ed] the ordinary consumer" to the product's dangers. 629 N.W.2d at 754. This inquiry, which goes to the second element of a strict liability claim (unreasonable danger), is separate from the third element (causation). *See Thomas*, 701 N.W.2d at 564; *Godoy*, 768 N.W.2d at 681 n.7. A plaintiff must always prove causation. *See Thomas*, 701 N.W.2d at 564.

825    *825 Because the plaintiffs do not dispute that they failed to present evidence of causation at trial, we need not address what type of evidence might suffice to prove causation. Moreover, because the defendants do not directly challenge the court's pretrial ruling on causation or its jury instructions, we need not address whether the court correctly stated the relevant legal principles (before departing from them post-trial).

Normally, the plaintiffs' failure to prove causation would require at least a new trial. In this case, however, any such relief would be redundant because Sherwin-Williams and Armstrong are already entitled to judgment as a matter of law on the strict liability claims, given the absence of a product defect.

We reject the defendants' other attacks on the strict liability verdict. The defendants argue first that the "ordinary consumers" of white lead carbonate were master painters and paint manufacturers, who required no warning as to the dangers of white lead carbonate. The defendants' argument appears to rest on one of two mistaken premises: (1) that products liability claims require "privity of contract," or (2) that component parts suppliers cannot be liable to the ultimate consumer. The Wisconsin Supreme Court has flatly rejected both arguments. *Godoy*, 768 N.W.2d at 681 (noting that the Second Restatement discarded the privity-of-contract requirement); *id.* at 688 ("When component manufacturers introduce defective components into the stream of commerce, they may be held liable for resulting injuries under the particular circumstances of the case.").

Moving to the fifth element of the strict liability claim, the defendants argue that their white lead carbonate could not have reached the plaintiffs without undergoing a "substantial change in condition" —i.e., integration into paint, application of paint to the plaintiffs' homes, and a lack of maintenance allowing the paint to deteriorate and become

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...          file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276          Document 143          Filed 03-02-2022          Page 20 of 25

ingestible. *Thomas*, 701 N.W.2d at 564. "[T]o succeed under the substantial change defense, the change must be both substantial and material." *Godoy*, 768 N.W.2d at 687. "The purpose of this requirement is to protect a manufacturer from liability when the dangerously defective aspect of the product was altered or introduced after the product left the manufacturer's control." *Id.* This is a "fact-intensive inquiry." *Id.*

We agree with the district court that any changes to the defendants' white lead carbonate were "not material, since the [white lead carbonate] was already toxic and in powder form before it underwent these changes." White lead carbonate is the singular source of lead poisoning in paint that contains it. As *Thomas* said, "the inherent dangerousness of the white lead carbonate pigment existed the moment the Pigment Manufacturers created it." 701 N.W.2d at 563. If anything, mixing it into paint "diluted the white lead carbonate's toxicity." *Id.* The deterioration of the paint may have helped facilitate the plaintiffs' ingestion of the white lead carbonate, but it did not introduce or alter its toxicity. The jury was on firm ground in finding no substantial change in condition.

## D. Other Issues

Sherwin-Williams and Armstrong raise several other challenges. Ordinarily we would avoid reaching these issues if possible. We are mindful, however, that there are a slew of similar cases pending at the district court and moving toward trial. As such, we will address some of these other issues in hopes of providing clarity for future trials.

826

### *826 1. Expert Testimony

Sherwin-Williams and Armstrong claim that the plaintiffs failed to prove the existence, cause, and extent of their injuries through admissible evidence. They challenge the district court's admission of Dr. Trope's and Dr. Besunder's testimony on these issues. "We review de novo whether a district court properly followed the framework for determining the admissibility of expert testimony." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 430-31 (7th Cir. 2013); *see also* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). If it did, "we review its decision to admit or exclude expert testimony only for an abuse of discretion." *Schultz*, 721 F.3d at 431. We review de novo the court's denial of judgment as a matter of law on this ground. *Turubchuk*, 958 F.3d at 548.

Federal Rule of Evidence 702 permits a qualified expert witness to offer an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Courts can examine the reliability of an expert's principles and methods by looking at factors such as "(1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Schultz*, 721 F.3d at 431 (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786). This list is not exhaustive. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

Although Rule 702 "places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions" but rather "the soundness and care with which the expert arrived at her opinion." *Schultz*, 721 F.3d at 431. "So long as the principles and methodology reflect reliable scientific practice, `[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

827      We begin with Dr. Trope. The defendants claim that her method for determining that each of the plaintiffs had brain damage—administering a neuropsychological evaluation—was unreliable, primarily because it failed to exclude

urton v. EI du Pont de Nemours and Co., Inc., 994    . 3d 791 - Court of...      file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 21 of 25

alternative causes. As Dr. Trope testified, however, she did not need to exclude alternative causes to testify to the *fact* of brain damage. And the defendants' attacks on the reliability of neuropsychological evaluations are unpersuasive. Dr. Trope and Dr. Besunder both testified that neuropsychological evaluations are the standard, well-accepted method for ascertaining whether an individual has brain damage. (The defendants' own expert relied on a similar methodology to testify that the plaintiffs did not have brain damage.) Many of the defendants' arguments wrongly equate neuropsychological evaluations with basic aptitude tests. As Dr. Trope explained, a neuropsychological evaluation tests how different parts of the brain function compared to *827 one another—not how they function on the whole. Large discrepancies indicate brain damage, according to both Dr. Trope and Dr. Besunder. We see no abuse of discretion in the court's decision to allow Dr. Trope to testify that the plaintiffs had brain damage. The defendants were free to cross-examine Dr. Trope about any weaknesses in her methodology. <u>Schultz</u>, 721 F.3d at 431.

Dr. Trope's testimony that lead poisoning caused the plaintiffs' brain damage presents a more difficult question because the plaintiffs did not offer her to prove causation; she testified to it only on cross-examination, over the plaintiffs' objections. Moreover, the defendants suggest that Dr. Trope, who is not a medical doctor, was unqualified to diagnose the plaintiffs' brain injuries.

We need not resolve this issue. Any error in the admission of Dr. Trope's causation testimony was harmless because the court was within its discretion to admit Dr. Besunder's causation testimony. Dr. Besunder testified that childhood lead poisoning was the source of the plaintiffs' injuries. He reached that conclusion by comparing their brain functioning—as shown in their neuropsychological evaluations—to documented patterns of brain functioning in other individuals who had suffered childhood lead poisoning. He testified that this type of comparison is a well-accepted method of ascertaining the cause of brain damage, and that he uses it in his own practice. He also testified that he reviewed the plaintiffs' medical records to determine whether there were potential alternative causes of their brain damage. *See* <u>Schultz, 721 F.3d at 434</u> (noting that "a reliable expert should consider alternative causes" but need not "rule out every alternative cause"); <u>Myers v. Illinois Cent. R.R. Co., 629 F.3d 639, 644-45 (7th Cir. 2010)</u>; *see also* <u>Thomas, 701 N.W.2d at 563</u> (reasoning that the potential for alternative causes of brain damage was an issue for the jury). To the extent that Dr. Besunder could not rule out every alternative cause, the defendants could—and did—try to bring that out through cross-examination. Moreover, the plaintiffs had to prove that lead poisoning was a substantial factor leading to their lead poisoning—not the sole cause. <u>Schultz, 721 F.3d at 433</u> (applying Wisconsin law).

Dr. Besunder's testimony about the extent of the plaintiffs' injuries is a different story. Dr. Besunder's IQ-loss testimony was a critical component of the plaintiffs' cases because it attempted to measure the extent of their injuries—and, thus, their damages. Yet the district court performed essentially no analysis of whether Dr. Besunder's methodology—using general epidemiological studies to quantify the plaintiffs' individual IQ losses —was reliable. The defendants argued, without apparent contradiction, that Dr. Besunder's methodology was unprecedented. They also argued that it was unreliable because Dr. Besunder did not personally evaluate the plaintiffs, nor did he have any evidence of their baseline IQs— even though the plaintiffs' other experts testified that they could not quantify the plaintiffs' IQ losses without knowing the plaintiffs' parents' IQ scores. The court dismissed these objections as issues for the jury. But trial judges are the "gatekeeper[s] for expert testimony." <u>Schultz, 721 F.3d at 431</u>. Before allowing an expert to testify before the jury, the judge must ensure that the expert's "principles and methodology reflect reliable scientific practice." *Id*. The district court failed to perform its gatekeeping function and ensure that Dr. Besunder's IQ-loss testimony rested on a reliable methodology, so the court abused its discretion in admitting it.

828    *828 The district court's admission of Dr. Besunder's IQ-loss testimony requires a new trial because there is "a significant chance" that the jury's identical $2 million damages awards rested on Dr. Besunder's testimony about the extent of the plaintiffs' injuries. <u>Smith v. Hunt, 707 F.3d 803, 808 (7th Cir. 2013)</u>. (After all, the court remitted Burton's damages award to $800,000 post-trial because Dr. Besunder admitted that, of the 10 IQ points that Burton lost due to lead poisoning, he lost six of them before he moved to the home that he focused on at trial.) As a practical matter, this relief only impacts Armstrong's liability on the negligence claim. For reasons discussed above, Sherwin-Williams is entitled to judgment as a matter of law on both claims and Armstrong is entitled to judgment as a matter of law on the strict liability claim.

## 2. Bifurcation

urton v. EI du Pont de Nemours and Co., Inc., 994   . 3d 791 - Court of...        file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276       Document 143       Filed 03-02-2022       Page 22 of 25

Next, Sherwin-Williams and Armstrong contend that the district court erred in bifurcating the trial into a liability phase and an apportionment phase and then excluding evidence about National Lead—the dominant producer of white lead carbonate pigment in the Milwaukee market—from the liability phase. They claim that the district court's rulings hampered their defenses and gave the jury the mistaken impression that at least one of the defendants on the verdict form must have been the responsible party.

We review the court's decision to bifurcate the trial for abuse of discretion. _Volkman v. Ryker_, 736 F.3d 1084, 1089 (7th Cir. 2013). We use the same standard to review whether the court erred in excluding evidence of National Lead or denying a new trial on this basis. _Turubchuk_, 958 F.3d at 548-49.

We see no abuse of discretion. Absent some clear prejudice, we will not fault the court for attempting to inject some semblance of order into this complex case—especially given district courts' "inherent authority to manage the course of trials." _Luce v. United States_, 469 U.S. 38, 41 n.4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The court's structure of the trial harmonized with _Collins_'s design to (1) create "a pool of defendants which can reasonably be assumed `could have caused the plaintiff's injuries'" and then (2) apportion liability among those "defendants who cannot exculpate themselves" through comparative negligence. _Thomas_, 701 N.W.2d at 565 (quoting _Collins_, 342 N.W.2d at 52). In this respect we find it relevant that _Collins_ expressly declined to adopt a "market-share" theory of liability, instead holding that market share was "a relevant factor in apportioning liability among defendants." _Collins_, 342 N.W.2d at 48-49. Under _Collins_, the defendants had every right to point the finger at National Lead during the apportionment phase of trial. They chose instead to settle and assign National Lead 12.5   of the damages. Their informed decision to settle prevents them from now complaining about not having been able to introduce evidence of National Lead's market domination.

To the extent that evidence of National Lead had any relevance in the liability phase—which is far from clear—the district court did not abuse its discretion in concluding that the likelihood of confusion and prejudice substantially out-weighed any such probative value. The defendants strain to connect evidence of National Lead to their liability defenses. As the district court pointed out, it is hard to see how evidence of National Lead's market domination had any bearing on whether another manufacturers' white lead carbonate could have reached the plaintiffs, which is the liability inquiry under _Collins_. _Id._ at 52. Meanwhile, it would *829 have been all too easy for the defendants to point the finger at National Lead and rely on the unstated implication that National Lead was probably the responsible party. Such a maneuver would have been inconsistent with the risk-contribution theory that _Collins_ and _Thomas_ adopted. Finally, there is no basis for the defendants' assertion that the jury was led to believe that one of the defendants who went to trial must have produced the white lead carbonate that injured the plaintiffs. In fact, the court dismissed American Cyanamid at the close of evidence and then instructed the jury not to consider any claims against American Cyanamid and not to speculate as to why it was no longer a defendant.

## 3. Public Policy

Forging along, Sherwin-Williams and Armstrong contend that Wisconsin's judicial public policy factors require overturning the jury verdicts against them. They claim that Wisconsin public policy does not tolerate holding them liable for injuries that they likely did not cause, which occurred decades after they stopped making white lead carbonate. They add that their liability is vastly out of proportion to the culpability of producing or marketing white lead carbonate at a time when it was widely used in residential paints.

We review de novo the court's denial of judgment notwithstanding the verdict. _Turubchuk_, 958 F.3d at 548; _see also Fandrey_, 680 N.W.2d at 350 (whether the public policy factors preclude liability is a question of law).

Wisconsin's public policy factors are judicial policy considerations that function like a proximate cause analysis. _See Fandrey_, 680 N.W.2d at 350-51, 351 n.7. "[W]hen a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause-in-fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery." _Id._ at 353. Overriding a jury verdict based on public policy considerations is "infrequent" and requires "unusual and extreme considerations." _Roehl Transp., Inc. v. Liberty Mut. Ins. Co._, 325 Wis.2d 56, 784 N.W.2d 542, 568 (2010) (internal quotation marks and citations omitted). The six public policy factors are: (1) is the injury too remote from the defendant's conduct   (2) is the plaintiff's injury disproportionate to the defendant's culpability   (3) is it

829

urton v. EI du Pont de Nemours and Co., Inc., 994 . 3d 791 - Court of...      file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 23 of 25

too extraordinary, in hindsight, that liability would attach here   (4) is the potential liability too burdensome for the defendant   (5) will imposing liability open the way to fraudulent claims   and (6) is there a sensible or just stopping point to the theory of liability   *See Fandrey*, 680 N.W.2d at 348 n.1.

If the defendants' public policy arguments look familiar, it is because they closely resemble the dissents in *Thomas.* At their core, the defendants' public policy arguments are arguments against *Thomas* itself. One of the dissents in *Thomas* similarly argued that the public policy factors precluded liability. 701 N.W.2d at 596-97 (Prosser, J., dissenting). The majority did not directly engage with that argument, *id.* at 565 n.54, but its reasoning for extending the risk-contribution theory was anchored in countervailing policy considerations, and many of its statements were directly responsive to the dissent's public policy arguments. *See, e.g., id.* at 562 ("[T]he Pigment Manufacturers' argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long."); *see also Collins*, 342 N.W.2d at 52 (accepting the possibility that innocent defendants could be found liable as "the price the defendants, and perhaps ultimately society, must pay to *830 provide the plaintiff an adequate remedy under the law"). We cannot accept that the Wisconsin Supreme Court would create a cause of action based on judicial policy considerations only to later hold that the same cause of action would violate judicial policy considerations. The public policy factors operate as a check on liability in rare cases. We will not hold, in essence, that they categorically preclude liability under *Thomas.*

Nor does Wis. Stat.   895.046 affect our conclusion. Wisconsin's public policy factors are judicial policy considerations whose role stands in "stark contrast" to the legislature's declarations of public policy. *Fandrey*, 680 N.W.2d at 354. That is why the public policy factors may preclude liability even where a statute authorizes it. *Id.* at 350.

## 4. Successor Liability

Armstrong also challenges the district court's ruling at summary judgment that Armstrong was MacGregor's successor-in-interest. Armstrong contends that the relevant asset purchase agreement is ambiguous as to whether Armstrong's admitted predecessor-in-interest assumed MacGregor's future legal liabilities, such as damages arising from the plaintiffs' lawsuits. And because the contract is ambiguous, Armstrong says its meaning was an issue for the jury. Our review is de novo. *Turubchuk*, 958 F.3d at 548; *see also Chemetall*, 320 F.3d at 719.

Neither party raised choice of law issues below, so we apply the law of the forum—Wisconsin. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) (citing *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)). Under Wisconsin law, "[w]hen the terms of a contract are clear and unambiguous, we construe the contract's language according to its literal meaning." *Ash Park, LLC v. Ale ander & Bishop, Ltd.*, 363 Wis.2d 699, 866 N.W.2d 679, 685 (2015). "When the terms of a contract are ambiguous, however, evidence extrinsic to the contract itself may be used to determine the parties' intent, and any remaining ambiguities will be construed against the drafter." *Id.* "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Id.* (quoting *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 557 N.W.2d 67, 75 (1996)).

In relevant part, the asset purchase agreement provides that Armstrong's predecessor will assume "the liabilities and obligations" of the sellers, including "[o]bligations with respect to litigation and claims against Sellers other than litigation and claims involving or arising out of liabilities and obligations expressly not assumed." The agreement also includes a catchall providing that, "[e]xcept for the obligations and liabilities" excluded elsewhere, Armstrong's predecessor will "assume all other obligations of sellers, whether accrued, contingent or future, based on, related to or arising out of events or occurrences prior to the closing, whether known or unknown and regardless of when arising or asserted."

Armstrong maintains that the terms "obligations" and "liabilities" are ambiguous, such that its predecessor's assumption of "obligations with respect to litigation and claims" does not necessarily include all future legal "liabilities," including damages arising from a lawsuit based on unforeseen events.

We disagree. To be sure, the contract is not a model of clear drafting, and the terms "obligations" and "liabilities" are not used consistently throughout. But, at least in the provisions quoted above, "obligations" must encompass "liabilities" because "obligations" is used as an umbrella *831 term from which other "liabilities and obligations" are excluded. Moreover, the plain terms of the exceptionally broad catchall easily encompass the damages liability in this case (and

urton v. EI du Pont de Nemours and Co., Inc., 994   . 3d 791 - Court of...      file:///R:/scans/JLT/+LEADPAINT/+%20Cases%20against%20Paint%2...

Case 2021CV003276      Document 143      Filed 03-02-2022      Page 24 of 25

Armstrong cannot point to any other provision that specifically excludes it).

Even if the contract were ambiguous, moreover, Armstrong has not demonstrated a genuine issue of material fact as to its meaning. When courts are stumped about the meaning of contracts, they do not simply hand the ambiguous contracts to juries. Rather, if a court decides that a contract is ambiguous, the parties may introduce extrinsic evidence of intent, and the jury resolves the fact question of what the parties intended, using on the extrinsic evidence. *See Town Bank v. City Real Estate Dev., LLC*, 330 Wis.2d 340, 793 N.W.2d 476, 483 (2010). Armstrong does not represent that it has any extrinsic evidence of the parties' intent, so it has not demonstrated a jury issue.

## . First Amendment

Finally, Sherwin-Williams argues that the district court violated its First Amendment rights by allowing the plaintiffs to introduce evidence of its product advertisements and associations with industry groups. The district court deemed this evidence relevant to certain aspects of the plaintiffs' claims, including Sherwin-Williams's knowledge of the hazards of lead-based paint and its presence in the Milwaukee market. And because Sherwin-Williams's liability rested on its production and sale of white lead carbonate—rather than its protected activities—the court saw no constitutional problem with admitting the evidence. We review the court's First Amendment analysis de novo, while reviewing its decisions to admit the evidence and deny a new trial for abuse of discretion. *See Turubchuk*, 958 F.3d at 548.

Sherwin-Williams is profoundly mistaken about the role of the First Amendment in evidentiary rulings. The First Amendment does not bar the admission of any and all evidence that falls within its protection. Just last month, we held that such a view of the First Amendment "utterly misunderstands the burdens of production and persuasion in litigation." *Gonzales v. Madigan*, 990 F.3d 561, 564 (7th Cir. 2021). The First Amendment steps in only when the protected activity itself is the basis for liability. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-19, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("The First Amendment ... restricts the ability of the State to impose liability on an individual *solely because* of his association with another.") (emphasis added). Here, the plaintiffs introduced evidence of Sherwin-Williams's advertisements and associations to prove elements of their claims. They did not ask the jury to find Sherwin-Williams liable for engaging in these protected activities. *Cf. Snyder v. Phelps*, 562 U.S. 443, 461, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (overturning a jury verdict finding the defendants liable for picketing on matters of public concern). Thus, the district court did not abuse its discretion in admitting this evidence.

We have considered the defendants' remaining arguments and determined that none merits discussion.

## III. Conclusion

For these reasons, we REVERSE the judgments and REMAND for further proceedings consistent with our opinion and the following instructions. Sherwin-Williams is entitled to judgment as a matter of law on both claims that went to trial. Armstrong is entitled to judgment as a matter of law on the strict liability claims *832 and a new trial on the negligence claims. DuPont is entitled to a new trial on both claims.

832

We close by commending Judge Adelman for his thoughtful dedication to these complex cases. Circuit Rule 36 supplies a default rule of reassignment when cases are remanded for new trials. Given Judge Adelman's enormous investments of time and effort in these cases, we believe that the interests of judicial efficiency favor retaining Judge Adelman as the trial judge in these cases. We therefore direct that Rule 36 shall not apply on remand. *See* Cir. R. 36 (providing for reassignment "unless the remand order directs ... that the same judge retry the case").

[1] The parties agree that Wisconsin law governs these diversity cases.

[2] The plaintiffs suggest that DuPont manufactured white lead carbonate until 1946. But the only evidence they cite indicates that National Lead manufactured white lead-in-oil for DuPont during those years.

Case 2021CV003276        Document 143        Filed 03-02-2022        Page 25 of 25

Save trees - read court opinions online on Google Scholar.

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT E

**2009 WI 78**

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2006AP2670 |
| COMPLETE TITLE: | |

> Ruben Baez Godoy, a minor, by his guardian ad
> litem, Susan M. Gramling,
> > Plaintiff-Appellant-Petitioner,
> > v.
> E.I. du Pont de Nemours and Company, The
> Sherwin-Williams Company, American Cyanamid
> Company, Armstrong Containers,
> > Defendants-Respondents,
>
> Walter Stankowski, Wayne Stankowski and
> Wisconsin Electric Power Company,
> > Defendants,
>
> Acuity,
> > Intervenor-Defendant.

---

REVIEW OF A DECISION OF THE COURT OF APPEALS
2007 WI App 239
Reported at: 306 Wis. 2d 226, 743 N.W.2d 159
(Ct. App. 2007-Published)

---

| | |
|---|---|
| OPINION FILED: | July 14, 2009 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 10, 2008 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Francis T. Wasielewski |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, J., concurs (opinion filed). ABRAHAMSON, C.J., joins concurrence. |
| | CROOKS, J., concurs (opinion filed). ABRAHAMSON, C.J. and BRADLEY, J., join the concurrence. |
| | PROSSER, J., concurs (opinion filed). ZIEGLER, and GABLEMAN, JJ., join the concurrence. |
| DISSENTED: | |
| NOT PARTICIPATING: | ROGGENSACK, J., did not participate. |

| | |
|---|---|
| ATTORNEYS: | |

For the plaintiff-appellant-petitioner briefs were by *Peter G. Earle* and *Law Offices of Peter Earle, LLC*, Milwaukee; and *Jonathan D. Orent, Fidelma Fitzpatrick,* and *Motley Rice, LLC*, Providence, R.I., and oral argument was by *Peter G. Earle* and *Fidelma Fitzpatrick*.

For the defendants-respondents E.I. du Pont de Nemours & Company, The Sherwin-Williams Company, and Armstrong Containers, Incorporated, there were briefs by *Paul E. Benson, Nathaniel Cade, Jr.,* and *Michael Best & Friedrich LLP*, Milwaukee; *Steven R. Williams, Joy C. Fuhr, R. Trent Taylor,* and *McGuire Woods LLP*, Richmond, Va.; *Timothy A. Bascom* and *Bascom, Budish, & Ceman, S.C.*, Wauwatosa; *Robert P. Alpert, Jeffrey K. Douglass,* and *Morris, Manning & Martin, LLP*, Atlanta, Ga.; *Jeffrey K. Spoerk, Christopher G. Meadows, Cheri L. Baden,* and *Quarles & Brady LLP*, Milwaukee; and *Robert S. Walker, Laura A. Meaden, Rebekah B. Kcehowski,* and *Jones Day*, Pittsburgh, Pa., and oral argument by *Joy C. Fuhr*.

For the defendant-respondent American Cyanamid Company, there was a brief by *Richard W. Mark, Elyse D. Echtman,* and *Orrick, Herrington & Sutcliffe, LLP*, New York, N.Y.; and *Ralph A. Weber, Beth Ertmatinger Hanan, Daniel S. Elger,* and *Gass Weber Mullins LLC*, Milwaukee, and oral argument by *Richard W. Mark*.

An amicus curiae brief was filed by *Stephanie A. Scharf, Sarah R. Marmor,* and *Schoeman, Updike, Kaufman & Scharf*, Chicago, Ill.; and *Colleen D. Ball*, Wauwatosa, on behalf of The Product Liability Advisory Council.

An amicus curiae brief was filed by *R. George Burnett*, and *Liebmann, Conway, Olejniczak & Jerry SC*, Green Bay, on behalf of Miller Brewing Company, S.C. Johnson & Son, Wisconsin Knife Works, Midwest Food Processors Association, and Wisconsin Dairy Business Association.

An amicus curiae brief was filed by *James A. Pelish* and *Thrasher, Pelish, Franti & Smith Ltd.,* Rice Lake, on behalf of the Civil Trial Counsel of Wisconsin and The Metropolitan Milwaukee Association of Commerce.

An amicus curiae brief was filed by *Gregory B. Conway* and *Liebmann, Conway, Olejniczak & Jerry SC*, Green Bay, on behalf of Hydrite Chemical Co.

An amicus curiae brief was filed by *Rhonda L. Lanford* and *Habush Habush & Rottiers S.C.*, Madison, on behalf of the Wisconsin Association for Justice.

2

**2009 WI 78**

NOTICE

This opinion is subject to further
editing and modification. The final
version will appear in the bound
volume of the official reports.

No. 2006AP2670
(L.C. No. 2006CV277)

STATE OF WISCONSIN              :        IN SUPREME COURT

Ruben Baez Godoy, a minor, by his guardian ad
litem, Susan M. Gramling,

       Plaintiff-Appellant-Petitioner,

    v.

E.I. du Pont de Nemours and Company, The
Sherwin-Williams Company, American Cyanamid
Company, Armstrong Containers,

       Defendants-Respondents,

**FILED**

**JUL 14, 2009**

David R. Schanker
Clerk of Supreme Court

Walter Stankowski, Wayne Stankowski and
Wisconsin Electric Power Company,

       Defendants,

Acuity,

       Intervenor-Defendant.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1    ANN WALSH BRADLEY, J.    The petitioner, Ruben Baez Godoy, seeks review of a published court of appeals decision affirming the circuit court's order dismissing his defective design claims in strict liability and negligence against

manufacturers of white lead carbonate pigment.[1] The issue presented here is whether the circuit court correctly concluded that Godoy's complaint failed to state a claim of defective design where (1) the product is white lead carbonate pigment; (2) the alleged design defect is the presence of lead; and (3) the defendant manufacturers were manufacturers of white lead carbonate pigment.

¶2    We determine that the circuit court correctly concluded that the complaint failed to state claims of defective design.  A claim for defective design cannot be maintained here where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself.  Without lead, there can be no white lead carbonate pigment.  We therefore conclude that the complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective.  Accordingly, albeit with some clarification of the rationale, we affirm the court of appeals.[2]

I

¶3    This is a review of the circuit court's dismissal of design defect claims.  Therefore, all facts and allegations in

_____

[1] See Godoy ex rel. v. E.I. du Pont de Nemours & Co., 2007 WI App 239, 306 Wis. 2d 226, 743 N.W.2d 159, affirming a non-final order of the circuit court for Milwaukee County, Francis T. Wasielewski, Judge.

[2] Godoy filed suit under theories of strict liability and negligence.  Our opinion today addresses only the defective design claims.  Other claims remain pending at the circuit court and are not affected by this interlocutory appeal.

2

the complaint are presumed to be true. These facts are primarily taken from Godoy's first amended complaint.[3]

¶4    Ruben Baez Godoy is a minor child who grew up in Milwaukee, Wisconsin. When he was approximately one year old, he lived in an apartment at 1502 West Windlake Avenue. The surfaces of the apartment had been coated with paint containing white lead carbonate pigment.

¶5    Beginning in March of 1998 and for the duration of his tenancy, Godoy sustained lead poisoning. The source of the lead poisoning was white lead carbonate pigment derived from painted surfaces, paint chips, paint flakes, and dust containing paint in his apartment.

¶6    The defendants in this case include E.I. du Pont de Nemours and Company, Armstrong Containers, the Sherwin-Williams Company, and American Cyanamid (collectively, "manufacturer defendants"). These defendants designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold white lead carbonate products used as a pigment in paints and coatings for residential use. Godoy alleged that the intended purpose of white lead carbonate pigment was as an ingredient in paint. Godoy is unable to identify the particular manufacturer of the white lead carbonate pigment present in the apartment.

---

[3] The defendant manufacturers filed the motion to dismiss in response to Godoy's first amended complaint. Godoy subsequently filed a second amended complaint adding party defendants. However, the substantive allegations remained unchanged.

3

¶7    Ingesting white lead carbonate pigment, like other products containing lead, can cause severe and permanent injuries including learning disabilities, decreased intelligence, deficits in neurophsychological functioning, coma, seizure, and death.   By the second half of the twentieth century, manufacturers and members of the scientific community acknowledged that lead is hazardous to human health and that children could get lead poisoning through exposure to paint containing lead.   Godoy alleges that the manufacturer defendants nonetheless promoted the use of white lead carbonate pigment in residential paints, marketing it as a safe product that fostered health and well-being.

¶8    Godoy filed suit alleging, among other things, that white lead carbonate pigment is defectively designed and that the defendant manufacturers are liable under theories of strict liability and negligence.   Although three of the manufacturer defendants designed and manufactured paint in addition to white lead carbonate pigment, Godoy filed suit against them in the capacity of white lead carbonate pigment manufacturers, not in the capacity of paint manufacturers.[4]

¶9    The manufacturer defendants responded by filing a motion to dismiss the defective design claims.   They argued that Godoy did not identify a legally cognizable design defect in white lead carbonate pigment and that, as a result, his

_____

[4] American Cyanamid is the only defendant white lead carbonate manufacturer that did not also manufacture paint.   For further discussion, see Part III.B below.

4

complaint failed to state design defect claims upon which relief could be granted.[5] The circuit court dismissed the design defect claims, concluding that "lead is an inherent characteristic of white lead carbonate," and that white lead carbonate pigment cannot be designed without lead.

¶10  Godoy was granted permission to file an interlocutory appeal. The court of appeals affirmed the order of the circuit court, determining that a product cannot be said to be defectively designed when that design is inherent in the nature of the product so that an alternative design would make the product something else. See Godoy ex rel. v. E.I. du Pont de Nemours & Co., 2007 WI App 239, ¶¶4, 8, 306 Wis. 2d 226, 743 N.W.2d 159.

¶11  In its analysis, the court noted that Wisconsin has neither accepted nor rejected the Restatement (Third) of Torts: Product Liability. Id., ¶8. Nonetheless, the opinion stated that the Restatement (Third) could "illumine" its inquiry. Id. The court quoted the definition of design defect from the Restatement (Third), and then applied the facts to that definition. Id. Unlike Wisconsin law, the Restatement (Third)

---

[5] In the memorandum in support of the motion to dismiss, the defendants advanced that "[t]o the extent that Plaintiff's claims rest on an allegation of a design defect, they should be dismissed because white lead carbonate is, by definition, made of lead, and can be made no other way. . . . A design defect claim aimed at a product such as white lead carbonate is not a complaint about a defect in the design of the product. It is, rather, a complaint that it should be a different product altogether."

5

requires proof of a reasonable alternative design in design defect cases.  Id.  Noting that "there is no 'alternative design' to make white-lead carbonate without using lead," the court concluded that the Restatement (Third) "does not sanction imposing liability on the defendants."  Id.

## II

¶12  Whether a complaint states a claim upon which relief can be granted is a question of law, which we review independently of the determinations rendered by the circuit court and the court of appeals.  John Doe 1 v. Archdiocese of Milwaukee, 2007 WI 95, ¶12, 303 Wis. 2d 34, 734 N.W.2d 827.  A motion to dismiss tests the legal sufficiency of the claim.  Id.  We accept as true both the facts in the complaint and the reasonable inferences that may be drawn from such facts.  Id.

¶13  We construe the allegations liberally in favor of stating a cause of action.  Id.  However, legal inferences and unreasonable inferences need not be accepted as true.  Id.; Morgan v. Pa. Gen. Ins. Co., 87 Wis. 2d 723, 731, 275 N.W.2d 660 (1979).  A claim will not be dismissed as legally insufficient unless it appears certain that the plaintiff cannot recover under any circumstances.  John Doe 1, 303 Wis. 2d 34, ¶12.

## III

¶14  In order to provide context to our analysis and focus to our inquiry, we initially embark on two threshold areas: (a) an overview of the development of our strict liability jurisprudence; and (b) a determination of the product at issue in this case.

6

A

¶15    Products    liability    law    involves    complex    and
continually    evolving    concepts    regarding    a    manufacturer's
responsibility for providing safe consumer products.[6]  Less than
a  century  ago,  products  liability  jurisprudence  was  firmly
rooted  in  contract  law,  which  frustrated  recovery  for  many
injured consumers.  See generally  David G. Owen, The Evolution
of  Products  Liability  Law,  26  Rev.  Litig.  955  (2007).
Manufacturers of defective products could claim lack of 'privity
of  contract'  as  a  near-absolute  defense  to  liability.   Id. at
961-64.   By  mid-century,  courts  began  to  respond  to  "ever-
growing  pressure  for  protection  of  the  consumer."   Id. at  966
(quoting Fleming James, Jr., Products Liability, 34 Tex. L. Rev.
44,  44  (1955)).   In  1963,  the  landmark  case  Greenman v. Yuba
Power Products, Inc., 377 P.2d 897 (Cal. 1963), declared that
manufacturers  of  defective  products  could  be  held  strictly
liable in tort.

¶16    Shortly    thereafter,    the    American    Law    Institute
introduced  the  Restatement  (Second)  of  Torts,  which  included  for
the  first  time  "Special  Liability  of  Seller  of  Product  for
Physical  Harm  to  User  or  Consumer."   See Restatement (Second) of
Torts § 402A (1965).   This section created a new rule of strict
liability,  holding  sellers  of  defective  products  liable  for

---

[6] For  an  extensive  discussion  of  the  history  of  products
liability,  see  David  G.  Owen,  The  Evolution  of  Products
Liability Law, 26 Rev. Litig. 955 (2007) and Richard W. Wright,
The Principles of Product Liability, 26 Rev. Litig. 1067 (2007).

7

defective products even if "the seller has exercised all possible care in the preparation and sale of [the] product." Id. § 402A(2)(a); see also id. cmt. a.  The intended effect was to prevent manufacturers, who were in the best position to ensure the quality of their wares, from invoking inapt contract law defenses.  Manufacturers could be held strictly liable for a product defect even if they were not negligent.  Two years later, Wisconsin embraced Section 402A and strict liability[7] in Dippel v. Sciano, 37 Wis. 2d 443, 155 N.W.2d 55 (1967).

---

[7] The Restatement (Second) of Torts § 402A clarified that strict liability "does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved."  Id. cmt. a.  Our cases explain that negligence and strict liability are separate avenues of recovery.  Morden v. Cont'l AG, 2000 WI 51, ¶42, 235 Wis. 2d 325, 611 N.W.2d 659.  Both causes of action require a plaintiff to prove that the product causing injury was "defective."  See Wis. JI—Civil 3200.  However, the elements of negligence and strict liability claims are substantively different.  A determination that a manufacturer is strictly liable for a defect is "completely independent of and irrelevant to" a determination that a defect was caused by the manufacturer's negligence.  Giese v. Montgomery Ward, Inc., 111 Wis. 2d 392, 414, 331 N.W.2d 585 (1983).

¶17 By the 1990s, some commentators believed that it was necessary to revise the restatement to reflect developments in the law.  See Owen, supra, at 980.  In response, the American Law Institute introduced the Restatement (Third) of Torts: Products Liability in 1998.  One major innovation was that the Restatement (Third) split products liability into three distinct categories: manufacturing defects, design defects, and defects based on failure to warn.  See Restatement (Third) of Torts: Products Liability § 2 (1998).  In defining these categories, the restatement eschewed the doctrinal labels "strict liability" and "negligence."    Rather, the restatement defined the

---

Strict liability is based on Restatement (Second) of Torts § 402A and focuses on the nature of the defendant's product, whereas liability in negligence "hinges in large part on the defendant's conduct under circumstances involving a foreseeable risk of harm."  Green v. Smith & Nephew AHP, Inc., 2001 WI 109, ¶55, 245 Wis. 2d 772, 629 N.W.2d 727.  To prevail under strict liability, a plaintiff must prove that: (1) the product was in a defective condition when it left the possession or control of the seller; (2) it was unreasonably dangerous to the user or consumer; (3) the defect was a cause of the plaintiff's injuries or damages; (4) the seller engaged in the business of selling such a product; and (5) the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when the seller sold it.  Dippel v. Sciano, 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967).

Here, what is lacking in the strict liability for defective design claim is lacking in the negligent design claim as well. Neither claim alleges a design defect that is not characteristic of the product itself.  As such, neither alleges a design feature that makes the design of white lead carbonate pigment defective.

9

categories functionally, according to their required elements of proof.  Owen, supra, at 982.

¶18  Although we have recognized that the Restatement (Third) may offer new insights into product liability, we have neither adopted nor rejected it in its entirety.[8]  Haase v. Badger Mining Corp., 2004 WI 97, ¶23, 274 Wis. 2d 143, 682 N.W.2d 389.  Section 402A of the Restatement (Second) of Torts has remained the touchstone of our analysis for strict products liability.

<div align="center">B</div>

¶19  The next threshold area of discussion requires that we pinpoint the product that is the subject of the design defect claims in this case.  The identity of the product is essential to an analysis of its design.  The circuit court and the court of appeals based their analyses on the design of white lead carbonate pigment, but Godoy argues that the product in question is actually residential paint pigment.

¶20  An examination of the complaint, however, undermines Godoy's argument.  The complaint alleges that "[t]he white lead carbonate pigment designed . . . by the Industry Defendants was and is an inherently defective and unreasonably dangerous product."  The complaint states that defendant manufacturers are strictly liable because the defect existed "[a]t the time the

---

[8]  Recently, we stated that the Restatement (Third)'s definition of "defective design" is "fundamentally at odds with current Wisconsin products liability law."  Green, 245 Wis. 2d 772, ¶72.

<div align="center">10</div>

white lead carbonate left possession and control of the Industry Defendants[.]"  The complaint refers to "white lead carbonate," "white lead pigment," or "white lead carbonate pigment" dozens of times.[9]  The words "residential paint pigment" do not appear in the complaint.

¶21 During the review of a motion to dismiss, the allegations in a complaint must be construed liberally in favor of stating a cause of action.  John Doe 1, 303 Wis. 2d 34, ¶12. Nonetheless, in a products liability case, the plaintiff must—at minimum—identify the product alleged to be defective.  Doing so puts the defendant on notice and allows the defendant to begin building a defense.  See Midway Motor Lodge of Brookfield v. Hartford Ins. Group, 226 Wis. 2d 23, 35, 593 N.W.2d 852 (Ct. App. 1999) ("[T]he complaint must give the defendant fair notice of not only the plaintiff's claim but the grounds upon which it rests as well." (internal quotations omitted)).  A liberal pleading standard cannot transform a complaint regarding "white lead carbonate pigment" into one regarding "residential paint pigment."

¶22 Further, in order to advance his claim, the product cannot be residential paint pigment because Godoy is proceeding under the Collins risk-contribution theory.  Normally, an injured plaintiff is required to identify the particular

---

[9] The terms "white lead carbonate" or "white lead pigment" are found at least once and sometimes repeatedly in the following paragraphs of the first amended complaint: 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 25, 26, 27, 28, 30, 36, 37, 38, 39, 41, 42, 44, 46(a), 46(b), 46(c), and 46(d).

manufacturer of the product that caused the injury.  <u>Collins v. Eli Lilly Co.</u>, 116 Wis. 2d 166, 181-82, 342 N.W.2d 37 (1984). Under risk-contribution, however, the plaintiff is not required to identify the specific manufacturer when all similar products are fungible and identically defective.  <u>Id.</u> at 180, 194.

¶23  We recently applied the risk-contribution theory to white lead carbonate pigment.[10]   <u>Thomas ex rel. Gramling v. Mallett</u>, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523.  In <u>Thomas</u>, we concluded that for the purposes of risk-contribution, white lead carbonate pigment is fungible, and all manufacturers of white lead carbonate pigment could be held jointly and severally liable for injuries caused by the product.  <u>Id.</u>, ¶27. We have not, however, applied the risk-contribution theory to residential paint pigment.

¶24  Nonetheless, <u>Thomas</u> provides little guidance for the issue we address in this case.  This case is about defective design claims and <u>Thomas</u> was based on failure to warn claims. The question of whether white lead carbonate pigment was defectively designed was not before the <u>Thomas</u> court.  All defective design claims had been dismissed at the circuit court, and that ruling was not appealed.  <u>Thomas</u>, 285 Wis. 2d 236, ¶181 n.2 (Wilcox, J., dissenting).

---

[10] In the present case, the court of appeals mistakenly stated that the product in <u>Thomas ex rel. Gramling v. Mallett</u>, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523, was paint containing white lead carbonate.  <u>See</u> <u>Godoy</u>, 306 Wis. 2d 226, ¶¶3, 5.  This statement misconstrues our holding in <u>Thomas</u>.

¶25   Because Godoy cannot identify which defendant produced the defective product that caused his injury, he must proceed under the risk-contribution theory.  Godoy does not ask us to extend the risk-contribution theory to residential paint pigment.  He does not assert that all residential paint pigments are identically defective, which is a prerequisite of risk-contribution.  Perhaps he does not assert that all residential paint pigments are identical because he cannot make such an assertion given that not all residential paint pigments contain lead, the alleged defect.  Accordingly, based on a review of the complaint, we determine that the product at issue is white lead carbonate pigment.

IV

¶26   Having examined these threshold matters, we now address the substantive issue before the court.  At issue is the narrow question of whether a complaint alleging strict liability and negligence for a defective design states a claim where (1) the product is white lead carbonate pigment; (2) the alleged design defect is the presence of lead; and (3) the defendant manufacturers were manufacturers of white lead carbonate pigment.

¶27   Under Dippel and the Restatement (Second) of Torts, manufacturers of defective products can be liable for the injuries their products cause, regardless of the care taken by the manufacturer or the foreseeability of the harm:

13

No.    2006AP2670

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is liable for physical harm . . . if:
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1).  Section 402A, along with its comments, defines what it means to be defective.

¶28 Nonetheless, a determination that a product is <u>defective</u> is not identical to a determination that the product was <u>defectively designed</u>.  Put another way, the fact that a defect exists does not compel the conclusion that the source of the defect is the product's design.  This distinction makes a difference.

¶29 The issue in this case is not whether white lead carbonate pigment is defective, but whether the source of the alleged defect is the product's design.  Wisconsin cases have discussed three categories of product defects—manufacturing defects, design defects, and defects based on a failure to adequately warn.  A product has a manufacturing defect when it deviates from the manufacturer's specifications, and that deviation causes it to be unreasonably dangerous.[11]  A product has a design defect when the design itself is the cause of the

---

[11] See, e.g., <u>City of Franklin v. Badger Ford Truck Sales, Inc.</u>, 58 Wis. 2d 641, 648-49, 207 N.W.2d 866 (1973) (affirming a jury verdict that a wheel was defectively constructed because the wheel did not meet manufacturer specifications).

14

unreasonable danger.[12]  Finally, a product is defective based on a failure to adequately warn when an intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction.[13]  Although Section 402A of the Restatement (Second) does not draw clear lines between these types of defects, the comments provide guidance, discussed below.

¶30  Godoy's complaint does not identify a particular design feature that is alleged to be defective.  However, a fair reading of the complaint suggests that the alleged defect is the presence of lead.[14]

---

[12] See, e.g., Green, 245 Wis. 2d 772 (concluding that latex gloves were defectively designed because they contained excessive levels of allergy-causing latex proteins, and because they were powdered, which increased the likelihood that the allergenic proteins would be inhaled); Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 346, 375, 360 N.W.2d 2 (1984) (concluding that a car seat was defectively designed because it was not padded with energy-absorbing material).

[13] See, e.g., Schuh v. Fox River Tractor Co., 63 Wis. 2d 728, 737, 218 N.W.2d 279 (1974) (concluding that a tractor could be unreasonably dangerous and defective when the manufacturer failed to adequately inform the consumer that engaging the clutch would not turn off the fan).

[14] At the hearing on the motion to dismiss, the circuit court asked Godoy's counsel to identify the specific defect in the design of white lead carbonate pigment.  Godoy's counsel identified lead.  The exchange between Godoy's counsel, Mr. Earle, and the court was set forth in the transcript as follows:

> MR. EARLE: . . . This is a motion to dismiss.  There are fact questions about whether or not white lead carbonate is designed in a defective manner.
>
> THE COURT: There is no question that you can't design white lead carbonate without lead, is there?

15

¶31 Lead is a characteristic ingredient of white lead carbonate pigment.  By definition, white lead carbonate pigment contains lead.  Removing lead from white lead carbonate pigment would transform it into a different product.  Under these circumstances, we conclude that the design of white lead carbonate pigment is not defective.

¶32 An analogy illustrates the distinction.  Foil can be made using ingredients other than aluminum—gold, for example—but aluminum foil cannot be made without aluminum.  The presence of aluminum is characteristic of aluminum foil.  If aluminum posed a hidden danger that the ultimate consumer would not contemplate, a manufacturer might be liable based on the failure to adequately warn or other claims.  However, the manufacturer would not be liable based on the design of aluminum foil.

¶33 The comments to Section 402A support our conclusion. Comment h lists four potential deficiencies that can result in a defective condition: foreign objects, deterioration before sale, the way in which the product was packaged or prepared, and

---

MR. EARLE: Right.

THE COURT: That is the defect that you are claiming, the harmful defect, that is what makes white lead carbonate dangerous.  That is the defect in it, do you agree?

MR. EARLE: I agree.

THE COURT: There is no dispute about any of those facts. . . .

"harmful ingredients, not characteristic of the product itself." Restatement (Second) of Torts § 402A, cmt. h.  It does not state that a defective condition can arise from harmful ingredients that are characteristic of the product.  See id.  However, if a manufacturer "has reason to anticipate that danger may result from a particular use . . . [the manufacturer] may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition."  Id.; see also id. cmt. j ("In order to prevent the product from being unreasonably dangerous, the [manufacturer] may be required to give directions or warning, on the container, as to its use.").

¶34  This distinction is consistent with Wisconsin law. See Green v. Smith & Nephew AHP, Inc., 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727.  In Green, the plaintiff was a hospital worker who developed a severe allergy to latex.  Id., ¶1  She brought suit against the manufacturer of latex gloves, alleging a defective design.  Id.  Notably, the plaintiff did not claim that latex gloves were defective because they contained latex.  The presence of latex is "characteristic" of latex gloves.  Rather, the plaintiff alleged that they were defective because (1) they contained excessive levels of latex; and (2) they were powdered, which allowed the latex to be airborne.  Id., ¶11.  In effect, she argued that the quantity of latex in the gloves was not characteristic of the product, and that a particular design feature, powder, made the gloves more dangerous.

17

¶35  Godoy argues that the defendants confuse barring a design defect claim based on characteristic ingredients with barring a claim based on the open and obvious danger doctrine. Under the open and obvious danger doctrine, a manufacturer is not liable for injuries when the danger posed by the product should have been apparent to the consumer. See Tanner v. Shoupe, 228 Wis. 2d 357, 367, 596 N.W.2d 805 (Ct. App. 1999) ("In order for a defective design to render a product unreasonably dangerous the defect must be hidden from the ordinary consumer, that is, not an open and obvious defect.").

¶36  The doctrine is not applicable in this case. Under the open and obvious danger doctrine, a manufacturer is not strictly liable when a knife cuts flesh, when an alcoholic beverage leads to intoxication, or when the flame on a gas stove burns the chef. See Dippel, 37 Wis. 2d at 459; Greif v. Anheuser-Busch Cos. Inc., 114 F. Supp. 2d 100, 103 (D. Conn. 2000). Further, a Volkswagen driver who has been injured in a car accident cannot allege that the car was defectively designed because it was too small—any danger posed by its size should have been readily apparent. Arbet v. Gussarson, 66 Wis. 2d 551, 225 N.W.2d 431 (1975), overruled in part on other grounds by Greiten v. LaDow, 70 Wis. 2d 589, 601 n.1, 235 N.W.2d 677 (1975) (Heffernan, J., concurring). Here, the danger is not readily apparent. Godoy's complaint alleges that the dangerous quality

18

of white lead carbonate pigment is hidden and that the average consumer would not contemplate the risk.[15]

¶37  The circuit court correctly concluded that the complaint failed to state claims of defective design.  A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself.  Without lead, there can be no white lead carbonate pigment.  We therefore conclude that the complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective.

V

¶38  We have thus determined that Godoy's defective design claims were properly dismissed.  However, we recognize that two areas of products liability law require further clarification given the arguments advanced by the parties interpreting the analysis of the court of appeals.  We take this opportunity to reaffirm that: (a) Wisconsin strict products liability law does not require a plaintiff to prove the feasibility of an alternative design; and (b) the substantial change defense is not a basis of our decision here and was not an alternative

---

[15] Under Section 402A, manufacturers have an obligation to warn consumers about the hidden dangers of their products.  See Restatement (Second) of Torts § 402A cmts. h., i.  If the defendant manufacturers had reason to anticipate that white lead carbonate pigment would be dangerous for its intended use, that fact could give rise to a requirement to give adequate warning.  Without such warning, white lead carbonate pigment could be considered "defective" under § 402A.  These legal and factual questions properly remain pending at the circuit court.

19

basis of the decision of the court of appeals. Substantial change is a fact-intensive inquiry which is generally not appropriate to decide on a motion to dismiss for failure to state a claim. We address these two issues in turn.

<div align="center">A</div>

¶39  Godoy argues that the court of appeals' analysis was in error because it relied on the Restatement (Third) of Torts: Products Liability § 2(b), which Wisconsin declined to adopt in Green, 245 Wis. 2d 772, ¶74. He asserts that the court of appeals circumvented the consumer contemplation test, the established test for a product defect under Wisconsin law, and instead substituted the Restatement (Third)'s reasonable alternative design requirement.

¶40  This court recently reaffirmed that Wisconsin applies the consumer contemplation test to determine whether a product is defective under strict liability. Id., ¶35. "Defective," for purposes of the consumer contemplation test, means that the product is "in a condition not contemplated by the ultimate consumer and unreasonably dangerous to that consumer." Id., ¶29 (quoting Beacon Bowl, Inc. v. Wis. Elec. Power Co., 176 Wis. 2d 740, 792, 501 N.W.2d 788 (1993)).

¶41  The term 'defect' is not susceptible to any general definition. Rather, the determination is made on a case-by-case basis relying on the ultimate consumers' expectations. Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 368, 360 N.W.2d 2 (1984). However, the fact that a defect exists does not compel the conclusion that the source of the defect is the

<div align="center">20</div>

product's design.  The question in this case is not whether white lead carbonate pigment is defective, but whether the source of the alleged defect is the product's design.

¶42  The court of appeals concluded that the design could not be defective because there is no alternative design to make white lead carbonate pigment without using lead.  See Godoy, 306 Wis. 2d 226, ¶8 ("[A]s we have seen there is no 'alternative design' to make white-lead carbonate without using lead.").  To the extent that the court of appeals relied on a reasonable alternative design requirement, the court's analysis was misguided.

¶43  We have explained that although the feasibility of an alternative design can be considered when evaluating a design defect claim, it is not a requirement.  Sumnicht, 121 Wis. 2d at 370-71.  In Sumnicht, we refused to require a plaintiff to prove that a safer alternative design was commercially available:

> A product may be defective and unreasonably dangerous even though there are no alternative, safer designs available. . . . The question is not whether any other manufacturer has produced a safer design . . . .

Id. at 371; see also Green, 245 Wis. 2d 772, ¶73 (concluding that proof of a reasonable alternative design would "add[] an additional——and considerable——element of proof" to the analysis.)

¶44  Godoy argues that it is inconsistent to reject a reasonable alternative design requirement and still maintain that characteristic ingredients of the product cannot support a claim for defective design.  Godoy asserts that our conclusion

21

is analogous to imposing a reasonable alternative design requirement.

¶45 Holding that the presence of an ingredient which is "characteristic of the product itself" is an improper basis for a defective design claim is not equivalent to imposing a reasonable alternative design requirement. We do not require that a plaintiff affirmatively prove, through expert testimony, that an alternative design is commercially viable. We do not impose an expensive burden and require a battle of the experts over competing product designs. We simply acknowledge that some ingredients cannot be eliminated from a design without eliminating the product itself. When the ingredient cannot be designed out of the product, the Restatement (Second) instructs that although other claims may be asserted, the proper claim is not design defect.

B

¶46 The manufacturer defendants also argue that Godoy cannot recover for a design defect because white lead carbonate pigment is substantially changed when it is integrated into paint. Section 402A states that a product must reach the consumer "without substantial change" in order for the manufacturer to be strictly liable for an injury it causes. Restatement (Second) of Torts § 402A(1)(b). Our cases state that to succeed under the substantial change defense, the change must be both substantial and material. Glassey v. Cont'l Ins. Co., 176 Wis. 2d 587, 601, 500 N.W.2d 295 (1993). The purpose of this requirement is to protect a manufacturer from liability

22

when the dangerously defective aspect of the product was altered or introduced after the product left the manufacturer's control.

¶47  Defendant manufacturer American Cyanamid asserts that the "substantial change" defense was actually an alternative basis for the court of appeals' decision. We do not find support for this assertion. See Godoy, 306 Wis. 2d 226, ¶7.

¶48  American Cyanamid cites to the court of appeals' opinion, which provides: "Here, consistent with Shawver, the white-lead carbonate had to be further processed by its integration into paint." Id., ¶7. It is a stretch to conclude from this citation that the court of appeals set forth an alternative basis for its dismissal of the plaintiff's complaint based on a substantial change defense.

¶49  Likewise, the substantial change defense was not a basis for the circuit court's decision to dismiss Godoy's defective design claims. The defendants' motion to dismiss did not argue that the claims should be dismissed because the white lead carbonate pigment experienced a substantial and material change after leaving the possession and control of the defendant manufacturers. In fact, the circuit court record is devoid of any reference to substantial change.

¶50  It is not surprising that substantial change was not discussed at the circuit court. Often, the issue of whether there was a substantial and material change is a fact-intensive inquiry. This type of inquiry may not be amenable to resolution

23

on a motion to dismiss where the facts in the complaint are accepted as true.[16]

¶51  In this case, Godoy's first amended complaint alleges that "[t]he white lead carbonate that the Plaintiff was exposed to was in substantially the same condition as it was before leaving the control of the Industry Defendants."  The complaint further alleges that "[a]t the time that the white lead carbonate left the possession and control of the Industry Defendants, it was a defective and unreasonably dangerous product[.]"

¶52  For purposes of a motion to dismiss, the allegations of the complaint are taken as true and are to be liberally construed in favor of allowing a cause of action to be maintained.   John Doe 1, 303 Wis. 2d 34, ¶12.  Given the procedural posture of this case, we do not address the issue of whether as a matter of law the white lead carbonate pigment underwent a substantial and material change.

¶53  Further, we emphasize that our decision here should in no way be interpreted to provide component manufacturers blanket

---

[16] The very cases that American Cyanamid relies upon to advance its argument illustrate this point.  It cites to the following cases: Glassey v. Cont'l Ins. Co., 176 Wis. 2d 587, 500 N.W.2d 295 (1993); Haase v. Badger Mining Corp., 2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389; Shawver v. Roberts Corporation, 90 Wis. 2d 672, 280 N.W.2d 226 (1979); City of Franklin, 58 Wis. 2d 641; Westphal v. E.I. du Pont De Nemours & Co., 192 Wis. 2d 347, 531 N.W.2d 386 (Ct. App. 1995).  None of these cases was decided at a motion to dismiss.  With the exception of Westphal, each case had been submitted to a jury.  Westphal was decided on summary judgment, after a record had been fully developed through discovery.

24

immunity from liability.  Integration into another product does not shift responsibility from the manufacturer of a defective component to another party "who [is] in no position to detect the hidden defect."  City of Franklin v. Badger Ford Truck Sales, Inc., 58 Wis. 2d 641, 649-50, 207 N.W.2d 866 (1973).  We have stated:

> Where there is no change in the component part itself, but it is merely incorporated into something larger, and where the cause of harm or injury is found, as here, to be a defect in the component part, we hold that, as to the ultimate user or consumer, the strict liability standard applies to the maker and supplier of the defective component part.  Where the component part is subject to further processing or substantial change, or where the causing of injury is not directly attributable to defective construction of the component part, the result might be different.

Id. at 649.  When component manufacturers introduce defective components into the stream of commerce, they may be held liable for resulting injuries under the particular circumstances of the case.

VI

¶54  We determine that the circuit court correctly concluded that the complaint failed to state claims of defective design.  A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself. Without lead, there can be no white lead carbonate pigment.  The complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective.  Accordingly, albeit

25

with some modification in the rationale, we affirm the court of appeals.

 *By the Court.*—The decision of the court of appeals is affirmed.

 ¶55  PATIENCE DRAKE ROGGENSACK, J. did not participate.

No.  2006AP2670.awb

¶56  ANN  WALSH  BRADLEY,  J.  *(concurring)*.  I  write  a concurrence separate from the lead opinion to address an issue neither  raised  nor  advanced  by  the  parties  in  this  case. Instead,  it  is  a  policy  determination  advanced  by  Justice Prosser's concurrence below.  <u>See</u> Justice Prosser's concurrence (joined by Justices Ziegler and Gableman).

¶57  The  concurrence  below  mistakes  judicial  restraint  for intransigence.  Challenging  the  lead  opinion  to  "muster[]  the intellectual firepower to defend" our reliance on the consumer contemplation  test,  the  concurrence  wants  to  square  off  and impose an agenda it seeks to advance.  <u>See</u> <u>id.</u>, ¶109.

¶58  Neither  of  the  parties  in  this  case  has  called  upon the court to deviate from over 40 years of case law and adopt the  Restatement  (Third)  of  Torts:  Products  Liability  § 2(b).  In their  brief,  the  defendant  manufacturers  disclaimed  any  reliance by the court of appeals on the Restatement (Third), arguing that "the Restatement  (Third)  of  Torts  was  not  briefed,  discussed,  or even mentioned  by  any  party  prior  to  the  Court  of  Appeals'  sua sponte  discussion  of  it."[1]  Both  parties  agree  that  the  consumer

---

[1] The  court  of  appeals  discussed  the  Restatement  (Third)  in a  single  paragraph  of  its  opinion.  See  <u>Godoy v. E.I. du Pont de Nemours & Co.</u>,  2007  WI  App  239,  ¶8,  306  Wis. 2d 226,  743 N.W.2d 159.  It  prefaced  its  comments  as  follows:  "Wisconsin  has neither  adopted  nor  rejected  the  Restatement  (Third)  of  Torts: Products  Liability  (1998),  . . . and  we  need  not  adopt  it here[.]"  <u>Id.</u> (citation omitted).

1

contemplation test is the applicable test, and that it controls the outcome in this case.

¶59 Judicial restraint is especially appropriate here because adopting the Restatement (Third)'s approach to product liability would be a sea change in Wisconsin law. Over the last 42 years since we adopted Restatement (Second) of Torts § 402A, manufacturers of defective products can be held strictly liable even if they were not negligent. *See* Dippel v. Sciano, 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967). "Defective," for purposes of the consumer contemplation test, means that the product is "in a condition not contemplated by the ultimate

---

Further, contrary to the assertion in Justice Prosser's concurrence, the Restatement (Third) was not advanced as an alternative ground for recovery in Horst v. Deere & Co., 2009 WI 75, __ Wis. 2d __, __ N.W.2d __. *See* Justice Prosser's concurrence, ¶81 n.2. For a description of the negligible discussion of the Restatement (Third) in Horst, *see* __ Wis. 2d __, ¶84 (J. Crooks, concurring).

Any doubt as to whether the plaintiffs in Horst advocated for the adoption of the Restatement (Third) is erased by a review of the oral arguments. No attorney uttered the words "Restatement (Third)" at oral argument. In fact, the plaintiffs' attorney specifically disclaimed any reliance on a risk-utility test, which is one of the principles underlying the Restatement (Third). He stated: "I didn't argue for the adoption of a risk-utility test[.]" *See* Wisconsin Court System, Supreme Court Oral Arguments, http://wicourts.gov/opinions/soralarguments.htm (search "Party name" for "Horst"; then follow "Playback" link), at 26:35.

Finally, Justice Prosser argues that the Restatement (Third) was briefed fully in a previous appeal to this court, Green v. Smith & Nephew AHP, Inc., 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727. Justice Prosser is correct. The issue in Green, which was fully briefed and argued, was whether Wisconsin should adopt the Restatement (Third) § 2(b). The majority of the court said no. *See id.*, ¶¶71-74.

2

consumer and unreasonably dangerous to that consumer." Green v. Smith & Nephew AHP, Inc., 2001 WI 109, ¶29, 245 Wis. 2d 772, 629 N.W.2d 727.

¶60  Strict products liability focuses on the dangerous condition of the product rather than on the manufacturer's conduct.  Under the Restatement (Third)'s approach, however, strict liability for design defects is essentially eliminated. Instead, liability is predicated on the manufacturer's negligence.  See Restatement (Third) § 2 cmt. a (Liability "achieve[s] the same general objectives as does liability predicated on negligence.") (emphasis added).  The Restatement (Third) imposes liability "when the foreseeable risk of harm could have been reduced or avoided by the adoption of a reasonable alternative design[.]" Id. § 2(b).

¶61  The Restatement (Third)'s approach remains controversial.  See, e.g., George W. Conk, Punctuated Equilibrium: Why Section 402A Flourished and the Third Restatement Languished, 26 Rev. Litig. 799 (2007); Frank J. Vandall & Joshua F. Vandall, A Call for an Accurate Restatement (Third) of Torts: Design Defect, 33 U. Mem. L. Rev. 909, 922 (2003); Ellen Wertheimer, The Biter Bit: Unknowable Dangers, the Third Restatement, and the Reinstatement of Liability Without Fault, 70 Brook. L. Rev. 889 (2005); James A. Henderson, Jr. & Aaron D. Twerski, A Fictional Tale of Unintended Consequences: A Response to Professor Wertheimer, 70 Brook. L. Rev. 939 (2005); William E. Westerbeke, The Sources of Controversy in the New

3

Restatement of Products Liability: Strict Liability Versus Products Liability, 8 Kan. J.L. & Pub. Pol'y 1 (1998-1999).

¶62  Unlike the orientation of § 402A, which arose out of a concern for the protection of consumers, the orientation of Restatement (Third) reportedly emphasizes the protection of manufacturers.  One authority observes the elimination of the consumer contemplation test "from the products liability equation is highly significant, and symbolic of the orientation of the Third Restatement towards protecting manufacturers." Wertheimer, supra, at 927.

¶63  Some jurisdictions that have adopted the Restatement (Third) are now back-tracking.  The current judicial trend appears to be a return to the pro-consumer policies of origin and reinstating strict products liability under § 402A.  See id. at 893.

¶64  In advocating for this policy change, the concurrence in this case and the concurrence in Horst v. Deere & Co. (released today)[2] eschew the role of an appellate court. Instead, they appear to act like legislators, advancing a policy initiative which they favor.  Typically, it is the role of the legislature to identify and enact policy initiatives.  Appellate courts, on the other hand, play a more restrained role.

¶65  Courts decide cases and controversies.  A court depends upon the parties to identify and raise issues and to advocate for a position.  After considering the parties' briefs and arguments, the court renders a decision.

_____

[2] 2009 WI 75, __ Wis. 2d __, __ N.W.2d __.

4

¶66 By contrast, the concurrence here would toss stare decisis to the wind. It would overrule or otherwise modify scores of cases which refer to or apply § 402A as the test for products liability. These cases would no longer be guides and precedent for litigants and the courts. Forty-two years of judicial analysis should not be thrown down the tubes without the benefit of briefing or argument by the parties.[3]

---

[3] See, for example:

- Tatera v. FMC Corp., 2009 WI App 80, __ Wis. 2d __, __ N.W.2d __ (publication decision pending);

- Haase v. Badger Mining Corp., 2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389;

- Green v. Smith & Nephew AHP, Inc., 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727;

- Insolia v. Philip Morris, Inc., 216 F.3d 596 (7th Cir. 2000) (applying Wisconsin law);

- Morden v. Continental AG, 2000 WI 51, 235 Wis. 2d 325, 611 N.W.2d 659;

- Sharp ex rel. Gordon v. Case Corp., 227 Wis. 2d 1, 595 N.W.2d 380 (1999);

- Bittner v. American Honda Motor Co., Inc., 194 Wis. 2d 122, 533 N.W.2d 476 (1995);

- Westphal v. E.I. du Pont de Nemours & Co., Inc., 192 Wis. 2d 347, 531 N.W.2d 386 (Ct. App. 1995);

- Sedbrook v. Zimmerman Design Group, Ltd., 190 Wis. 2d 14, 526 N.W.2d 758 (Ct. App. 1994);

- Estate of Cook v. Gran-Aire, Inc., 182 Wis. 2d 330, 513 N.W.2d 652 (Ct. App. 1994);

- Rogers v. AAA Wire Prods., Inc., 182 Wis. 2d 263, 513 N.W.2d 643 (Ct. App. 1994);

- Beacon Bowl, Inc. v. Wisconsin Elec. Power Co., 176 Wis. 2d 740, 501 N.W.2d 788 (1993);

5

- <u>Glassey v. Continental Ins. Co.</u>, 176 Wis. 2d 587, 500 N.W.2d 295 (1993);

- <u>Northridge Co. v. W.R. Grace and Co.</u>, 162 Wis. 2d 918, 471 N.W.2d 179 (1991);

- <u>Kolpin v. Pioneer Power & Light Co., Inc.</u>, 162 Wis. 2d 1, 469 N.W.2d 595 (1991);

- <u>Nelson v. Nelson Hardware, Inc.</u>, 160 Wis. 2d 689, 467 N.W.2d 518 (1991);

- <u>Rolph v. EBI Cos.</u>, 159 Wis. 2d 518, 464 N.W.2d 667 (1991);

- <u>Kemp v. Miller</u>, 154 Wis. 2d 538, 453 N.W.2d 872 (1990);

- <u>Estate of Schilling v. Blount, Inc.</u>, 152 Wis. 2d 608, 449 N.W.2d 56 (Ct. App. 1989);

- <u>Tony Spychalla Farms, Inc. v. Hopkins Agr. Chemical Co.</u>, 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989);

- <u>St. Clare Hosp. of Monroe v. Schmidt, Garden, Erickson, Inc.</u>, 148 Wis. 2d 750, 437 N.W.2d 228 (Ct. App. 1989);

- <u>O'Brien v. Medtronic, Inc.</u>, 149 Wis. 2d 615, 439 N.W.2d 151 (Ct. App. 1989);

- <u>Mulhern v. Outboard Marine Corp.</u>, 146 Wis. 2d 604, 432 N.W.2d 130 (Ct. App. 1988);

- <u>Griffin v. Miller</u>, No. 1986AP1562, unpublished slip op. (Wis. Ct. App. Oct. 1, 1987);

- <u>Van's Realty & Const. of Appleton, Inc. v. Blount Heating and Air Conditioning, Inc.</u>, No. 1985AP1812, unpublished slip op. (Wis. Ct. App. Oct. 7, 1986);

- <u>Clarke v. Flad & Assocs.</u>, No. 1984AP780, unpublished slip op. (Wis. Ct. App. Jan. 27, 1988);

- <u>Gonzalez v. City of Franklin</u>, 128 Wis. 2d 485, 383 N.W.2d 907 (Ct. App. 1986);

- <u>Sumnicht v. Toyota Motor Sales, U.S.A., Inc.</u>, 121 Wis. 2d 338, 360 N.W.2d 2 (1984);

- <u>Collins v. Eli Lilly Co.</u>, 116 Wis. 2d 166, 342 N.W.2d 37 (1984);

- <u>Burrows v. Follett and Leach, Inc.</u>, 115 Wis. 2d 272, 340 N.W.2d 485 (1983);

6

No.  2006AP2670.awb

- <u>Giese v. Montgomery Ward, Inc.</u>, 111 Wis. 2d 392, 331 N.W.2d 585 (1983);

- <u>Krueger v. Tappan Co.</u>, 104 Wis. 2d 199, 311 N.W.2d 219 (Ct. App. 1981);

- <u>Wangen v. Ford Motor Corp.</u>, 97 Wis. 2d 260, 294 N.W.2d 437 (1980);

- <u>Shawver v. Roberts Corp.</u>, 90 Wis. 2d 672, 280 N.W.2d 226 (1979);

- <u>Priske v. General Motors Corp.</u>, 89 Wis. 2d 642, 279 N.W.2d 227 (1979);

- <u>Black v. General Elec. Co.</u>, 89 Wis. 2d 195, 278 N.W.2d 224 (Ct. App. 1979);

- <u>Ransome v. Wisconsin Elec. Power Co.</u>, 87 Wis. 2d 605, 275 N.W.2d 641 (1979);

- <u>Kozlowski v. John E. Smith's Sons Co.</u>, 87 Wis. 2d 882, 275 N.W.2d 915 (1979);

- <u>Keller v. Welles Dept. Store of Racine</u>, 88 Wis. 2d 24, 276 N.W.2d 319 (Ct. App. 1979);

- <u>Austin v. Ford Motor Co.</u>, 86 Wis. 2d 628, 273 N.W.2d 233 (1979);

- <u>Fonder v. AAA Mobile Homes, Inc.</u>, 80 Wis. 2d 3, 257 N.W.2d 841 (1977);

- <u>Heldt v. Nicholson Mfg. Co.</u>, 72 Wis. 2d 110, 240 N.W.2d 154 (1976);

- <u>Howes v. Deere & Co.</u>, 71 Wis. 2d 268, 238 N.W.2d 76 1976);

- <u>Barter v. General Motors Corp.</u>, 70 Wis. 2d 796, 235 N.W.2d 523 (1975);

- <u>Greiten v. LaDow</u>, 70 Wis. 2d 589, 235 N.W.2d 677 (1975);

- <u>Vincer v. Esther Williams All-Aluminum Swimming Pool Co.</u>, 69 Wis. 2d 326, 230 N.W.2d 794 (1975);

- <u>Schuh v. Fox River Tractor Co.</u>, 63 Wis. 2d 728, 218 N.W.2d 279 (1974);

- <u>City of Franklin v. Badger Ford Truck Sales Inc.</u>, 58 Wis. 2d 641, 207 N.W.2d 866 (1973);

7

¶67  As is, Justice Prosser's concurrence in this case and Justice Gableman's concurrence in <u>Horst</u> leave Wisconsin law unsettled.  Does <u>Green</u> remain Wisconsin law?  How are circuit courts and practitioners to grapple with the significance of the fact that in both this case and in <u>Horst</u>, an equal number of justices have voted to change Wisconsin law as have voted to uphold it?

¶68  I am uncertain whether the Restatement (Third) should be adopted.  What I am certain of, however, is that rather than pushing a predetermined agenda, I would wait until the issue is raised by a party, and briefed and argued before this court.

¶69  For the reasons discussed above, I respectfully concur.

¶70  I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

- <u>Schnabl v. Ford Motor Co.</u>, 54 Wis. 2d 345, 195 N.W.2d 602 (1972);

- <u>Netzel v. State Sand & Gravel Co.</u>, 51 Wis. 2d 1, 186 N.W.2d 258 (1971);

- <u>Dippel v. Sciano</u>, 37 Wis. 2d 443, 155 N.W.2d 55 (1967) (adopting the Restatement (Second) § 402A and strict products liability).

8

No.  2006AP2670.npc

¶71  N. PATRICK CROOKS, J.  *(concurring)*.  I join the lead opinion, but I write separately in response to Justice Prosser's concurrence.  Justice Prosser would have this court "acknowledge that the law has evolved and adopt Restatement (Third) of Torts: Products Liability § 2(b) to analyze products liability claims alleging defective design."  Justice Prosser's concurrence, ¶110.

¶72  I emphasize that the parties in this case did not invite the court to adopt § 2(b) of the Restatement (Third).  The briefing and arguments to the court of appeals and this court in this case did not address the implications of adopting that approach.  As the brief of defendants-respondents noted, "In short, the Restatement (Third) of Torts was not briefed, discussed, or even mentioned by any party prior to the Court of Appeals' sua sponte discussion of it."  Before this court, the parties vigorously disputed whether the court of appeals, in referring to § 2(b) in its ruling, had "essentially adopted" the provision and based its ruling on it, but no party advocated for its adoption.

¶73  Because any consideration of such a fundamental change in Wisconsin law should not be done without a full and thorough briefing followed by oral arguments before this court, I believe we should decline to reach beyond the controversy the parties ask us to resolve to consider adopting an approach that no party has asked us to adopt.  The parties in this case argued that this case could be resolved on the basis of existing Wisconsin law, and we have done so.  We should address the question of

1

adopting Restatement (Third) § 2(b) when a case arises in which one of the parties asks us to do so and not before.  We need briefing and oral arguments before deciding to make a sea change in Wisconsin law——one that could result in throwing out forty-two years of precedent beginning with <u>Dippel v. Sciano</u>, 37 Wis. 2d 443, 155 N.W.2d 55 (1967).

¶74  I therefore respectfully concur.

¶75  I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this concurrence.

2

¶76 DAVID T. PROSSER, J. *(concurring)*.  This review involves defective design claims against manufacturer defendants.  While I agree with the lead opinion's decision to affirm the dismissal of these claims, I write separately to defend the merits of Restatement (Third) of Torts: Products Liability § 2(b) (1998).  The lead opinion chastises the court of appeals for citing Restatement (Third), <u>see</u> lead op., ¶¶39-42, and it tries to put as much distance between Restatement (Third) and Wisconsin products liability law as possible, <u>see, e.g.</u>, lead op., ¶¶17-18, 39-45.  The purpose behind this criticism of Restatement (Third) is evident in Justice Bradley's concurring opinion.  Justice Bradley does not want to consider Restatement (Third); she wishes to bury it.

¶77 In 2001 former Justice Diane S. Sykes wrote that Wisconsin was "seriously out of step with product liability law as it has evolved since this court adopted Restatement (Second) of Torts § 402A [(1965)] in <u>Dippel v. Sciano</u>, 37 Wis. 2d 443, 155 N.W.2d 55 (1967)." <u>Green v. Smith & Nephew AHP, Inc.</u>, 2001 WI 109, ¶122, 245 Wis. 2d 772, 629 N.W.2d 727 (Sykes, J., dissenting).  Some members of this court would like to address this disparity.  Nonetheless, the issue might not have come up in this case had Justice Bradley not been so determined to discredit Restatement (Third) in her writings.

¶78 The truth is, however, that the justification provided by the lead opinion for dismissing the plaintiff's defective

1

design claim is strikingly similar to the analysis that would be employed under Restatement (Third).

¶79  To illustrate, the lead opinion reasons that a claim for defective design cannot be maintained against the manufacturers of white lead carbonate pigment "where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself." Lead op., ¶2. Specifically, the opinion states, "Without lead, there can be no white lead carbonate pigment." Id. Similarly, Restatement (Third) § 2(b) would not impose liability against the pigment manufacturers for defective design because it would be impossible for them to design white lead carbonate pigment without using lead, see id., and therefore, the plaintiff would be unable to submit evidence of a reasonable alternative design that, if adopted, would reduce or eliminate white lead carbonate pigment's potential dangers, see Restatement (Third) of Torts: Products Liability § 2. Although claiming not to "require that a plaintiff affirmatively prove . . . that an alternative design is commercially viable," see lead op., ¶45, the rationale employed by the lead opinion is ultimately tantamount to a conclusion that the plaintiff's claim must fail because he cannot establish a reasonable alternative design for white lead carbonate pigment.

¶80  Despite the similarity of analysis, the lead opinion declares that "[t]o the extent that the court of appeals relied on a reasonable alternative design requirement [under

2

Restatement (Third)], the court's analysis was misguided." Id., ¶42.

¶81  The distinction between the analysis the lead opinion disparages and the analysis the lead opinion employs is too metaphysical to justify continuing disavowal of Restatement (Third) of Torts: Products Liability § 2(b). Instead of denigrating Restatement (Third), I would adopt § 2(b) of Restatement (Third) for analyzing defective design claims[1] and put Wisconsin back in step with the evolution of products liability law.[2]

---

[1] Justice Bradley asserts that adopting Restatement (Third) of Torts: Products Liability § 2(b) for analyzing defective design claims would require that this court "overrule or otherwise modify scores of cases." Justice Bradley's concurrence, ¶66; Horst v. Deere & Co., 2009 WI 75, ¶133, __ Wis. 2d __, __ N.W.2d __ (Bradley, J., dissenting). The cases cited by Justice Bradley do not support her assertion. See Justice Bradley's concurrence, ¶66 n.3; see also Horst, __ Wis. 2d __, ¶133 n.2 (Bradley, J., dissenting).

Most notably, all but six of the cases cited by Justice Bradley were decided before Restatement (Third) was published in 1998. See Justice Bradley's concurrence, ¶66 n.3; see also Horst, __ Wis. 2d __, ¶133 n.2 (Bradley, J., dissenting). Therefore, there is no reason why this court would need to reach back to the cases decided before Restatement (Third) and overrule or otherwise modify their holdings. Moreover, a large portion of the pre-Restatement (Third) cases cited by Justice Bradley do not mention Restatement (Second) or involve claims for defective design and would not be disturbed by the adoption of § 2(b) of Restatement (Third) for defective design claims. See Horst, __ Wis. 2d __, ¶104 n.9 (Gableman, J., concurring).

[2] Although the parties in this case did not rely upon Restatement (Third) to support their arguments, that did not prevent the lead opinion from seizing the opportunity to discredit Restatement (Third) and create roadblocks to its eventual adoption in Wisconsin. If Restatement (Third) is not relevant to this dispute, then the lead opinion should not use six paragraphs addressing its substance. See lead op., ¶¶39-45.

3

I

¶82  Restatement (Second) of Torts was promulgated by the American Law Institute (ALI) in 1965.  Section 402A, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer," was actually approved in 1964.

¶83  Section 402A was one of the most important and visionary sections of Restatement (Second).  William L. Prosser (1898-1972), the preeminent scholar in American tort law who served as sole Reporter for most of the work on Restatement (Second), inspired and helped codify this strict liability section.

¶84  Section 402A reads as follows:

> (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>     (a)  the seller is engaged in the business of selling such a product, and

---

It should be noted that Restatement (Third) § 2(b) was discussed in some detail by the court of appeals when it decided this case.  See Godoy v. E.I. du Pont de Nemours & Co., 2007 WI App 239, ¶8, 306 Wis. 2d 226, 743 N.W.2d 159.  Also, in their reply brief, the plaintiffs advanced Restatement (Third) as an alternative grounds for recovery in Horst, a case argued only a few months after the present case, and Restatement (Third) was discussed by an amicus brief in that case as well.  See Horst, __ Wis. 2d __, ¶102 n.8 (Gableman, J., concurring) (quoting the plaintiffs' reply brief).  Finally, Restatement (Third) § 2(b) was briefed fully in a previous appeal to this court.  See Green v. Smith & Nephew AHP, Inc., 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727.

4

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

¶85  At the time that Section 402A was written and adopted, the law on products liability was largely undeveloped.  For instance, the third edition of Prosser's Handbook of the Law of Torts, published in 1964, contained no chapter on products liability, and only a brief section on "Sellers of Chattels: Strict Liability." See id. at 672-85.

¶86  The principal concern with Section 402A today is that it is outdated and no longer reflects the complexities that have developed in products liability law over the past 45 years.

II

¶87  In 1997, the ALI adopted Restatement (Third) of Torts: Products Liability.  This limited, long-awaited undertaking represented "an almost total overhaul of Restatement (Second)['s]" products liability law.  Restatement (Third) of Torts: Products Liability at 3.  The new Restatement split products liability into three distinct categories: manufacturing defects, design defects, and defects based on failure to warn. See id, § 2.  Each functional category now carries its own separate standard of liability.  See id.

5

¶88  Sections 1 and 2 of Restatement (Third) of Torts: Products Liability read as follows:

§ 1.  Liability of Commercial Seller or Distributor for Harm Caused by Defective Products

One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

§ 2. Categories of Product Defect

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings.  A product:

(a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

¶89  The introduction to Restatement (Third) describes what necessitated such wholesale revision:

In 1964 The American Law Institute adopted § 402A as part of the Restatement Second of Torts . . . .  The major thrust of § 402A was to eliminate privity so

6

that a user or consumer, without having to establish negligence, could bring an action against a manufacturer, as well as against any other member of a distributive chain that had sold a product containing a <u>manufacturing defect</u>.  <u>Section 402A had little to say about liability for design defects</u> or for products sold with inadequate warnings.  In the early 1960s these areas of litigation were in their infancy.

In restating the law of products liability more than a quarter of a century later, the [ALI] had before it thousands of judicial decisions that had fine-tuned the law of products liability in a manner hardly imaginable when Restatement Second was written. <u>Issues that had not occurred to those members involved in drafting Restatement Second had become points of serious contention and debate in the courts</u>.  <u>What should be the governing standard for design and warning liability</u>?

<u>Id.</u> at 3 (emphasis added); <u>see also</u> Victor E. Schwartz, <u>The Role of the Restatement in the Tort Reform Movement: The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance</u>, 10 Kan. J.L. & Pub. Pol'y 41, 42 (2000) ("Restatement (Second)'s <u>Section 402[A] shed no light on what should be the legal standard for defect of design</u>.  None of the cases cited in support of § 402[A] discussed design liability.  All of the cases concerned products that were mismanufactured.") (emphasis added).

¶90  As defective design claims became more prevalent in the late 1960s and the early 1970s, the ALI came to realize "that <u>§ 402A, created to deal with liability for manufacturing defects, could not appropriately be applied to cases of design defects</u>."  Restatement (Third) of Torts: Products Liability § 1 cmt. a. (emphasis added).  This is because the consumer

7

contemplation test,[3] the test utilized by Restatement (Second) § 402A, makes little or no sense in the context of defective design claims.[4]

¶91 First, the test is amorphous and defies precise definition when used in a products liability case. See W. Page Keeton, Prosser & Keeton on Torts § 99, at 699 (5th ed. 1984) ("The test can be utilized to explain most any result that a court or jury chooses to reach. The application of such a vague concept does not provide much guidance for a jury.").

¶92 Second, consumer expectations regarding how a product should be designed are "more difficult to discern than in the case of a manufacturing defect." Restatement (Third) of Torts: Products Liability § 2 cmt. a. In fact, it is hard to imagine that ordinary consumers have any expectations regarding "the technical design characteristics of a product" other than the most basic expectation that the product be designed to work and to work safely. See Mary J. Davis, Design Defect Liability: In Search of a Standard of Responsibility, 39 Wayne L. Rev. 1217, 1236-37 (1993).

¶93 Third, applying the consumer contemplation test to defective design claims runs the risk of labeling entire product

---

[3] Specifically, the consumer contemplation test asks whether the product in question, when it left the manufacturer, was in a condition not contemplated by the ordinary consumer, Restatement (Second) of Torts § 402A cmt. g. (1965), and whether the product was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer," id. at cmt. i.

[4] A similar argument can be made for failure to warn claims.

8

lines defective without ever considering the utility the products create for society. See Keeton, supra, § 99, at 698-99 ("This test can result in the identification of products as being defectively dangerous that are clearly not, as when a new drug is a great boon to humanity but a few are victimized by a side effect or adverse reaction that was an unknowable risk[.]") (footnote and citation omitted). Because a finding of liability for defective design has grave repercussions for the product at issue, courts should be required to consider not only the risks associated with the product but also the benefits. See Restatement (Third) of Torts: Products Liability § 2 cmt. a. ("Some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary [to determine whether a product is defectively designed].").

¶94 The lead opinion's willingness to close the door on Restatement (Third) of Torts: Products Liability § 2(b) evinces a belief that there is no meaningful difference among manufacturing defects, design defects, and failure to warn defects—that one standard of liability fits all three categories.

¶95 Most of the country has decided otherwise. Wisconsin is now one of only six states that clings to the consumer contemplation test as the exclusive test for analyzing defective design claims.[5]

---

[5] Alaska: Caterpillar Tractor Co. v. Beck, 593 P.2d 871, 878 (1979).

9

### III

¶96 By separating the standards of liability for manufacturing defects, design defects, and failure to warn defects, Restatement (Third) § 2 offers significant improvements in products liability law.

¶97 Restatement (Third) § 2(b) removes the focus of the inquiry in defective design cases from the ordinary consumer's expectations and shifts it to asking whether the product's design was reasonable. See id., § 2 cmt. d.

> Whereas a manufacturing defect consists of a product unit's failure to meet the manufacturer's design specifications, a product asserted to have a defective design meets the manufacturer's design specifications but raises the question whether the specifications

---

Arkansas: Boerner v. Brown & Williamson Tobacco Corp., 260 F.3d 837, 846 (8th Cir. 2001); French v. Grove Mfg. Co., 656 F.2d 295, 298 (8th Cir. 1981).

Hawaii: Tabieros v. Clark Equip. Co., 944 P.2d 1279, 1310-11 (1997); Ontai v. Straub Clinic & Hosp. Inc., 659 P.2d 734, 739 (1983).

Nebraska: Kudlacek v. Fiat, 509 N.W.2d 603, 610 (1994).

Oklahoma: Bishop v. Takata Corp., 12 P.3d 459, 461 (2000); Lee v. Volkswagen of Am., Inc., 688 P.2d 1283, 1285 (1984).

Justice Bradley's concurrence cites Professor Ellen Wertheimer's commentary in The Biter Bit: Unknowable Dangers, the Third Restatement, and the Reinstatement of Liability Without Fault, 70 Brook L. Rev. 889, 893 (2005), for the claim that "[s]ome jurisdictions that have adopted the Restatement (Third) are now back-tracking." Justice Bradley's concurrence, ¶63. However, a close look at Professor Wertheimer's assertion shows virtually no empirical support for the statement. See Wertheimer, supra, at 934-37. Without citation to courts that have actually retreated from their previous adoption of Restatement (Third), Justice Bradley's reliance on Professor Wertheimer's assertion is unpersuasive.

10

themselves create unreasonable risks.  Answering that question requires reference to a standard outside the specifications.

Such a change in focus diminishes the likelihood that "strict liability will become absolute liability."  <u>Green</u>, 245 Wis. 2d 772, ¶132 (Sykes, J., dissenting) ("[W]e must have some principled standards by which to evaluate product defectiveness in design . . . defect cases . . . .  Evaluating design . . . defectiveness solely by reference to consumer expectations comes close to imposing absolute liability.").

¶98  Restatement (Third)'s risk-utility balancing approach flows from the premise that risks must be foreseeable in order for the manufacturer to protect against them.  <u>See</u> Restatement (Third) of Torts: Products Liability § 2(b) (stating that a product "is defective in design when the <u>foreseeable risks of harm</u>" could have been reduced or eliminated by the adoption of a reasonable alternative design) (emphasis added).  Holding manufacturers liable for defective design based on "the foreseeable risks of harm posed by the product" promotes efficient investment in product safety and avoids the risk of recklessly eliminating entire product lines as a result of a hidden or undiscoverable design risk.  <u>Id.</u>, § 2 cmt. a. ("Most courts agree that, for the liability system to be fair and efficient, the balancing of risks and benefits in judging product design and marketing must be done in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of distribution.").

11

¶99 The fact that, under Restatement (Third) § 2(b), "a product is defective in design if the foreseeable risks of harm could have been reduced by a reasonable alternative design is based on the commonsense notion that liability for harm caused by product designs should attach only when harm is reasonably preventable." Id., § 2 cmt. f.

## IV

¶100 Despite the lead opinion's suggestion to the contrary, Restatement (Third) is not unfriendly to and does not impose unreasonable burdens upon plaintiffs making products liability claims. See lead op., ¶¶42-43, 45. It is true that to recover for defective design under Restatement (Third), most plaintiffs are required to submit evidence establishing that the manufacturer could have adopted a reasonable alternative design and that adopting the alternative design would have reduced or eliminated the harm posed by the product. See Restatement (Third) of Torts: Products Liability § 2(b) & cmt. f. However, the reasonable alternative design requirement is not as significant a barrier to recovery as the lead opinion suggests. See lead op., ¶¶42-43, 45.

¶101 One of the lead opinion's primary gripes with the reasonable alternative design element under Restatement (Third) is that it will require an expensive "battle of the experts over competing product designs." Id., ¶45. Although a complex products liability case may result in a "battle of the experts," this is not likely to be caused by the plaintiff having to submit sufficient evidence of a reasonable alternative design.

12

Much of this evidence, where it exists, can be obtained through discovery.  Even if Wisconsin did not adopt Restatement (Third) § 2(b) and incorporate its reasonable alternative design requirement into our defective design jurisprudence, a "battle of the experts" would likely remain the norm in complex products liability litigation.

¶102 In some defective design cases, however, expert testimony would not be necessary, even if the plaintiff were required to present evidence of a reasonable alternative design. In particular, "[c]ases arise in which the feasibility of a reasonable alternative design is obvious and understandable to laypersons and therefore expert testimony is unnecessary to support a finding that the product should have been designed differently and more safely."  Restatement (Third) of Torts: Products Liability § 2 cmt. f.[6]

---

[6] Comment f. to Restatement (Third) § 2 continues with the following:

> For example, when a manufacturer sells a soft stuffed toy with hard plastic buttons that are easily removable and likely to choke and suffocate a small child who foreseeably attempts to swallow them, the plaintiff should be able to reach the trier of fact with a claim that buttons on such a toy should be an integral part of the toy's fabric itself (or otherwise be [ir]removable by an infant) without hiring an expert to demonstrate the feasibility of an alternative safer design.  Furthermore, other products already available on the market may serve the same or very similar function at lower risk and at comparable cost.  Such products may serve as reasonable alternatives to the product in question.

13

¶103 Furthermore, the actual burden of presenting sufficient evidence of a reasonable alternative design would require only that the plaintiff establish "the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." <u>Id.</u> Thus, for plaintiffs who do need the assistance of expert testimony, there would be no requirement that an expert undertake the expensive and time-consuming burden of producing a model of the proposed reasonable alternative design. <u>Id.</u>

¶104 In addition, Restatement (Third) does not require proof of a reasonable alternative design in <u>all</u> defective design cases. Specifically, comment e. to Restatement (Third) § 2 leaves open the possibility that, absent a reasonable alternative design, courts may hold products to be defectively designed if the danger posed by the product eclipses its social utility. <u>Id.</u>, § 2 cmt. e.[7] ("[T]he designs of some products are so manifestly unreasonable, in that they have low social utility and high degree of danger, that liability should attach even absent proof of a reasonable alternative design."); <u>see also id.</u>, § 2 cmt. b. Furthermore, under Restatement (Third) § 3, circumstantial evidence may be sufficient in some cases to support a conclusion that a product was defectively designed

---

[7] Comment e. to Restatement (Third) § 2 is sometimes referred to as "the "Habush Amendment" in recognition of ALI Advisory Committee member Robert L. Habush from Milwaukee. <u>See</u> Victor E. Schwartz, <u>The Role of the Restatement in the Tort Reform Movement: The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance</u>, 10 Kan. J.L. & Pub. Pol'y 41, 45 (2000).

14

without requiring proof of a reasonable alternative design, if the product fails to perform its intended function. Id., § 3;[8] see also id., § 2 cmt. b. Finally, under Restatement (Third) § 4, absolute liability is imposed if the product's design is in violation of applicable product safety statutes or regulations.

¶105 In sum, the lead opinion's fear of Restatement (Third) § 2(b) and the reasonable alternative design requirement is exaggerated.

V

¶106 Under some circumstances, plaintiffs may find Restatement (Third) more favorable to their chances of recovery than Restatement (Second). For example, manufacturer warnings can no longer inoculate the manufacturer from liability for the defect as was the case under Restatement (Second). Id., § 2 cmt. l. ("In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks."); James A.

---

[8] Restatement (Third) of Torts: Products Liability § 3 states the following:

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of product defect; and

(b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

15

No. 2006AP2670.dtp

Henderson, Jr. & Aaron D. Twerski, A Fictional Tale of Unintended Consequences[:] A Response to Professor Wertheimer, 70 Brook. L. Rev. 939, 946 (2005) ("Several high-profile cases have taken this position much to the chagrin of manufacturers who sought to absolve themselves from liability because they had thoroughly warned against the dangers."). Similarly, Restatement (Third) does not recognize the "open and obvious danger" defense that manufacturers can use under Restatement (Second) to avoid liability for defectively designed products by making the product's dangerous conditions "open and obvious." Restatement (Third) of Torts: Products Liability § 2 cmt. d. ("The fact that a danger is open and obvious is relevant to the issue of defectiveness, but does not necessarily preclude a plaintiff from establishing that a reasonable alternative design should have been adopted that would have reduced or prevented injury to the plaintiff."); see also Davis, supra, at 1236-37. Consequently, it is not hard to imagine that some plaintiffs' products liability claims would be treated more favorably under Restatement (Third) than under Restatement (Second).

<div align="center">VI</div>

¶107 The two Reporters for Restatement (Third) of Torts: Products Liability were Professors James A. Henderson, Jr. (Cornell Law School) and Aaron D. Twerski (Brooklyn Law School). See Restatement (Third) of Torts: Products Liability at XVII. In 1998, these distinguished scholars were lauded by Professor Geoffrey C. Hazard, Jr., then Director of the ALI, who noted that the ALI's Executive Committee had designated them "as joint

<div align="center">16</div>

holders of the R. Ammi Cutter Reporter's Chair, an honor reserved for [ALI] Reporters whose service is regarded as especially outstanding." Id. at XVI.

¶108 In 2005, Professors Henderson and Twerski penned an article answering Professor Ellen Wertheimer's critique of Restatement (Third) of Torts: Products Liability. See Henderson & Twerski, supra. In the course of that article, the professors observed that "Wisconsin has long been the lone star state in our products liability law, marching to its own, sometimes quite peculiar, drummer." Id. at 940.

¶109 The lead opinion restates Wisconsin's peculiar position on alleged design defects without mustering the intellectual firepower to defend it. Wisconsin has every right to stand alone, but it should not do so unless its singular approach can be supported objectively and defended as sound.

¶110 In this case, the court should acknowledge that the law has evolved and adopt Restatement (Third) of Torts: Products Liability § 2(b) to analyze products liability claims alleging defective design. Other features of Restatement (Third) should be considered in appropriate cases another day.

¶111 For the reasons stated, I respectfully concur.

¶112 I am authorized to state that JUSTICE ANNETTE KINGSLAND ZIEGLER and JUSTICE MICHAEL J. GABLEMAN join this concurrence.

17

No.  2006AP2670.dtp

1

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT F

760 F.3d 600 (2014)

## Ernest GIBSON, Plaintiff-Appellant,

v.

## AMERICAN CYANAMID CO., et al., Defendants-Appellees.

No. 10-3814.

### United States Court of Appeals, Seventh Circuit.

Argued January 9, 2012.

Decided July 24, 2014.

Rehearing En Banc Denied August 21, 2014.[*]

604    *604 Peter G. Earle, Law Office of Peter Earle, LLC, Milwaukee, WI, Fidelma L. Fitzpatrick, Motley & Rice, Providence, RI, for Plaintiff-Appellant.

Elyse Echtman, Orrick, Herrington & Sutcliffe, Philip H. Curtis, Arnold & Porter, New York, NY, Beth Ermatinger Hanan, Gass Weber Mullins LLC, Paul E. Benson, Michael Best & Friedrich LLP, James T. Murray, Peterson, Johnson & Murray SC, Anthony S. Baish, Godfrey & Kahn S.C. Cheri L. McCourt, Jeffrey K. Spoerk, Quarles & Brady LLP, Milwaukee, WI, Timothy A. Bascom, Bascom, Budish & Ceman, S.C. Wauwatosa, WI, Cortney G. Sylvester, Nilan, Johnson, Lewis PA, Minneapolis, MN, Brian J. Murray, Jones Day, Chicago, IL, for Defendants-Appellees.

Before FLAUM, KANNE, Circuit Judges, and CHANG, District Judge.[**]

CHANG, District Judge.

The plaintiff, Ernest Gibson, filed suit in Wisconsin state court against former manufacturers of white lead carbonate pigments.[1] This pigment was used, before the federal government banned it in the 1970s, in paints, including paints applied to residences. Gibson brings negligence and strict liability claims against the pigment manufacturers, but because he cannot identify which manufacturer made the white lead carbonate pigment that injured him, he relies on the "risk contribution" theory of tort liability fashioned by the Wisconsin Supreme Court. *Thomas v. Mallett*, 285 Wis.2d 236, 701 N.W.2d 523, 564 (2005). Under the risk-contribution theory, plaintiffs are relieved of the traditional requirement to prove that a specific manufacturer caused the plaintiff's injury. The district court held that risk-contribution theory violates the substantive component of the Due Process Clause, and granted summary judgment in favor of the defendants. As we

605    explain below, in light *605 of the broad deference that the Constitution grants to the development of state common law, risk-contribution theory survives substantive Due Process scrutiny, as well as the manufacturers' other constitutional challenges. We thus reverse the judgment and reinstate the plaintiff's case.

## I.

Because this is an appeal from the grant of summary judgment, we review the district court's decision *de novo,* meaning independently, and draw all reasonable inferences of fact in the non-movant's favor (here, Gibson). *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir.2002). As it turns out, the genuinely disputed facts are not material to the legal question presented by the appeal.

In 1997, Gibson and his family moved into a house in Milwaukee, Wisconsin. The house was built in 1919. Unfortunately, the paint applied to that house contained white lead carbonate pigment. In the late 1800s and in the 1900s, paint manufacturers valued white lead carbonate pigments for several reasons, including their strength, durability, flexibility, washability, brushability, and brightness. The white lead carbonate pigment poisoned Gibson, causing neurological defects, among other injuries. The paint was applied to Gibson's home sometime before 1978, which is when the Consumer Products Safety Commission banned paint makers from intentionally adding lead into residential paint.

Gibson is not able to identify which specific manufacturer made the white lead carbonate pigment that poisoned him. In Wisconsin state court, Gibson sued seven companies that either made white lead carbonate pigment or were successors-

in-interest to companies that had made that type of pigment.[2] Gibson alleged that he had been injured by the makers' negligence and their failure to warn about the dangers of white lead carbonate pigment. Those seven companies were not the only possible makers of white lead carbonate pigment, although they, along with a no-longer-in-business company, Eagle-Picher Industries, did comprise the primary producers of the pigment.

On the basis of diversity jurisdiction, the case was removed to federal court. The district court initially remanded the case back to state court because of a question over whether the amount-in-controversy minimum had been met. In state court, the parties engaged in discovery on the controversy-amount issue; afterwards, once again the case was removed to federal court. One manufacturer, Millennium Holdings LLC, was dismissed from the case after that defendant filed for bankruptcy (more on this below).

The remaining six pigment manufacturers are:

  • American Cyanamid (made white lead pigments until 1972).

  • Armstrong Containers (successor to MacGregor, which made white lead pigments until 1971).

  • E.I. DuPont (made white lead pigments until 1924).

  • NL Industries, Inc. (made white lead pigments, sold its lead paint and pigment business in 1976).

  • Atlantic Richfield (successor to Anaconda, which made white lead pigments until 1946).

  • Sherwin-Williams (made white lead pigments until 1947).

606    Because Gibson could not identify which of these manufacturers made the white *606 lead carbonate pigment that poisoned him, he had to rely on a theory of tort liability fashioned by the Wisconsin Supreme Court in _Thomas v. Mallett_, 285 Wis.2d 236, 701 N.W.2d 523, 564 (2005). As discussed in more detail below, _Thomas_ held that a plaintiff who brings a white lead carbonate pigment case does not bear the traditional burden of proving that a particular lead-pigment manufacturer caused the plaintiff's injury. Instead, so long as a plaintiff makes a prima facie showing that the manufacturer produced or marketed white lead carbonate pigment sometime during the house's existence, then the burden is on each manufacturer to prove that it did not produce or market white lead carbonate pigment either during the house's existence or in the geographical market where the house is located. If there are no records (or no longer any records) to prove the manufacturer's defense, then the defense fails.

Atlantic Richfield Corporation (better known as ARCO) moved for summary judgment, arguing that _Thomas_'s liability framework violates the Constitution. ARCO presented various constitutional arguments, including that the risk-contribution theory of liability violates the Due Process Clause. The district court granted summary judgment for ARCO, and then followed-up with summary judgment for the other five remaining defendants. R.39, R. 107. Gibson appeals.

## II.

### A.

Before addressing the merits of the dispute, first we must ensure, as in all cases, that there is subject matter jurisdiction over the case in the district court, as well as appellate jurisdiction over the appeal. On the question of subject matter jurisdiction, Gibson's opening brief disclaimed knowledge about the citizenship of one of the former defendants in the case, Millennium Holdings LLC. As discussed in the next section, Millennium Holdings has been dismissed from the case in the district court. But at the time of the complaint's removal (the second time around) to federal court, Millennium Holdings was a named defendant and its citizenship had to be evaluated for diversity of citizenship. So we ordered the parties to file jurisdictional memoranda.

In response, the manufacturer-defendants filed an affidavit executed by a Millennium Holdings officer, Regina Lee. Lee was the Secretary and Treasurer of Millennium Holdings. In the affidavit, Lee averred that Millennium Holdings is a Delaware limited liability company, with only one member, Millennium America, Inc. That corporation was incorporated in Delaware and had its principal place of business there. So Millennium Holdings LLC was, for purposes of diversity jurisdiction, a

citizen of Delaware. The plaintiffs (Gibson and his guardian) were citizens of Wisconsin, as was Milwaukee County, a party that had been realigned to be a plaintiff. Accordingly, there was complete diversity at the time of the filing of the notice of removal.

Against this, Gibson argues that Lee's affidavit should not be considered because Millennium Holdings had filed an answer to the complaint, and the answer had stated that Millennium Holdings was a Delaware corporation with its principal place of business in Texas. But the answer does not undermine diversity jurisdiction. First, even if Millennium Holdings was bound by the characterization of citizenship in the answer, then there still would be complete diversity, with only Wisconsin citizens on the plaintiffs' side of the litigation and only non-Wisconsin citizens on the other side. More importantly, where subject matter jurisdiction turns on actual facts, the pleadings are not the end-all *607 of determining the facts. Indeed, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. We have previously permitted jurisdictional statements to be filed on appeal to fix defective allegations. *E.g., Thomas v. Guardsmark, LLC*, 487 F.3d 531, 533-34 (7th Cir.2007); *Tylka v. Gerber Products Co.*, 211 F.3d 445, 448 (7th Cir.2000). Accordingly, we consider the notice of removal to be amended by the defendants' filing of Lee's affidavit, which establishes that Millennium Holdings' citizenship does not undermine complete diversity. Diversity jurisdiction was the proper basis for subject matter jurisdiction over the case.

## B.

In addition to subject matter jurisdiction over the case, we also must ensure that there is jurisdiction over the appeal, whether or not the parties raise the issue. *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 660 (7th Cir.1998) (per curiam). Here, the only question is whether there is a final, appealable decision in the district court in light of the fact that Millennium Holdings was dismissed from the case "without prejudice." Specifically, after Millennium Holdings filed for bankruptcy in the Southern District of New York, the district court and the parties treated Millennium Holdings as if it was no longer a party to the case. When the district court entered a final judgment under Federal Rule of Civil Procedure 58(a), the district court stated that the "claims against Millennium Holdings LLC are dismissed without prejudice because it is in Chapter 11 bankruptcy." The district court then stated, on the judgment, "This action is hereby dismissed." By the time of the entry of the judgment in the district court, the bankruptcy court had already discharged Gibson's claim in the bankruptcy proceeding by confirming a plan of reorganization.

This procedural posture renders the judgment entered by the district court a final, appealable decision under 28 U.S.C. § 1291. When the district court issued its summary judgment decisions, there was nothing more for the district court to do with the lawsuit, which is the hallmark of a final decision. "A district court's decision is final if `the district court has finished with the case.'" *Minnesota Life Ins. Co. v. Kagan*, 724 F.3d 843, 847 (7th Cir.2013) (quoting *Chase Manhattan Mortg. Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir.2006)). In a similar prior decision, we concluded that, in a case where two of the four defendants had filed for bankruptcy but had not been formally dismissed from the case in the district court, the judgment of the district court with regard to the remaining defendants was still a final decision, for purposes of appellate jurisdiction, because any pursuit of the particular claims "will be pursued if at all in the bankruptcy court." *Dimmitt & Owens Financial, Inc. v. United States*, 787 F.2d 1186, 1190 (1986).

The finality of the judgment in this case distinguishes our situation from *Wilhelm v. Eastern Airlines, Inc.*, 927 F.2d 971, 972 (7th Cir.1991). There, the plaintiff filed suit against two defendants; one of the defendants filed for bankruptcy, and the other defendant won a motion to dismiss with prejudice for failure to state a claim. *Id.* at 972. The plaintiff sought to appeal the dismissal for failure to state a claim, but the district court had *not* dismissed the entirety of the action. Instead, the district court had entered an order stating that the plaintiff could either file his claim in the bankruptcy proceeding or move the bankruptcy court to lift the automatic stay and thereby reopen the district-court case. *Id.* We held that it was possible for the plaintiff to reopen the case, so the case was not entirely finished in the district court. *Id.* Accordingly, if it is possible for *608 the automatic stay to be lifted, thereby allowing the district-court litigation to resume, then there is no final decision under 28 U.S.C. § 1291. *Kimbrell v. Brown*, 651 F.3d 752, 756 (7th Cir.2011). In contrast, as we discussed above, the discharge of Gibson's claim in Millennium Holdings' bankruptcy proceeding renders the judgment entered in the district court a final, appealable decision. Our appellate jurisdiction is secure.

## III.

## A.

There is yet another issue that we must address before getting to the merits of the appeal. During the appeal's pendency, the Wisconsin state legislature enacted Wisconsin Statute 895.046, which purports to extinguish risk-contribution theory in Wisconsin state courts, including for cases that were already pending at the time of the statute's enactment, like Gibson's case. Plaintiffs in already-filed lead-pigment cases have challenged the constitutionality of Section 895.046, primarily on the ground that retroactive application of the statute violates the Wisconsin Constitution's guarantee of due process. Wisc. Const. art. I, § 1. At our request, the parties filed supplemental briefs on the impact of Section 895.046, including on the question of whether we must (or should) address the constitutional challenge to the statute, and on the merits of that challenge.[3]

We conclude that we have no choice but to address the challenge under the Wisconsin Constitution to the state legislature's attempt to extinguish risk-contribution theory in already-pending cases. This conclusion arises from our general duty to avoid *federal* constitutional issues if the matter can be resolved on other grounds — including *state* constitutional grounds. *See, e.g., RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir.1997) ("And we must at least try to address the state constitutional issue first because the doctrine of constitutional avoidance counsels that federal courts should avoid addressing federal constitutional issues when it is possible to dispose of a case on pendent state grounds."); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir.2001) ("[W]here possible, courts will render decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law (whether statutory or constitutional)."). If Section 895.046 has indeed successfully (meaning, constitutionally) extinguished risk-contribution theory in this and other already-pending cases, then discussing the federal constitutional challenges to risk-contribution theory would amount to issuing an advisory opinion.

So, in light of our duty to avoid opining on federal constitutional issues if possible, we must apply the Wisconsin Supreme Court's precedent on the retroactive application of state legislation. As noted above, plaintiffs in already-pending lead-pigment cases have already brought Wisconsin-Constitution based challenges to Section 895.046.[4] In *Clark ex rel. Gramling v. American Cyanamid Co.*, 2014 WL 1257118, Case No. 06-CV-12653 (Wis. Circuit Ct. March 25, 2014), the Circuit Court of Milwaukee County struck down the statute as violating Wisconsin's constitutional guarantee of due process.

609   *609 We agree with *Clark* that Wisconsin Supreme Court precedent demands holding that Section 895.046 violates state due-process principles by trying to extinguish Gibson's vested right in his negligence and strict-liability causes of action. The state high court tests the due-process constitutionality of the retroactive application of state statutes by asking, first, whether the statute is taking away a "vested right" of the challenger. *Matthies v. Positive Safety Mfg. Co.*, 628 N.W.2d 842, 852-53, 244 Wis.2d 720, 737-38 (Wis.2001); *see Martin by Scoptur v. Richards*, 531 N.W.2d 70, 90, 192 Wis.2d 156, 206 (1995). If the answer is that no vested right is at stake, then the statute satisfies due process and the inquiry ends. If, however, the challenger is losing a vested right, then the second step of the inquiry asks whether retroactive application has a rational basis, which is discerned by balancing the public interest served by retroactive application against the private interest impacted by the statute. *Matthies*, 628 N.W.2d at 855, *Martin*, 531 N.W.2d at 93.

Under Wisconsin law, Gibson did have a "vested right" in his claims under *Thomas*'s risk-contribution theory. The Wisconsin Supreme Court decisions in *Matthies* and in *Martin* both dictate that a plaintiff's interest in a common-law claim is a protected vested interest. In *Matthies,* the interest was the plaintiff's previously existing common-law negligence claim, specifically, his right to hold a defendant jointly and severally liable without having to prove that the defendant was more than 50% negligent (the statute at issue extinguished joint and several liability unless that threshold of comparative negligence was met). 628 N.W.2d at 852-53. *Matthies* explained that an "existing right of action which has accrued under the rules of the common law or in accordance with its principles is a vested property right." *Id.* at 852 (quotation and citation omitted). Similarly, in *Martin,* the statute at issue imposed caps on non-economic damages, and the Wisconsin Supreme Court held that, when the plaintiffs' claim accrued, they "had a substantive right to recover, in full, the non[-]economic damages awarded by the jury," and that right was vested for due-process purposes. 531 N.W.2d at 91-92. Just so here, where Gibson's right to pursue the risk-contribution theory of liability on his negligence and strict-liability claims had already accrued by the time Section 895.046 tried to extinguish that right in June 2013.

On the second step of the analysis — the balancing of the public interest and the private interest — it is true that Wisconsin case law grants Section 895.046 a presumption of constitutionality, even in retroactive application. But here again Wisconsin Supreme Court precedent dictates that Section 895.046 cannot be retroactively applied in light of the state

constitution's guarantee of due process. In *Martin,* the state high court rejected retroactive application of the cap on non-economic damages in medical malpractice cases, because the legislature burdened — retroactively — "severely injured litigants" at the expense of trying to bring down the costs of medical-malpractice suits and of health care overall. 531 N.W.2d at 93.

Similarly, in *Matthies,* despite the public interest in modifying joint and several liability so that a defendant who is less than 51% negligent would not have to pay the entirety of the damages award, the Wisconsin Supreme Court emphasized that retroactive application of the statute on the plaintiff would deprive him of his ability to recover full compensation for his injury. 628 N.W.2d at 860-61. Moreover, the public interest in retroactive application did not outweigh the plaintiff's private interest because there already existed contribution claims among tortfeasors to apportion liability. *Id.* at 857.

610     *610 In our case, Section 895.046 was enacted to serve the public interest in permitting businesses to operate in Wisconsin without fear of products-liability litigation in the indefinite future based on risk-contribution theory. Wis. Stat. § 895.046(1g) (describing legislative findings and intent). And, of course, Section 895.046 serves this purpose by extinguishing risk-contribution theory altogether. But the competing private interest is significant, even more so than in *Martin* and *Matthies.* Without risk-contribution theory, Gibson (and similarly situated plaintiffs) cannot prove causation-in-fact as to a particular manufacturer and thus will likely recover nothing, even though Gibson can show (if he proves his prima facie case) that the pigment manufacturers contributed to the risk of injuring him. In *Martin* and *Matthies,* the statutes at issue did not entirely extinguish the plaintiffs' vested right to recover some amount of damages, whether it was from another negligent defendant (*Martin*) or under the statutory cap of damages (*Matthies*), and yet even there the Wisconsin Supreme Court rejected retroactive application. Here, Gibson would likely have no remedy at all. As interpreted by the Wisconsin Supreme Court, the state constitution's due-process guarantee prohibits retroactive application of Section 895.046. Gibson's claims remain viable, so we therefore cannot avoid the federal constitutional issues.

## B.

Turning now to the merits of this appeal, the manufacturers challenge the constitutionality of the liability framework created by *Thomas v. Mallett,* 285 Wis.2d 236, 701 N.W.2d 523, 564 (2005). Before we get to *Thomas,* however, we first need to discuss the case on which *Thomas* was built. That building-block case is another Wisconsin Supreme Court case, *Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 342 N.W.2d 37 (1984).

In that case, the plaintiff was Therese Collins, and her mother was Roseann Collins. In 1957, during Roseann Collins's pregnancy, her doctor prescribed diethylstilbestrol, known as "DES," a drug that would ostensibly prevent miscarriages by keeping hormonal levels constant. *Id.* at 43. Therese Collins was born without apparent incident in 1958. But seventeen years later, in 1975, Therese Collins was diagnosed with vaginal cancer. *Id.* at 41. Therese Collins filed suit against twelve drug companies that allegedly produced or marketed DES. The trial court granted the drug companies' motion for summary judgment because Collins could not prove which specific drug company manufactured the DES that her mother used. *Id.* at 42.

In reversing the trial court, the Wisconsin Supreme Court identified the problems of proof faced by Collins in trying to prove which specific DES maker caused her injuries. First, DES was produced in generic form, and the drug itself did not have any clearly identifiable characteristics that could distinguish one maker's version of the drug from any other maker. 342 N.W.2d at 44. Second, during the twenty-four-year period that DES was on the market, over 300 companies produced or marketed DES. *Id.* Third, many drug companies did not have access to accurate records as to where, when, and what type of DES they produced or marketed. *Id.* In light of these proof problems, the Wisconsin Supreme Court observed that the choice it faced was either to fashion a novel method for recovery for DES plaintiffs, or to permit possibly negligent defendants to escape liability. *Id.* at 45. The state high court refused to allow liability to go unaddressed, relying on Article I, Section 9 of the Wisconsin Constitution to make the choice. That section provides that "every person is entitled to a certain

611     remedy in the laws for all injuries, or *611 wrongs, which he may receive in his person, property, or character." *Id.* at 45.

In deciding what form the remedy would take, the Wisconsin Supreme Court chose to fashion the risk contribution theory of liability, and rejected other potential theories. First among the rejected theories was the "alternative" liability theory embodied in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1, 4-5 (1948). In *Summers,* there were only two potentially liable defendants, but for DES cases, there were hundreds of drug makers that might be liable. Therefore, alternative liability would not be a fair way to apportion damages among the defendants. *Collins,* 342 N.W.2d at 46.

The Wisconsin Supreme Court also rejected enterprise liability, which is a framework that allows a plaintiff to hold defendants liable for industry-wide practices that created a risk of harm. 342 N.W.2d at 47. The state high court observed that DES manufacturers did not jointly control the risk of injury to plaintiffs because so many different companies entered and exited the market over twenty-four years. *Id. Collins* also rejected the plaintiff's theory that the drug companies conspired to misrepresent DES's safety. *Id.* at 47-48.

Finally, *Collins* decided not to adopt, in its entirety, the market share theory adopted by the California Supreme Court in *Sindell v. Abbott Labs.*, 26 Cal.3d 588, 613, 163 Cal.Rptr. 132, 607 P.2d 924, 937 (1980). *Sindell* also involved DES, and the California Supreme Court reasoned that it was fair to shift the burden of causation to the defendants. Based on the market share theory, the defendants would be liable for the percentage of damages that approximated their share of the market. *Collins*, 342 N.W.2d at 48. The Wisconsin Supreme Court rejected the market-share theory, however, because of the practical difficulty of defining and proving market share. *Id.* But in rejecting market-share liability, *Collins* still noted that market share, if it could be determined, is a relevant "factor" in deciding how to apportion liability among defendants. *Id.* at 49.

After rejecting these other theories of liability, *Collins* adopted the "risk contribution" theory of liability. The premise of this form of liability is that each defendant "contributed to the risk of injury to the public and consequently, the risk of injury to individual plaintiffs." 342 N.W.2d at 49. The Wisconsin Supreme Court explained that it was better for drug companies to share the cost of injury than to place the entire burden on the innocent plaintiff. So instead of having to prove that a particular defendant produced or marketed the DES taken by her mother, Collins simply had to prove — by a preponderance of the evidence — that the defendant produced or marketed the "type" of DES taken by her mother, "type" meaning the color, shape, markings, size, or other characteristics of the DES. 342 N.W.2d at 50. Practically speaking, that burden of proof would not narrow the possible defendants by much, because "DES was, for the most part, produced in a `generic' form which did not contain any clearly identifiable shape, color, or markings," *Id.* at 37. Collins would not have to prove any facts related to the time period during which the defendant made or marketed DES, nor what the geographic area was in which the defendant distributed DES. *Id.* at 50. On the issues of time period of distribution and geographic area of distribution, *Collins* decided that "it is appropriate to shift the burden of proof on time and geographic distribution to the defendant drug companies because they will have better access to relevant records than the plaintiff." *Id.* at 53. But even if relevant records did not exist any longer, the Wisconsin Supreme Court opined, "we believe that the equities *612 of DES cases favor placing the consequences on the defendants." *Id.* at 53.

612

## C.

This brings us to the heart of this appeal, the Wisconsin Supreme Court's extension of *Collins*'s risk-contribution theory of liability to white lead carbonate pigment cases, as held by *Thomas v. Mallett*, 285 Wis.2d 236, 701 N.W.2d 523 (2005). *Thomas* compared DES cases with white lead carbonate pigment cases, and concluded, over two dissenting opinions, that the "main policy reasons identified in *Collins* warrant extension of the risk-contribution theory here." *Id.* at 558. Primary among those reasons was, as the Wisconsin Supreme Court put it, the widespread health problem posed by white lead carbonate poisoning, a problem so significant that *Thomas* described it as "a public health catastrophe that is poised to linger for quite some time." *Id.*

*Thomas* went on to explain that the blame for this public-health problem is on the defendants, each of which contributed to the risk of injury. 701 N.W.2d at 558. Indeed, the blame was deeper than negligence: "Many of the individual defendants or their predecessors-in-interest did more than simply contribute to a risk; they knew of the harm white lead carbonate pigments caused and continued production and promotion of the pigment notwithstanding that knowledge." *Id.* In addition to the culpability of the defendants and the innocence of the plaintiff, *Thomas* also relied on the view that the defendants are "in a better position to absorb the cost of the injury," because the defendants "can insure themselves against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business." *Id.*

In extending the risk contribution theory of liability to white lead carbonate pigment, *Thomas* also rejected the manufacturers' attempts to distinguish lead pigment from DES. First, the manufacturers argued that plaintiffs in white lead carbonate pigment cases do have alternative remedies, because plaintiffs can sue their landlords, so it is unnecessary to apply risk contribution liability. In contrast, the manufacturers contended, DES plaintiffs had no other remedies. The Wisconsin Supreme Court disagreed, rejecting the manufacturers' argument that suing landlords would provide an adequate remedy. 701 N.W.2d at 552. *Thomas* explained that the landlords' insurers could rely on a "pollution exclusion" in

commercial general liability insurance policies to avoid a duty to indemnify landlords. *Id.* So, although Thomas himself had been able to obtain a settlement from two of the landlord's insurers, other plaintiffs might not be so lucky. *Id.* at 552-53. Moreover, under a Wisconsin statute (which has since been repealed), landlords could immunize themselves from liability if they had received a certificate (from a certified lead-risk assessor) that the housing units were lead-free. *Id.* at 553. And, in any event, it did not matter that plaintiffs could seek remedies against other wrongdoers, such as landlords, because those remedies did not absolve other wrongdoers, such as the manufacturers, from liability. *Id.* at 553-54.

In addition to the alternative-remedies argument, white lead carbonate pigment makers also tried to distinguish their product from DES by pointing out that white lead carbonate came in three different chemical formulas, whereas DES was a fungible drug produced with a chemically identical formula. 701 N.W.2d at 559. But that distinction did not make a difference, *Thomas* concluded. Even though there are three different chemical compositions, the bottom line was that all forms of white lead carbonate pigment contained an *613 inherently hazardous element: lead. *Id.* at 550-60. What's more, the various forms of white lead carbonate pigment still all performed the same function, were physically indistinguishable, and presented the same risk to health. *Id.* at 560-61. *Thomas* concluded that the different forms of white lead carbonate pigment were sufficiently similar to warrant the same risk-contribution treatment.

*Thomas* also rejected the manufacturers' argument that, unlike the nine-month pregnancy period in DES cases, the time period during which the white lead carbonate pigment could have been applied was, in some cases, on the order of decades. The plaintiff in *Thomas* lived in houses built in 1900 and 1905, so the white lead carbonate pigment could have been applied any time between then and the 1978 lead-paint ban. 701 N.W.2d at 562. The Wisconsin Supreme Court acknowledged that the time period was "drastically larger" than the nine-month window in DES cases. *Id.* In response, however, *Thomas* reasoned that "the window will not always be potentially as large as appears in this case," but even if the time window would "routinely" be that long, "the Pigment Manufacturers' argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long." *Id.* Ultimately, *Thomas* again invoked the "equities" of the situation, and concluded that the time window, although potentially long, did not justify putting the causation burden back on the innocent plaintiff. *Id.* at 563.

The next unsuccessful attempt to distinguish white lead carbonate pigment from DES was the lack of a "signature" injury arising from white lead carbonate pigment. The Wisconsin Supreme Court acknowledged that the records showed that lead poisoning could be caused by many different sources, including "ambient air, many foods, drinking water, soil, and dust." 701 N.W.2d at 563. And the injuries themselves (cognitive defects) could have causes other than lead poisoning, such as genetics or complications during birth. *Id.* In rejecting this purported distinction, *Thomas* reasoned that, "Harm is harm, whether `signature' or otherwise." *Id.* The important thing is that a white lead carbonate pigment plaintiff still must prove that the pigment caused his or her injuries. *Id.* "[T]hat merely means that Thomas may have a harder case to make to his jury." *Id.* It did not mean, *Thomas* held, that risk-contribution theory should not apply. *Id.*

The final attempt by the pigment manufacturers to distinguish DES cases also failed. Specifically, the pigment manufacturers argued that they did not have exclusive control of the risk posed by their white lead carbonate pigment; for example, *paint* manufacturers took control of the pigment when making paint. But *Thomas* responded that the level of control over the product was no different from DES cases, where "doctors were the ones who prescribed the dosage of DES" or pharmacists filled prescriptions. 701 N.W.2d at 563. And, in any event, the paint manufacturers' exertion of control over white lead carbonate pigment *diluted* (if it did anything) the toxicity of the white lead carbonate from the time it left the pigment manufacturers' hands. *Id.* Worse, the manufacturers "actually magnified the risk through their aggressive promotion of white lead carbonate, even despite the awareness of the toxicity of the lead." *Id.* at 564. *Thomas* concluded that the level of control over white lead carbonate pigment made no difference. *Id.*

With all the proffered differences from DES cases rejected,[5] *Thomas* *614 extended the risk-contribution theory of liability to white lead carbonate pigment cases. That means, for negligence claims, that the plaintiff must prove duty, breach of duty, and injury caused by white lead carbonate ingestion, but with regard to imposing liability on a particular manufacturer, the plaintiff "need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the houses' existence." 701 N.W.2d at 564. For strict liability claims, the identification of the manufacturer on which liability can be imposed is proven by showing "[t]hat the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer." *Id.*

As *Thomas* describes it, the actual implementation of the risk-contribution theory comprises the following: the plaintiff makes a prima facie case for either a negligence or strict liability claim (or both), and then "the burden of proof shifts to each defendant[-manufacturer] to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located." 701 N.W.2d at 564. *Thomas* also specifically instructs trial courts what to do if there are no records (or no longer any records) to prove the defense: "if relevant records do not exist that can substantiate either defense, we believe that the equities of [white lead carbonate] cases favor placing the consequences on the [Pigment Manufacturers]." *Id.* (internal quotation omitted).

With risk-contribution theory in place for white lead carbonate pigment claims, the Wisconsin Supreme Court remanded the case to the trial court for a jury trial. At the trial, the jury decided that Thomas had failed to prove that his injuries were caused by white lead carbonate pigment, so the jury did not end up applying the risk contribution theory. *Thomas v. Mallett,* 331 Wis.2d 486, 795 N.W.2d 62 (Wisc.Ct.App.2010) (unpublished order).

## D.

In considering the manufacturers' constitutional challenges against applying risk-contribution theory to white lead carbonate pigment cases, we start with the proposition that the federal Constitution gives a wide berth to state (and local) laws, allowing state legislatures to enact laws unless a specific constitutional bar prevents it. In this case, the manufacturers' primary challenge to risk contribution theory is that it violates the substantive component of the Due Process Clause, and this is the argument with which the district court agreed.

Generally speaking, state laws need only be rational and non-arbitrary in order to satisfy the right to substantive due process. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *see also Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). The reason for this deference is that other parts of the Constitution contain more specific guarantees of rights, and judicial self-restraint requires caution when invoking the "more generalized notion of `substantive due process.'" *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "As a general matter, the [Supreme] Court has always been reluctant to expand the concept *615 of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citing *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225-26, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). Substantive due process protections "have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion).

Of course, none of those concerns are at stake in risk-contribution theory, but the manufacturers argue that the theory still violates substantive due process. In particular, the manufacturers argue that the district court correctly held that a combination of the United States Supreme Court's plurality, concurring, and dissenting opinions in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), dictates a substantive due process analysis that renders risk-contribution theory unconstitutional. Relying on the combined opinions, the district court concluded that risk-contribution theory "imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." R. 39 at 29 (quoting *Eastern Enterprises,* 524 U.S. at 528-29, 118 S.Ct. 2131 (plurality opinion)).

*Eastern Enterprises,* however, did not produce a binding precedent (other than its specific result) because no controlling principle can be gleaned from the plurality, concurrence (which was a concurrence in the judgment only), and the dissenting opinions. In order to understand why *Eastern Enterprises* cannot be said to have produced binding precedent, it is necessary to examine the opinions in detail and the history and context of the federal statutory scheme at issue there. It starts in 1946, when the United Mine Workers of America and various coal companies reached an agreement that led to the creation of other funds that would provide health benefits, survivors' benefits, and pension-type benefits for miners and their dependents. *Eastern Enterprises,* 524 U.S. at 505, 118 S.Ct. 2131. These funds served as the basis for the creation of funds in later years that operated as trusts: a portion of coal-production profits were placed into the funds, which would provide benefits to miners and their families. *Id.* But no specific amount of benefits was promised by the funds. *Id.* In 1950, the United Mine Workers and the coal operators entered into an agreement that increased the royalty payments into another fund (which again took the form of a trust). *Id.* at 506, 118 S.Ct. 2131. But, again, the fund did not promise miners and their dependents a specific amount of benefits. *Id.* at 506, 507, 118 S.Ct. 2131. This included no promise as to providing lifetime health benefits for coal miners and their dependents. *Id.* at 508, 118 S.Ct. 2131.

In 1974, the Employment Retirement Income Security Act (ERISA) created new requirements for pension plans, and to comply with ERISA, the United Mine Workers and the Bituminous Coal Operators Association entered into an agreement. *Id.* at 509, 118 S.Ct. 2131. The new agreement stated that miners who retired before 1976 would be covered by the 1950 plan, and miners who retired after 1975 would be covered by the 1974 plan. *Id.*

616     Soon, with declining coal operator profits, along with the acceleration of health care costs, both the 1950 and 1974 plans ran into financial trouble. *Id.* at 510, 118 *616 S.Ct. 2131. Coal companies began to withdraw from the plans, leaving the remaining employers to absorb the increasing cost of covering retirees. *Id.* In an attempt to deal with the problem, eventually Congress passed the Coal Act in 1992. *Id.* at 514, 118 S.Ct. 2131. The Coal Act combined the 1950 and 1974 plans (the "Combined Fund"), and provided substantially the same health benefits to retirees and their dependents as they were receiving under the prior plans. The Combined Fund was financed by "annual premiums assessed against `signatory coal operators,' *i.e.,* coal operators that signed any [National Bituminous Coal Wage Agreement] [NBCWA] or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans." *Id.* Any signatory operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," could be liable for those premiums. *Id.* (internal quotation omitted). Beyond signatory operators themselves, where a signatory was no longer involved in any business activity, premiums could be levied against "related persons," including successors-in-interest and businesses or corporations under common control. *Id.* The Act gave the Commissioner of Social Security the duty to assign retirees to employers who would be responsible for paying for the retirees' benefits. *Id.* at 515, 118 S.Ct. 2131.

Under the Coal Act, the Social Security Commissioner assigned Eastern Enterprises an obligation for premiums covering over 1,000 retired miners who had worked for the company before 1966. But Eastern had, back in 1965, transferred all of its coal-related operations to a subsidiary. At that time (more precisely, in 1966), the 1950 fund had a positive balance topping $145 million. In 1987, Eastern had sold its ownership interest in the subsidiary to another corporation. This was five years before the passage of the Coal Act, and the two not-yet-combined funds still had a total positive balance of over $33 million.

After Eastern was assigned the 1,000+ retired miners, which represented more than a $5 million liability to the Combined Fund, Eastern filed suit, arguing that the Coal Act violated substantive due process (as applied to Eastern) and was a "taking" that violated the Fifth Amendment's Takings Clause. The Supreme Court held that this aspect of the Coal Act was unconstitutional as applied to Eastern, but the four-Justice plurality opinion and the one-Justice concurring-in-the-judgment opinion invoked different grounds for the decision. The four dissenters would have upheld the constitutionality of the Coal Act.

According to the four-Justice plurality opinion, the Coal Act was an unconstitutional taking of Eastern's property in violation of the Fifth Amendment; the plurality decided not to reach the substantive due process issue. Specifically, the plurality, in an opinion authored by Justice O'Connor, analogized the Coal Act's assignment to an economic regulation that amounted to a taking. *Eastern Enterprises,* 524 U.S. at 522-23, 118 S.Ct. 2131. To be sure, "Congress had considerable leeway to fashion economic legislation," including "impos[ing] retroactive liability to some degree." *Id.* at 528, 118 S.Ct. 2131. But, the plurality explained, economic legislation can amount to an unconstitutional taking "if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 528-29, 118 S.Ct. 2131.

617     The plurality explained that the Coal Act did amount to an unconstitutional taking. The assignment of liability to Eastern was retroactive because it "substantially interfere[d] with Eastern's reasonable investment-backed expectations" by reaching *617 back "30 to 50 years to impose liability... based on the company's activities between 1946 and 1965." 524 U.S. at 532, 118 S.Ct. 2131. The Coal Act operated "retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 W & R Fund to have been settled." *Id.* at 534, 118 S.Ct. 2131. Indeed, the 1974 fund had not even been created at the time that Eastern transferred its coal-related operations to a subsidiary.

According to the plurality, the assignment of liability was not only retroactive, it would be severe. Although the parties provided different estimates for what Eastern's total payments would be under the Act, the range was between $50 to $100 million (the $5 million liability was only for the first year of the Coal Act's operation). *Id.* at 529, 118 S.Ct. 2131. And the severe financial impact was not proportionate to Eastern's experience with the funds. *Id.* at 529-30, 118 S.Ct. 2131. During the time that Eastern actually employed minors, the benefits were "far less extensive," and indeed there were no promises to pay specific amounts. *Id.* at 530-31, 118 S.Ct. 2131. Combining the retroactive nature of the liability with the enormous financial impact resulted in substantial interference with Eastern's reasonable investment-backed expectations. *Id.* at 532-33, 118 S.Ct. 2131.

Finally, the plurality acknowledged that "analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." *Id.* at 537, 118 S.Ct. 2131. But, in line with prior cases, the plurality expressed hesitation about using the Due Process clause to invalidate economic legislation. *Id.* Ultimately, the plurality expressly declined to address Eastern's substantive due process claim. *Id.* at 538, 118 S.Ct. 2131.[6]

Justice Kennedy provided the fifth vote to invalidate the Coal Act's assignment of liability to Eastern. But his concurrence rejected that a taking had occurred, because no specific property or assets were identified to be taken. *Id.* at 540, 118 S.Ct. 2131. Justice Kennedy acknowledged that, in some prior cases, economic regulations had such a broad reach that the Court had deemed those regulations to be a taking of property, but always there was a "specific property right or interest... at stake." *Id.* at 540-41, 118 S.Ct. 2131. In contrast, the Coal Act's assignment did not destroy or take a specific asset or property interest, so it was imprecise to interpret the Coal Act as amounting to a taking. *Id.* at 541-42, 118 S.Ct. 2131.

Instead, Justice Kennedy reasoned, substantive due process was the correct way to analyze the Coal Act's constitutionality, a test that, in his view, the Act failed as applied to Eastern. *Id.* at 547, 118 S.Ct. 2131. Like the plurality, Justice Kennedy acknowledged the general hesitancy with scrutinizing economic legislation under the Due Process Clause. *Id.* But the concurrence stated that retroactive laws had long invoked "a singular distrust," "requir[ing] an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way." *Id.* One reason for this concern over retroactive laws is the "'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *Id.* at 548, 118 S.Ct. 2131 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Without due-process scrutiny of retroactive laws, the stability of property ownership *618 would be vulnerable to government action: "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548, 118 S.Ct. 2131.

618

With regard to the Coal Act, Justice Kennedy concluded that this was one of the "rare instances" where the legislature exceeded due process limits. *Id.* at 549, 118 S.Ct. 2131. The concurring opinion referred to the plurality opinion's "convincing" demonstration that "in creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope." *Id.* "As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving" the prior funding agreement. *Id.* at 550, 118 S.Ct. 2131. Thus, Justice Kennedy concluded, the Coal Act's assignment of liability to Eastern exceeded even the "permissive standard" of substantive due process. *Id.* at 550, 118 S.Ct. 2131.

Justice Breyer, writing for the four dissenting Justices, agreed with Justice Kennedy that the Coal Act did not present a takings issue.[7] Along the same lines as Justice Kennedy's concurring opinion, the dissent explained that although some economic regulations amount to a taking, those regulations identified *specific* physical property or *specific* assets, rather than a *general* liability. *Id.* at 555, 118 S.Ct. 2131.

Like Justice Kennedy, the dissent identified the Due Process Clause as the "natural home" for scrutinizing "the potential unfairness of retroactive liability." *Id.* at 557, 118 S.Ct. 2131. Due Process protects against arbitrary and irrational legislation, and if a law is fundamentally unfair because of its retroactivity, then it is arbitrary. *Id.* The question presented by the Coal Act is "whether or not it is fundamentally unfair to require Eastern to make future payments for health care costs of retired miners and their families, on the basis of Eastern's past association with those miners." *Id.* at 558-59, 118 S.Ct. 2131.

The dissent concluded that the Coal Act did not violate due process, because the Act only made assignments of miners whom Eastern had employed in the past. *Id.* at 560, 118 S.Ct. 2131. Moreover, even though Eastern had not made contractually enforceable promises to the miners, coal companies and the federal government had acted in a way that led the miners to reasonably expect that they would continue to receive medical benefits. *Id.* at 560-63, 118 S.Ct. 2131. The dissent viewed the historical record as showing that, in reaction to the conduct of the coal companies and the government, the United Mine Workers had acted in a way (by giving layoff and work-force concessions) that was based on assurances of continued benefits. *Id.* at 563-64, 118 S.Ct. 2131. On top of this, Eastern continued to receive, through its subsidiary, profits from the coal mining industry. *Id.* at 565-66, 118 S.Ct. 2131. Under these circumstances, it was not fundamentally unfair to impose the liability on Eastern. *Id.* at 566, 118 S.Ct. 2131.

Returning to our case, the district court here concluded, as noted above, that the opinions in *Eastern Enterprises* established a substantive due process right that invalidates state law when the law "imposes severe retroactive liability on a

619  limited *619 class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." R. 39 at 29 (quoting 524 U.S. at 528-29, 118 S.Ct. 2131 (plurality opinion)). On appeal, the parties debate whether *Eastern Enterprises* establishes a rule of decision.

Generally put — and more easily stated than applied — when the Supreme Court issues divided opinions with no single opinion commanding a majority, the holding of the case "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). "When, however, a concurrence that provides the fifth vote necessary to reach a majority does not provide a `common denominator' for the judgment, the *Marks* rule does not help to resolve the ultimate question." *United States v. Heron*, 564 F.3d 879, 884 (7th Cir.2009) (collecting cases). This means that *Marks* applies "only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc). "[W]hen it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir.2003).

There is no narrow-grounds rationale that supplies the rule of decision in *Eastern Enterprises.* The five Justices "who concurred in the judgments," *Marks*, 430 U.S. at 193, 97 S.Ct. 990, did not even agree on which constitutional provision applied to the Coal Act to render it invalid. The four-justice plurality based its decision on the Takings Clause, whereas Justice Kennedy — who concurred in the judgment only and was the necessary fifth vote for the case's result — concluded that the Coal Act violated substantive due process. Unlike *Marks,* which examined a prior set of opinions where at least the same constitutional provision was the basis for the rule of decision (the First Amendment), in *Eastern Enterprises* the plurality and the concurrence were not even interpreting the same constitutional right, so neither one of those opinions could be said to be the narrower of the other. Asking which opinion is narrower than the other would be like examining a square with a width that is the same length as the diameter of a circle, and futilely asking which is narrower, the square or the circle.

It is true that, at times, the plurality opinion and Justice Kennedy's concurring opinion refer to one another in a way that suggests some level of overlap in their respective analysis. 524 U.S. at 537, 118 S.Ct. 2131 (plurality opinion) (the "analysis of legislation under the Takings and Due Process Clauses are correlated to some extent"); *id.* at 549, 118 S.Ct. 2131 (Kennedy, J., concurring) ("The plurality opinion demonstrates in convincing fashion that the remedy created by the Coal Act bears no legitimate relation to the interest which the Government asserts in support of the statute."); *id.* at 530, 118 S.Ct. 2131 (Kennedy, J., concurring) ("As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business."). But it is not possible to take these isolated references and translate the plurality opinion's Takings Clause analysis into Justice Kennedy's substantive due process analysis, and vice-versa. The opinions themselves do not purport to decode how the respective analyses relate to one another. The plurality opinion declined to address the substantive due process argument. And the ability to compare the two opinions for *Marks*

620  purposes *620 is undermined even more by Justice Kennedy's concurring opinion, which expressly rejected the plurality's reasoning and concluded that the Takings Clause did not apply at all to the Coal Act. In Justice Kennedy's view, no taking occurs if no "specific property interest" is invaded. *Id.* at 543, 118 S.Ct. 2131. Without that limitation on the Takings Clause, the "plurality opinion would throw one of the most difficult and litigated areas of the law into confusion...." *Id.* at 542, 118 S.Ct. 2131. The concurring opinion did not try to fit the substantive due process analysis into the "already difficult and uncertain" jurisprudence on regulatory takings. *Id.*

In light of the different provisions and different approaches of the plurality opinion and Justice Kennedy's opinion, neither can be characterized as narrower or broader than the other. Our colleagues in other Circuits agree that no governing holding emerged from *Eastern Enterprises. See Alcan*, 315 F.3d at 189; *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 240-41 (4th Cir.2002); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 172 (3d Cir.1999); *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1256 (D.C.Cir.1998). The specific result of *Eastern Enterprises* — the Coal Act's unconstitutionality, on a combination of the plurality and the concurrence's votes — is the only binding precedent that arises from the case.

In deciding that *Eastern Enterprises* articulated a governing substantive due process standard applicable to risk-contribution theory, the district court reasoned that Justice Kennedy and the four *dissenting* Justices agreed to apply substantive due process to the Coal Act, and they combined for a majority of the Court on that proposition. But the problem with that approach is that *Marks* itself instructs that "the holding is the narrowest position taken by those members who *concurred* in the judgment." 430 U.S. at 193, 97 S.Ct. 990 (emphasis added). So, under *Marks,* the positions of those Justices who *dissented* from the judgment are not counted in trying to discern a governing holding from divided opinions. It makes sense

to exclude the dissenting opinions: by definition, the dissenters have disagreed with both the plurality and any concurring Justice on the outcome of the case, so by definition, the dissenters have disagreed with the plurality and the concurrence on *how* the governing standard applies to the facts and issues at hand (even if there is agreement on what constitutional provision is being interpreted). It is very likely that if the dissenters disagree with the outcome of the case, then lower courts and (more importantly) litigants will not have a clear idea on the contours of the standard and how to apply it in future cases. This is not the way to make binding precedent.

*Eastern Enterprises* is itself an example of the difficulty in combining a concurring opinion and a dissenting opinion to arrive at binding precedent. Justice Kennedy reasoned that Eastern Enterprises was "not responsible for their [the former miners and their beneficiaries] expectation of lifetime health benefits or for the perilous financial condition" of the benefits plans. *Id.* at 550, 118 S.Ct. 2131. But the dissenting opinion concluded otherwise, relying on the significance of the employer-employee relationship and, more importantly, on the statements and conduct of Eastern Enterprises, the coal industry, and even the federal government, in creating an expectation of lifetime benefits. *Id.* at 560-64, 118 S.Ct. 2131. So while both Justice Kennedy's concurrence and the dissenting opinion applied the Due Process Clause, their application of substantive due process was starkly different and provides little guidance for future applications to future cases. *Eastern Enterprises*

621   demonstrates why dissenting opinions cannot be *621 counted under *Marks* to create binding precedent.[8]

It is possible to argue that, in two prior cases, we have at least made reference to dissenting opinions when discussing *Marks. See United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir.2006); *United States v. Hodge*, 558 F.3d 630, 634 (7th Cir.2009). Of course, *Marks* itself is binding on us, and instructs that only those positions of the Justices concurring in the outcome count in the analysis. And, in any event, in neither of our prior cases was inclusion of the dissenting opinion necessary to the outcome of the appeal; in other words, the references to the dissenting opinion were dicta. In *Gerke Excavating,* we examined a Supreme Court opinion, *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), that had been decided on a four-Justice plurality opinion, a concurring opinion by Justice Kennedy, and a four-Justice dissent. We observed that Justice Kennedy's standard for testing the scope of federal authority over wetlands under the Clean Water Act was narrower than the plurality's (in the sense that it imposed greater restrictions on federal authority) in most cases, so we went ahead and applied the rationale in Justice Kennedy's concurrence. *Gerke Excavating*, 464 F.3d at 724-25. It is true that we made the same narrower-grounds point in comparing the concurrence with the dissenting opinion, *id.* at 725, but that comparison was not necessary to resolving the appeal, so it was dicta.

The same is true with the mention of a dissenting opinion in *United States v. Hodge*. There, we discussed the potential combination of a one-Justice concurrence and four-Justice dissent in *United States v. Santos*, 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008). But there was no need to decide what impact the combination would have, if anything, on the appeal because the government conceded what standard should control. 558 F.3d at 633-34. We therefore expressly declined to decide the issue. *Id.* at 633 ("Whether the concession was appropriate is a difficult question, which we need not answer....") So the discussion of the dissenting opinion was dicta. The bottom line is that neither *Gerke Excavating* nor *Hodge* provides support for counting dissenting opinions in a *Marks* analysis.

Without a controlling test from *Eastern Enterprises,* then, we are back to where we started: economic legislation does not violate substantive due process unless the law is arbitrary and irrational. The question is *not* whether a law is wise or not; we test only whether the law is arbitrary or irrational. As put by the Supreme Court:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Turner Elkhorn Mining*, 428 U.S. at 15, 96 S.Ct. 2882; *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). This rational-basis review applies "even though the effect of the legislation is to impose a new duty or liability

622   based on *622 past acts." *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 637, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). Legislation "is not unlawful solely because it upsets otherwise settled expectations." *Concrete Pipe and Prods.*, 508 U.S. at 637, 113 S.Ct. 2264 (quoting *Gray*, 467 U.S. at 729, 104 S.Ct. 2709).

The manufacturers primarily argue that two characteristics of risk-contribution theory render it arbitrary and irrational: first, that the theory dispenses with the traditional tort requirement that the plaintiff prove that the defendant caused the injury at

issue; and second, that the theory imposes liability retroactively, that is, the rule of liability has changed after the defendants engaged in the conduct that is the subject of the suit.

On the latter point, although "retroactive legislation does have to meet a burden not faced by legislation that has only future effects," _Gray_, 467 U.S. at 730, 104 S.Ct. 2709, "that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose," _id._ Indeed, while we have been setting out the deferential standard for reviewing state _legislation,_ even more deference is owed to _judicial_ common-law developments, which by their nature must operate retroactively on the parties in the case.

The development of state common law is a fundamental feature of our legal system. And, in turn, "the foundation of the common law system" is "the incremental and reasoned development of precedent." _See Rogers v. Tennessee_, 532 U.S. 451, 461, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001). If strict constraints on retroactivity applied to state-court common-law decisions, then the development of common law would be impaired. _Rogers_ explained this point in the context of deciding whether to extend Ex Post Facto Clause protection (which applies against legislatures only) through the Due Process Clause against the courts. Rogers was a criminal defendant whose victim died 15 months after Rogers stabbed him. Rogers was convicted of murder in Tennessee state court, despite the fact that, at the time of his trial, Tennessee common law held that no defendant could be convicted of murder if his victim died more than a year and a day after the fatal act. 532 U.S. at 455, 121 S.Ct. 1693. On appeal, the Tennessee Supreme Court acknowledged that the year-and-a-day rule was indeed part of the state's common law, but the state high court abolished the rule in Rogers's appeal and affirmed his conviction. In Rogers's appeal to the United States Supreme Court, he argued that Ex Post Facto Clause protection should apply against state common-law decision-making.

Even though the direct question presented in _Rogers_ was whether to incorporate the Ex Post Facto Clause into the Due Process Clause, which is not the issue in this case, the rationale of _Rogers_ helps in evaluating the retroactivity concerns raised by the pigment manufacturers here. There are indeed Due Process limits on the retroactive application of a judicial decision, but only if the judicial decision "is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." 532 U.S. at 457, 462, 121 S.Ct. 1693 (quoting _Bouie v. City of Columbia_, 378 U.S. 347, 352, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)). _Rogers_ declined to apply to courts the same ex post facto standard applicable to legislatures, because of the lesser danger presented by judicial interpretations and the need to allow for common-law

623     developments. 532 U.S. at 461-62, 121 S.Ct. 1693. On the *623 point about danger, a "court's opportunity for discrimination ... is more limited than a legislature's in that it can only act in construing existing law in actual litigation." 532 U.S. at 460-61, 121 S.Ct. 1693 (quoting _James v. United States_, 366 U.S. 213, 247 n. 3, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961)) (Harlan, J., concurring in part and dissenting in part). Unlike legislatures, which have the general freedom to explore whatever subject area at whatever time, courts can only decide issues in cases brought them to by litigants.

On the second point — the breathing space that common law development requires — _Rogers_ explained that "[i]n the context of common law doctrines ..., there often arises a need to clarify or even to reevaluate prior opinions as new circumstances and fact patterns present themselves." 532 U.S. at 461, 121 S.Ct. 1693. The need to adjust the common law as new cases are presented is the reason why common law courts are granted "substantial leeway ... [in] reevaluating and refining [doctrines] as may be necessary to bring the common law into conformity with logic and common sense." _Id._ To wrap any greater straitjacket on common-law development "would place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system." _Id._ at 461, 121 S.Ct. 1693. Thus, judicial decisions that retroactively change the common law do not violate due process unless they are "unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue." _Id._ at 462, 121 S.Ct. 1693.[9]

With these principles in mind, we conclude that risk-contribution theory is not arbitrary and irrational, nor is it unexpected and indefensible. In developing the common-law torts of negligence and strict liability by adopting risk-contribution theory, the Wisconsin Supreme Court balanced the tortious conduct of pigment manufacturers in distributing an unreasonably dangerous product with the possibility of leaving the non-culpable plaintiff without a sufficient remedy, while recognizing that the state high court was relaxing the traditional standard of causation. _Thomas_, 701 N.W.2d at 558. _Thomas_ rationally relied on the wide scope of the health dangers posed by white carbonate lead pigment. The lead poisoning caused by the pigment is not only widespread in terms of the number of individuals affected, but just as problematic, in the Wisconsin Supreme Court's view, is the ongoing exposure to lead pigment that would continue to cause injuries in the foreseeable future. _Id._ (describing the hazard as "a public health catastrophe that is poised to linger for quite some time"). At the same time,

victims of pigment poisoning face difficult problems of proof, in part because the pigment was so unreasonably dangerous that it remains a health danger even decades later.

To address the problem of compensating victims and the problem of proof, neither problem of which could be blamed on plaintiffs in pigment cases, *Thomas* extended risk-contribution theory to the pigment manufacturers, each of which contributed to the risk of injury, either directly or via their predecessors-in-interest. 701 N.W.2d at 558. The manufacturers either knew or should have known of the harm that they were causing, so culpability was laid at the feet of the \*624 manufacturers. *Id.* Relaxing the standard of causation was justified in favor of the innocent plaintiff and against the risk-creating manufacturers. *Id.* In addition to the culpability of the manufacturers and the innocence of the plaintiff, *Thomas* also reasoned that the manufacturers are "in a better position to absorb the cost of the injury," because they "can insure themselves against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business." *Id.* In sum, the Wisconsin Supreme Court rationally concluded that, under the state's common law, "it is better to have the Pigment Manufacturers or consumers share the cost of injury rather than place the burden on the innocent plaintiff." *Id.* There is nothing irrational about developing the state's common law to prevent the manufacturers from avoiding liability for injuries caused by risks to which they contributed.

It is important to understand that, in fashioning risk-contribution theory and relaxing the traditional cause-in-fact requirement, *Thomas* did *not* entirely eliminate causation. In order to invoke the risk-contribution theory against a particular manufacturer, the plaintiff still must "prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the houses' existence." 701 N.W.2d at 564. And even under the relaxed causation-in-fact standard of risk-contribution theory, liability is far from automatic: the plaintiff still must prove that white carbonate lead pigment was the cause of the lead poisoning. This poses a substantial causation question because there are other sources of lead poisoning (such as the ambient air, drinking water, soil, and dust), and there is no "signature" injury for lead poisoning specifically from white carbonate lead pigment, 701 N.W.2d at 563. In other words, causation is *not* entirely eliminated: plaintiffs still must prove that lead pigment caused their injuries, and only then do the manufacturers face liability for having contributed to the risk.

Despite the pigment manufacturers' argument that they will be held liable in *particular* cases for injuries that they did not cause, what risk-contribution theory does is reflect the *overall* liability that the manufacturers should have expected to face from selling lead pigment. In other mass-tort contexts, similar tort-liability theories reflect the same overall compensation framework: "Assuming every injured person will sue, looking at the total number of successful claims, each defendant will, at least theoretically, only be held responsible for that part of the damage that it caused to the community." *In re Agent Orange Product Liab. Litig.*, 597 F.Supp. 740, 823 (E.D.N.Y.1984). Put another way, if for example Sherwin-Williams ends up paying for harm it did not cause in a particular case brought by a particular plaintiff, it will also end up paying less than it should in the next case — where it did cause the harm — when another manufacturer is also found liable for harm caused by Sherwin-Williams.

This reflection of overall liability is consistent with other common-law developments in tort schemes where causation-in-fact is not required for recovery and liability is instead premised in some way on the defendants' contribution to the risk of injury. Whether the liability arises from a simple two-defendant scenario of alternative liability, *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1, 4-5 (1948), or from a multi-defendant market-share approach, *Sindell v. Abbott Labs.*, 26 Cal.3d 588, 613, 163 Cal.Rptr. 132, 607 P.2d 924, 937 (Cal.1980), *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, 1078 (1989), or from *Thomas*'s risk-contribution theory, all of these theories dispatch \*625 with the requirement that the plaintiff prove which particular defendant harmed the plaintiff in a particular case, and all permit tortfeasors to be held liable to plaintiffs who they did not actually injure or to be held liable for injuries that they did not cause. *See also Conley v. Boyle Drug Co.*, 570 So.2d 275, 286 (Fla. 1990) (DES); *Ray v. Cutter Labs.*, 754 F.Supp. 193, 195 (M.D.Fla.1991) (blood-clotting product, Factor VIII); *Smith v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717, 728 (1991) (Factor VIII); *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, 173 (1984) (DES); *Martin v. Abbott Labs.*, 102 Wash.2d 581, 689 P.2d 368, 382-83 (1984)(DES). To be sure, most states for most types of claims continue to apply a strict causation-in-fact requirement, but that does not mean that those states that have chosen to develop their common law to permit recovery on a theory of culpable contribution to the risk of injury have made an irrational or arbitrary choice.

One final point on the Due Process challenge to *Thomas*. The Wisconsin Supreme Court's decision was not an "unexpected and indefensible" break from Wisconsin's prior common law. As discussed earlier, *Thomas*'s foundation in Wisconsin common law was *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37, 52 (1984), which applied risk-contribution theory to DES cases. By the time that *Thomas* was decided, *Collins* had been part of the state's common law for twenty years. The

Wisconsin Supreme Court applied the same rationale in *Collins* as in *Thomas,* recognizing for DES cases the same balancing between the culpable set of defendants and the innocent plaintiff:

> We believe that this procedure [risk-contribution theory] will result in a pool of defendants which it can reasonably be assumed could have caused the plaintiff's injuries.... [S]ome of the remaining defendants may be innocent, but we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law.

*Collins,* 342 N.W.2d at 52. Operating from this same premise, *Thomas* rationally rejected the pigment manufacturers' attempts to distinguish lead pigment from DES for purposes of applying risk-contribution theory, as we detailed above. *See* 701 N.W.2d at 552 (rejecting distinction based on purported existence of other remedies, because those remedies are limited at best and do not absolve the manufacturers); *id.* at 559-561 (rejecting distinction based on three chemical compositions for lead pigment versus one for DES, because the lead pigment was still physically indistinguishable); *id.* at 562 (rejecting distinction based on time period of exposure, because expansive time period reflected culpability); *id.* at 563 (rejecting distinction based on other potential sources of lead poisoning, because the plaintiff still must prove lead-pigment as the source of injury); *id.* at 563 (rejecting distinction based on paint makers as intervening actor, because doctors were involved in distributing DES). In light of the "substantial leeway" given to state courts to develop the common law, *see Rogers,* 532 U.S. at 461, 121 S.Ct. 1693, taking the step from *Collins* to *Thomas* was reasonably expected under Wisconsin law. *Thomas* satisfies the test of substantive due process.

## E.

In light of our conclusion that the manufacturers' substantive-due-process challenge to *Thomas* must fail, and that *Eastern Enterprises* does not support that challenge, we can readily reject the manufacturers' other constitutional challenges. The primary premise of the manufacturers' argument that *Thomas* amounts to a "taking" of property under the Takings Clause is
626    that the plurality *626 opinion in *Eastern Enterprises* announces the applicable test, but as we explained earlier, there is no binding precedent arising from that case, whether on substantive due process or on the Takings Clause.[10] This leaves the manufacturers without a basis to argue that a statute or regulation (let alone a judicial decision) that imposes a liability on a party rather than take or burden a specific property interest owned by that party amounts to a "taking." Instead, the Supreme Court has recognized that Congress, for example, "may set minimum wages, control prices, or *create causes of action* that did not previously exist," all without implicating the Takings Clause. *Connolly v. Pension Ben. Guaranty Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (emphasis added). Assessing liability "that adjusts the benefits and burdens of economic life to promote the common good ... does not constitute a taking." *Id.* at 225, 106 S.Ct. 1018; *accord Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 643, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

Next, the manufacturers argue that procedural due process is violated by risk-contribution theory. Ordinarily, the familiar three-factor balancing test of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), governs whether the "risk of erroneous deprivation" is too great in light of the private interest at stake, the government's interest, and the probable value of other procedures. But the manufacturers' challenge is not really any different from the substantive-due-process argument, because what the manufacturers primarily complain about is the risk of being found liable even though one or more of them did not actually cause Gibson's injury. But such a finding would not be a "mistake" against which more procedural safeguards are needed; instead, that finding would be a result of the permissible and rational common-law development that the Wisconsin Supreme Court fashioned. And in individual cases, there is no reason to believe that the manufacturers will not have notice and a meaningful opportunity to be heard in litigating whether the plaintiff has proved his or her prima facie case or in litigating their defenses against the rebuttable presumption created by *Thomas.* Indeed, as noted above, on remand to the trial court in *Thomas,* the jury found that the plaintiff failed to prove that lead pigment caused his injuries, *see Thomas v. Mallett,* 331 Wis.2d 486, 795 N.W.2d 62 (Wisc.Ct.App.2011) (unpublished order), and thus the defendant prevailed. Liability simply is not automatic, and risk-contribution theory satisfies due process, both substantively and procedurally.

Finally, Sherwin-Williams argues that *Thomas* discriminates against interstate commerce, in violation of the Commerce Clause, U.S. Const., art. I, § 8, cl. 3. Sherwin-Williams cites no precedent for the proposition that a state court's decision providing for tort compensation of the state's residents amounts to a Commerce Clause violation. It is one thing for a state court, through a jury verdict, to burden interstate commerce by imposing sanctions for out-of-state behavior with no in-state

impact, *see BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 572-73, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (cited by Sherwin-
Williams Br. at 47), but there is no Commerce Clause obstacle to fashioning a tort remedy for in-state residents *627 who
suffer in-state injuries. Indeed, the closest case, factually speaking, to ours (where a state common-law remedy is
challenged for providing a remedy to an injured in-state resident) that is cited by Sherwin-Williams actually *rejected* the
interstate-commerce argument, concluding that the state's interest in the health and safety of its residents has long justified
imposing burdens, in the form of tort liability, on out-of-state entities. *See Estate of Stone v. Frontier Airlines, Inc.* 256
F.Supp.2d 28, 46-47 (D.Mass.2002). *Thomas*'s adoption of risk-contribution theory does not violate the Commerce Clause.
[11]

## IV.

627

The Wisconsin Supreme Court's decision in *Thomas,* establishing the risk-contribution theory of liability for lead pigment
claims, does not violate the Due Process, Takings, or interstate-commerce Clauses of the Constitution. The judgment in
favor of the defendants is reversed, and the case is remanded to reinstate the case and for further proceedings.

[*] Circuit Judge Ilana Diamond Rovner did not participate in the consideration of these petitions for rehearing en banc.

[**] Of the Northern District of Illinois, sitting by designation.

[1] Although Gibson is a minor, and thus ordinarily should be identified only by his initials (at least after the case was removed to federal
court), the parties (including on his behalf) have used his full name throughout the proceedings. *See* Fed.R.Civ.P. 5.2(a)(3), (h) (waiver of
protection by filing own information without redaction).

[2] ARCO disputes that it took on the liabilities of the predecessor corporations (Anaconda Lead Products Company, Anaconda Sales
Company, and the International Lead Refining Company), but Gibson is entitled to all reasonable inferences on this issue.

[3] Gibson filed motions asking us to take judicial notice of various state-court filings and the Clark decision, see Docket Entries R. 75, 88,
94. For the sake of a complete record, the motions are granted.

[4] Because Gibson challenges Section 895.046 under Wisconsin's Constitution, not the federal constitution, there is no need to certify the
challenge to the Wisconsin Attorney General under 28 U.S.C. 2403(b) or Federal Rule of Appellate Procedure 44(b).

[5] The Wisconsin Supreme Court decided not to decide the federal constitutional challenges made by the manufacturers because, in the
state high court's view, the procedural posture of the case rendered it premature to take up those challenges. 701 N.W.2d at 565.

[6] Justice Thomas joined the plurality, and wrote a separate concurrence that expressed a willingness to consider whether the *Ex Post
Facto* Clause could apply outside the criminal-law context. 524 U.S. at 538-39, 118 S.Ct. 2131 (Thomas, J., concurring).

[7] Justice Stevens wrote a separate dissent that explained why he believed the retroactive application of the Coal Act did not raise a
takings issue.

[8] As a matter of logic, too, dissenting opinions must be excluded from the *Marks* analysis, as demonstrated again by considering the Coal
Act and *Eastern Enterprises.* If the Coal Act had been litigated again, lower courts would be bound to hold it was unconstitutional by
combining the result of the plurality and concurrence, rather than be free to apply a substantive due process standard under which the
dissenting Justices would outnumber the concurring Justice.

[9] *Rogers* arrived at this deferential standard when addressing a development of state common law concerning a criminal-law doctrine,
one that was to the detriment of the defendant. If anything, the retroactivity concern should be less forceful in the context of civil disputes,
and the bar for constitutionality correspondingly lower.

[10] The other case cited by the manufacturers, *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env'l Protection,* 560 U.S. 702, 714,
130 S.Ct. 2592, 177 L.Ed.2d 184 (2010), was divided in a way similar to *Eastern Enterprises,* with only four Justices relying on the Takings
Clause to analyze the state-court decision there.

[11] Sherwin-Williams also argues that the Wisconsin Supreme Court apparently intended to discriminate against out-of-state corporations
because *Thomas* imposed risk-contribution theory only against pigment manufacturers (which are all out-of-state) and not against paint
makers and retailers (some of which are in-state). This argument makes an inferential leap too far, and also ignores *Thomas*'s discussion of
pigment manufacturers' greater culpability, when compared to paint makers and retailers. *See Thomas,* 701 N.W.2d at 563 (stating that, if
anything, paint makers and retailers reduced the risk of harm by diluting the lead pigment).

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLENN BURTON, JR.,**
        **Plaintiff,**

**v.**
                                     **Case No.  07-C-303**

**AMERICAN CYANAMID CO., et al.**
        **Defendants.**

---

## SPECIAL VERDICT

**Question 1**:  Did plaintiff Glenn Burton, Jr. ingest white lead carbonate pigment?
        Answer: _Yes_
              Yes or No

If your answer to Question 1 is "no," then do not answer any other question.  Proceed to the final page and sign/date this form.
If you answer Question 1 "yes," then answer Question 2.

**Question 2**: Did Burton's ingestion of white lead carbonate cause an injury?
        Answer: _Yes_
              Yes or No

If the answer to Question 2 is "no," do not answer any other question.  Proceed to the final page and sign/date this form.
If you answer Question 2 "yes," then answer Question 3.

**Question 3**: Answering separately for each defendant listed below, did the defendant prove that it did not produce or market white lead carbonate ingested by Burton?
        a.     Atlantic Richfield
               Yes_____            No _X_
        b.     Armstrong Containers, Inc.
               Yes_____            No_X_
        c.     E.I. du Pont de Nemours Company
               Yes_____            No_X_
        d.     Sherwin-Williams Company
               Yes_____           No_X_

If you answered "yes" as to any defendant in question 3, answer no further questions as to that defendant.

Considering only those defendants for whom you answered "no" in Question 3, answer Questions 4 and 5:

**Question 4**: Answering separately for each defendant, was the defendant negligent in producing or marketing white lead carbonate?

    a.    Atlantic Richfield
        Yes\_\_\_\_        No\_✗\_

    b.    Armstrong Containers, Inc.
        Yes\_✗\_        No\_\_\_\_

    c.    E.I. du Pont de Nemours Company
        Yes\_✗\_        No\_\_\_\_

    d.    Sherwin-Williams Company
        Yes\_✗\_        No\_\_\_\_

**Question 5**: Answering separately for each defendant listed below, was the white lead carbonate manufactured and sold by the defendant defective and unreasonably dangerous due to inadequate warnings at the time the product was sold?

    a.    Atlantic Richfield
        Yes\_\_\_\_        No\_✗\_

    b.    Armstrong Containers, Inc.
        Yes\_✗\_        No\_\_\_\_

    c.    E.I. du Pont de Nemours Company
        Yes\_✗\_        No\_\_\_\_

    d.    Sherwin-Williams Company
        Yes\_✗\_        No\_\_\_\_

Considering only those defendants for whom you answered "yes" to question 5, answer Question 6:

**Question 6**: Answering separately for each defendant listed below, were the defendant's inadequate warnings a cause of Burton's injuries?

    a.    Atlantic Richfield
        Yes\_\_\_\_        No\_\_\_\_

    b.    Armstrong Containers, Inc.
        Yes\_✗\_        No\_\_\_\_

    c.    E.I. du Pont de Nemours Company
        Yes\_✗\_        No\_\_\_\_

    d.    Sherwin-Williams Company
        Yes\_✗\_        No\_\_\_\_

If you answered "yes" as to any defendant on Question 4 or Question 6, then answer Question 7:

2

**Question 7**: What amount of money will fairly compensate Burton for his injuries caused by ingesting white lead carbonate:

$ *2,000,000* .

**Each juror should sign this verdict form.**

3

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT H

334 F.Supp.3d 949 (2018)

# Glenn BURTON, Jr., Plaintiff,

## v.

# AMERICAN CYANAMID, et al., Defendants;

## Ravon Owens, Plaintiff,

## v.

# American Cyanamid, et al., Defendants;

## Cesar Sifuentes, Plaintiff,

## v.

# American Cyanamid, et al., Defendants.

Case No. 07-CV-0303, Case No. 07-CV-0441, Case No. 10-CV-0075.

**United States District Court, E.D. Wisconsin.**

Signed September 12, 2018.

953    *953 Corey G. Lorenz, Edward A. Wallace, Mark R. Miller, Wexler Wallace LLP, Chicago, IL, Frank T. Crivello, II, Keith E.
954    Trower, Krista G. LaFave Rosolino, Victor C. Harding, Warshafsky Rotter Tarnoff & *954 Bloch SC, Peter G. Earle, Law Offices of Peter Earle LLC, Milwaukee, WI, Robert J. McConnell, Fidelma L. Fitzpatrick, Jonathan D. Orent, Michael G. Rousseau, Motley Rice LLC, Providence, RI, Breanne V. Cope, Motley Rice LLP, Mt. Pleasant, SC, Neil T. Leifer, Neil T. Leifer LLC, Auburndale, MA, for Plaintiffs.

Richard W. Mark, Gibson Dunn & Crutcher LLP, Elyse D. Echtman, Orrick Herrington & Sutcliffe LLP, New York, NY, Anthony S. Baish, Godfrey & Kahn SC, Daniel J. Kennedy, Ralph A. Weber, Gass Weber Mullins LLC, Jeffrey K. Spoerk, Steven M. DeVougas, Eric W. Matzke, Alexandra W. Shortridge, Quarles & Brady LLP, Jonathan J. Strasburg, Aaron H. Kastens, Paul E. Benson, Michael Best & Friedrich LLP, Trevor J. Will, Foley & Lardner LLP, Milwaukee, WI, Jaclyn Clair Kallie, Timothy Andrew Bascom, Bascom Budish & Ceman SC, Wauwatosa, WI, Andrew M. Belisle, Benjamin J. Warlick, Eric A. Larson, Jeffrey K. Douglass, Robert P. Alpert, Morris Manning & Martin LLP, Jennifer B. Flannery, Richard H. Deane, Jr., Altanta, GA, Jontille D. Ray, Lisa MacKinnon Sharp, Christian E. Henneke, Joy C. Fuhr, Steven R. Williams, McGuireWoods LLP, Richmond, VA, Cortney G. Sylvester, Courtney E. Ward-Reichard, Dana M. Lenahan, Erik T. Salveson, Michael T. Nilan, Nilan Johnson Lewis PA, Minneapolis, MN, Angela J. Showalter, Bruce R. Kelly, Philip H. Curtis, Arnold & Porter LLP, New York, NY, Charles B. Robertson, Joel C. Simon, Stephen M. Fernelius, Fernelius Simon PLLC, Houston, TX, Daniel T. Flaherty, Godfrey & Kahn SC, Appleton, WI, Charles H. Moellenberg, Jr., Cynthia D. Driscoll, Hayley A. Haldeman, Joseph N. Parsons, Laura A. Meaden, Leon F. DeJulius, Jr., Necia B. Hobbes, Pittsburgh, PA, Robert S. Walker, Cleveland, OH, Stacy A. Alexejun, Quarles & Brady LLP, Madison, WI, for Defendants.

# DECISION AND ORDER

LYNN ADELMAN, District Judge.

Plaintiffs bring these negligence and strict products liability claims against various manufacturers and alleged successors-in-interest to manufacturers of white lead carbonate pigment (WLC). Plaintiffs allege that they were harmed by ingesting paint containing WLC when they were children. Each plaintiff further alleges that he or she is unable to identify the manufacturer of the WLC that harmed him or her; in consequence, plaintiffs' substantive claims rely on Wisconsin's risk contribution theory of liability which relaxes the traditional causation standard and requires a plaintiff to prove only that defendants "contributed to the risk of injury to the public, and, consequently, ... to the individual plaintiffs." _Thomas ex rel. Gramling v. Mallett_, 2005 WI 129 ¶¶ 103-104, 285 Wis.2d 236, 701 N.W.2d 523. Before me now are several defendants' motions for summary judgment.

# I. RISK CONTRIBUTION THEORY

Many of the motions before me require me to resolve questions of law with respect to risk contribution. In order to provide context for these issues, I begin with an overview of the development of risk contribution law.

The Wisconsin Supreme Court created its risk contribution theory of liability in order to address a problem of proof that might otherwise have functioned as an effective barrier to remedy in certain products liability cases. _Collins v. Eli Lilly Co._, 116 Wis.2d 166, 342 N.W.2d 37 (Wis. 1984). In _Collins,_ the seminal Wisconsin risk contribution case, the mother of the plaintiff had been prescribed the drug diethylstilbestrol ("DES") during her pregnancy in order to prevent miscarriage. Seventeen *955 years later, the plaintiff was diagnosed with vaginal cancer, thought to be caused by her _in utero_ exposure to DES. The plaintiff filed suit against twelve drug companies that produced or marketed DES, but was "unable to identify the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time." _Id._ at 177, 342 N.W.2d 37.

Recognizing that the plaintiff could not satisfy the common law requirement that she prove legal causation between the defendant's conduct and her injury in order to recover on her negligence and strict liability claims, the _Collins_ court crafted a novel method of recovery for the DES case which relaxed the plaintiff's burden of proof in establishing causation. Under the risk contribution doctrine, instead of having to prove that a particular defendant produced the DES that harmed her, a plaintiff might establish a prima facie case by showing that the defendant produced or marketed the type of DES taken by the plaintiff's mother. _Id._ at 193, 342 N.W.2d 37. In the case where the plaintiff could not allege and prove what type of DES the mother took, the plaintiff needed only to allege and prove that the defendant drug company produced or marketed DES for use in preventing miscarriages during pregnancy. _Id._ at 193-4, 342 N.W.2d 37. Once the plaintiff had proven the _prima facie_ case (including other elements of strict liability or negligence), the burden of proof shifted to the defendant that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographic market area in which the plaintiff's mother acquired the DES. _Id._ at 197-198, 342 N.W.2d 37. The court "believe[d] that this procedure [would] result in a pool of defendants which it can be reasonably assumed could have caused the plaintiff's injuries." _Id._ at 198, 342 N.W.2d 37.

The _Collins_ court discussed a number of factual circumstances that justified the application of risk contribution theory in DES cases. These fall into three general areas. First is the problem of proof faced by the plaintiff. The court noted that the passage of time, the lack of records and other factors created an "insurmountable obstacle" to the plaintiff's identification of the manufacturer of the product that actually caused her injury. Second, the court considered public policy matters, including the number of manufacturers of DES, the number of possible plaintiffs who had been exposed to DES, and the fungibility of DES itself. _Id._ at 180, 342 N.W.2d 37; _also see id._ at 181, 342 N.W.2d 37 ("It is probable, given the sheer number of potential victims, that many more [DES] suits will arise. Thus it is quite clear that in this case we are not dealing with an isolated, unique set of circumstances which will never occur again."). These circumstances warranted the court's reliance on a modified version of market share theory to justify the likelihood that under risk contribution theory individual defendants would be held liable for injuries that their products did not actually cause. The nature of the product and the market was such that by producing and marketing DES, each manufacturer contributed to the risk to the public and by extension to the individual plaintiffs. _Id._ at 191, 342 N.W.2d 37. Finally, the court considered the balance of equities between the plaintiff and defendant. The court noted that because the plaintiff was a child in utero when she was exposed to DES, the plaintiff was entirely innocent, while evidence in the record support a conclusion that defendants had acted culpably by producing and marketing DES without adequately researching the risks associated with DES. *956 _Id._ at 191-192, 342 N.W.2d 37. The court also considered that the defendants were better positioned to absorb the costs of the injuries caused by DES than were the plaintiffs. _Id._ In light of these imbalances, the court found that the equities supported a shifting of the burden of proof to the defendants.

In crafting risk contribution theory, the _Collins_ court paid considerable attention to the practical mechanics of litigation, as especially evidenced in the court's discussion and ultimate rejection of the "market share" theory of recovery that had been adopted by the California Supreme Court in _Sindell._ Under _Sindell,_

> "once a plaintiff joins manufacturers of a substantial share of the DES produced and marketed in the relevant area and proves a prima facie case on every element except identification of the direct tortfeasor, the burden of proof shifts to the defendants to prove that they did not cause the plaintiff's injuries. This can be done by each defendant demonstrating that it could not have made the DES which caused the plaintiff's injuries. Those defendants failing in this proof are held liable for the percentage of damages approximating their share of the market.

*Collins*, 116 Wis.2d at 188-89, 342 N.W.2d 37, citing *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 612, 163 Cal.Rptr. 132, 607 P.2d 924 (1980). While the *Collins* court the viewed the *Sindell* approach as both "fundamental[ly] fair[]" and "conceptually attractive," the court had misgivings about the practicability of defining and proving market share, in light of the fluidity and scale of the drug market and the likely destruction of relevant records in the time since the plaintiff's exposure to DES. Further, the court observed that the "waste of judicial resources which would be inherent in a "second mini-trial to determine market share militates against its adoption by this court." To avoid these practical impediments, the court elected to permit a plaintiff to bring suit against just a single manufacturer, provided the plaintiff could allege and prove that the defendant produced the type of DES that caused the injury.

*Collins* expressly allowed for the recognition of risk contribution theory in factually similar cases, and the *Thomas* court made risk contribution theory available to the WLC plaintiff in that case on the basis of the same general factual considerations as *Collins.* Reviewing a grant of summary judgment to the defendants and thus reading the facts in the plaintiff's favor, the court determined that, "due to the number of manufacturers, the loss of records and passage of time," the plaintiff could not identify the manufacturer of the WLC that harmed him and thus faced a problem of proof similar to that in *Collins. Thomas*, 285 Wis.2d at 309, 701 N.W.2d 523. The court considered the nature of WLC and of the WLC market, concluding (on the summary judgment record) that WLC is fungible such that application of risk contribution theory would result in a pool of defendants which can be reasonably assumed have caused the plaintiff's injuries. *Id.* at 312-316, 321, 701 N.W.2d 523. And the court considered the equities, finding that the record established that defendants were culpable for contributing to the risk of harm to the public, and that the defendants were also better positioned to absorb the cost of injury than was the innocent plaintiff. *Id.* at 308, 701 N.W.2d 523.

Adapting the framework from *Collins, Thomas* described the procedure to be followed in a WLC case under the risk contribution theory as follows.

957    "Thomas has brought claims for both negligence and strict liability. Applying *957 the risk-contribution theory to Thomas' negligence claim, he will have to prove the following elements to the satisfaction of the trier of fact:

(1) That he ingested white lead carbonate;

(2) That the white lead carbonate caused his injuries;

(3) That the [defendants] produced or marketed the type of WLC he ingested; and

(4) That the [defendants'] conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to Thomas.

Because Thomas cannot prove the specific type of white lead carbonate he ingested, he need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the house's existence.

Applying risk contribution theory to Thomas' strict products liability claim, Thomas will have to prove the following elements to the satisfaction of the trier of fact:

(1) That the white lead carbonate was defective when it left the possession or control of the pigment manufacturers;

(2) That it was unreasonably dangerous to the user or consumer;

(3) That the defect was a cause of [the plaintiff's] injuries or damages;

(4) That the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer; and,

(5) That the product was one which the company expected to reach the user or consumer without substantial change in the condition when it was sold.

Once Thomas makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographic market where the house is located.

*Thomas*, 285 Wis.2d at 320-321, 701 N.W.2d 523.

Once the plaintiff makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or marked white WLC either during the relevant time period or in the geographical market where the house is located. *Thomas* ¶ 163.

## II. FAILURE-TO-WARN IN THE RISK CONTRIBUTION CONTEXT

The duty to warn is implicated in both the plaintiffs' negligence and their strict liability claims. Among the elements required to prevail on the strict liability claim, plaintiffs must prove that the WLC they ingested "was defective when it left the possession or control of the manufacturers." *Thomas*, 285 Wis.2d 236, ¶ 162, 701 N.W.2d 523. Plaintiffs rely on the failure-to-warn theory of product defect recognized by Wisconsin law: "a product is defective based on a failure to adequately warn when an intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction." *Godoy v. E.I. du Pont de Nemours and Co.*, 319 Wis.2d 91, ¶ 29, 768 N.W.2d 674. Separately, plaintiffs' negligence claims require proof that "the pigment manufacturers conduct in producing the white lead carbonate constituted a breach of a legally recognized duty to [the plaintiff]." *Thomas*, *958 285 Wis.2d 236, ¶ 161, 701 N.W.2d 523. Plaintiffs proffer the duty to warn as one such legally recognized duty, while reserving the possibility that parallel negligence claims might be pursued on the basis of other sorts of duty.

958

Defendants Sherwin-Williams, Armstrong Containers and American Cyanamid have each moved for summary judgment on plaintiffs' failure to warn claims, arguing that they had no duty to warn about the hazards associated with WLC when used in paint, and that plaintiffs cannot prove that a failure to warn by defendants caused their injuries.

Courts applying Wisconsin law have often stated that, though failure-to-warn claims may sound in negligence or in strict liability, the proof requirements of the claims are essentially the same. See, e.g., *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F.Supp.2d 791, 811 (E.D. Wis., 2010)(failure to warn claim under strict liability is substantially indistinguishable from a claim of negligent failure to warn). While this is no doubt accurate in most cases, the risk contribution theory's unique approach to causation reveals a salient difference between the duty element of strict liability and that of negligence such that the two failure to warn claims are best analyzed separately.

Specifically, the negligence claim outlined in *Thomas* required proof that "the Pigment Manufacturer's conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to Thomas." *Thomas*, 285 Wis.2d 236, ¶ 161, 701 N.W.2d 523 (emphasis supplied). Thus the duty that must be established is necessarily a duty to the plaintiff. However, once this duty has been established, the *Thomas* negligence elements do not include a requirement that the plaintiff establish a causal relationship between the defendant's specific breach of a duty and the plaintiff's injuries. *Id.*

On the other hand, the strict liability failure to warn claim under *Thomas* does not require proof that the defendant owed and breached a duty to the plaintiff. The emphasis in strict liability is rather on the condition of the product at the time the manufacturers released it into the market. Again, under *Thomas,* the first required element of the plaintiff's proof on strict liability claims based on risk contribution is "that the white lead carbonate was defective when it left the possession or control of the pigment manufacturers." *Id.,* ¶ 162. Under Wisconsin strict liability law, "if a manufacturer has reason to anticipate that danger may result from a particular use ... [the manufacturer] may be required to give adequate warning of the danger, and a product sold without such warning is in defective condition." *Godoy*, 319 Wis.2d 91, ¶ 33, 768 N.W.2d 674, citing Restatement (Second) of Torts § 402A, cmt. h. However, a manufacturer does not have a duty to warn about dangers that are obvious to or readily known by potential users, or so commonly known that it can reasonably be assumed that users will be familiar with them. *Godoy*, 319 Wis.2d 91, ¶ 32, 768 N.W.2d 674 ("If [the product] posed a hidden danger that the ultimate consumer would not contemplate, a manufacturer might be liable based on the failure to adequately warn or other claims."); Restatement (Second) of Torts, § 402A, cmt. g. Thus, establishing the existence of a product defect based on failure to warn in the strict liability context requires analysis of what the manufacturer knew and what potential consumers or users knew about the hazards of the product at the time that the product left the manufacturer's control. The duty, in other words, is not to the plaintiff; it is a general duty owed at *959 the moment of sale to potential users of the

959

products, such that the breach of the duty becomes a characteristic of the product itself—a defect, a quality of unreasonable dangerousness. On the other hand, in further contrast to the negligence framework, the plaintiff seeking to recover on a strict liability claim using risk contribution theory must demonstrate that the defect in the product (i.e., the manufacturer's failure to adequately warn about a known danger at the time the product was transferred or sold) was a cause of the plaintiff's injuries or damages. _Thomas_, 285 Wis.2d 236, ¶ 162, 701 N.W.2d 523.

To summarize: a plaintiff claiming failure to warn in the context of a _Thomas_ negligence claim must establish that the defendant owed the plaintiff a duty to warn and breached that duty, but need not establish a direct line of causation between that breach and the plaintiff's injuries. On the other hand, a plaintiff claiming failure to warn in the context of a _Thomas_ strict liability claim need not establish that the defendant owed any duty to the individual plaintiff; rather, the plaintiff need only establish a duty owed to potential customers or users at the time the product was sold. However, once that duty and its breach have been established, the plaintiff also must prove that the breach was a substantial factor in causing the plaintiff's eventual injuries.

## III. SUMMARY JUDGMENT STANDARD

When I consider a motion for summary judgment, I am to treat the evidence of the non-movant as true and draw all reasonable inferences in the non-movant's favor. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). I am to grant summary judgment if the movant shows that there are no genuine issues of material fact such that the movant is entitled to judgment as a matter of law. _Blasius v. Angel Automotive, Inc._, 839 F.3d 639, 644 (7th Cir. 2016).

## IV. FACTS

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## A. _Sherwin Williams_

Sherwin-Williams made WLC pigments at most times from May 1910 to June 1947, and used some of the WLC it produced in its own ready-mixed paints. From the early 1900s onwards, Sherwin-Williams' product labels listed lead or WLC pigments as an ingredient whenever it was present. In 1940, Sherwin-Williams added a product label warning, stating "Keep away from fire. Use in a well-ventilated place. Observe cleanliness and sanitary precautions." In 1955, Sherwin-Williams and other paint manufacturers began voluntary participation in a national standard to limit the lead content of interior residential paints to 1% or less of the total weight of the contained solids. Also in 1955, Sherwin-Williams and other manufacturers placed a warning on other paints with lead exceeding the 1% by weight restriction. That warning said, in part: "CONTAINS LEAD OR OTHER COMPOUNDS. HARMFUL IF EATEN. Do not apply on toys, furniture or interior surfaces which may be chewed by children."

Federal, state and local governments have warned of the risks of lead in the home since the 1970s. The plaintiffs' claimed exposure to WLC pigments occurred in 1993 and 2001-02. Parents and caregivers of each plaintiff have acknowledged that they were aware of the risk of lead exposure from paint at or before the time that the plaintiff was exposed.

960      *960 Internal Sherwin-Williams publications from the early 20th century discuss risks associated with the use of lead in paint. An article from the January, 1900 edition of the Sherwin-Williams publication The Chameleon stated:

> It is also familiarly known that white lead is a deadly cumulative neurotoxin, while zinc is innocuous. It is true, therefore, that any paint is poisonous in proportion to the percentage of lead contained in it. This noxious quality becomes serious in a paint which disintegrates and is blown about by the wind; but if a paint containing lead (such as the better class of combinations) is not subject to chalking, the danger is minimized.

A July, 1904 article in the Sherwin-Williams publication The SWP described a European conference at which an expert stated that he "condemn[ed] the addition of white lead to paints and all colors containing it, declaring them to be poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors."

## B. *American Cyanamid*

Cyanamid first manufactured WLC in June, 1971, when it purchased the assets of a WLC manufacturing operation in a transaction involving the MacGregor Lead Company and its parent Armstrong Chemcon, Inc. The only location where MacGregor manufactured WLC was in Chicago, Illinois. As of 1971, one of Cyanamid's business lines involved manufacturing additives used in making plastics and selling those additives to plastics manufacturers. Cyanamid asserts that its primary purpose in purchasing the Chicago lead processing facility was to manufacture lead stabilizers for sale to the plastics industry.

Part of Cyanamid's June, 1971, asset transaction included a contract under which it agreed to sell WLC to Armstrong Chemcon, the maker of Scotch Laddie paint. The parties dispute whether Armstrong manufactured other residential paints besides Scotch Laddie. Cyanamid did not sell WLC to general customers. There are no documents evidencing any sales of WLC to Armstrong or its subsidiaries pursuant to the contract. Any sales pursuant to the contract would have happened in Chicago, between June 1971 and December 1972. Cyanamid never made paint.

## C. *Armstrong Containers*

Plaintiffs sue Armstrong Containers as an alleged successor to the interest of the John R. MacGregor Lead Company. Armstrong disputes that it is successor-in-interest to MacGregor, but that dispute is not material to the present motion before the court.

The John R. MacGregor Lead Company was formed in 1937 in Illinois. It manufactured WLC at a single plant in Chicago from 1938 to 1971, when it sold the plant to Cyanamid. MacGregor manufactured the Scotch Laddie line of paint using its own WLC. The parties dispute whether MacGregor also sold WLC to other manufacturers for use in paint.

MacGregor was a member of the Lead Industries Association. Publications and internal papers of the LIA indicate awareness, dating to at least 1959 and perhaps earlier, of the risk that children might ingest chips or peelings of deteriorated lead paint, leading to cumulative lead poisoning. No. 07-C-0303, ECF No. 893-9 at 17.

961 MacGregor had no known presence in the Milwaukee area until 1949, when ads for Scotch Laddie paint issued by a local paint supplier first appeared in the Milwaukee Journal. Ads for Scotch Laddie *961 appeared intermittently in the Milwaukee Journal and Milwaukee Sentinel until 1966.

Plaintiffs have presented evidence of two labels for Scotch Laddie brand paint. The label for Scotch Laddie Pure White Lead Paint No. 22 — Ready to Use states:

> CAUTION! COMBUSTIBLE
>
> Keep away from Heat, Sparks, and Open Flame. CONTAINS LEAD OR OTHER COMPOUNDS HARMFUL IF EATEN. Do not apply on toys, furniture, window sills or any interior surfaces which might be chewed by children... Do Not Take Internally ... USE WITH ADEQUATE VENTILATION... Avoid prolonged contact with skin... Wash thoroughly after using and before eating or smoking ... Keep container closed when not in use.
>
> KEEP OUT OF THE REACH OF CHILDREN.

The label for Scotch Laddie Titanized Exterior Primer No. 20 states:

> WARNING COMBUSTIBLE — Keep away from heat and open flame. Do Not Take internally: CONTAINS LEAD OR OTHER COMPOUNDS HARMFUL IF EATEN. Do not apply on toys or surfaces children might chew. Use with adequate ventilation. Avoid prolonged breathing of vapor or spray mist. Avoid prolonged contact with skin. After using and before eating or smoking, wash skin thoroughly. Keep container closed when not in use.

# V. PLAINTIFFS' NEGLIGENCE CLAIMS

For plaintiffs' negligent failure to warn claims to survive summary judgment, each plaintiff must establish that the defendant manufacturers owed a duty to that plaintiff to warn him or her (or his or her parents and caregivers) of the risks associated with WLC when used for residential paint. To establish the existence of a duty to warn in a negligence context, a plaintiff must show that the manufacturer "(a) knows or has reason to know that the chattel is likely dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." _Strasser v. Transtech Mobile Fleet Serv., Inc.,_ 2000 WI 87, ¶ 58, 236 Wis.2d 435, 613 N.W.2d 142 (quoting Restatement (Second) of Torts, § 388. Thus, plaintiffs claim here relies on showing that defendants "had no reason to believe" that plaintiffs or their caregivers would realize that the pigment on their walls was dangerous. This they cannot do: as plaintiffs acknowledge, Sherwin Williams and other paint manufacturers had issued product warnings since at least 1955, No. 07-CV-0303, ECF No. 797, ¶ 10, while federal, state and local governments have warned of risks of lead in the homes since the 1970s, _id._ at ¶ 31. Defendants therefore had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in the paint, and of the various mechanisms by which that lead might be ingested. Deposition testimony of plaintiffs' witnesses supports this point, as parents or caregivers of each plaintiff testified that they knew, before each plaintiff's lead exposure, that children should not eat paint chips because of the risk of lead exposure. I therefore conclude that the defendants did not owe a duty to plaintiffs or their caregivers to warn them directly of the risks associated with WLC in residential paint. Plaintiffs are therefore foreclosed from pursuing negligence claims that rely on a duty to warn theory. Plaintiffs may, however, continue to pursue negligence claims based on the general duty of ordinary care.

962    *962 **VI. PLAINTIFFS STRICT LIABILITY FAILURE TO WARN CLAIMS**

To survive Sherwin-Williams' and Armstrong's motions for summary judgment on their strict liability claims, plaintiffs must establish that issues of material fact exist regarding (1) whether each defendant had, at the time of sale, an obligation to warn of the hazards to children arising from ingesting WLC in residential paints, and (2) that the defendants' failure to so warn is a cause of plaintiffs' alleged lead exposure.

## A. _Existence of Duty to Warn_

The Wisconsin Supreme Court invokes the comments to § 402A of the Restatement (Second) of Torts to explain the circumstances that give rise to a duty to warn in a strict liability context. See _Godoy,_ 319 Wis.2d 91, ¶ 36, n. 15, 768 N.W.2d 674 ("Under Section 402A, manufacturers have an obligation to warn consumers about the hidden dangers of their products.")(citing Restatement (Second) of Torts § 402A, cmts. h., i.). "Where ... [a manufacturer] has reason to anticipate that a danger may result from a particular use, ... he may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition." Restatement (Second) of Torts § 402A, cmt. h. Further, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." _Id.,_ cmt. i.

Undisputed facts in the record show that Sherwin-Williams had ample reason to anticipate that danger might result from use of WLC in household paint, long before it ceased to manufacture WLC. As Sherwin-Williams acknowledges, an internal Sherwin-Williams publication dated January 1900 identified WLC as a "deadly cumulative poison," noting that "any paint is poisonous in proportion to the percentage of lead contained in it" and further indicating that this "noxious quality" of the lead paint "becomes serious in a paint which disintegrates and is blown about by the wind." Another internal publication dated 1904 notes a European expert's declaration that paints containing lead are "poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors."

Evidence of Sherwin-Williams knowledge of the danger is not sufficient for plaintiffs to survive summary judgment on the question of duty; plaintiffs must also have adduced evidence sufficient to raise a question of fact as to whether the hazards of WLC in paint were "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." The "ordinary consumer" in question here must be understood as the ordinary consumer who purchased or used WLC or paint containing WLC during the years that Sherwin-Williams made WLC, i.e., 1910-1947. The parties agree that since Greek and Roman times, it has been common knowledge that lead is toxic if too much is ingested; thus if the only danger of WLC were that it is toxic when consumed directly, the manufacturer would be under no special duty to warn about the toxicity of lead so long as the purchaser knew that the product contained lead. However, the danger known to Sherwin-Williams was more extensive than mere toxicity. For example, Sherwin-Williams knew that the noxious quality of lead paint

"becomes serious in paint which disintegrates and is blown about by the wind." Would ordinary consumers purchasing paint containing WLC between 1910 and 1947 have contemplated the possibility that the paint would disintegrate and possibly 963 *963 distribute lead elsewhere in their homes? Sherwin-Williams also knew that lead was a "cumulative" toxin. Would ordinary consumers have contemplated the possibility that small amounts of lead ingested over time would yield cumulative injuries?

Though the question is closer, I find that plaintiffs have also adduced evidence sufficient to create a triable question of fact whether ordinary consumers and users of paint during the period that Sherwin-Williams was manufacturing WLC would have contemplated the risk that deteriorating paint would cause children to be exposed to lead. In particular, evidence that during the relevant years lead industry executives affirmatively sought to suppress and rebut news stories and other efforts to inform the product about childhood lead poisoning caused by consumer products supports an inference that the public was not fully informed about lead poisoning and the mechanisms of exposure, and the therefore the extent of the risks known to Sherwin-Williams would not have been contemplated by consumers and users of paint at the time. See No. 07-CV-0303, ECF No. 798-7 at 50-58. Plaintiffs have also adduced evidence that, during the relevant years, Sherwin-Williams and others in the lead industry actively worked to promote a public perception that lead-based paint was safe and hygienic. See *id.* at 29 (Lead Industry Association asserting that its promotional work and advertising "helps to build up good will for out metal and in the long run will share in dispelling anxiety about its use"); *id.* at 18 (Sherwin-Williams advertisements between 1922 and 1928 advocating use of lead-based paint on toys and interior surfaces); *id.* at 30 (book published by Lead Industry association informing readers that while lead poisoning could occur when lead gained "entrance into the human system in measurable quantity either through inhalation of vapors and dusts or ingestion of lead compounds introduced into the mouth on the fingers," ingestion was "by far the less important [danger] and is most often associated with children chewing on objects coated with paint containing lead"; this book was published 5 years after Sherwin-Williams stopped producing WLC, but it is relevant to the state of public understanding of the mechanisms of lead exposure in the years preceding the book's publication.). Again, this evidence could support a factfinder's inference that the dangers known to Sherwin-Williams at the time the pigment left its control were beyond the contemplation of consumers and users of paint containing Sherwin-Williams WLC. See *Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 739, 218 N.W.2d 279, 285 (Wis. 1974) ("Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that ... there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous.").

As for Armstrong, it argues that MacGregor owed no duty to warn because children's ingestion of lead paint was unintended and an unforeseeable misuse at the time that MacGregor was manufacturing WLC. In support of this argument, MacGregor cites entirely to a portion of the expert report of its expert witness, Christine T. Wood, that I have already excluded as unreliable. No. 07-C-0303, ECF No. 1066. On the other hand, admissible documentary evidence and opinion testimony from plaintiffs' expert historian suggests that MacGregor leadership had knowledge at relevant times that WLC was toxic and, if allowed to deteriorate, might be ingested by children. No. 07-CV-0303, ECF No. 1024 at 28, ¶ 5. On this summary 964 judgment record, I must infer *964 that MacGregor had reason to anticipate the risk to children of WLC in deteriorating paint. I cannot grant summary judgment to Armstrong on these grounds.

## B. *Duty to Warn of Component Supplier*

Cyanamid and Armstrong further argue that Wisconsin law does not impose a duty to warn on manufacturers of non-defective component parts. They argue that, to the extent that they supplied WLC to other companies for integration into paint, they are shielded from liability by the "bulk supplier" and "sophisticated user" doctrines. I have already addressed component supplier liability and the bulk supplier doctrine in an earlier decision on a motion for summary judgment brought by other defendants to this case, ruling that neither theory established that component parts-suppliers of WLC to the paint industry are exempt from the duty to warn as a matter of law. (No. 07-cv-0303, ECF No. 1058; No. 07-cv-0441, ECF No. 985; No. 10-cv-0075, ECF No. 921). However, I now recognize that that ruling was in error, and I will reverse course for the following reasons.

Sellers of bulk materials to manufacturers of finished products often have no mechanism to reach the end user of the product with warnings. Though the Wisconsin Supreme Court has not ruled on the issue, courts in the state have recognized that bulk suppliers' duties to warn are limited by this practical reality. See, e.g., *Nigh v. Dow Chem. Co.*, 634 F.Supp. 1513, 1517 (W.D. Wis. 1986)("A manufacturer who cannot control the content of the warning passed to the ultimate

supplier can hardly be guilty of failing to exercise ordinary care with respect to such warnings or of producing warnings that it did not give and could not improve."). Similarly, the Wisconsin Court of Appeals has ruled that a component manufacturer has no duty to warn end users when the manufacturer supplies a product to a sophisticated intermediary and the end users are individuals to whom the sophisticated intermediary owes a duty of communication. _Haase v. Badger Mining Corp._, 2003 WI App 192, ¶¶ 21, 24, 266 Wis.2d 970, 669 N.W.2d 737, _aff'd on other grounds_, 2004 WI 97, 274 Wis.2d 143, 682 N.W.2d 389 (manufacturer of silica sand had no duty to warn foundry or foundry's employees because foundry was "a knowledgeable employer in a knowledgeable industry" and owed its employees a duty to warn).

_Haase_ applied the sophisticated user doctrine only to a negligent failure-to-warn claim, 2003 WI App 192, ¶ 26, 266 Wis.2d 970, 669 N.W.2d 737, and _Nigh_ treated negligent and strict liability failure-to-warn claims as indistinguishable, 634 F.Supp. at 1517; still, the logic of both cases applies to the strict liability claim outlined in _Thomas_ with equal force. Under _Thomas_, the plaintiff must prove that the WLC was defective (i.e., inadequately warned about) at the time it left the possession or control of the pigment manufacturer (i.e., when it was delivered to the paint manufacturer), and that that defect was a cause of the plaintiffs ultimate injuries. It makes little sense for the WLC manufacturer to owe a duty to warn the _consumer_ at the moment that the pigment is delivered to the _paint manufacturer,_ because the WLC manufacturer has no effective means of communicating that warning. And if the duty could be met by means of a _pro forma_ warning to the already-knowledgeable paint manufacturer, a claim that a WLC manufacturer failed to give such a warning would almost inevitably fail on causation.

Furthermore, recognizing that the bulk supplier/sophisticated user doctrines shield the pigment manufacturers from failure-
965      to-warn liability to the extent that they *965 supplied WLC to third-party paint manufacturers does not subvert the Wisconsin Supreme Court's purpose in making WLC manufacturers subject to suit under the risk contribution theory. To the extent that certain WLC manufacturers used some or all of their WLC to manufacture their own paint products, those manufacturers might still be subject to ordinary negligence and to strict liability for failure to adequately warn consumers at the time that they released their paint into the market. To the extent that WLC manufacturers supplied their WLC to third-party paint manufacturers, those WLC manufacturers might still be liable for ordinary negligence.

The parties agree that Cyanamid never made paint. No. 07-CV-0303, ECF No. 776, ¶ 40. They further agree that the only paint manufacturer to which Cyanamid sold WLC was Armstrong/MacGregor which had been manufacturing paint for decades and was a knowledgeable player in the paint industry. _Id._ at ¶¶ 33, 70-71. I therefore conclude that the bulk supplier and sophisticated user doctrines shield Cyanamid from liability for failure to warn, and that Cyanamid is entitled to summary judgment on plaintiffs' strict liability failure-to-warn claims.

Factual disputes remain as to whether MacGregor sold WLC to other companies for integration into paint. To the extent that it did so, Armstrong is entitled to summary judgment on plaintiffs failure-to-warn claims.

Further, I will partially reverse my earlier decision on Atlantic Richfield's motion (in which Sherwin-Williams joined) for summary judgment based on component suppliers' lack of legal duty to warn. Factual disputes remain regarding whether Atlantic Richfield's alleged predecessors manufactured paint. No. 07-C-0303, ECF No. 851, ¶ 11. However, to the extent that Atlantic Richfield's alleged predecessors supplied WLC to third party paint manufacturers, Atlantic Richfield is entitled to summary judgment on plaintiff's failure to warn claims. Similarly, factual issues remain regarding the extent to which Sherwin-Williams supplied WLC to other paint manufacturers. No. 07-C-0303, ECF No. 797, ¶ 3. To the limited extent to which Sherwin-Williams did so, it is entitled to summary judgment on plaintiffs' failure to warn claims.

I note that Cyanamid's briefs raise certain other issues regarding the adequacy of warnings and the "substantial change" element of the _Thomas_ strict liability claim. Because Cyanamid owed no duty to warn and is therefore not subject to strict liability, I will not address those issues.

## C. _Adequacy_

Armstrong argues that plaintiff has failed to prove that the warning labels on MacGregor's paint products containing WLC were "inadequate," so as to render the WLC defective. Both labels contain the language "HARMFUL IF EATEN" and direct the user not to use the paint on surfaces that children might chew. Whether this warning adequately conveys the full extent of the risk known to Armstrong at the time that it issued these warnings so as to render the product not unreasonably dangerous is a question for the jury. _See Tanner v. Shoupe_, 228 Wis.2d 357, 368, 596 N.W.2d 805 (Wis. Ct. App. 1999).

## D. *Causation*

Sherwin-Williams and Armstrong both also argue that, to the extent that their WLC pigment was defective on a failure to-warn-theory at the time the pigment left their control, they are nevertheless entitled to summary judgment because plaintiffs cannot prove that the defect was a cause of their injuries. Defendants *966 argue that, under Wisconsin products liability law, "[a] plaintiff who has established both a duty and a failure to warn must also establish causation by showing that, if properly warned, he or she would have altered behavior and avoided injury." No 07-CV-0303, ECF No. 572 at 7, citing Lemmermann, 713 F.Supp.2d at 811. Defendants therefore asserts that it is plaintiffs burden to show that, had Sherwin-Williams or MacGregor product labels warned of the alleged risks to children of ingesting WLC during the time that each company manufactured WLC, such a warning would have changed someone's conduct and prevented each plaintiff's lead exposure and alleged harm. Defendants also argues that plaintiffs cannot meet their burden of proof with respect to causation on the warnings claim because they have not provided expert testimony.

I begin my discussion of this point by clarifying the precise nature of the causal relationship that must be established between a WLC defendant's failure to warn and a plaintiff's subsequent injury in order to meet the standard for strict liability under *Thomas*. The defendants want the standard to be a direct line between the individual defendant's conduct and the individual plaintiff's harm. However, that interpretation is fundamentally incompatible with the purpose of risk contribution theory to enable a plaintiff to recover without identifying the specific manufacturer of the product that caused his or her harm. And, indeed, the *Thomas* strict liability formulation requires no such individualized chain of causation. Rather, as relevant here, *Thomas* requires the plaintiff to prove "that the white lead carbonate was defective when it left the possession or control of the pigment manufacturers," and "that the defect was a cause of the plaintiff's injuries or damages." Thomas, 285 Wis.2d 236, ¶ 162, 701 N.W.2d 523. The outcome of the "defect" analysis is properly a conclusion about the condition of the product and not the conduct of the manufacturer; if a plaintiff prevails on the "defect" element on a failure to warn theory, then "inadequately-warned-aboutness" becomes, in a sense, a property of the product itself. The causation element of *Thomas* then requires the plaintiff to show a causal connection between that defect (i.e., that property of the product) and the plaintiff's eventual harm.

The *Thomas* court's discussion of the concept of fungibility is salient here. 285 Wis.2d 236, ¶¶ 141-148, 701 N.W.2d 523. As the court explained,

> "Fungibility ... is not a term that is capable of being defined with categorical precision. Its character will depend on the context of the injury, its cause, and the particular obstacles encountered in linking the causation to the possibly negligent defendants. See *Hamilton* [v. *Accu-Tek*], 32 F.Supp.2d [47] at 51 [(E.D.N.Y. 1998)] ("It is the characteristic relevant to the matter at issue that determines whether a product is the same as and substitutable for another, and therefore whether the two are interchangeable...").

Thomas, 285 Wis.2d 236, ¶ 145, 701 N.W.2d 523. The court then discussed three overlapping meanings of fungibility as functional interchangeableness, physical indistinguishableness, and uniformity of risk. A product is fungible in the sense of uniformity of risk when "as a result of sharing an identical or virtually identical chemical formula, each manufacturer's product pose[s] the same amount of risk as every other manufacturer's product," such that the products are "identically defective, with none being more or less defective than the rest." Id. at ¶ 144, 701 N.W.2d *967 523. Applying this analysis to WLC, the court concluded that on the summary judgment record in that case, all WLCs were identically defective because all contained lead. Id. at ¶ 148, 701 N.W.2d 523. This finding partially justified the court's relieving the plaintiff of the requirement to identify the individual manufacturer that caused harm. Failure to warn effectively adds another layer to the uniformity of risk presented by WLC. Inadequacy of warning constitutes a product defect over and above the presence of lead, and all manufacturers that supplied WLC for use in paint without adequate warning placed an identically defective product on the market. This reading is bolstered by the *Thomas* court's use of the plural "pigment manufacturers" in the first element of the strict liability framework: "... the white lead carbonate was defective when it left the control of the pigment manufacturers." Id. at ¶ 162, 701 N.W.2d 523. This choice, which contrasts with the use of the singular "manufacturer" in other elements of the claim, reflects the court's understanding that multiple manufacturers might have caused the identical defect.

Therefore, to satisfy the causation element of the *Thomas* strict liability framework on a failure-to-warn theory of defect, a plaintiff must prove to the satisfaction of the trier of fact that the presence of inadequately-warned-about WLC on the market during the existence of the residence where the plaintiff ingested WLC was a substantial factor in causing the plaintiff's

injury. Human behavior is implicated in the question of causation, in addition to the medical[1] and mechanical[2] issues already built into the risk contribution model of proof.

To prove such a tenuous connection to the satisfaction of a jury will be a tall order, but at this juncture I believe it is reasonable to permit plaintiffs to proceed on their failure to warn claims. Although plaintiffs still bear the ultimate burden of showing causation, a jury might find in their favor by making the permissible inference, e.g., that the persons responsible for selecting and applying paint in the plaintiffs' homes throughout the buildings' existence would have heeded warnings regarding the risk of childhood lead exposure if such warnings had been issued. *See Michael's v. Mr. Heater, Inc.*, 411 F.Supp.2d 992, 1007 (W.D. Wis. 2006); *Tanner v. Shoupe*, 228 Wis.2d 357, 379, 596 N.W.2d 805 (1999). Defendants' citations to *Lemmermann* to disallow such an inference is unpersuasive, as the plaintiff in that case had failed to adduce evidence that her exposure to the product in question was a cause of her injuries in a medical sense. 713 F.Supp.2d 791, 812 (2010). Defendants' argument that plaintiffs must produce an expert witness to testify as to causation on a failure to warn claim is also unpersuasive, as the necessary inference here does not require specialized technical, scientific or medical knowledge, but may be made on the basis of common understandings of human behavior.

## VII. CHEMICAL ANALYSIS DEFENSE

Both Cyanamid and Armstrong assert that they are entitled to summary judgment because scientific analysis of paint chips taken from the houses where the plaintiffs allegedly consumed WLC excludes them as the producer of the WLC that caused plaintiffs' harm. Experts on behalf of the Plaintiffs and defendant DuPont *968 had previously conducted analyses identifying the elemental composition of each discernable layer of paint in the chips. Cyanamid and Armstrong's expert then calculated elemental ratios for the components of the actual paint in each layer, and compared that data to a formula for Scotch Laddie paint that had been published in Scotch Laddie advertisements in 1964 and 1971, and to a 1942 formula for Elliots paint. The expert concluded that none of the layers of paint matched the Scotch Laddie or Elliots formulas.

Cyanamid asserts that the only residential paint manufacturer to which it sold WLC was the manufacturer of Scotch Laddie paint, such that the only possible pathway for Cyanamid WLC into the plaintiffs' homes would be in Scotch Laddie paint. Cyanamid would have me conclude from this evidence that no Cyanamid WLC was present in plaintiffs' homes, and that therefore Cyanamid could not have caused the plaintiffs' injuries.

Armstrong asserts that the analysis shows that the Scotch Laddie and Elliots formulas were not present in the plaintiffs' homes, and that therefore plaintiffs cannot assert a risk contribution theory as to these formulas.

I have already ruled that defendants in WLC risk-contribution cases are entitled to present a chemical-analysis defense along these lines. See my discussion at No. 07-C-0303, ECF No. 1060 at 4-6. I have also ruled that the testimony of Cyanamid's expert chemist is admissible, but that questions about the accuracy of the published formulas on which he relies must be resolved by a jury. No. 07-C-0303, ECF No. 1069 at 5-6. Because these factual issues remain, I will not grant summary judgment to either Cyanamid or Armstrong on the chemical analysis defense.

## VIII. GEOGRAPHIC MARKET DEFENSE

Cyanamid also requests summary judgment on the basis of the "geographic market" exculpatory defense framed in *Thomas*: once the plaintiff has established a prima facie case under the risk contribution doctrine, the "burden of proof shifts to the defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographic market where the house is located." *Thomas*, 285 Wis.2d 236 at ¶ 163, 701 N.W.2d 523 (emphasis added). Essentially, this defense gives the defendant an opportunity to disprove causation: if the defendant did not produce or market WLC in the geographic area where the plaintiff ultimately ingested lead, then the defendant could not have reasonably contributed to the plaintiff's alleged injuries.

Certain of Cyanamid's arguments on the geographic market exculpation defense resemble the "purposeful availment" arguments that arise in the context of personal jurisdiction. Cyanamid insists that its "only conduct regarding white lead carbonate occurred in Chicago and it did not purposefully direct any production or sales of that product to Wisconsin." (No. 07-cv-0303, ECF No. 554 at 29). This approach misses the mark: while many of the facts relevant to personal jurisdiction will also be relevant to the geographic market defense, the focus here is not on the intentional conduct of the defendant with

respect to the geographic region but on the possibility of an actual causal relationship between the defendant's product and the plaintiff's harm. See _Collins_, 116 Wis.2d 166, 198, 342 N.W.2d 37 (1984)("In utilizing these [time period and geographical market] defenses [in risk-contribution cases involving the drug DES], the defendant must establish that the DES it produced *969 or marketed could not have reached the plaintiff's mother") (emphasis supplied); _Thomas_, 285 Wis.2d at 325, 701 N.W.2d 523 (geographical defense part of a procedure designed to "result in a pool of defendants which can reasonably be assumed could have caused plaintiff's injuries."). Cyanamid states that it only sold WLC to the manufacturer of Scotch Laddie paint in Chicago, and that it does not know where the Scotch Laddie paint was subsequently sold. Even taking those facts as true, they do not lead to a conclusion as a matter of law that Cyanamid WLC could not have caused plaintiffs' harm.

969

## IX. WIS. STAT. § 895.046

Armstrong argues that it is entitled to summary judgment because plaintiffs' use of risk contribution theory is barred by Wis Stat. § 895.046. I previously considered this issue in the context of a motion for summary judgment filed by defendant Sherwin Williams, and concluded that I was bound by the Seventh Circuit's holding in _Gibson v. American Cyanamid Co._, 760 F.3d 600 (7th Cir. 2014) that retroactive application of the statute would deprive plaintiffs of their rights under the due process clause of the Wisconsin constitution. (ECF No. 07-CV-0303, No. 1057). I reject Armstrong's argument for the same reason.

## X. CONCLUSION

For the foregoing reasons, IT IS ORDERED that defendant Sherwin-Williams' Motion for Summary Judgment on Failure to Warn (No. 07-CV-0303, ECF No. 570; No. 07-CV-0441, ECF No. 497; No. 10-CV-0075, ECF No. 427) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that defendant American Cyanamid's Motion for Summary Judgment (No. 07-CV-0303, ECF No. 553; No. 07-CV-0441, ECF No. 498; No. 10-CV-0075, ECF No. 436) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that defendant Armstrong Containers' Motion for Summary Judgment (No. 07-CV-0303, ECF No. 613; No. 07-CV-0441, ECF No. 551; No. 10-CV-0075, ECF No. 494) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that defendant Atlantic Richfield Company's Motions for Summary Judgment Based on Component Suppliers' Lack of Legal Duty to Warn (No. 07-cv-0303, ECF No. 530; No. 07-cv-0441, ECF No. 467; No. 10-cv-0075, ECF No. 397) are GRANTED IN PART.

SO ORDERED at Milwaukee, Wisconsin this 12th day of September, 2018.

[1] I.e., were the plaintiff's symptoms caused by lead exposure, as opposed to other genetic or environmental factors?

[2] I.e., was WLC in paint the source of plaintiff's lead exposure, as opposed to lead in water or soil?

Save trees - read court opinions online on Google Scholar.