# EXHIBIT 1
# Part 4
# Documents 149-157

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT J

```
1    STATE OF WISCONSIN   :   CIRCUIT COURT   :   MILWAUKEE COUNTY

2    -----------------------------------------------------------------
     STEVEN THOMAS, ET AL.,
3
                    Plaintiff,
4
         -vs-                                CASE NO. 99CV006411
5

6    CLINTON MALLETT, ET AL.,

7                    Defendant.
     -----------------------------------------------------------------
8    MARCH 15, 2007                   THE HON. RICHARD J. SANKOVITZ
     DECISION                         Circuit Judge Presiding, Br. 29
9
                         TRANSCRIPT OF PROCEEDINGS
10
         A P P E A R A N C E S :
11
         PETER EARLE, DOUG RAINES and MICHAEL ROUSSEAU
12       Attorneys at Law
         Appearing for the Plaintiffs.
13
         BRUCE KELLY, PHILLIP CURTIS and DAVID PETERSON
14       Attorneys at Law
         Appearing on behalf of the Defendant Atlantic Richfield.
15
         CHRISTIAN HENNEKE, Attorney at Law
16       Appearing on behalf of the Defendant Dupont.

17       MICHAEL JONES, MICHAEL WIRTH and JAMES MURRAY
         Attorneys at Law
18       Appearing.  On behalf of the Defendant NL Industries.

19       ERIC SALVESON, MICHAEL NILAN, CORT SYLVESTER
         and TREVOR WILL, Attorneys at Law
20       Appearing on behalf of the Defendant Millennium.

21       ROBERT WALKER and JEFFREY SPOERK
         Attorneys at Law
22       Appearing on behalf of the Defendant Sherwin-Williams.

23
                              CAROLYN LEVERANCE,
24                            Official Reporter

25
                                    1
```

```
 1                    PROCEEDINGS VIA TELEPHONE:
 2              THE COURT:  This is Steven Thomas versus Mallett;
 3        99CV006411.  Appearances for the plaintiff, please?
 4              MR. EARLE:  Peter Earle for the plaintiff.
 5              MR. RAINES:  Doug Raines for the plaintiff.
 6              MR. ROUSSEAU:  Michael Rousseau for the
 7        plaintiff.
 8              THE COURT:  Appearances for Dupont?
 9              MR. HENNEKE:  Christian Henneke of McGuire Woods.
10              THE COURT:  Appearances for Atlantic Richfield?
11              MR. KELLY:  Bruce Kelly from Arnold and Porter.
12              MR. CURTIS:  Phillip Curtis from Arnold and
13        Porter.
14              MR. PETERSON:  And David Peterson from Godfrey
15        and Kahn.
16              THE COURT:  Appearances for NL Industries?
17              MR. WIRTH:  Michael Jones, Michael Wirth and
18        James Murray.
19              THE COURT:  Appearances for Millennium Holding?
20              MR. SALVESON:  Eric Salveson, Mike Nilan and Cort
21        Sylvester, and Trevor Will.
22              THE COURT:  Appearances for Sherwin-Williams?
23              MR. WALKER:  Bob Walker and Jeff Spoerk.
24              THE COURT:  And I'll confirm again, any
25        appearances for ConAgra?  There appear to be none.  Okay.
```

2

1           Let's move on to the matter at hand.  My previous
2      ruling on August 8, 2006 was that the only theory on which
3      the case may be submitted to a jury is a failure to warn,
4      either in support of a negligence claim or a strict
5      liability claim.  I rejected the plaintiffs' request to
6      instruct the jury on what we have come to call ordinary
7      negligence.
8           The plaintiff challenges that ruling on the
9      ground that product suppliers owe the same ubiquitous duty
10     of good care owed by all of us, and if there is evidence to
11     suggest that the duty has been violated, then a jury should
12     be instructed that it may find the supplier negligent
13     regardless of whether the supplier might be found negligent
14     under some more refined theory of product liability.
15          The briefs that I've read are excellent and the
16     tour of tort law that the parties conducted among the
17     fundamental roots of this area of the law and among the
18     budding new branches was enlightening.  It's been a little
19     bit like sitting in Dean Prosser's waiting room at the
20     University of Minnesota Law School while he was writing the
21     book on torts, observing which torts showed up and which
22     ones got an interview, and which ones made the cut.  So
23     it's been a professional pleasure.  I'm sure in a way it's
24     been like that for you, although I would have to consider
25     the fact that each of you has more of a horse in this race

3

1      than I do.

2            Having considered all the briefing on the

3      subject, here are four observations I can make about what

4      I've read.  First, Mr. Earle is correct to point out the

5      general duty the defendants owed to Mr. Thomas, that is,

6      the ordinary duty to refrain from that conduct, and I

7      emphasize the word conduct, that would cause Mr. Thomas or

8      anyone else in the world any foreseeable harm.  This

9      general rule is stated in many cases, including the Supreme

10     Court's recent decision in Hoida versus M&I Midstate Bank,

11     and Alvarado versus Sersch.  The instructions I give the

12     jury have to be accountable to this principle, to this

13     general duty, and my earlier ruling is not.  As I suggested

14     when we gathered on February 2nd, my statements regarding

15     negligence theories of product liability were based on an

16     over-compartmentalized view of tort law.

17            In other words, while it is true that the field

18     of product liability law is dominated by three classic

19     species of negligence claims -- design defect,

20     manufacturing defect and failure to warm -- no court has

21     held that those are the only three liability claims that

22     can be brought against a manufacturer/supplier.  I won't

23     list all the cases I've consulted, although if I did I

24     might have a good start on a Wisconsin version of Prosser

25     on Torts.  Although I could probably save myself the time

                                4

1     and merely publish footnote 3 of Mr. Curtis and Mr. Kelly's

2     supplemental brief filed on March 2nd.  Although I didn't

3     -- I won't list all the cases I've consulted, I will say

4     that neither Morden nor Sharp nor Westphal nor Greiten, nor

5     Dean Keeton on his Syracuse Law Review article, nor the law

6     note to trial judges contained in Wisconsin Jury

7     Instruction Civil 3200 states that the classic trio is

8     exclusive.

9              Not even the Restatement (Third) of Torts, which

10    seems to be tidying up some of the controversial areas of

11    product liability law, has taken a position one way or the

12    other.  This comes as no surprise, as it is apparent that

13    none of these courts nor commentators were asked whether

14    the classic trio is exclusive, and they might not have ever

15    even considered the possibility because 99.9% of products

16    cases out there seem to fall into one of those categories.

17    No law giver has ever determined that an allegation of

18    negligence about a product fails to state a claim if it

19    does not fall into one of those categories.

20             Nor did I find any law that ruled out in all

21    cases a claim premised on an allegation of the negligent

22    marketing of a product.

23             The decision of the District Court in McClain

24    versus Metobolife International, it's a 2002 decision of

25    the Northern District of Alabama, seems to sweep quite

1    broadly, but there wasn't much analysis of the decision, so

2    I found it unpersuasive.

3        The Port Authority of New York versus Arcadian

4    Corporation, the 1999 3rd Circuit decision which involved

5    the World Trade Center bombing, seems to make the same

6    point as McClain, but more robustly.  However, the alleged

7    negligent marketing in that case, that is, failing to

8    confirm that users had a legitimate and lawful use for

9    ammonium nitrate fertilizer, is substantially different

10    than what is alleged to have been negligent by the

11    plaintiff in this case.

12        Negligent marketing has been ruled out in cases

13    where the product defect is obvious.  A good example is

14    First National Bank of Dwight versus Regent Sports, the

15    1986 7th Circuit decision, but the defendants have not

16    persuaded me that lead pigment compares with lawn darts.

17        Negligent marketing was rejected in handgun

18    cases.  For example, by New York's high court in Hamilton

19    versus Beretta in 2001.  Only because the plaintiff's claim

20    in that case depended on the manufacturers to control the

21    conduct of third persons in a way, I'll point out, that a

22    mere warning could not accomplish, and that issue, that

23    issue of control may or may not present itself in

24    Mr. Thomas's case.  We'll have to see what the evidence

25    shows on that point, and I will remain mindful that the

6

1    plaintiff must show some nexus between the allegedly

2    negligent marketing and the claimed injury that a supplier

3    would have some control over.

4          Now I will say that I'm not persuaded that the

5    alleged relationship of white lead carbonate suppliers to

6    paint manufacturers and painters in this case parallels the

7    alleged relationship of handgun suppliers to criminals in

8    cases like Hamilton, or of Corvette manufacturers to

9    juvenile car thieves, as hypothesized in In re Firearms,

10    the 2004 decision of the 9th Circuit.  So, I'm not

11    persuaded that negligent marketing must be rejected here

12    for the same reason it was rejected in New York and

13    California.

14          A number of courts have held that a negligent

15    marketing theory is equivalent to or subsumed within a

16    failure to warn theory.  Spain versus Brown and Williamson,

17    the 2004 decision of the 11th Circuit, suggests this

18    possibility, although it needs to be said that the case

19    there in Spain was before the court on a motion to dismiss,

20    not on the question of how to instruct the jury, and all

21    the court had to go on there was the pleadings.  In

22    Mr. Thomas's case, the judgment whether the negligent

23    marketing theory is subsumed within the failure to warn

24    theory may come down to what evidence at trial

25    discloses -- I should say, what the evidence at trial

7

1    discloses.  I will discuss in a moment, if the only thing

2    that makes a certain kind of promotion or marketing

3    unreasonable from the viewpoint of the reasonable person to

4    whom we look in our jury instructions is the fact that it

5    lacked a warning, then I may not need to instruct on both

6    failure to warn and negligent marketing.

7        The second observation I draw after reviewing

8    everything that has been submitted is that the defendants'

9    concerns about a general negligence instruction, a'la

10   Wisconsin Jury Instruction Civil Number 1005, which states

11   the definition of negligence, those concerns are not

12   unreasonable.  The defendants offer three compelling

13   concerns.

14       First, the jury must be offered some link in the

15   instructions between the general notion of negligence and

16   the particular conduct that is being scrutinized in this

17   case; otherwise the defendants might face a prospect like

18   the one famously described by Dean Prosser.  You will

19   remember the famous quote.  "It is never enough for the

20   plaintiff to prove merely that he has been injured by the

21   negligence of someone unidentified.  Even though there is

22   beyond all possible doubt negligence in the air, it is

23   still necessary to bring it home to the defendant".

24       In this case the question is not whether the

25   defendant can be identified, but instead nailing down for

8

1       the jury what particular conduct of the defendants should

2       be scrutinized for negligence.  Otherwise, there is a

3       potential risk of the jury finding negligence in the air.

4               The defendants' second concern is that giving an

5       instruction that is stated as broadly as it is stated in

6       1005 may have the effect of exposing the defendants to

7       liability for conduct that is too remote from the harm, it

8       is out of proportion to their potential culpability, would

9       impose an unmanageable burden that would open the way for

10      fraudulent claims, that the liability for conduct over

11      which they may not have had any control is potentially

12      limitless, et cetera.  Their papers echo the usual mantra

13      that every product poses some foreseeable risk and that

14      manufacturers cannot be held to be insurers of the safety

15      of their products.  In short, they urge the application of

16      the six familiar public policy factors to limit as a matter

17      of law their culpability under a general negligence theory.

18              My reaction to this concern is that it is

19      premature to apply those public policies at this stage of

20      the game, particularly in a case like this that seems to be

21      on the forefront of the law, where all the evidence in the

22      matter has been fully laid out.  For more on that I would

23      refer you to Alvarado versus Sersch, at paragraph 18 of the

24      decision.

25              I do agree, however, with the defendants, and I

9

1    do not think that the plaintiff disagrees that the

2    instructions should respect the notion that a product with

3    legitimate uses should be permitted to be sold as long as

4    users are not unaware of its potential dangers, at least of

5    those potential dangers of which the supplier is aware at

6    the time that the product is supplied.

7    Likewise, I recognize the concern that lies at

8    the margin of this discussion that recognizing a certain

9    sort of negligent marketing claim might infringe on the

10    First Amendment right of a supplier or manufacturer to make

11    a truthful, undeceptive, nonmisleading statement about its

12    product.  But I have not been asked to judge whether any

13    particular act of promotion alleged by the plaintiff to

14    constitute negligent marketing would be a truthful,

15    nonmisleading statement.  Therefore, I believe that it is

16    premature to rule on whether the plaintiffs' cause of

17    action conflicts with the First Amendment.

18    The defendants' third concern is that a general

19    negligence instruction may not be stated carefully enough

20    to spare the defendants from liability on theories that

21    already have been trimmed from this case.  In earlier

22    proceedings in the case it was determined that these

23    defendants cannot be held liable for any design defect nor

24    may they be held liable for misrepresentation.  A broadly

25    worded general instruction might not give the jury

10

1    sufficient guidance to avoid punishing the defendants for

2    conduct like this that is no longer legitimately at issue.

3    My instruction should ensure that the jury not

4    inadvertently award a recovery on a theory that the court

5    has already rejected as a matter of law.  The plaintiffs

6    concede that such a risk, albeit a small risk, exists.  I

7    found that at page 11 of the supplemental brief filed on

8    February 16th.

9          The third general observation I draw from what

10    has been submitted is that the plaintiff, perhaps in

11    response to the defendants' concerns, has rearticulated his

12    ordinary negligence and placed it on a more narrow footing.

13    The plaintiff says he will not seek to hold the defendants

14    liable merely for supplying the market with white lead

15    carbonate -- the so-called "they just shouldn't have done

16    it" theory that Ms. Fitzpatrick coined -- but only for

17    promoting and marketing lead pigments and the products made

18    from them for use in residences.

19          This shift in strategy confirms the concerns that

20    one might have with giving the 1005 instruction as is and

21    suggests that at the very least a more tailored version of

22    the instruction should be given.  Of course, as Anderson

23    versus Alfa-Laval Agri teaches us, that's the 1997 Court of

24    Appeals decision, the court's objective in a complex case

25    like this is to give tailored instructions, not boilerplate

11

1           The fourth observation I make is that, as the
2       defendants contend, a negligent marketing theory resembles
3       quite closely a failure to warn theory.  As Millennium puts
4       it, negligent marketing may not be divisible from a failure
5       to warn because both kinds of conduct are wrapped around a
6       single notion, that is, what information is provided to
7       consumers.  In fact, it may be that the only thing that
8       makes a certain kind of promotion unreasonable from the
9       viewpoint of the reasonable person to whom we look in our
10      jury instructions is the lack of a warning.  If that's how
11      the evidence shapes up, of course, my task in drawing up
12      the instructions will become much easier.
13          The descriptors "failure to warn" and "negligent
14      promotion" might be distinct in a certain sense, but if
15      they are no more distinct that the head of a coin is from
16      its tail, then perhaps the most neatly tailored instruction
17      I can give addresses both kinds of conduct in a single
18      instruction.
19          Indeed, the most salient commonality among these
20      two kinds of conduct is that a jury would be approaching
21      them from a single standard.  The overarching standard of
22      negligence concerns ordinary care -- what kind of care
23      would a reasonable person use in the same circumstances?
24      What kind of conduct would a reasonable person recognize as
25      creating an unreasonable risk of harm?

12

```
 1                    I will acknowledge that the plaintiff tries hard
 2          to distinguish negligent promotion from a failure to warn,
 3          but the distinctions are not strong or clear enough to
 4          warrant separate instructions.  I do not believe this is
 5          the result of any intentional sleight of hand or
 6          legerdemain.  It's just not a sufficiently rigorous
 7          distinction.
 8                    I'm not persuaded that failures to warn are
 9          always passive and always exclusively entail a misuse of
10          the product.  To the contrary, a manufacturer might
11          deliberately refrain from warning, perhaps because the
12          manufacturer does not believe at the time that the product
13          is harmful, and the consumer might use the product exactly
14          as the manufacturer intended.
15                    Likewise, I am not persuaded that what makes
16          marketing negligent is always the result of active conduct,
17          and always results in a "promoted misuse" of the product
18          that is never a misuse of the product.  A manufacturer
19          caught up in the enthusiasm for his or her new product
20          might simply neglect to consider its safety, or what the
21          user does or does not know about the product, and therefore
22          failed to do what a reasonable person would do in the same
23          circumstances.  Or the manufacturer might assume that the
24          dangers are known to the user when in fact they are not.
25          That's passive negligence in my way of looking at it, not
```

13

1     active negligence.

2          Furthermore, a promoted use is not necessarily

3     distinct from a misuse.  The term misuse implies a value

4     judgment of sorts about the results of the use of the

5     product.  It's quite possible that in promoting the use of

6     a product a user can be alerted to its dangers, and it's

7     possible as well that in a supplier's zeal to attract

8     customers its product promotion leads to a use that the

9     supplier may have anticipated but a tragic result might

10    make it look in hindsight as though the product was being

11    misused.

12         In fact the longer you work with the distinction

13    the plaintiff tries to draw, the more you find yourself

14    chasing your tail.  Why is the use of a product without a

15    proper warning a misuse any more so than the promoted use

16    of a harmful product that can be used in a variety of ways,

17    only some of which yield a potential for harm?  The

18    distinction doesn't seem to answer the question for me.

19         To the contrary, the plaintiffs' efforts at

20    distinction which are conspicuous and palpable persuade me

21    that the plaintiffs' theories at the very least overlap.  I

22    think that both of the plaintiffs' theories can be

23    subjected to a more or less singular assessment from the

24    jury.  Would a reasonable person in the same circumstances

25    have marketed and promoted the product in the same way and

14

1    without a warning?  If a reasonable person would continue

2    to market the product but include a warning, a jury should

3    be entitled to consider that possibility in determining

4    negligence.  If a reasonable person would have sold the

5    product and promoted it only to those who could be counted

6    upon to use it safely and not promote it for use in

7    residences if it could not be used safely there, but would

8    not have felt it necessary to include a warning, then a

9    jury should be entitled to consider that possibility in

10   determining negligence.

11         If a reasonable person would have marketed the

12   product only to bridge and submarine painters and would

13   have included a warning just for good measure, then a jury

14   should be entitled to consider that possibility as well.

15         So, these four observations lead me to theses

16   conclusions.

17         First, I should reconsider my previous ruling

18   because the law of negligence governing the conduct of

19   suppliers like the defendants and their predecessors is not

20   confined to just that classic trio of product liability

21   theories.

22         Second, my instructions cannot be narrowly

23   confined to, for example, Wisconsin Jury Instruction Civil

24   3242 on product warning defects.

25         Third, I should not give a general instruction on

15

1    negligence along the lines of Wisconsin Jury Instruction
2    Civil 1005.
3            Therefore, fourth, this case calls for some
4    customizing of the standard instructions, to incorporate
5    general notions of negligence while drawing the line
6    against claims for negligent misrepresentation and design
7    defect.
8            Accordingly, depending on the evidence that is
9    introduced at trial, I might give the jury an instruction
10   along the following lines.  I will assume for now that the
11   plaintiff will elicit evidence to justify the following
12   proposed instruction, or if there's no evidence to support
13   it, no reason to give it, and I invite your comment on this
14   proposed instruction when we reach an appropriate point in
15   the proceedings to compare the evidence to the proposed
16   instruction.  In making this proposal I want to make sure
17   everybody is aware that I still have much to learn about
18   the evidence in the case and as well about the nuances of
19   the law that governs, and, therefore, I will not be
20   surprised if this instruction needs further tailoring.
21           If you like, you might consider the following an
22   illustration of my ruling today, more than a hard and fast
23   decision of the particular instruction that I will give at
24   trial.
25           In the order that I will issue later today

                              16

1     capsulizing my decision I will include this text.

2          A person is negligent when the person fails to

3     exercise ordinary care.  Ordinary care is the care which a

4     reasonable person would use in similar circumstances.

5          The plaintiff contends that the defendants failed

6     to exercise ordinary care for two related reasons.  First,

7     the plaintiff contends that the defendants promoted the use

8     in homes of white lead carbonate and products made from it

9     despite, as the plaintiffs also contend, knowing that white

10    lead carbonate was dangerous to children in ways that were

11    not known, obvious to, or readily discoverable by their

12    parents and guardians, and at the same time foreseeing that

13    children would be exposed to its dangers.  Second, the

14    plaintiff contends that the defendants were negligent for

15    failing to warn users of its products -- I should say, to

16    warn users of its product of those alleged dangers.

17          A supplier of a product has a duty not to promote

18    the product for uses that the supplier knows or should know

19    are unsafe for those who the supplier foresees or should

20    foresee will be exposed to the dangers of the product if

21    used in the manner suggested by the supplier unless the

22    users of the product know or readily discover its dangers,

23    the dangers are obvious, or the supplier of the product can

24    give an effective warning to users to avoid those dangers.

25          Therefore, you must determine whether in the

17

1    circumstances of this case the person named in the question

2    on the special verdict failed to exercise ordinary care in

3    the sale of white lead carbonate for either or both of

4    those two reasons.

5          In addition, a supplier has the duty to warn of

6    dangers inherent in a use not intended by the supplier if

7    such unintended use is reasonably foreseeable by the

8    supplier.  However, a supplier does not have a duty to warn

9    about dangers that are known to the user, or are obvious to

10   or readily discoverable by potential users, or are so

11   commonly known that it can be reasonably assumed that

12   users will be familiar with them.  Additionally, the

13   supplier does not have to warn about dangers associated

14   with unforeseeable misuse of the product.

15         There is no dispute in this case about whether

16   the white lead carbonate supplied by the defendants had any

17   defect in it.  You may not find a defendant liable merely

18   because you believe that there was some defect in the

19   product sold by that defendant.  Nor is there a dispute

20   about whether the defendants made false statements in

21   promoting their products.  You may not find a defendant

22   liable merely because you believe the defendant made false

23   statements in the promotion of the product sold by that

24   defendant.

25         That's something to start the discussion going

18

1     about our instructions.  Obviously, suggestions you have

2     for making that shorter or clearer will be welcome.  And I

3     will issue that along with a short order today granting the

4     motion to reconsider.

5               Is there anything else that we need to do on the

6     record?

7               MR. EARLE:  Nothing from the plaintiff, Your

8     Honor.

9               THE COURT:  Anything from any of the defendants?

10              MR. KELLY:  I don't believe so.

11              THE COURT:  Good.  Well, I think that concludes

12    all we need to do today.

13                   (PROCEEDINGS CLOSED.)

14                     * * * * *

15

16

17

18

19

20

21

22

23

24

25

                                19

1     STATE OF WISCONSIN   )
                           ) SS:
2     MILWAUKEE COUNTY     )

3

              I, CAROLYN LEVERANCE, Official Court Reporter in and
4
      for the State of Wisconsin, do hereby certify that I reported
5
      the foregoing proceedings and that the foregoing transcript,
6
      consisting of 20 pages is a true and correct transcript
7
      of my original stenographic notes transcribed to the best of my
8
      ability at said time and place.
9

10            Dated at Milwaukee, Wisconsin, this 19th day of

11    March, 2007.

12

13                                    _____
                                      Carolyn Leverance,
14                                    Official Reporter

15

16

17

18

19

20

21

22

23

24

25

                                      20

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT K



UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

GLENN BURTON, JR.,                          )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )     Case No. 07-CV-0303
                                            )
AMERICAN CYANAMID CO., et al.,              )
                                            )
                    Defendants;             )
                                            )
RAVON OWENS,                                )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )     Case No. 10-CV-0441
                                            )
AMERICAN CYANAMID CO., et al.,              )
                                            )
                    Defendants;             )
                                            )
CESAR SIFUENTES,                            )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )     Case No. 10-CV-0075
                                            )
AMERICAN CYANAMID CO., et al.,              )
                                            )
                    Defendants.             )

----------------------------------------------------------------

**TRANSCRIPT OF TELEPHONIC HEARING RE: ORAL DECISION ON MOTIONS**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

Milwaukee, Wisconsin
March 26, 2019
2:01 p.m.

U.S. Official Reporter:        JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:             WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

```
 1    FOR PLAINTIFFS:                    Fidelma L Fitzpatrick
                                         Motley Rice LLC
 2                                       321 S Main St
                                         PO Box 6067
 3                                       Providence, RI 02940
                                         401-457-7700
 4                                       Fax: 401-274-7708
                                         ffitzpatrick@motleyrice.com
 5
                                         Peter G Earle
 6                                       Law Offices of Peter Earle LLC
                                         839 N Jefferson St - Ste 300
 7                                       Milwaukee, WI 53202
                                         414-276-1076
 8                                       Fax: 414-276-0460
                                         Email: peter@earle-law.com
 9
                                         Robert J McConnell
10                                       Motley Rice LLC
                                         321 S Main St
11                                       PO Box 6067
                                         Providence, RI 02940
12                                       401-457-7700
                                         Fax: 401-274-7708
13                                       bmcconnell@motleyrice.com

14                                       Neil T Leifer
                                         Neil T Leifer LLC
15                                       16 Kingswood Rd
                                         Auburndale, MA 02466
16                                       617-429-4892
      FOR DEFENDANT:                     Email: n.leifer@ntllaw.com
17
      American Cyanamid Co:              Ralph A Weber
18                                       Daniel J Kennedy
                                         Gass Weber Mullins LLC
19                                       241 N Broadway - Ste 300
                                         Milwaukee, WI 53202
20                                       414-223-3300
                                         Fax: 414-224-6116
21                                       Email: weber@gwmlaw.com
                                         Email: kennedy@gwmlaw.com
22

23

24

25
```

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 2 of 41   Document 1324
Case 2:22-cv-00378-PP    Filed 03/25/22    Page 26 of 143   Document 1-4

2

1  **APPEARANCES CONT'D:**

2  Armstrong Containers Inc.
   Millennium Holdings:                **Timothy Andrew Bascom**
3                                       Bascom Budish & Ceman SC
                                        2600 N Mayfair Rd - Ste 1140
4                                       Wauwatosa, WI 53226
                                        414-476-0800
5                                       Fax: 414-476-8545
                                        Email: tbascom@bbclaw.com
6
                                        **Robert P Alpert**
7                                       Morris Manning & Martin LLP
                                        1600 Atlanta Financial Ctr
8                                       3343 Peachtree Rd NE
                                        Altanta, GA 30326
9                                       404-504-7692
                                        Fax: 404-365-9532
10                                      Email: rpa@mmmlaw.com
   E I du Pont de Nemours
11 and Company:                        **Paul E Benson**
                                        Michael Best & Friedrich LLP
12                                      100 E Wisconsin Ave - Ste 3300
                                        Milwaukee, WI 53202-4108
13                                      414-271-6560
                                        Fax: 414-277-0656
14                                      pebenson@michaelbest.com

15 Atlantic Richfield Co:              **Anthony S Baish**
                                        Godfrey & Kahn SC
16                                      833 E Michigan St - Ste 1800
                                        Milwaukee, WI 53202-5615
17                                      414-273-3500
                                        Fax: 414-273-5198
18                                      Email: abaish@gklaw.com

19                                      **Daniel T Flaherty**
                                        Godfrey & Kahn SC
20                                      100 W Lawrence St
                                        PO Box 2728
21                                      Appleton, WI 54913-2728
                                        920-830-2800
22                                      Fax: 920-830-3530
                                        Email: dflaherty@gklaw.com
23

24

25

3

Case 2:07-cv-00303-LA  Filed 03/27/19  Page 3 of 41  Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 27 of 143   Document 1-4

1

2

3

4

5    Sherwin-Williams Co:

6

7

8

9

10

11

12

13

14

15

16

17

**Jonathan L Stern**
Arnold & Porter LLP
399 Park Ave
New York, NY 10022-4690
212-715-1073
Fax: 212-715-1399
jonathan.stern@arnoldporter.com

**Jeffrey K Spoerk**
Quarles & Brady LLP
411 E Wisconsin Ave - Ste 2350
Milwaukee, WI 53202-4426
414-277-5337
Fax: 414-978-8970
Email: jeff.spoerk@quarles.com

**Charles H Moellenberg, Jr**
Jones Day
1 Mellon Bank Ctr
500 Grant St - Ste 4500
Pittsburgh, PA 15219-2514
412-391-3939
Fax: 412-394-7959
Email: chmoellenberg@jonesday.com

**Jennifer B Flannery**
**Richard H Deane Jr.**
Jones Day
1420 Peachtree St NE - Ste 800
Atlanta, GA 30309-3053
404-581-8008
Email: jbflannery@jonesday.com
Email: rhdeane@jonesday.com

18

19

20

21

22

23

24

25

4

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 4 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 28 of 143   Document 1-4

1                    P R O C E E D I N G S

2               (All appearances via telephone.)

3               THE COURT:  Hello.  Hello.

4               COUNSEL IN UNISON:  Hello, Judge.

02:01   5       THE COURT:  I think we've got pretty many people on

6       here.  So, we've got a court reporter, and we don't have all the

7       names so unfortunately this is going to take awhile.  So why

8       don't we start with everybody giving their appearance.

9               MR. WEBER:  American Cyanamid, by Ralph Weber and Dan

02:02   10      Kennedy in Milwaukee.  But I think we have some people on the

11      phone, out of town.

12              MR. BASCOM:  And, Judge, this is Tim Bascom on behalf

13      of Armstrong Containers, as well as Bob Alpert is on the phone.

14              THE COURT:  Okay.

02:02   15      MR. EARLE:  Your Honor, it's Peter Earle is on the

16      phone for the Plaintiffs.

17              THE COURT:  Okay.

18              MS. FITZPATRICK:  Your Honor, Fidelma Fitzpatrick on

19      behalf of the Plaintiffs.

02:02   20      THE COURT:  Okay.

21              MR. LEIFER:  Your Honor, this is Neil Leifer on behalf

22      of the Plaintiffs.

23              MR. MC CONNELL:  And also for the Plaintiffs, Robert

24      Mc Connell.

02:02   25      MR. FLAHERTY:  Good afternoon, Your Honor.  This is

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 5 of 41   Document 1324
Case 2:22-cv-00378-PP      Filed 03/25/22      Page 29 of 143      Document 1-4

5

1    Dan Flaherty from Godfrey & Kahn on behalf of Atlantic

2    Richfield.  And there are other counsel on the phone as well.

3              MR. BENSON:  Good afternoon, Your Honor.  Paul Benson

4    from Michael Best on behalf of DuPont.  And there are also

02:03    5    others for DuPont on the phone.

6              MR. SPOERK:  Good afternoon, Your Honor.  This is Jeff

7    Spoerk from Quarles & Brady.  We're representing

8    Sherwin-Williams.  We have some others on the phone as well.

9              MR. MOELLENBERG:  Judge, also for Sherwin-Williams,

02:03    10    Charles Mollenberg from Jones Day.

11              MS. FLANNERY:  And Jennifer Flannery from Jones Day.

12              MR. DEANE:  And Richard Deane from Jones Day.

13              MR. STERN:  Good afternoon, Your Honor.  Also for

14    ARCO, Jonathan Stern from Arnold & Porter.

02:03    15              MR. BAISH:  Tony Baish from Godfrey & Kahn, also for

16    Atlantic Richfield.

17              THE COURT:  Is that it?  Great.  Okay.  Thanks.

18              Well, before I start reading all this, anything new?

19    You guys settled yet or what?

02:04    20              (General laughter.)

21              THE COURT:  I take it that was a no, huh?  Okay.

22              All right.  Well, let's just start here.

23              Basically, the purpose of this is to read into the

24    record decisions on these pending motions.  We'll start with --

02:04    25    we'll do them by docket numbers.

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 6 of 41   Document 1324
Case 2:22-cv-00378-PP     Filed 03/25/22     Page 30 of 143     Document 1-4

6

1      **Docket # 637 – Defendant's Motion to Exclude Testimony**

2  **Regarding the Source of Lead in Dust and Soil.**

3          This motion addresses samples taken of dust and soil

4  of Plaintiffs' homes around the time of their elevated blood

02:04   5  levels.  The samples indicate that lead was present in the dust

6  and soil, but don't identify the specific lead compound; i.e.,

7  they don't indicate whether the dust contained white led

8  carbonate, a different compound used in paint or compounds

9  associated with lead gasoline emissions.

02:05  10          Because this testing was not done, Defendants move

11  under Rule 702 to bar Plaintiffs' experts from testifying that

12  white led carbonate pigments are a source of lead in the soil or

13  dust at Plaintiffs' homes.  I find, though, that Plaintiffs'

14  experts have a sufficient basis to offer this testimony.

02:05  15  Testing of the paint on the walls of the home indicated the

16  presence of "WLC."

17          I'll use that as an abbreviation.

18          Plaintiffs cite CDC sources describing how paint which

19  flakes or chalks as it ages can contaminate house dust with

02:05  20  lead.  That is a sufficient basis for Plaintiffs' experts to

21  testify that WLC from deteriorated paint could have been a

22  source of the lead found in the dust in Plaintiffs' homes.

23  Defendants may rebut this argument with evidence that the lead

24  may have derived from other sources.

02:06  25          Okay.  The next one is:

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 7 of 41   Document 1324
Case 2:22-cv-00378-PP     Filed 03/25/22     Page 31 of 143     Document 1-4

7

1     **# 1087 - DuPont's Motion to Exclude Certain Testimony**

2     **of Joseph Swider;** AND

3     **# 1092 - Armstrong Containers' Motion For Joinder in**

4     **DuPont's Motion.**

5     Plaintiffs don't dispute DuPont's motion to exclude

6     Dr. Swider's opinions relating to Dr. Lamb's calculations of

7     lead-to-zinc ratios based on Dr. Lamb's alleged failures to cite

8     specific paint formulations or address extender pigments.  So

9     that portion of the motion is GRANTED.

10    I'm going to admit the remainder of the testimony, for

11    the following reasons:

12    DuPont relies heavily on two forms of argument:

13    First, that Swider's testimony is not based on

14    sufficient facts because he did not test or analyze the paint

15    samples himself.

16    Second, that his testimony is unreliable because he

17    describes alternative methods that might have yielded a more

18    reliable result, but he did not apply those methods himself.

19    However, as I understand it, Dr. Swider's testimony is

20    directed almost entirely at the credibility of Dr. Lamb's

21    conclusions.  Swider isn't presenting an alternative chemical

22    analysis of the paint chips, nor an alternative interpretation

23    of the data they yield.  Instead, he's giving the jury reasons

24    to perhaps be skeptical of Dr. Lamb's results.

25    Thus, the underlying facts and data on which his

8

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 8 of 41   Document 1324
Case 2:22-cv-00378-PP     Filed 03/25/22     Page 32 of 143     Document 1-4

1    opinions rest are those in Dr. Lamb's reports, and his
2    methodology is to read those reports through the lens of his own
3    accumulated professional expertise, identifying areas where
4    uncertainty might creep in.
5         That he has not, in fact, performed some of the
6    hypothetical alternative testing methods he describes doesn't
7    render his opinion unreliable, since his point in describing
8    them is explanatory: it's a means of revealing uncertainties in
9    the approach that Dr. Lamb applied.  So I'll admit Dr. Swider's
10   testimony.
11        Plaintiffs did not respond to DuPont's argument that
12   Swider has no basis to offer any rebuttal opinions in the Owens
13   or Sifuentes cases, since his supplemental declaration does not
14   reference samples of paint chips from their homes.  However,
15   since Swider's testimony is addressed to the reliability of
16   Lamb's methodology, which was essentially the same in each of
17   the three cases, I don't think it's an issue that Swider didn't
18   specifically address the underlying data in each case
19   separately.
20        I will grant Armstrong Containers' motion for joinder,
21   and I will grant in part and deny in part DuPont's motion.
22        Next one is:
23        **# 1122 - Motion For Reconsideration of Court's**
24   **Decision to Exclude the Testimony of David Schretlen in its**
25   **Entirety**; AND

9

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT K

1    **# 1283 - Plaintiffs' Motion to Strike the Affidavit of**

2    **David Schretlen.**

3          On this one, I'm going to revise my January 25th order

4    and exclude only those portions of Dr. Schretlen's testimony

02:09   5    which are based on estimations of parental IQ and abstracts

6    regarding children in Baltimore, both of the which I found to be

7    unreliable.

8          I will also deny Plaintiffs' motion to strike the

9    affidavit of Dr. Schretlen.

02:09   10         And I'll issue a somewhat broader warning -- seeing

11   that Schretlen is not going to be excluded, I want to extend a

12   somewhat broader warning that extends beyond the question of his

13   testimony.  I'm a little concerned by possible themes raised

14   that challenge Plaintiffs' claims with respect to the existence,

02:09   15   extent, and cause of the alleged injuries, and evidence of

16   genetics, childhood experiences, social environment.  Those are

17   somewhat relevant, I agree that they're somewhat relevant, but I

18   think we gotta be careful with this evidence because it's the

19   kind of evidence that can arouse prejudices among the jury.

02:10   20   And, you know, this kind of evidence can have that effect

21   whether race or class are never explicitly mentioned, so I guess

22   I just want to have a caution to be careful with this.

23         Defendants' focus on this category of evidence and

24   their sort of assertion that the jury has to know who these

02:10   25   Plaintiffs are and where they come from, I don't disagree with

10

1    that, I'm just saying that I want to be very careful in the case

2    that we don't arouse or exploit, or both, any kind of -- any

3    kind of prejudice.  And so that's what I'm saying here.

4           And, you know, 403 is out there if it's necessary, and

02:11  5   I won't hesitate to use it if the testimony along these lines

6    gets excessive.  But, in the meantime, I am going to overturn my

7    previous decision and not bar his testimony.

8           The next one is:

9           **# 1124 - Sherwin-Williams Motion to Clarify Decision**

02:11  10  **and Order Regarding Testimony of Dean Webster.**

11          And I confirm that my January 25th order excludes only

12   the three opinions identified in Plaintiffs' motion and

13   discussed in that order.

14          Okay.  The next one's **# 1132**.  This is **Plaintiffs'**

02:11  15  **Motion in Limine on Unrelated Medical Conditions.**

16          Plaintiffs want to exclude as irrelevant and

17   prejudicial evidence that they may have suffered from various

18   medical conditions, including, for example, premature births,

19   ear infections, headaches, nutritional deficits that experts for

02:12  20  both sides agree can sometimes cause cognitive delays.

21          Plaintiffs argue that such evidence is irrelevant

22   because it provides no basis for proving or disproving that the

23   Plaintiffs were lead poisoned as young children.

24          If Plaintiffs were only claiming damages with an

02:12  25  immediate causal and temporal relationship to acute lead

11

1    poisoning, for example, costs of hospitalization and chelation

2    therapy, then I would agree that the medical conditions they

3    identify are irrelevant.  But Plaintiffs alleged injuries are

4    more ambiguous and expansive.  They claim permanent injuries to

02:12  5    body and mind, neuropsychological deficits, lost earning

6    capacity and so on.

7            And as I explained in my order at Docket No. 1119,

8    page 6, Plaintiffs' burden is to prove that the WLC was a

9    substantial factor in producing these injuries, and defendants

02:13  10   can rebut their causation theory by presenting alternative

11   causes of the injuries the Plaintiffs claim.  And evidence of

12   medical conditions that experts have identified as possible

13   alternative causes of Plaintiffs' claimed cognitive injuries is

14   relevant and admissible.

02:13  15           Plaintiffs also argue that even if admissible, this

16   evidence is so prejudicial, because the conditions are

17   associated with poverty, that I should categorically exclude it

18   under 403.  As I've discussed, I do agree that there is some

19   potential for prejudice, but I also recognize that there's some

02:13  20   substantial probative value as to one of the fact issues in the

21   case.

22           So I'm going to deny Plaintiffs' motion.  But, again,

23   a lot of this is going to be on a sort of we'll see how it goes

24   during the trial and what exactly is said.  But we're going to

02:14  25   have to watch it closely because I don't want to get any

12

Case 2:07-cv-00303-LA  Filed 03/27/19  Page 12 of 41  Document 1324
Case 2:22-cv-00378-PP    Filed 03/25/22    Page 37 of 143    Document 1-4

1    testimony in that's beyond what is necessary to make the point

2    that's trying to be made or that prejudices anybody.

3              All right.  The next one is **# 1134**.  This is:

4    **Plaintiffs' Motion in Limine on Medical Condition and Education**

02:14    5    **Histories of Plaintiffs' Family Members.**

6              It's Plaintiffs' burden to prove that they were

7    injured and that WLC caused their injuries.  As I made clear in

8    my January 25th order, defendants may attack Plaintiffs' prima

9    facie case by presenting other explanations for Plaintiffs'

02:14    10   cognitive and behavorial challenges and other possible causes of

11   their conditions.

12             That's at ECF Number 1119 at 25.

13             Defendants have established the relevance of each of

14   the following pieces of evidence as alternative causes of the

02:15    15   Plaintiffs' alleged injuries, and I will admit them:

16             Plaintiff Burton's mother's high blood pressure during

17   pregnancy;

18             Plaintiff Burton's mother's anxiety;

19             Plaintiff Sifuentes' mother's diabetes and high blood

02:15    20   pressure;

21             Plaintiff Owens' family members' tobacco use.

22             As for the evidence regarding Plaintiffs' family

23   members' educational histories, defendants have not presented a

24   developed theory of how much of this evidence would inform the

02:15    25   jury's determination of the existence, extent, or cause of

13

Oral Decision on Motions
March 26, 2019

1  Plaintiffs' alleged cognitive injuries.

2       Defendants argue that this evidence is a benchmark for

3  Plaintiffs' likely ability level had they not been exposed to

4  lead, but they don't explain by what non-speculative mechanism

02:15  5  family education achievement is predictive of an individual's

6  cognitive ability.  So for that reason I'm going to exclude the

7  following evidence:

8       Mr. Burton, Sr. did not graduate from high school and

9  attempted but did not earn his GED;

02:16  10       Ms. Gallegos left school after fourth grade;

11       Pedro and Victor Sifuentes failed to graduate high

12  school;

13       Peggy Conley does not have a high school diploma.

14       I will, however, admit the following evidence as the

02:16  15  relevance to the Plaintiffs' cognitive development as measured

16  by school performance is more developed:

17       Neither Mr. Sifuentes, Sr. nor Ms. Gallegos speak

18  English, and;

19       Mrs. Conley did not assist Mr. Owens with his

02:16  20  homework.

21       Next is:  **#1136 — Defendants' Motion in Limine to**

22  **Exclude Evidence of Foreign Occupational Health Regulation of**

23  **Lead Paint.**

24       This evidence is admissible as it is relevant to the

02:16  25  Defendants and their alleged predecessors' knowledge of the

14

1  health risks associated with lead paint at the time they were

2  manufacturing and marketing WLC.  The jury will be capable of

3  navigating the distinction between hazards to painters applying

4  lead paint and hazards to children occupying homes containing

5  lead paint.  So this motion is DENIED.

6  Next is:  **#1137 — Atlantic Richfield's Motion in**

7  **Limine Concerning Trade Associations and Other Defendants.**

8  Atlantic Richfield first argues that evidence of

9  conduct and statements of the Lead Industries Association and

10  National Paint, Varnish and Lacquer Association should not be

11  admitted against it under an agency theory.  I'll address this

12  portion of Atlantic Richfield's motion together with the

13  Defendants' joint motion on the same issue, at Docket 1150.

14  Atlantic Richfield also moves to exclude evidence of

15  conduct or statements of the LIA after 1946, which is when

16  Atlantic Richfield's alleged predecessors stopped manufacturing

17  WLC.

18  I'll address this portion of Atlantic Richfield's

19  motion together with Defendants' joint motion on evidence dating

20  after each defendant stopped manufacturing WLC, at Docket 1182.

21  I'll also address Atlantic Richfield's motion

22  excluding evidence of the conduct of other Defendants as against

23  Atlantic Richfield, together with the joint motion on the same

24  issue at Docket 1182.

25  Okay.  Next is:  **# 1139 — Plaintiffs' Motion in Limine**

02:17
02:17
02:17
02:17
02:18

15

1  **on Crimes or Other Acts of Plaintiffs, Plaintiffs' Parents, and**
2  **Other Relatives.**

3        Plaintiffs have moved to exclude evidence of crimes
4  and misconduct of Plaintiffs and their relatives on grounds that
5  such evidence is irrelevant and prejudicial.  Their motion
6  includes a list of specific acts that they seek to have
7  excluded, but indicates that the list may not be all inclusive.
8  Defendants argue in opposition that such evidence is relevant to
9  whether Plaintiffs sustained any injury and whether that injury
10  was caused by ingestion of WLC.

11        What makes this issue difficult is that each
12  Plaintiffs alleged brain injury happened when the Plaintiff was
13  exposed to lead, but the symptoms from which Plaintiffs and
14  their experts seek to establish the existence and the extent of
15  the injury arose well after the exposure.  And while crimes or
16  other acts by the Plaintiffs or their relatives can't reasonably
17  have caused the initial exposure or injury, it's plausible to
18  draw a causal connection between that conduct and some of the
19  symptoms that Plaintiff cite as evidence of that injury and the
20  damages Plaintiffs claim as consequences for that injury.

21        So, to some extent, the admissibility of crimes and
22  other acts evidence is going to hinge on what symptoms the
23  Plaintiff choose before the jury as evidence of their injuries
24  and what adverse consequences of brain injury the Plaintiffs
25  present in support of their claim for damages.

1    I also note that the risk of prejudice to the

2  Plaintiffs associated with some of the evidence listed in their

3  motion is very high.  That means it's going to be very important

4  for defendants to lay a foundation showing not just that the

02:20  5  evidence is relevant, but that its probative value outweighs the

6  very high risk of prejudice.

7    For example, an expert witness's abstract statement

8  that a certain kind of conduct by a relative might in theory

9  contribute to a certain kind of outcome for a kid is not

02:20  10  adequate.  I'm going to need a pretty compelling showing that a

11  particular Plaintiff was, in fact, affected by something one of

12  his relatives did, and affected in a way that relates causally

13  to a symptom or outcome that Plaintiff has raised before I allow

14  that relative's act before the jury.

02:20  15    And the same guidelines apply to Plaintiffs' own

16  behavior, but with an added nuance, which is that some of the

17  conduct listed in Plaintiffs' motion could conceivably do double

18  duty as both cause of some of the negative outcomes that

19  Plaintiffs claim and a symptom of the underlying injury.

02:20  20    So, for example, Mr. Owens arguing with teachers and

21  getting suspended several times could be framed by Defendants as

22  an alternative causal factor in his poor school performance and

23  consequent earning potential; but the same conduct could also be

24  at least in part a symptom of an underlying brain injury caused

02:21  25  by lead.  That's something the jury would need to work out.  But

17

1   the underlying principle remains that, to get this sort of

2   evidence in, Defendants need to show that the risk of prejudice

3   is outweighed by the evidence's probative value regarding the

4   fact issue that Plaintiff has chosen to raise.

02:21   5       I note that the evidence that Mr. Owens and

6   Mr. Sifuentes used marijuana will likely be admissible as a

7   possible causal factor in their cognitive ability and school

8   performance, but the fact that Mr. Owens has been charged and

9   pled guilty to marijuana possession is not relevant for this

02:21   10   purpose.  I'll hold off on ruling on the other listed items for

11   now.  Okay.

12       **#1141 — Defendant's Motion in Limine to Exclude**

13   **Evidence of or Reference to Prior Deposition Testimony of James**

14   **C. Burrows.**

02:22   15       Plaintiffs have indicated they do not intend to offer

16   testimony of Burrows into evidence unless one of the Defendants

17   opens the door by referencing that testimony.  Accordingly, that

18   motion is GRANTED.  Okay.

19       **#1144 — DuPont's Motion in Limine to Exclude Evidence**

02:22   20   **of Baltimore Health Department Correspondence.**

21       This motion concerns letters exchanged in 1937 between

22   the Baltimore Health Department and DuPont's medical director

23   concerning children who had died of lead poisoning.  In each

24   case, there was a history of the child chewing on a crib or

02:22   25   other painted surface.

18

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 18 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 43 of 143   Document 1-4

1       DuPont argues that evidence of its knowledge of

2   hazards associated with paint on cribs and toys will confuse or

3   mislead the jury which must decide whether DuPont had knowledge

4   of hazards to children from lead in architectural paint.

5       I disagree.  I find this evidence is relevant to the

6   question of DuPont's knowledge, and I think the jury is capable

7   of handling the distinction between cribs and walls.

8       DuPont also argues that this evidence is irrelevant

9   because the letters were written at a time when DuPont was no

10  longer manufacturing its own WLC, but was rather purchasing WLC

11  from other manufacturers to integrate into its own finished

12  paints.

13      As I'll explain in a moment, I've the determined that

14  DuPont can still be liable under risk contribution for

15  integrating WLC into finished paints, so I won't exclude the

16  health department correspondence on those grounds either.  So

17  this motion is DENIED.

18      **# 1147 — DuPont's Motion in Limine to Exclude Evidence**

19  **of Reference to Contracts With National Lead to Purchase White**

20  **Lead in Oil;** AND

21      **# 1162 — Sherwin-Williams' Motion in Limine to Exclude**

22  **Evidence of Sherwin-Williams' Products and Promotions of**

23  **Products Containing WLC That it Did Not Make.**

24      These motions are similar in that both DuPont and

25  Sherwin-Williams seek to exclude evidence of products that they

19

1    made and promoted that contained WLC made by other

2    manufacturers, on grounds that risk contribution only applies to

3    the manufacture of WLC and not paint.  I'm going to deny these

4    motions for a couple of reasons.

02:24    5        First, the *Thomas* decision explicitly indicates that a

6    defendant's marketing, as well as producing WLC, can be a basis

7    for liability.

8        See paragraphs 161 and 162 of that decision.

9        Integrating WLC into paint and then selling the paint

02:24    10    sounds like marketing WLC to me.

11        Second, barring liability for sale and promotion of

12    products containing WLC made by a third party would be

13    inconsistent with my application of the bulk supplier doctrine

14    at ECF No. 1070 at 21.  There I held that manufacturers who

02:25    15    supplied WLC to third-party manufacturers for integration into

16    paint had no duty to warn end-users of the paint because the WLC

17    manufacturer had no means of communicating its warning to the

18    end-user, and because the manufacturer of the finished product

19    would bear the responsibility for warning consumers.  It doesn't

02:25    20    make sense to shield finished product manufacturers from a duty

21    to warn about a dangerous component of their product in a case

22    where the component manufacturers are already shielded from that

23    duty.

24        So I'll hold now that manufacturers who integrated

02:26    25    another company's WLC into their own finished product and then

1   sold that finished product in the relevant time and geographic
2   area can be liable under risk contribution.

3           DuPont further argues for exclusion of its contracts
4   to purchase white lead-in-oil from National Lead, because the
02:26  5   lead-in-oil it purchased from National Lead and then sold under
6   its own label was not available for sale in Milwaukee.  But
7   Plaintiffs have presented, and DuPont doesn't refute, evidence
8   that DuPont integrated the lead-in-oil it purchased from
9   National Lead into finished paint products which were sold in
02:26  10  Milwaukee.

11          So I won't grant DuPont's motion on those grounds
12  either.  Evidence of DuPont's purchase of WLC from National Lead
13  to integrate into its own products is admissible.

14          **# 1150 — Defendants' Motion to Exclude Evidence of**
02:27  15  **Reference to Defendants' Lobbying Activities and to Exclude Any**
16  **Evidence of the Conduct or Statements of the LIA/NPVLA Under an**
17  **Agency Theory.**

18          Defendants seek to exclude evidence of their lobbying
19  activity on the theory that it's protected speech under the
02:27  20  *Noerr-Pennington* doctrine.  I agree with the Defendants that
21  their lobbying activity cannot itself form a basis of civil
22  liability.  But *Noerr-Pennington* isn't an absolute bar to
23  admission of such evidence.  Footnote 3 of the *Pennington* case
24  makes clear that such evidence can be admitted if it tends
02:27  25  reasonably to show the character and purpose of the particular

21

1    transactions under scrutiny.

2           If Defendants argue that the warning labels on their

3    products are adequate because they complied with government

4    requirements, the jury ought to be allowed to consider evidence

02:27  5    that the Defendants lobbied the government for permissive

6    regulation and labeling requirements for WLC products.

7           Evidence of lobbying activity may also be considered

8    by the jury in allocating liability among the Defendants.  See

9    *Collins v. Eli Lilly Company*, 116 Wis. 166, 200 (1984).

02:28  10           Defendants have also presented arguments that the

11    industry associations were not Defendants' agents.  Their motion

12    suggests that the question of agency might surface at trial in

13    two ways.

14           First, a statement that would otherwise be

02:28  15    inadmissible hearsay might come in as a statement of a party

16    opponent if the entity that made the statement was acting as an

17    agent of the party.

18           And second, an agent's conduct may under appropriate

19    circumstances be imputed to the principal for purposes of

02:28  20    assigning liability.  But it's not yet clear to me what

21    statements or conduct of the LIA or the NVPLA the Plaintiffs

22    might seek to introduce, or for what purpose.  And, depending on

23    the evidence and the purpose for which it's offered, it may be

24    that admissibility can be decided without any need to address

02:29  25    the question of agency at all.  So I prefer not to rule on the

1  agency question in the abstract.  I'll resolve this question at

2  the trial if it becomes necessary.  Next is:

3        **# 1153 — Defendants' Motion in Limine to Exclude**

4  **Evidence of Other Lawsuits.**

02:29  5        Defendant filed a broad motion to exclude reference to

6  other lawsuits brought on behalf of people other than the

7  Plaintiffs against manufacturers of lead pigments or paints.

8  Plaintiffs argue that such evidence may be relevant to

9  Defendants' knowledge, intent, and indifference to the hazards

02:29  10  of lead paint.

11        That may be, but it's not a basis to admit evidence of

12  any lawsuits that were filed after the Plaintiffs were exposed

13  to lead.  Accordingly, I'll grant this motion in part, and

14  exclude reference to lawsuits filed after the last of the three

02:30  15  Plaintiffs' lead exposure.  I'll also -- I'll rule on the

16  admissibility of earlier-filed lawsuits at the trial.

17        This order does not bar the parties from using

18  testimony from prior lawsuits for impeachment or other

19  permissible purposes.  But, again, I direct counsel to present

02:30  20  such prior testimony in a manner that doesn't reveal to the jury

21  the nature of the claims or the identities of the parties to

22  those cases.

23        **# 1154 — Defendants' Motion in Limine to Exclude**

24  **Undisclosed Expert Opinions.**

02:30  25        Defendants have not identified any expert whose

23

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 23 of 41   Document 1324
Case 2:22-cv-00378-PP    Filed 03/25/22    Page 48 of 143    Document 1-4

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT K



1    opinions or reports are the target of this motion.  So it seems

2    pretty speculative.  I won't rule on it in the abstract.  So

3    I'll deny the motion without prejudice.  It can be raised again

4    if the need arises.

02:30    5         **# 1155 — Defendants' Motion in Limine to Exclude**

6    **Punitive Damages Evidence and Arguments.**

7         Plaintiffs don't dispute this motion, therefore, it's

8    GRANTED.

9         **# 1156 — American Cyanamid Motion in Limine to Exclude**

02:31    10   **Evidence, Argument, or Reference to Advertisements for Scotch**

11   **Laddie Paint Appearing in Publications Outside Milwaukee;** AND

12        **# 1185 — Armstrong Containers' Motion for Joinder in**

13   **Cyanamid's Motion.**

14        Plaintiffs agree that the identified advertisements

02:31    15   are inadmissible for purpose of rebutting Cyanamid's and

16   Armstrong Containers' geographic market defenses.

17        I am conscious, though, that the question of this

18   court's personal jurisdiction over Cyanamid remains unresolved,

19   and the identified advertisements may be relevant to that issue.

02:31    20        I'll now order that these advertisements are

21   inadmissible for purposes of the geographic market issue.  I'll

22   rule on their admissibility for other purposes subsequently.

23        **# 1157 — Sherwin-Williams' Motion in Limine to Exclude**

24   **Liability Based on Sherwin-Williams' Manufacturing, Promotion or**

02:32    25   **Labeling of Paint.**

24

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 24 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 50 of 143   Document 1-4

1       Sherwin-Williams seeks to exclude all evidence and
2   argument attempting to impose liability based on its
3   manufacture, promotion, or labeling of paint containing WLC or
4   white lead-in-oil.  Its argument is that risk contribution
5   applies only to fungible products, and that paint and
6   lead-in-oil are not fungible.

7       I've already ruled as a matter of law that WLC is
8   fungible.  Risk contribution is a relaxation of the causation
9   standard, such that the causation element of each Plaintiff's
10   case against Sherwin-Williams can be satisfied with proof that
11   Plaintiff was harmed by ingesting WLC, and that Sherwin-Williams
12   manufactured or marketed WLC.

13       As I've already explained, incorporating WLC into a
14   finished product and selling that product falls under the
15   "marketing" umbrella.  Risk contribution simply means that
16   Plaintiff is not required to prove that Sherwin-Williams
17   manufactured or marketed the *specific* white lead carbonate that
18   had caused the harm.

19       As to Sherwin-Williams' arguments that paint and
20   lead-in-oil are not fungible such that risk contribution
21   shouldn't apply, they miss the mark.  Sherwin-Williams can only
22   be liable for manufacturing and marketing products containing
23   WLC, a fungible component part.  Sherwin-Williams is free to
24   build an exculpatory defense around demonstrations that the
25   chemical makeup of the WLC-containing paint that Plaintiffs

02:32
02:32
02:33
02:33
02:33

25

1  claim harmed them does not match the known formulas of any paint

2  products known to contain WLC manufactured by Sherwin-Williams.

3  So Sherwin-Williams' motion is DENIED.

4      **# 1159 — Sherwin-Williams' Motion in Limine to Exclude**

02:33   5  **Evidence or References to the Forest Products-Better Paint**

6  **Campaign.**

7      Sherwin-Williams seeks to exclude all reference to a

8  promotional campaign run by the Lead Industries Association

9  called the "Forest Products-Better Paint Campaign," on grounds

02:34   10  that the campaign promoted white lead-in-oil and prepared

11  exterior paints while the risk contribution theory only extends

12  to white lead carbonate.

13      This argument doesn't work.  Again, the risk

14  contribution doctrine only relaxes the causation standard; it

02:34   15  doesn't affect the other elements of a negligence or a strict

16  liability claim.  Evidence of this advertising campaign doesn't

17  go to causation but to public knowledge, adequacy of warnings,

18  and the allocation of proportional responsibility, so the

19  advertising needn't be narrowly tied to WLC in order to be

02:34   20  relevant.  Accordingly, I'll DENY Sherwin-Williams' motion.

21      **# 1161 — Sherwin-Williams' Motion in Limine to Exclude**

22  **Evidence Relating to Any Alleged Failure to Warn Adequately**

23  **After Passage of the Federal Hazardous Substances Act;** AND

24      **# 1186 — Armstrong Container's Motion to Join in**

02:35   25  **Sherwin-Williams' Motion.**

26

Case 2:07-cv-00303-LA  Filed 03/27/19  Page 26 of 41  Document 1324
Case 2:22-cv-00378-PP    Filed 03/25/22    Page 52 of 143    Document 1-4

1     Lead-based paint is a hazardous substance to which the

2   FHSA's labeling requirements apply.  Plaintiffs cite a portion

3   of the report of Defendants' expert Christine Wood in support of

4   their argument that the FHSA did not apply to lead-based paint

02:35   5   in the 1960s.  However, her point was that lead paint did not

6   qualify as a poison under the law, a category apart from

7   hazardous substances and subject to heightened labeling

8   standards.

9     The FHSA was passed in 1960, and then amended in 1966,

02:35   10   to include an explicit preemption provision which clearly bars

11   any claim based on a state law theory that a product's label

12   should have included particular warnings not required by the act

13   and corresponding regulations.

14     This is citing *Suarez vs. W.M. Barr & Company, Inc.,*

02:36   15   842 F.3d 513, 518 (7th Cir. 2016.)

16     Sherwin-Williams further argues that, though the act

17   did not include an express preemption provision until 1966,

18   Congress's intent that the 1960 act establish national uniform

19   labeling requirements in passing is sufficiently clear to

02:36   20   establish preemption.  Citing *Moss vs. Parks Corp.,* 985 F.2d

21   736, 739 (4th Cir. 1993).

22     Sherwin-Williams relies on a 1960 House Report

23   indicating that the FHSA provided "nationally uniform

24   requirements for adequate cautionary labeling of packages of

02:37   25   hazardous substances."

27

1       The presence of the word "adequate" suggests to me

2   that at this stage of the FHSA's evolution, Congress's intent

3   was not to preempt state law but rather to set a minimum floor

4   for such state regulation, leaving room for states to enforce

02:37   5   their own standards above and beyond the federal standards.

6       Therefore, I conclude that, in the present case, the

7   FHSA precludes liability arising from FHSA-compliant labels on

8   products sold after the passage of the preemption amendment in

9   1966.  In theory, these labels might still be admissible for

02:37  10   purposes others than to establish Defendants' liability on a

11   failure-to-warn theory, but Plaintiffs have not identified any

12   such purposes.

13       Accordingly, I'll grant Atlantic Richfield's motion to

14   join in Sherwin-Williams' motion, and I'll GRANT in part

02:38  15   Sherwin-Williams' motion and categorically exclude all

16   FHSA-compliant product labels dating after the 1966 preemption

17   amendment.  Okay.

18   **# 1164 — Sherwin-Williams' Motion in Limine to Exclude**

19   **Constitutionally Protected Advertisements.**

02:38  20       Sherwin-Williams seeks to exclude evidence of truthful

21   product advertisements on the grounds that they are commercial

22   speech protected by the First Amendment and can't be a basis for

23   liability.

24       I'm not convinced though.  The First Amendment cases

02:38  25   that Sherwin-Williams cites in its brief generally involve

28

1   challenges to statutes or regulations that restrict or prohibit

2   certain sorts of advertising, such that, if the statutes or regs

3   were given effect, advertising itself might be actionable

4   conduct.

02:39   5         But here, Sherwin-Williams' advertising is not the

6   conduct that gives rise to Plaintiffs' claims.  Rather,

7   Plaintiffs may seek to introduce advertising evidence as

8   probative of other non-conduct elements of their tort claims;

9   for example, knowledge or geographic causation.

02:39   10         Further, courts have held that in failure-to-warn

11   cases a jury can consider a manufacturer's nondeceptive

12   promotion of its product in testing the adequacy of a warning.

13         See *Salmon vs. Parke, Davis & Company*, 520 F.2d 1359,

14   1363 (4th Cir. 1975).  So this motion is DENIED.

02:39   15         **# 1166 — American Cyanamid's Motion in Limine to**

16   **Exclude or Limit Evidence, Arguments or Reference to Warnings,**

17   **Trade Associations and Other Defendants.**

18         I agree with the principle that each defendant must be

19   liable only for its own conducts and not for the conduct or

02:40   20   statements of other Defendants.  I have taken Cyanamid's

21   proposed jury instruction under advisement.  I'll DENY this

22   motion without prejudice for now.

23         **# 1168 — Defendants' Motion in Limine to Exclude**

24   **Improper Golden Rule Arguments.**

02:40   25         This motion is unopposed, I will GRANT it.  The

29

1  prohibition against Golden Rule Arguments will apply equally to

2  all parties.

3       **# 1170 — Defendants' Motion in Limine to Exclude**

4  **Evidence, Arguments, or Reference to Opinions of Paul Mushak.**

02:40  5       Plaintiffs have indicated they don't intend to present

6  evidence, argument or a reference to his opinions, so this

7  motion is GRANTED.

8       **# 1172 - Plaintiffs' Motion in Limine With Four Parts.**

9       Plaintiffs move to exclude all evidence of social

02:40  10  media posts made by Plaintiffs.

11       Defendants asked each Plaintiff in their deposition

12  whether the Plaintiff used social media like Facebook or

13  Instagram.  Plaintiffs Burton and Owens indicated that they did.

14  Defendants haven't indicated any specific posts they want to

02:41  15  present.  And Plaintiffs attached to their motion several

16  "exemplar" social media posts by the Plaintiffs Burton and

17  Owens, which they claim are representative of what they seek to

18  exclude.  Some of these exemplars include memes that allude to

19  drugs, sexuality, money, cynicism about school.

02:41  20       I am reluctant to rule in the abstract about social

21  media posts that were not included among the exemplars that

22  Plaintiffs provided.  However, I will say that none the

23  exemplars strikes me as sufficiently probative of any contested

24  issue to warrant its admission at trial, particularly given the

02:41  25  damage or the danger of unfair prejudice.

30

Case 2:07-cv-00303-LA  Filed 03/27/19  Page 30 of 41  Document 1324
Case 2:22-cv-00378-PP  Filed 03/25/22  Page 56 of 143  Document 1-4

1    Defendants argue that these images are probative of

2  Plaintiffs' damages or lack thereof, the extent of their

3  cognitive and psychological impairments, their ability to live

4  and enjoy their lives, and their earning capacity.  There is

02:42    5  ample non-prejudicial evidence in the record from which the jury

6  can form an assessment of these issues, including neurocognitive

7  and behavorial evaluations performed by defense experts and

8  testimony of the Plaintiffs' teachers and Plaintiffs themselves.

9    Therefore, I'll GRANT Plaintiffs' motion with respect

02:42   10  to the specific exemplar posts they submitted.  But, again, I'm

11  not going to make any blanket ruling that all media posts are

12  excluded.  If Defendants want to offer a specific post that I

13  haven't seen, they can argue that it's admissible.

14    Plaintiffs seek to exclude testimony that Plaintiffs

02:42   15  may have been exposed to lead from sources other than paint on

16  grounds that such testimony is not based on actual testing of

17  the residence where Plaintiffs allege they were exposed to lead

18  and is therefore speculative and irrelevant.

19    This motion targets three of Defendants' experts —

02:43   20  Conner, Magee, and Banner — whose testimony challenges

21  Plaintiffs' experts' conclusions that the paint was the source

22  of Plaintiffs' lead exposure on grounds that Plaintiffs' experts

23  did not adequately consider other possible sources of lead.

24    I'm going to admit this testimony.  It's relevant in

02:43   25  that it will help the jury assess the credibility of Plaintiffs'

31

1   experts' conclusions.  It's also based in reviews of the record,

2   the witness's professional expertise, and, in Magee's case,

3   evidence about lead and water and soil in the community

4   surrounding Plaintiffs' homes.  Plaintiffs certainly can

02:43   5   challenge this testimony, but they haven't really stated a

6   reason to exclude it.  And so I will DENY this portion of

7   Plaintiffs' motion in limine.

8           Plaintiffs seek to exclude evidence of the recent

9   controversy surrounding the Milwaukee Health Department's

02:43   10   handling of childhood lead poisoning cases which resulted in

11   resignations and suspensions of key Milwaukee Health Department

12   personnel in 2018.

13           Defendants agree that this recent controversy is

14   unrelated to the inspections and other activities undertaken by

02:44   15   the Health Department regarding Plaintiffs in this case.  So

16   I'll GRANT this portion of Plaintiffs' motion.

17           The ruling does not bar Defendants from presenting

18   evidence concerning the Health Department's inspections and

19   activities regarding Plaintiffs and their families after their

02:44   20   elevated blood levels were reported, and it doesn't bar them

21   from presenting evidence that Plaintiffs may have been exposed

22   to lead through other sources than paint.

23           Plaintiffs seek to exclude evidence that the Burton

24   family's home was in foreclosure when they moved out in 2011.

02:44   25   Defendants argue that this evidence is relevant as one of many

32

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 32 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 58 of 143   Document 1-4

1   factors that impacted Burton's childhood and subsequent

2   development.  They suggest that poverty and its associated

3   stressors may have been a contributing factor to Burton's

4   alleged cognitive, psychological and behavorial impairment.  I

02:45   5   agree with Defendants that evidence of poverty affecting

6   Burton's family is relevant for this purpose.  But I'm also

7   cognizant of Plaintiffs' concerns that this sort of evidence is

8   likely to prejudice the jury and then turn the trial into a

9   referendum on Plaintiffs' families.

02:45   10   So I'm not going to exclude evidence of the

11   foreclosure, but I warn Defendants again on this point, we're

12   going to be very careful to not -- try not to let anything in

13   that's at all prejudicial or inflammatory.  Okay.

14   **# 1173 - Defendants' Motion in Limine to Exclude**

02:45   15   **Testimony by Gerald Markowitz and David Rosner Regarding**

16   **Adequacy of Warnings.**

17   These expert historians may not testify as to the

18   legal adequacy of lead warnings, as they admit they are not

19   qualified to do so.

02:46   20   As I discussed in my August 2018 order, they may place

21   these warnings in historical context by articulating their

22   relationship to Defendants' knowledge and public knowledge of

23   lead hazards, or by comparing them to warning practices among

24   manufacturers in other industries.  So I'll stand on the August

02:46   25   order here.

33

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT K

4

Oral Decision on Motions
March 26, 2019

1     **# 1175 — Defendant Armstrong Containers' Motion in**

2     **Limine to Bar Misidentification of MacGregor or Other Entities**

3     **as Armstrong Containers.**

4          I've ruled as a matter of law that Armstrong is a

02:46   5     successor-in-interest to MacGregor.  Plaintiffs have stated

6     their intention at trial is to refer to Armstrong as a successor

7     to MacGregor, and that when they introduce evidence against

8     Armstrong they will refer to the evidence as being introduced

9     against Armstrong as the successor to MacGregor.  Armstrong

02:47   10    argues that this practice is likely to cause jury confusion.

11         I don't think so. I think the jury is more likely to

12    be confused by evidence offered against an entity that is not a

13    named party.  So I will DENY this motion and permit Plaintiffs

14    to use the Armstrong name at trial, provided that they make

02:47   15    clear that Armstrong is party to this suit as a successor to

16    MacGregor.

17         **# 1179 — Plaintiffs'** (sic) **Motion in Limine to Exclude**

18    **Evidence of Capillary Blood Lead Levels.**

19         Defendants seek to exclude evidence of capillary

02:47   20    measurements of Plaintiffs' blood lead levels because capillary

21    measurements are less accurate than venous blood lead

22    measurements.  They point to various medical authorities,

23    including the CDC, the American Academy of Pediatrics, the

24    Wisconsin Department of Health and Human Services, all of which

02:48   25    indicate that capillary tests of blood lead levels are

34

Case 2:07-cv-00303-LA    Filed 03/27/19    Page 34 of 41    Document 1324
Case 2:22-cv-00378-PP    Filed 03/25/22    Page 61 of 143    Document 1-4

1   appropriate as a screening tool but must be confirmed with a

2   venous test for diagnoses.

3          Capillary tests are less reliable because the lead in

4   the environment or on the surface of the skin can contaminate

5   the sample and skew the results.

6          I think the jury is capable of understanding the

7   potential for error in capillary measurements of blood lead

8   levels and adjusting accordingly the weight they give to such

9   evidence.  It's possible that such evidence may be unnecessarily

10  cumulative, since venous blood lead tests are also available for

11  each Plaintiff, but that's for determination at trial.  This

12  motion is DENIED.

13         **# 1182 — Defendants' Motion in Limine to Exclude**

14  **References to Defendants Collectively as an Industry, to Exclude**

15  **Evidence of Conduct of Other WLC Manufacturers as Against**

16  **Individual Defendants, and to Exclude Evidence With Respect to**

17  **Each Defendant or its Alleged Predecessor After it Ceased**

18  **Manufacturing WLC.**

19         Defendants seek to preclude Plaintiffs from referring

20  to Plaintiffs (sic) collectively as the "lead industry."  I

21  agree that we need to be careful throughout the trial in making

22  very clear which evidence applies to which defendant or which

23  defendants.  And the "lead industry" isn't a concept with very

24  clear boundaries.  So I guess I'm going to order Plaintiffs to

25  steer clear of ambiguous language like this and to be as precise

35

1    as possible in identifying which entity they're discussing

2    through a trial or which entities.

3         Defendants seek to exclude evidence of conduct of

4    other WLC manufacturers as against any particular individual

02:50    5    defendant.

6         Again, I agree with the principle that every

7    Defendant's liable only for its own conduct, and that Plaintiffs

8    have a substantial responsibility for maintaining distinctions.

9    It may be, though, that evidence of some entity's conduct,

02:50    10   whether it's a defendant or not, may be admissible as against

11   another for purposes other than imputing conduct, and I'll make

12   those special-case rulings in the course of the trial.

13        Defendants seek to exclude evidence with respect to

14   each Defendant or its alleged predecessor from the time period

02:50    15   after it ceased manufacturing WLC.

16        We've established that risk contribution also applies

17   to marketing of WLC, including by incorporating WLC, whether

18   made by a given defendant or by a third-party manufacturer, into

19   a finished product like paint or lead-in-oil and then selling

02:50    20   that product, so it's too restrictive to draw lines based solely

21   on manufacture.  I will agree, though, that a company's conduct

22   after it ceased producing or marketing WLC cannot be relevant to

23   its liability.

24        I note, though, that such evidence may be relevant to

02:51    25   the allocation of contributory negligence.  In *Collins vs. Eli*

36

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 36 of 41   Document 1324
Case 2:22-cv-00378-PP     Filed 03/25/22     Page 63 of 143   Document 1-4

1  *Lilly*, the Wisconsin Supreme Court case that established risk

2  contribution, the court noted that comparative negligence is "an

3  equitable doctrine based on natural justice" and then identified

4  several factors that a jury could consider in apportioning

02:51  5  liability among defendants that had been unable to exculpate

6  themselves.  See 116 Wis.2d 166, 200.  The nonexclusive list of

7  factors identified by the court included:

8           Whether the drug company conducted tests on DES for

9  safety and efficacy in use for pregnancies;

02:52  10          to what degree the company took a role in gaining FDA

11  approval of DES for use in pregnancies;

12          whether the company had a small or large market share

13  in the relevant area;

14          whether the company took the lead or merely followed

02:52  15  the lead of others in producing or marketing DES;

16          whether the DES issued warnings about the danger of

17  DES;

18          whether the company produced or marketed DES after it

19  knew or should have known of the possible hazards that DES

02:52  20  presented to the public, and;

21          whether the company took any affirmative steps to

22  reduce the risk of injury to the public.

23          The *Collins* court further specified that the trial

24  court "might in its discretion permit the jury to consider other

02:52  25  factors relevant to apportioning liability."

37

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 37 of 41   Document 1324
Case 2:22-cv-00378-PP      Filed 03/25/22      Page 64 of 143      Document 1-4

1    I'll rule now that evidence of Defendants' conduct

2    after it ceased producing or marketing WLC may be admissible for

3    the limited purpose of allocation of liability.  A party seeking

4    to admit evidence for this purpose, however, has to make a

02:53    5    strong case for it during the course of the trial.

6    **# 1187 - Defendants' Motion in Limine to Exclude**

7    **Evidence of or References to Evidence Regarding an Alleged "Lead**

8    **Poisoning Epidemic."**

9    Defendants seek exclusion of references to a

02:53    10    contemporary "childhood lead poisoning epidemic," "lead health

11    crisis," "public health disaster," or other similar language, on

12    grounds that such evidence is irrelevant and prejudicial.

13    In response, Plaintiffs argue that such evidence is

14    relevant because risk contribution requires them to prove that

02:53    15    each defendant contributed to the risk of harm to the public.

16    I disagree with that characterization of risk

17    contribution theory.  It's the contribution to risk of harm to

18    the public that justifies application of the doctrine, but that

19    has been established already in the Wisconsin Supreme Court's

02:54    20    *Thomas* decision.  The elements that Plaintiffs have to prove are

21    those laid out in paragraphs 161 and 162 of the *Thomas* case, and

22    they are focused on establishing a plausible causal nexus

23    between the Defendants' conduct and the individual Plaintiff's

24    harm.

02:54    25    So I agree with Defendants that evidence of a

38

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 38 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 65 of 143   Document 1-4

1    contemporary "epidemic" is of limited relevance to the issues

2    for trial, and I also agree that such evidence is sufficiently

3    prejudicial to warrant exclusion.

4             Note, however, that this ruling applies only to

02:54    5    contemporary evidence.  Historical evidence probative of

6    Defendants' knowledge or public knowledge at times relevant to

7    negligence or to the duty to warn remains admissible.

8             Okay.  That's all I have.  And, I don't know, we've

9    got a pretrial when, next week?  Anything anybody wants to bring

02:55    10   up now?  (No response.)

11            THE COURT:

12            Well, okay, I'll take that.

13            MR. WEBER:  Judge, this is Ralph Weber for Cyanamid.

14            THE COURT:  Sure, go ahead.

02:55    15            MR. WEBER:  How long do you have scheduled for the

16   pretrial?  I think we're starting at 11:00.

17            THE COURT:  Well, I'll be here as long as you want.

18   Does that help?  I mean, I don't know.  11:00.  I'm sure we'll

19   go through the lunch hour.  I don't know how to deal with that.

02:55    20   If everybody gets hungry I suppose and we're not done we can

21   take a short break or if somebody wants to bring in some pizza

22   that's fine, too.

23            Yeah.  I don't think -- I mean, I'm here to do

24   whatever we have to do to get everything resolved.  So ....

02:56    25            MR. WEBER:  Thanks, Judge.

39

Case 2:07-cv-00303-LA   Filed 03/27/19   Page 39 of 41   Document 1324
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 66 of 143   Document 1-4

```
1            THE COURT:  Okay.  Well, all right, everybody.

2    Thanks.  See you then.

3            UNIDENTIFIED SPEAKER:  Bye.

4            Thank you, Judge.

5            Bye-bye.

6            (Proceedings concluded at 2:56 p.m.)

7                          *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

02:56

40

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter for the United States District Court for the Eastern
District of Wisconsin, do hereby certify that the foregoing
pages are a true and accurate transcription of my original
machine shorthand notes taken in the aforementioned matter to
the best of my skill and ability.


Signed and Certified March 27, 2019.

/s/John T. Schindhelm

John T. Schindhelm


        John T. Schindhelm, RPR, RMR, CRR
        United States Official Reporter
        517 E Wisconsin Ave., Rm 236,
           Milwaukee, WI 53202
        Website: WWW.JOHNSCHINDHELM.COM



41

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT L

Place holder for Godoy

Complaint requested

from storage at

Milwaukee County

Courthouse

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT M

9/10/99

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

STEVEN THOMAS, a Minor,
by his guardian ad litem,
SUSAN M. GRAMLING;
       Plaintiff,

                   Case No. 99-CV-6411

v.

                   **AMENDED COMPLAINT**
                   Case code 30107

LEAD INDUSTRIES ASSOCIATION, INC.;
AMERICAN CYANAMID CO.;
ATLANTIC RICHFIELD CO.;
E.I. DUPONT DE NEMOURS AND CO.;   HON. PATRICIA D. MCMAHON BR. 18
THE O'BRIEN CORPORATION;
THE GLIDDEN CO.;                          CIVIL E
NL INDUSTRIES, INC.;
SCM CHEMICALS;
THE SHERWIN-WILLIAMS CO.;
CLINTON L. AND BILLIE R. MALLETT,
GERMANTOWN MUTUAL INSURANCE,
and HEALTHCARE RECOVERIES, INC.,
PETER W. HENKE, BAILEY INVESTMENT CO., INC,
ABC INSURANCE COMPANY, and XYZ INSURANCE
COMPANY.,
       Defendants.

FILED & AUTHENTICATED
SEP 1 0 1999
JOHN BARRETT
Clerk of Circuit Court

Now Comes the above-named Plaintiff, by his attorneys, for a cause of action against the above-named defendants, and alleges and shows to the Court as follows:

**PARTIES**

    1.    <u>Steven Thomas</u> ("Thomas") is a minor and is a resident of the State of Wisconsin, residing at 2539 North 28th Street, Milwaukee, Wisconsin.

    2.    <u>Lead Industries Association, Inc.</u> ("LIA") is a New York corporation with its principal place of business in the State of New York.

1

3.    American Cyanamid Company ("American Cyanamid"), the successor-in-interest to the John R. MacGregor Co. and the MacGregor Lead Company, is a Maine corporation with its principal place of business in New Jersey.

4.    Atlantic Richfield Company ("Atlantic Richfield"), the successor-in-interest to International Smelting and Refining Company and Anaconda Lead Products Company, is a Delaware corporation with its principal place of business in California.

5.    E.I. Du Pont de Nemours and Company ("Du Pont") is a Delaware corporation with its principal place of business in Delaware.

6.    The O'Brien Corporation ("O'Brien"), the successor-in-interest to W.P. Fuller Company and Fuller-O'Brien, is an Indiana corporation with its principal place of business in Indiana.

7.    The Glidden Company ("Glidden") is a Delaware corporation with its principal place of business in Ohio.

8.    NL Industries. Inc. ("NL Industries"), formerly known as the National Lead Company, is a New Jersey Corporation with its principal place of business in Texas.

9.    SCM Chemicals ("SCM"), the successor-in-interest to The Glidden Company, is a Delaware corporation with its principal place of business in New York.

10.    The Sherwin-Williams Company ("Sherwin-Williams") is an Ohio corporation with its principal place of business in Ohio.

11.    Clinton L. Mallett ("C. Mallett") is an adult resident of the State of Wisconsin and at all times material, together with his wife Billie R. Mallett, owned, maintained, supervised and had

2

control of the property located at 2654 North 25th Street, Milwaukee, Wisconsin ("25th Street Residence") which was constructed prior to 1978.

12.   Billie R. Mallett ("B. Mallett") is an adult resident of the State of Wisconsin and at all times material, together with her husband, Clinton L. Mallett, owned, maintained, supervised and had control of the 25th Street Residence.

13.   Germantown Mutual Insurance, ("GMI") is a Wisconsin corporation, licensed to do business in the State of Wisconsin, and was at all times material, the liability insurer of the defendants, C. Mallett and B. Mallett, pursuant to an insurance policy which covered any and all liability incurred by the defendants, C. Mallett and B. Mallett. GMI is a proper party pursuant to the provisions of § 803.04(2), Wis. Stats., and is by reason of the terms of its policy and the laws of the State of Wisconsin, directly liable to the Plaintiff.

14.   Heathcare Recoveries, Inc., ("HR") is a Wisconsin corporation and handles the subrogation interests of Primecare Health Plan, Inc. which has made certain payments on behalf of the Plaintiff, with respect to medical, hospital and/or disability expenses which were incurred by the Plaintiff as a result of the unlawful acts alleged herein. Said defendant is joined as a party for the purpose of complying with the provisions of § 803.03 Wis. Stats.

15.   Peter W. Henke ("Henke") is an adult resident of the State of Wisconsin and at all times material owned, maintained, supervised and had control of the property located at 4736 North 37th Street, Milwaukee, Wisconsin.

16.   Bailey Investment Co., Inc. is a Wisconsin corporation whose principal place of business is 3515 North 124th Street, Brookfield, Wisconsin, and at all times material, maintained,

3

supervised and had control of the property located at 4736 North 37th Street, Milwaukee, Wisconsin on behalf of the property owner, Peter W. Henke.

17.     Upon information and belief, ABC Insurance Company is licensed to do business in the State of Wisconsin, and was at all times material, the liability insurer of the Defendant, Peter W. Henke, pursuant to an insurance policy which covered any and all liability incurred by the Defendant, Peter W. Henke. It is a proper party pursuant to the provisions of § 803.04(2), Wis. Stats., and is by reason of the terms of its policy and the laws of the State of Wisconsin, directly liable to the Plaintiff.

18.     Upon information and belief, XYZ Insurance Company is licensed to do business in the State of Wisconsin, and was at all times material, the liability insurer of the Defendant, Bailey Investment Co. Inc., pursuant to an insurance policy which covered any and all liability incurred by the Defendant, Bailey Investment Co., Inc. It is a proper party pursuant to the provisions of § 803.04(2), Wis. Stats., and is by reason of the terms of its policy and the laws of the State of Wisconsin, directly liable to the Plaintiff.

19.     C. Mallett, B. Mallett, GMI, Henke, Bailey Investments, ABC Insurance Company, and XYZ Insurance Company are collectively referred to herein as "Landlord Defendants."

20.     From its inception through the present, the LIA was the agent, servant, employee, alter ego, co-conspirator, aider and/or abettor of one or more of the Manufacturing Defendants and acted individually and/or within the scope of its agency, servitude, employment and conspiracy.

21.     At all pertinent times, the LIA, American Cyanimid, Atlantic Richfield, Du Pont, O'Brien, Glidden, NL Industries, SCM, and Sherwin-Williams, together with their agents, servants, employees, alter egos, co-conspirators and aiders and/or abettors (collectively "Industry

4

Defendants") acted individually and/or in the course of their agency, servitude, employment and conspiracy and in furtherance of the business of the Defendants and of the conspiracy.

22.     American Cyanimid, Atlantic Richfield, Du Pont, O'Brien, Glidden, NL Industries, SCM and Sherwin-Williams and their agents, servants, aiders and/or abettors and co-conspirators (collectively referred to herein as the "Manufacturing Defendants") manufactured, processed, marketed, promoted, supplied, distributed and/or sold all or substantially all lead products contained in paint (hereinafter "Lead") in the State during the relevant time period.

## FACTS

23.     In or about June 1990, Thomas' parent entered into a residential rental agreement for the rental of property located at 2652 North 37th Street.  Thereafter, the premises were occupied by Thomas and his family until January 1993.

24.     During the period that Thomas resided at 2652 North 37th Street, the surfaces at the residence contained Lead that was manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants.

25.     In or about January, 1993 Thomas' parent entered into a residential rental agreement with the defendants, Clinton L. and Billie R. Mallett, for the rental of the 25th Street Residence. Thereafter the premises were occupied by Thomas and his family.

26.     During the period that Thomas resided at the 25th Street Residence, the surfaces at the residence contained Lead that was manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants.

27.     Between October 1992 and August 1993, Thomas was a frequent social visitor at a residence located at 4736 North 37th Street, Milwaukee, Wisconsin .

5

28.     Thomas also resided at 4736 North 37th Street between August 10, 1993 and approximately September 23, 1993.

29.     During the period that Thomas was a frequent social visitor at and/or resided at 4736 North 37th Street, the surfaces at the residence contained Lead that was manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants.

30.     The Lead manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants was and is an inherently dangerous product.

31.     Specifically, Lead is hazardous because exposure of children to Lead causes severe and permanent injuries, including, but not limited to learning disabilities, decrements in intelligence, and deficits in a wide range of neuropsychological functioning, including visual motor skills, fine motor skills, verbal skills, attention and concentration, memory, comprehension and impulse control. It can also cause coma, seizure and death.

32.     All of the Lead manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants was virtually identical and interchangeable and shared the same defective qualities.

33.     The Plaintiff is unable to identify the specific manufacturer, supplier and/or distributor of the Lead present in the residences in which he was exposed. The Plaintiff's inability to identify the manufacturer, supplier and/or distributor of the Lead was not and is not the fault of the Plaintiff.

34.     Although the use of Lead was banned in the United States in 1978, Lead is still present in and on many homes, schools, hospitals and other public and private buildings throughout

6

the State, including the 25th Street Residence, the residence located at 2652 North 37th Street, and the residence located at 4736 North 37th Street.

35.    The Industry Defendants knew and/or should have known since at least the early 1900's that Lead is hazardous to human health, and in particular to children.

36.    The Industry Defendants also knew and/or should have known that there were, at all relevant times, safer alternatives to the use of Lead.

37.    Despite their knowledge that Lead, when used as intended, was hazardous to human health, the Industry Defendants continued to manufacture, process, market, promote, supply, distribute and/or sell Lead, failed to warn of the hazardous nature of Lead, and failed to adequately test Lead.

38.    The Industry Defendants also misrepresented and/or failed to disclose the hazardous nature of Lead and intentionally, fraudulently and/or negligently misrepresented products containing Lead as safe.

39.    Specifically, the Industry Defendants engaged in promotional campaigns that failed to disclose the dangers of using and exposing children to Lead. Further, the Industry Defendants misrepresented Lead as a product that fostered health and well-being and that could be used safely on interior and exterior surfaces where the presence of children was likely.

40.    For example, National Lead's publication, Dutch Boy Painter, misrepresented Lead as safe and beneficial to humans. The publication claimed, among other things, the following:

•    "Lead Helps to Guard Your Health."

•    "While lead is invaluable in assuring comfort and proper sanitation, its best-known and most widespread use is as white-lead in paint."

7

- "There is no cause for worry when fingerprint smudges or dirt spots appear on a wall painted with Dutch Boy white lead . . . painted walls are sanitary, cheerful and bright."

- "If a wall is covered with a good water proof coat of paint such as produced with white-lead-oil, its smooth surface is easily washed and need never afford a resting place for germs. That is why every inch of surface in a hospital is painted."

- "In short we recommend pure lead paint without reservations as a safe, time-tested paint to use on your house."

- "One hundred pounds of heavy paste white-lead thinned with two gallons of flatting oil make a good heavy body paint suitable [for use in nurseries]."

41.    Sherwin-Williams followed a similar course of concealment, deception and misrepresentation. Despite its knowledge, Sherwin-Williams' advertisements for its Lead-containing paints failed to disclose the dangers of using and exposing children to these products and misrepresented the product:

- In an advertisement for Lead-containing paint, Sherwin-Williams claimed "Cousin Susie says her health improved instantly" after painting her home with Lead-containing paints.

- Sherwin-Williams proclaimed that its Lead-containing "Semi-Lustre" paint was "[u]nexcelled for bathrooms . . . kitchens . . . stairways . . .nurseries . . . recreation rooms . . . all woodwork."

42.    Despite its knowledge, Glidden also failed to disclose the dangers of using and exposing children to Lead in their advertising, actively marketed its Lead-containing paint for use in areas accessible to children, and misrepresented the health effects of its products:

- After noting that "[p]aint brings . . . sanitation to the school," Glidden specified "Florenamel" and "Jap-a-Lac," both Lead-containing paints, for school classrooms.

- Glidden described a play area painted with Lead-containing paint as "[a] good idea for giving small tots a safe, pleasurable place to play." Lead-containing "Jap-A-Lac" paint was recommended for children's furniture and the fence. Lead-containing Florenamel paint was specified for the floor.

8

43.     Through the LIA, each Industry Defendant knowingly, intentionally, fraudulently and/or negligently omitted adequate warnings about the hazards of Lead, concealed information about the deleterious effects of Lead and deceived consumers, and local, state and federal regulators.

44.     Despite the Industry Defendants' knowledge regarding the hazards of Lead, each failed to disclose the dangers of using and exposing children to Lead and knowingly, intentionally, fraudulently and/or negligently concealed the evidence of Lead's harmful effects on children.

45.     Instead, for decades the Industry Defendants represented Lead as a safe product that fostered health and well-being and promoted Lead for use in areas inhabited by children.

46.     The LIA knowingly, intentionally, fraudulently and/or negligently conducted and/or sponsored misleading advertising and promotions for Lead.  For example,

        a.     A 1934 article in <u>Lead</u>, published by the LIA, discussed the use of Lead on the interiors of a Connecticut school.  In promoting Lead for interiors, the article noted that "[t]he fifteen years of service of white lead interior is more remarkable when it is considered that it is in a school, where wear and tear on painted walls is generally great."

        b.     In the September 1939 issue of <u>Lead</u>, the LIA promoted the use of Lead paint for interior walls, including those in children's bedrooms in low income housing.

        c.     In 1952, the LIA published <u>Lead in Modern Industry</u> that claimed that "white lead adds more desirable qualities to paint than any other white pigment and has practically no undesirable qualities to nullify its advantages."

9

    d.    In a separate chapter of the same publication, the LIA acknowledged that interior and exterior lead paints could create a risk of childhood lead poisoning. Yet, the LIA misrepresented the risk as minimal:

> However, since most inside paints and paints used by manufacturers on children's furniture or toys contain no lead, a hazard usually exists only if children are allowed to chew outside paint surfaces, like porch railings, or if parents inadvertently repaint furniture with outside house paint.

    e.    The LIA continued to distribute <u>Lead in Modern Industry</u>, containing these misrepresentations, through at least 1959.

47.    The LIA also sought to suppress any unfavorable publicity about Lead without regard for the truth of such reports and despite its own knowledge about the hazards posed by Lead. For example:

    a.    A paper was presented in September 1946 at the Seventh Annual Congress on Industrial Health, authored by Felix Wormser, the first secretary and treasurer of the LIA. In that paper, entitled "Facts and Fallacies Concerning Exposure to Lead," Wormser, despite his knowledge that Lead was hazardous to human health, stated that "[c]onsidering the thousands and thousands of homes painted and protected with white lead and the rare and doubtful occurrence of any lead poisoning to the public because of its use, I think that the record here is also in favor of lead."

    b.    The Report of the 1954 Annual Meeting of the LIA lays out some of the activities undertaken by the LIA:

> <u>Hygiene:</u> The following is a summary of our principal activities in the field of lead hygiene in 1953. The importance

10

of this work is tremendous in preventing undue discrimination against lead.

1.      Childhood lead poisoning continues to be our major 'headache' and source of adverse publicity. Threats of poison labeling regulations for lead paints have come from health authorities in New York, Chicago, and some other cities. We are working with the Paint Association to combat these moves .

2.      The research on childhood plumbism at Johns-Hopkins, supported by our grant of $10,000 was completed in October and a report is expected momentarily.

3.      Results of similar work, supported by us for a number of years at Harvard, will soon be published in two papers in the American Journal of Diseases of Children. These findings and those in item 2 should provide us with valuable facts useful in combating the movements reported in 1.

\*     \*     \*

9.      Our investigation, including over 150 analyses of water from red-lead-painted tanks, has enabled us to stop publication of a paper somewhat unfavorable to red lead and secure a promise of revision.

\*     \*     \*

13.     Adverse publicity at the rate of 30 to 40 newspaper items per month has appeared on the effects of lead on children, adults, livestock and wildfowl. Wherever possible these have been followed up with a view to correcting misconceptions and misstatements, often with gratifying results.

c.      To more efficiently execute its campaign of disinformation, the LIA developed a 'health and safety division.' Despite its name, the division's concern was the financial success of the LIA's member companies and not the health and safety of the general public, as evidenced in the following excerpt from the LIA's 1958 Quarterly Report:

11

> Directly or indirectly, the intent of all our health and safety work is to be of service to industry, but certain of its components are so specifically of that nature as to warrant mention in this category. Outstanding here has been the effort to forestall the publication by the Public Health Service of a report inevitably damaging to the 50-year-old custom of coating the interiors of potable water tanks with red lead paint, a proposal reactivated last fall by the producer of a competitive paint.

d.      The following excerpt from the LIA's 1959 Annual Report emphasizes the

mission and role of the 'health and safety' division:

> I want to stress one other important phase of our activities. That is our health and safety work. I can not overemphasize its importance. The toxicity of lead poses a problem that other nonferrous industries generally do not have to face. Lead poisoning, or the threat of it, hurts our business in several different ways. While it is difficult to count exactly in dollars and cents, it is taking money out of your pockets every day.
>                          * * *
> I hope you will agree with me that our health and safety activities are not just an altruistic public service. They can also mean just as much in dollars and cents to you as any market or product development or research program can.

48.      As a result of the intentional, negligent and other wrongful conduct of the Industry

Defendants in manufacturing, processing, marketing, promoting, supplying, distributing and/or

selling Lead, Lead is present in and on the 25th Street Residence, the residence located at 2652 North

37th Street, and the residence located at 4736 North 37th Street.

49.      Beginning on or about August 21, 1991, Thomas sustained lead poisoning by

ingesting Lead derived from intact accessible painted surfaces, paint chips, paint flakes and dust that

was derived from Lead-containing paints and coatings in and on the 25th Street Residence, the

residence located at 2652 North 37th Street, and the residence located at 4736 North 37th Street.

12

50.     During the course of his tenancy at 2652 North 37th Street, Thomas continued to be poisoned by the ongoing ingestion of Lead derived from the surfaces of the aforementioned premises which were painted with Lead-containing paints and coatings.

51.     During the course of his tenancy at the 25th Street Residence, Thomas continued to be poisoned by the ongoing ingestion of Lead derived from the surfaces of the aforementioned premises which were painted with Lead-containing paints and coatings.

52.     C. Mallett and B. Mallett knew, or in the use of ordinary care should have known, that there was intact but deteriorated accessible painted surfaces, as well as, peeling and chipping paint in and on the 25th Street Residence. This knowledge was obtained or should have been obtained prior to Thomas' occupancy of said premises, as well as on numerous occasions during the course of Thomas' tenancy in said premises.

53.     C. Mallett and B. Mallett did not test for the presence of Lead-containing paints and coatings in and on the 25th Street Residence at any time before or during the time Thomas resided there.

54.     On or about August 12, 1993, the City of Milwaukee Health Department notified C. Mallett and B. Mallett that an inspection of the 25th Street Residence disclosed the following:

      a.     the presence of intact accessible Lead-containing painted and coated surfaces;

      b.     loose, peeling, flaking, or chipped paint which contained a hazardous concentration of Lead;

      c.     that the aforementioned conditions tended to cause lead poisoning;

      d.     the aforementioned conditions were a violation of the Milwaukee Code of Ordinances, including but not limited to §66-20, 66-22, and 66-29; and

13

e.     that C. Mallett and B. Mallet were directed to permanently correct the interior violations within thirty days.

55.     The Lead hazards referred to in paragraph 54, which constituted violations of the Milwaukee Code of Ordinances, were not corrected in a timely fashion and continued to pose a health hazard to Thomas throughout his tenancy at said premises and in fact poisoned Thomas by causing catastrophic and toxic levels of lead in his blood stream.

56.     Thomas also sustained lead poisoning by ingesting Lead derived from intact accessible painted surfaces, paint chips, paint flakes and dust that was derived from Lead-containing paints and coatings in and on the residence located at 4736 North 37th Street.

57.     During the course of his social visits and tenancy at the residence located at 4736 North 37th Street, Thomas continued to be poisoned by the ongoing ingestion of Lead derived from the surfaces of the aforementioned premises which were painted with Lead-containing paints and coatings.

58.     Defendants, Henke and Bailey Investment Co., Inc.,knew, or in the use of ordinary care should have known, that there was intact but deteriorated accessible painted surfaces, as well as, peeling and chipping paint in and on the residence located at 4736 North 37th Street. This knowledge was obtained or should have been obtained prior to Thomas' social visits to and/or occupancy of the premises, as well as on numerous occasions during the course of Thomas' tenancy in the premises.

59.     Defendants, Henke and Bailey Investment Co., Inc., did not test for the presence of Lead-containing paints and coatings in and on the residence located at 4736 North 37th Street at any time before or during the time Thomas was a frequent social visitor and/or resided there.

14

60.     On or about February 11, 1993, the City of Milwaukee Health Department notified the Defendants, Henke and Bailey Inverstment Co., Inc., that an inspection of the residence located at 4736 North 37th Street disclosed the following:

      a.     the presence of intact accessible Lead-containing painted and coated surfaces;

      b.     loose, peeling, flaking, or chipped paint which contained a hazardous concentration of Lead;

      c.     that the aforementioned conditions tended to cause lead poisoning;

      d.     the aforementioned conditions were a violation of the Milwaukee Code of Ordinances, including but not limited to §66-20, 66-22, and 66-29; and

      e.     that Defendants, Henke and Bailey Investments Co., Inc., were directed to permanently correct the interior violations within thirty days.

61.     The Lead hazards referred to in paragraph 60, which constituted violations of the Milwaukee Code of Ordinances, were not corrected in a timely fashion and continued to pose a health hazard to Thomas throughout his tenancy and/or social visits at the residence located at 4736 North 37th Street and in fact poisoned Thomas by causing catastrophic and toxic levels of lead in his blood stream.

62.     At all relevant times, the conduct of each Defendant was malicious and in intentional disregard for the rights of the Plaintiff.

63.     As a direct and proximate result of these and other wrongful actions by each Defendant, the Plaintiff has suffered severe and permanent injuries, including, but not limited to, great pain of body and mind and significant neurological deficits, past and future hospital and

15

medical expenses, and impairment of the Plaintiff's ability to live and enjoy life, all in an unspecified amount pursuant to Wisconsin Statutes.

## FIRST CAUSE OF ACTION
### Strict Liability (Manufacturing Defendants)

64.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

65.    The Manufacturing Defendants have at all times material to this action been engaged in the business of manufacturing, promoting, selling, distributing, and/or supplying of Lead which was used in the painting, staining, construction of, and the maintenance and remodeling of the 25th Street Residence, the residence located at 2652 North 37th Street, and the residence located at 4736 North 37th Street.

66.    The Lead that the Plaintiff was exposed to was in substantially the same condition as it was before leaving the control of the Manufacturing Defendants.

67.    At the time that Lead left the possession and control of the Manufacturing Defendants, it was a defective and unreasonably dangerous product because, when used in the manner in which it was intended to be used and/or for the purpose that it was reasonably foreseeable it may have been used, it caused substantial and severe injuries to the Plaintiff.

68.    The defective condition of the Manufacturing Defendants' Lead was a factor that substantially contributed to the Plaintiff's injuries.

## SECOND CAUSE OF ACTION
### Negligence (Industry Defendants)

69.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

16

70.     The Industry Defendants knew or should have known that Lead was harmful to children coming into contact with it.

71.     Despite the knowledge that Lead posed an unreasonable risk to the health and welfare of children exposed thereto, the Industry Defendants continued to manufacture, promote, sell, distribute, and/or supply Lead which was used in and on the 25th Street Residence, the residence located at 2652 North 37th Street, and the residence located at 4736 North 37th Street.

72.     At all times material hereto, the Industry Defendants were under an obligation of due care to refrain from any act which would cause foreseeable harm to others.

73.     At all times material, the Industry Defendants were under a continuing duty to warn about the hazards of their Lead products.

74.     The Industry Defendants also owed a heightened duty of care because their conduct directly impacted the health and welfare of children.

75.     The Industry Defendants breached their duties by engaging in conduct that posed an unreasonable risk of harm, including, among other things:

      a.     selling Lead without warning the general public and/or state, local and federal legislators and regulators of the dangerous characteristics thereof;

      b.     continuing to fail to adequately warn the general public and/or state, local and federal legislators and regulators of the dangerous characteristics of Lead following the sale of their product through the present time;

      c.     failing to adequately test the Lead; and/or

      d.     continuing to manufacture, promote, sell, distribute, and/or supply Lead when they knew, or in the exercise of ordinary care, should have known that Lead was harmful to children and other persons coming into contact with it.

17

76.     The negligence of the Industry Defendants was a factor that substantially contributed to the Plaintiff's injuries.

## THIRD CAUSE OF ACTION
### Negligent Misrepresentations and Omissions (Industry Defendants)

77.     The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

78.     At all times material hereto, the Industry Defendants were under an obligation of due care to refrain from any act which would cause foreseeable harm or unreasonable risk to others.

79.     The Industry Defendants also owed a heightened duty of care because their conduct directly impacted the health and welfare of children.

80.     The Industry Defendants knew or should have known that Lead was harmful to children coming into contact with it.

81.     The Industry Defendants' knowledge of the hazards of Lead exposure was and is superior to the knowledge of the Plaintiff and other purchasers, appliers, consumers and/or users of Lead.

82.     The Industry Defendants breached their duty towards the Plaintiff by negligently making material misrepresentations and omissions regarding the safety, suitability and qualities of Lead to the public at large in their public pronouncements and communications.

83.     The negligence of the Industry Defendants was a factor that substantially contributed to the Plaintiff's injuries.

## FOURTH CAUSE OF ACTION
### Fraudulent Misrepresentations and Omissions (Industry Defendants)

18

84.     The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

85.     The Industry Defendants knew that Lead was harmful to children coming into contact with it.

86.     The Industry Defendants' knowledge of the hazards of Lead exposure was and is superior to the knowledge of the Plaintiff and other purchasers, appliers, consumers and/or users of Lead.

87.     The Industry Defendants through their own public pronouncements and communications intentionally made affirmative misrepresentations and intentional omissions of material facts.

88.     Said affirmative misrepresentations and intentional omissions were material to Plaintiff's decision to live in the residences, as well as visiting, entering and staying in any building, home or residence containing a lead product.

89.     Said affirmative misrepresentations and intentional omissions or implications were made with the knowledge of their falsity and/or with reckless disregard to the truth thereof.

90.     Said affirmative misrepresentations and intentional omissions were made with the intent to mislead the general public and persons such as the Plaintiff.

91.     The Industry Defendants, motivated by economic gain, intended that the Plaintiff, purchasers, appliers, consumers and/or users of Lead rely upon these materially false, incomplete and/or fraudulent statements, representations and warranties.

92.     The Plaintiff, purchasers, appliers, consumers and/or users of Lead reasonably relied upon these materially false, incomplete and/or fraudulent statements, representations and warranties.

19

93.    The Industry Defendants' fraudulent misrepresentations substantially contributed to the Plaintiff's injuries.

## FIFTH CAUSE OF ACTION
### Concert of Action (Industry Defendants)

94.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

95.    The Industry Defendants coordinated their efforts through the LIA to conceal the known hazards of Lead, to mislead the public and the government as to those hazards, and to market and promote the use of the product despite knowledge of the hazards.

96.    By coordinating their efforts through the LIA, each Industry Defendant actively took part in the wrongful conduct of each other Industry Defendant as alleged herein and/or furthered the wrongful conduct of each other Industry Defendant by cooperation or request.

97.    The concerted action of the Industry Defendants' was a factor that substantially contributed to the Plaintiff's injuries.

## SIXTH CAUSE OF ACTION
### Civil Conspiracy (Industry Defendants)

98.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

99.    Two or more of the Industry Defendants coordinated their efforts through the LIA to conceal the known hazards of Lead, to mislead the public and the government as to those hazards, and to market and promote the use of the product despite knowledge of the hazards.

20

100. The Industry Defendants, using a common design, plan, scheme and/or course of conduct, undertook substantial overt acts in furtherance of these purposes, as set forth above.

101. The Industry Defendants' civil conspiracy was a factor that substantially contributed to the Plaintiff's injuries.

## SEVENTH CAUSE OF ACTION
### Enterprise Liability (Industry Defendants)

102. The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

103. The Industry Defendants, acting together and united in the joint prosecution of a purpose, and in a community of interest, created, promoted, directed, governed and adhered to an industry-wide standard of safety in the manufacture, promotion, sale, distribution, and/or supply of Lead.

104. The Industry Defendants also individually and jointly delegated the responsibility for developing industry-wide safety standards and/or practices for Lead to a trade association at a time they were aware of the risks Lead posed to human health and/or at a time they had the joint capacity to reduce or affect those risks.

105. Said joint industry-wide safety standards and/or practices and joint actions and inactions were insufficient and inadequate.

106. The Industry Defendants were jointly aware of the risks involved in exposure to Lead and were jointly capable of reducing or affecting those risks.

107. The creation, promotion, direction, and adherence to an industry-wide safety standards and/or practices in the manufacture, promotion, sale, distribution, and/or supply of

21

Lead by the Industry Defendants was a factor that substantially contributed to the Plaintiff's injuries.

## EIGHTH CAUSE OF ACTION
### Negligence (Landlord Defendants)

108.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

109.    C. Mallett and B. Mallett failed to exercise ordinary care and were negligent with regard to the presence of lead paint at the 25th Street Residence prior to and during the entire time that Thomas resided at said property and was exposed to Lead therein.

110.    Henke and Bailey Investments failed to exercise ordinary care and were negligent with regard to the presence of lead paint at the residence located at 4736 North 37th Street prior to and during the entire time that Thomas was a frequent social visitor at the property and/or resided at the property and was exposed to Lead therein.

111.    The Landlord Defendants' negligence included, but was not limited to, the manner in which they maintained the premises in which the Plaintiff sustained injury.

112.    The negligence of the Landlord Defendants was a factor that substantially contributed to the Plaintiff's injuries.

## NINTH CAUSE OF ACTION
### Violation of Wis. Admin. Code Ch. ATCP 134.04(2)(b)(4)(Landlord Defendants)

113.    The Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint.

114.    At the time Thomas moved into the 25th Street Residence, the residence contained numerous conditions constituting substantial hazards to the health and safety of the

22

tenants, including intact and accessible surfaces, as well as, deteriorated and poorly maintained

surfaces which had been previously painted with lead based paint, said conditions posing an

unreasonable risk of personal injury.

115.    At the time Thomas was a frequent social visitor and/or resided at 4736 North

37th Street, the residence contained numerous conditions constituting substantial hazards to the

health and safety of the tenants, including intact and accessible surfaces, as well as, deteriorated

and poorly maintained surfaces which had been previously painted with lead based paint, said

conditions posing an unreasonable risk of personal injury.

116.    The Landlord Defendants knew or should have known of said hazardous

conditions.

117.    C. Mallett and B. Mallett failed to disclose the existence of said hazardous

conditions to Thomas and his parents in violation of Wis. Admin. Code Ch. ATCP

134.04(2)(b)(4).

118.    Henke and Bailey Investments Company failed to disclose the existence of said

hazardous conditions to Thomas and his parents in violation of Wis. Admin. Code Ch. ATCP

134.04(2)(b)(4).

119.    The Landlord Defendants' violations of Wis. Admin. Code Ch. ATCP

134.04(2)(b)(4) were factors that substantially contributed to the Plaintiff's injuries.

## TENTH CAUSE OF ACTION
### Negligence Per Se (Landlord Defendants )

120.    The Plaintiff realleges and incorporates herein by reference the foregoing

paragraphs of this complaint.

23

121.     The failure of C. Mallett and B. Mallett to timely comply with the notice and order of the Milwaukee Health Department referred to above after having received a copy of said order, was a violation of the Milwaukee Code of Ordinances, §§ 66-20, 66-22, and 66-29 and constituted negligence per se.

122.     The failure of Henke and Bailey Investments to timely comply with the notice and order of the Milwaukee Health Department referred to above after having received a copy of said order, was a violation of the Milwaukee Code of Ordinances, §§ 66-20, 66-22, and 66-29 and constituted negligence per se.

123.     The aforementioned negligence per se was a factor that substantially contributed to the Plaintiff's injuries.


WHEREFORE the Plaintiff demands judgment against each Defendant, jointly and severally, as follows:

1.     For the Plaintiff, Steven Thomas, in an unspecified amount pursuant to Wisconsin Statutes, including but not limited to compensatory and punitive damages, as well as, twice the amount of pecuniary loss pursuant to § 100.20(5), Wis. Stats;

2.     For pre-judgment and post-judgment interest, together with the costs, disbursements and attorneys fees of this action pursuant to § 100.20(5), Wis. Stats.;

3.     For any other remedy the court deems just and equitable under the circumstances.

24

PLAINTIFF HEREBY DEMANDS A JURY TRIAL.

Dated at Milwaukee, Wisconsin, this 10ᵗʰ day of September, 1999.

BOYNTON & EARLE
Attorneys for Plaintiff

By: _____

PETER EARLE
State Bar No. 1012176
2266 No. Prospect Ave., Suite 505
Milwaukee, WI 53202
(414) 276-1076

Of Counsel:

John J. McConnell, Jr.
Robert J. McConnell
Fidelma L. Fitzpatrick
NESS, MOTLEY, LOADHOLT,
RICHARDSON & POOLE, P.C.
321 South Main Street
P.O. Box 6067
Providence, Rhode Island 02903
(401) 521-9400

Ronald L. Motley
Susan Nial
Anne McGinness Kearse
NESS, MOTLEY, LOADHOLT,
RICHARDSON & POOLE, P.C.
151 Meeting Street, Suite 600
P.O. Box 1137
Charleston, South Carolina 29402
(843) 720-9000

R. Bruce Carlson
PIERCE, RAIMOND, OSTERHOUT,
    WADE, CARLSON & COULTER, P.C.
2500 Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219
(412) 281-7229

F:\lead\thomas\complai2.wpd

25

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT N

STATE OF WISCONSIN　　　　CIRCUIT COURT　　　　MILWAUKEE COUNTY 2547

GLENN BURTON, JR., Minor, by his
guardian *ad litem*, SUSAN M.
GRAMLING,

　　Plaintiffs,

**COMPLAINT**

　　　　vs.

Case No. _____

AMERICAN CYANAMID CO.;
ARMSTRONG CONTAINERS, INC.;
CONAGRA FOODS, INC.; E.I. DUPONT
DENEMOURS & COMPANY; LEAD
INDUSTRIES ASSOCIATION, INC.;
MILLENNIUM HOLDINGS, LLC; NL
INDUSTRIES, INC., THE ATLANTIC
RICHFIELD COMPANY; THE
SHERWIN-WILLIAMS COMPANY;
DEPARTMENT OF HEALTH AND
FAMILY SERVICES, STATE OF
WISCONSIN;

Case code 30107

```
FILED
Authenticated

O    DEC 2 6 2006    O

JOHN BARRETT
Clerk of Circuit Court
```

　　Defendants.

---

　　　　Now comes the above-named Plaintiff, by his attorneys, for a cause of action against the

above- named defendants, and alleges and shows to the Court as follows:

## I.　　PARTIES

1.　　Glenn Burton, Jr. is a minor and is a resident of the State of Wisconsin, residing at 1320 W.

Locust Street, Milwaukee WI.

2.　　Susan M. Gramling is guardian *ad litem* for Glenn Burton, Jr. and is a resident of the State of

Wisconsin.

3.　　The Department of Health and Family Services, State of Wisconsin, has made certain

1

001496

payments on behalf of the Plaintiff, with respect to medical, hospital and/or disability expenses which were incurred by the Plaintiff as a result of the unlawful acts alleged herein. Said Defendant is joined as a party for the purpose of complying with the provisions of § 803.03 Wis. Stats.

4.     American Cyanamid Company ("American Cyanamid") is being sued in its own capacity and is a Maine corporation with its principal place of business in New Jersey.

5.     Armstrong Containers, Inc. ("Armstrong") is being sued in its capacity as the successor-in-interest to the John R. MacGregor Co. and the MacGregor Lead Company, and is a Delaware corporation with its principal place of business in Georgia.

6.     ConAgra Foods, Inc. ("ConAgra"), the successor-in-interest to WP Fuller and Fuller-O'Brien, is a Delaware corporation with its principal place of business in Nebraska.

7.     E.I. DuPont DeNemours & Company ("DuPont") is a Delaware corporation with its principal place of business in Delaware.

8.     Millennium Holdings, LLC ("Millennium'), the successor-in-interest to Glidden Paints, is a Delaware corporation with its principal place of business in Texas.

9.     NL Industries, Inc. ("NL Industries") formerly known as the National Lead Company, is a New Jersey corporation with its principal place of business in Texas.

10.     The Atlantic Richfield Company ("ARCO"), the successor-in-interest to International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Sales Company, Anaconda Copper Mining Company, and International Lead Refining Company, is a Delaware corporation with its principal place of business in California.

11.     The Sherwin-Williams Company ("Sherwin-Williams") is an Ohio corporation with its

2

001497

principal place of business in Ohio.

12.     At all pertinent times, American Cyanamid, Armstrong, ConAgra, DuPont, Millennium, NL Industries, ARCO and Sherwin-Williams (hereafter referred to collectively as "Industry Defendants") together with their agents, servants, employees, alter egos, and predecessor corporations, designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold white lead carbonate products used as a pigment in paints and coatings for residential use in the State during the relevant time period.

## II.     FACTS

13.     On or about February 25, 2002, Glenn Burton, Jr.'s family purchased the property located at 1320 W. Locust Street, Milwaukee, Wisconsin. Thereafter, the 1320 W. Locust Street premises were occupied by the Plaintiff and his family until present time.

14.     During the period the Plaintiff has resided at 1320 W. Locust Street, Milwaukee, Wisconsin, the surfaces of the residence was coated with paint containing white lead carbonate pigment that was designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants thereby causing the Plaintiff to be exposed to and ingest said white lead carbonate.

15.     The white lead carbonate pigment designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants was and is an inherently defective and unreasonably dangerous product.

16.     Specifically, the white lead carbonate designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold by the Industry Defendants is hazardous because

3

001498

exposure of children to white lead carbonate causes severe and permanent injuries, including, but not limited to learning disabilities, decrements in intelligence, and deficits in a wide range of neuropsychological functioning, including visual motor skills, fine motor skills, verbal skills, attention and concentration, memory, comprehension and impulse control. It can also cause coma, seizure and death.

17.    The Industry Defendants designed the white lead carbonate so as to allow them to distinguish between different grades at the point of sale and promoted the various grades for different purposes despite the fact that all of the white lead carbonate designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold for use in paint by the Industry Defendants was functionally interchangeable, physically indistinguishable and identically defective.

18.    The Plaintiff is unable to identify the specific manufacturer, supplier and/or distributor of the white lead carbonate present in the residences in which he was exposed. The Plaintiff's inability to identify the manufacturer, supplier and/or distributor of the white lead pigment was not and is not the fault of the Plaintiff.

19.    The white lead carbonate designed, manufactured, promoted, and sold by the Industry Defendants was in a condition not contemplated by the ultimate consumer and was dangerous to an extent beyond that which was contemplated by the ordinary consumer.

20.    Although the use of all leaded pigments was banned in the United States in 1978, white lead carbonate is still present in and on many homes, schools, hospitals and other public and private buildings throughout the State, including the premises located at 3123 North 41st Street, Milwaukee, Wisconsin.

4

001499

21.     Industry Defendants knew and/or should have known since at least the early 1900's that

white lead carbonate is hazardous to human health, and in particular to children.   For example,

in an 1881 booklet entitled "Paints and Painting," Sherwin-Williams wrote:

> "*While it is true that carbonate of lead possesses some of the best elements of paint, it is also true that in other respects it is defective.*"

In another example, in its employee newsletter for the month of January 1900,

Sherwin-Williams published the following statement:

> "*It is also familiarly known that white lead is a deadly cumulative poison, while zinc is innocuous.  It is true, therefore, that any paint is poisonous in proportion to the percentage of lead contained in it.*"

In an additional example, in its employee newsletter for the month of May, 1915,

Sherwin-Williams published the following statement:

> "*White lead . . . has some fatal defects, chief of which is the tendency to 'chalk' off after exposure for a year or two.*"

22.     The Industry Defendants also knew and/or should have known that there existed, at all

relevant times, safer alternatives to the use of white lead carbonate as a pigment for residential paints

and coatings.

23.     In 1971, after decades of medical research had unambiguously implicated lead pigments,

including white lead carbonate as the major contributing force in childhood lead poisoning, and at a

time when the majority of paint and pigment manufacturers had ceased production of whitelead

carbonate, American Cyanamid entered the white lead carbonate market.

24.     Despite their knowledge that white lead carbonate pigment, when used as designed and as

intended, was hazardous to human health, each of the Industry Defendants continued to design,

5

001500

manufacture, process, market, promote, supply, distribute and/or sell white lead carbonate pigments, failed to warn of the hazardous nature of white lead carbonate pigment, and failed to adequately test white lead carbonate pigments.

25.    Each of the Industry Defendants also contributed to the creation of a risk of harm to children when it failed to disclose the hazardous nature of white lead carbonate and instead marketed and represented its products containing white lead carbonate as safe.

26.    Specifically, the Industry Defendants engaged in promotional campaigns that failed to disclose the dangers of using and exposing children to paint and coatings products containing white lead carbonate pigments. Further, the Industry Defendants marketed paints and coatings containing white lead carbonate as a product that fostered health and well-being and that could be used safely on interior and exterior surfaces where the presence of children was likely.

27.    Despite the knowledge of each of the Industry Defendants regarding the hazards of white lead carbonate when used as a pigment in residential paint, each failed to disclose the dangers of using and exposing children to white lead and each thereby knowingly contributed to the creation of the risk of harm to the Plaintiff.

28.    Instead, for decades the Industry Defendants marketed white lead carbonate as a safe product that fostered health and well-being and promoted white lead as a pigment for use in areas inhabited by children.

29.    Each of the Industry Defendants also contributed to the creation of the risk of harm to the Plaintiff through participation in trade associations such as the Lead Industries Association ("LIA") and the National Paint, Varnish, & Lacquer Association (NPVLA), and said activity included, *inter*

6

*alia*, marketing white lead carbonate as a pigment in paint through misleading advertisements and promotions.

30.    The LIA is not a party because it is presently under the protection of the bankruptcy laws in the United States. From at least 1928 through the events material to allegations of this complaint, the LIA was the agent, servant, employee, alter ego, aider and abettor of one or more of the Industry Defendants and acted individually and/or within the scope of its agency, servitude and employment in promoting and marketing white lead carbonate products used as a pigment in paints and coatings for residential use in the State of Wisconsin during the relevant time period.

31.    Through the LIA and NPVLA, each of the Industry Defendants also sought to suppress all unfavorable information and publicity about white lead carbonate without regard for the truth of such information and despite its own contrary knowledge about the severe hazards posed by white lead carbonate when used as a pigment in paint.

32.    As a result of the intentional, negligent and other wrongful conduct of the Industry Defendants in designing, manufacturing, processing, marketing, promoting, supplying, distributing and/or selling white lead carbonate, said hazardous product is present in and on the residence located at 1320 W. Locust Street, Milwaukee, Wisconsin.

33.    Beginning on or about August 19, 2002, the Plaintiff sustained lead poisoning by ingesting white lead carbonate derived from intact accessible painted surfaces, paint chips, paint flakes and dust that was derived from paints and coatings in and on the residence located at the premises located at 1320 W. Locust Street, Milwaukee, Wisconsin.

34.    During the course of his residency at 1320 W. Locust Street, Milwaukee, Wisconsin, the

7

001502

Plaintiff continued to be poisoned by the ongoing ingestion of white lead carbonate derived from the surfaces of the aforementioned premises which were painted with paints and coatings containing said pigment.

35.    At all relevant times, the conduct of the Defendants was malicious and in reckless and/or intentional disregard for the rights of the Plaintiff.

36.    As a direct and proximate result of these and other wrongful actions by the Defendants, the Plaintiff has suffered severe and permanent injuries, including, but not limited to, great pain of body and mind and significant neurological deficits, past and future hospital and medical expenses, and impairment of the Plaintiff's ability to live and enjoy life, all in an unspecified amount pursuant to Wisconsin Statutes.

### III.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Strict Liability (Industry Defendants)

37.    The Plaintiff re-alleges and incorporates herein by reference the foregoing paragraphs of this complaint.

38.    The Industry Defendants have at all times material to this action been engaged in the business of designing, manufacturing, promoting, selling, distributing, and/or supplying of white lead carbonate which was used in the painting, staining, construction of, and the maintenance and remodeling of the residence located at 1320 W. Locust Street, Milwaukee, Wisconsin.

39.    The white lead carbonate that the Plaintiff was exposed to was in substantially the same condition as it was before leaving the control of the Industry Defendants.

40.    At the time that the white lead carbonate left the possession and control of the Industry

8

001503

Defendants, it was a defective and unreasonably dangerous product because, when used in the manner in which it was intended to be used and/or for the purpose that it was reasonably foreseeable it may have been used, it caused substantial and severe injuries to the Plaintiff.

41.     The defective condition of the white lead carbonate designed, manufactured, marketed, promoted, supplied, distributed and/or sold by Industry Defendants was a factor that substantially contributed to the Plaintiff's injuries.

## SECOND CAUSE OF ACTION
### Negligence (Industry Defendants)

42.     The Plaintiff re-alleges and incorporates herein by reference the foregoing paragraphs of this complaint.

43.     The Industry Defendants knew or should have known that white lead carbonate when used as a pigment in residential paints and coatings was harmful to children coming into contact with it.

44.     Despite the knowledge that white lead carbonate posed an unreasonable risk to the health and welfare of children exposed thereto, the Industry Defendants continued to design, manufacture, promote, sell, distribute, and/or supply white lead carbonate which was used in and on the residence located at 1320 W. Locust Street, Milwaukee, Wisconsin.

45.     At all times material hereto, the Industry Defendants were under an obligation of due care to refrain from any act which would cause foreseeable harm to others.

46.     At all times material, the Industry Defendants were under a continuing duty to warn about the hazards of their white lead carbonate products.

47.     The Industry Defendants also owed a heightened duty of care because their conduct directly impacted the health and welfare of children.

9

001504

48.     The Industry Defendants breached their duties by engaging in conduct that posed an unreasonable risk of harm, including, among other things:

    a.     selling white lead carbonate without warning the general public, including but not limited to, consumers, ultimate users, retailers, wholesalers, third party paint manufacturers, and other intermediaries, of the dangerous characteristics thereof;

    b.     continuing to fail to adequately warn the general public of the dangerous characteristics of white lead carbonate following the sale of its product through the present time;

    c.     failing to adequately test white lead carbonate for use in residential paints and coatings; and/or

    d.     continuing to design, manufacture, promote, sell, distribute, and/or supply white lead carbonate for use in residential paints and coatings when they knew, or in the exercise of ordinary care, should have known that white lead carbonate was harmful to children and other persons coming into contact with it.

49.     The negligence of the Industry Defendants was a factor that substantially contributed to the Plaintiff's injuries.

        WHEREFORE the Plaintiff demands judgment against each Defendant, jointly and severally, as follows:

1.     For the Plaintiff, Glenn Burton Jr., in an unspecified amount pursuant to Wisconsin Statutes, including but not limited to compensatory and punitive damages;

2.     For pre-judgment and post-judgment interest, together with the costs, disbursements of this

10

001505

action;

3.    For any other remedy the court deems just and equitable under the circumstances.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL.

Dated at Milwaukee, Wisconsin, this 22ᵈ day of December, 2006.

LAW OFFICES OF PETER EARLE

Peter G. Earle (WI State Bar No. 1012176)
Attorney for Plaintiff
700 North Water Street, Suite 646
Milwaukee, WI 53202
(414)276-1076

MOTLEY RICE LLC

Jonathan D. Orent (WI State Bar No. 1062035)
Michael G. Rousseau (WI State Bar No. I062037)
Attorneys for Plaintiff
321 South Main Street
P.O. Box 6067
Providence, RI 02940-6067
(401) 457-7700

11

001506

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT O

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MANIYA ALLEN, et al.,**
        **Plaintiffs,**

v.

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

**CASE NO. 11-CV-0055**

---

**DIJONAE TRAMMELL,**
        **Plaintiff,**

v.

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

**CASE NO. 14-CV-1423**

---

**ERNEST GIBSON,**
        **Plaintiff,**

v.

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

**CASE NO. 07-CV-0864**

---

**DESIREE VALOE, et al.,**
        **Plaintiff,**

v.

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

**CASE NO. 11-CV-0425**

---

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND MOTION TO RECONSIDER THE COURT'S ORDER OF SUMMARY JUDGMENT ON WAVE 2 PLAINTIFFS' NEGLIGENT FAILURE TO WARN CLAIMS**

1

# TABLE OF CONTENTS

**INTRODUCTION** ……………………………………………………………………5

**BACKGROUND** ……………………………………………………………………6

**LEGAL STANDARD** ……………………………………………………… 8

**ARGUMENT** ………………………………………………………………… 8

    **I.**    **Defendants had a duty to warn of the hidden dangers of lead paint, including those of lead dust, in the 1990s, 2000s and beyond**…..……………………………………9

        **A.**  **Defendants had a duty to warn of the specific nature of WLC's risks**………… 9

        **B.**  **Defendants knew of the specific and unique dangers of lead dust**………………11

        **C.**  **Plaintiffs and consumers did not contemplate the hidden risks of lead dust**……13

            **1.**  **Evidence of Plaintiffs' and their caregivers' lack of knowledge**…………...13

            **2.**  **Evidence of the general public's lack of knowledge**…………………………14

                **a.**  **Evidence of consumer knowledge already adduced**………………….. 14

                **b.**  **Dr. Jacobs' November 2021 Report and reliance documents provide additional evidence of a lack of consumer knowledge of the dangers of lead dust**………………………………………………………………16

                **c.**  **Defendants' recent documentation production demonstrates consumers in the 1900s/2000s were unaware of the dangers of lead dust**…………..21

    **II.**  **Because Defendants had a duty to warn, summary judgment is not available on Plaintiffs' negligent failure to warn claims, and the Court should revisit its ruling in the Wave 2 cases**………………………………………………………………..24

    **III.**  **Summary judgment is not appropriate on Plaintiffs' strict liability claims because Defendants' WLC is unreasonably dangerous**…………………………………….25

    **IV.**  **Neither "law of the case" nor "issue preclusion" require judgment as a matter of law**……………………………………………………………………………………26

        **A.**  **"Law of the case" does not bar Plaintiffs' failure to warn claims**……………...28

        **B.**  **"Issue preclusion" does not prevent Plaintiffs' failure to warn claims**………..29

    **V.**  **Atlantic Richfield is not entitled to summary on it's "additional" predecessor liability and component manufacturer arguments**…………………………………30

**CONCLUSION**………………………………………………………………………33

2

# TABLE OF AUTHORITIES

Cases

*Allen v. AM. Cyanamid Co*., 527 F. Supp. 3d 982, (E.D. Wis. 2021).........................................6-11

*Antwaun A. v. Heritage Mut. Ins. Co*., 596 N.W.2d 456 (Wis. 1999) ......................................... 24

*Arizona v. California*, 460 U.S. 605 (1983)................................................................................... 28

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found*., 402 U.S. 313, 321, 322 n.8 (1977) ............. 29

*Burton v. Am. Cyanamid*, 334 F. Supp. 3d 949 (E.D. Wis. 2018)................................................ 23

*Burton v. E.I. du Pont de Nemours & Co*., 994 F.3d (7th Cir. 2021) ("*Burton*") ................... 6,14,23

*Carmody v. Bd. of Trs. of the Univ. of Ill.*, 893 F.3d 397 (7th Cir. 2018)...................................... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 8

*Estate of Schilling v. Blount, Inc,* 449 N.W.2d 56 (Wis. Ct. App. 1989) .................................... 14

*Hansberry v. Lee*, 311 U.S. 32 (1940) ........................................................................................... 29

*Horst v. Deere & Co.*, 769 N.W.2d 536 (Wis. 2009) .................................................................... 14

*Insolia v. Phillip Morris, Inc*., 216 F.3d 596 (7th Cir. 2000) ....................................................... 26

*Jaburek v. Foxx*, 813 F.3d 626 (7th Cir. 2016)................................................................................ 8

*Kozlowski v. John E. Smith's Sons Co.*, 275 N.W.2d 915 (Wis. 1979) ......................................... 11

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. (1986)....................................... 8

*Peace v. Northwestern Nat'l Ins. Co*., 596 N.W.2d 429 (Wis. 1999)........................................... 23

*Michelle T. v. Crozier,* N.W.2d 327 (Wis. 1993)......................................................................... 30

*Overseas Shipholding Group, Inc. v. Skinner,* 767 F. Supp. 287 (D.C.D.C. 1991)..................... 27

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979).................................................... 29

*Payne v. Churchich*, 161 F.3d 1030 (7th Cir. 1998).………………………………………………………28

*People v Atlantic Richfield Company, et al.,* Superior Court of California, County of Santa Clara,

    Case No. 1-00-CV-788657, Amended Statement of Decision at 98) ....................................... 17

*Robinson v. Ada S. McKinley Community Services, Inc.,* 19 F. 3d 359 (7th Cir. 1994)................... 6

*Salima v. Scherwood S., Inc*. 38 F.3d 929 (7th Cir. 1994)............................................................. 8

*Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015) ........................................................................ 8

*Tanner v. Shoupe*, 596 N.W.2d (Ct. App. 1999)........................................................................... 11

*Taylor v. Sturgell*, 553 U.S. 880 (2008)....................................................................................... 29

*Thomas ex. Rel. Gramling v. Mallet*, 701 N.W.2d  (Wis. 2005) ................................................7-8

Statutes

S-W Br. at 8 (quoting WIS. JI-CIVIL § 3242) (emphasis added) .................................................. 8

Other Authorities

Housing and Community Development Act of 1992. Title X. Public Law 102-550, Sections
    1002(8) and 1003(7)) ............................................................................................................ 18

Subcommittee on Public Health, US Senate Health, Education, Labor and Pensions Committee,
    November 15, 1999, Lewiston, Maine) ................................................................................. 21

4

## INTRODUCTION

With one minor exception,[1] Defendants' arguments for summary judgment[2] hinge entirely on their request for a finding of fact that Defendants owed no duty to warn Plaintiffs because "by the time the plaintiffs suffered their alleged injuries, the dangers of WLC and lead in general were well known." *See Allen v. AM. Cyanamid Co.*, 527 F. Supp. 3d 982, 997 (E.D. Wis. 2021). As demonstrated below, the specific risks associated with children's ingestion of invisible White Lead Carbonate ("WLC") dust on the floors and surfaces of their homes were, or should have been, known to Defendants, but were not contemplated by ordinary consumers (moms, dads, and caregivers) at the time of Plaintiffs' injuries starting in the 1990s.[3] As such, Defendants had a

---

[1] Atlantic Richfield makes the "additional" argument that it alone is entitled to summary judgment on the grounds "to the extent its alleged predecessors supplied white lead carbonate as a component in paint." Dkt. No. 1079 at 5, 11-cv-00055.

[2] Sherwin Williams Company ("Sherwin-Williams") moved for summary judgment against "all Plaintiffs' claims in all remaining risk-contribution cases," arguing that Plaintiffs' negligence and strict liability failure to warn claims are legally insufficient, and there are no triable issues in these cases." *See* Dkt. No. 1084, 11-cv-00055 ("S-W Br."). Armstrong Containers, Inc. ("Armstrong") and E.I. du Pont de Nemours & Co. ("DuPont") filed notices of joinder in Sherwin-Williams' motion for summary judgment. *See* Dkt. Nos. 1087 (hereafter "Armstrong's Br.") and 1089 (hereafter "DuPont Br."), 11-cv-00055. Atlantic Richfield Company ("ARCO") filed its own, separate motion for summary judgment on "all plaintiffs' claims," similarly dependent on the assertion that Plaintiffs are unable to prove a duty to warn exists. *See* Dkt. No. 1079, 11-cv-00055 ("ARCO Br."). Defendants filed their motions and joinders in each of the four remained actions. *See* Dkts. *Allen v. American Cyanamid Co., et al* (No. 11-cv-00055), *Gibson v. American Cyanamid Co., et al* (No._07-cv-00864), *Valoe v. American Cyanamid Co., et al* (No. 11-cv-00425), and *Trammell v. American Cyanamid Co., et al* (No. 14-cv-01423). The motions and memorandums filed in each action are materially identical. Plaintiffs respond to all of Defendants' motions herein.

[3] *See* Plaintiffs' Response to Sherwin-Williams's Statement of Proposed Material Facts in Support of Its Renewed Motion for Summary Judgment, along with exhibits cited therein; *see also* the Plaintiffs' Statement of Additional Facts That Require Denial of Summary Judgment ("Stat. Add. Facts") appended to the Plaintiffs' Response, citing Ex. A attached to the Declaration of Fidelma Fitzpatrick ("Declaration"), filed contemporaneously herewith; *see also* Stat. Add. Facts ¶ 3, Exs. V, W, and X; ¶ 6, Ex. S, Y, Z; ¶ 12, Ex. E; 14, Ex. P, Q, R, V, W, X; ¶ 15-16, Ex. G; ¶ 18, Ex. H; ¶ 19, Ex. I; ¶ 20, Ex. D; ¶¶ 2122, Ex. J; and ¶ 23, Exs. T and U. The Statements of Additional Facts in response to Sherwin Williams's motion are incorporated by reference in Plaintiffs' responses to ARCO's, Armstrong's and DuPont's statements of fact. Thus, in the interest of economy, Plaintiffs cite to the additional facts filed in response to Sherwin-Williams's motion, herein.

duty to warn of those hidden dangers of their WLC-containing paint products, and their failure to do so renders them negligent and their products defective. At the very least, a question of fact exists as to the level of consumer knowledge, and as a result, the existence of a duty.

For the reasons below, the Court should: (1) deny summary judgment on the remaining Plaintiffs' negligence and strict liability failure to warn claims; and (2) revisit its decision on Wave 2 Plaintiffs' negligence failure to warn claims.

## **BACKGROUND**

Defendants argue that there is no cause of action available to any of the children poisoned by their WLC products despite the clear mandate of the Wisconsin Supreme Court in *Thomas ex. Rel. Gramling v. Mallett*, 701 N.W.2d 523 (Wis. 2005). As *Thomas* is still controlling Wisconsin law on Plaintiffs' risk-contribution claims, it cannot simply be washed away by the Seventh Circuit's opinion in *Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791 (7th Cir. 2021) ("*Burton*"). *See Robinson v. Ada S. McKinley Community Services, Inc.,* 19 F. 3d 359, 363 (7th Cir. 1994) (federal courts sitting in diversity are bound by the decisions of a state's highest court.). That is effectively what is at risk with Defendants' motions.

Plaintiffs suffered childhood injuries due to poisoning from paint containing WLC— precisely the same injury suffered by plaintiff Thomas. *See* Stat. Add. Facts ¶ 2, Exs. A and B. There is no fact of consequence distinguishing Thomas's case from those brought by these Plaintiffs. In fact, Thomas himself was "born on June 23, 1990," and alleged "that he sustained lead poisoning by ingesting lead paint from accessible painted surfaces, paint chips, and paint flakes and dust at two different houses he lived in during the early 1990's." *Thomas*, 701 N.W.2d at 528. Specifically, Thomas claimed to be poisoned by the lead paint in the houses he

6

inhabited as late as "November 1993." *Id.*[4] Defendants still insist, however, that there is absolutely no path to recovery for Plaintiffs, because they had no duty to warn consumers in the 1990s—such as Thomas and Plaintiffs—of the dangers of their WLC product. That simply cannot be without superseding or abrogating the Wisconsin Supreme Court's decision in *Thomas*—which was specifically intended to, and did, create a cause of action for these children. *See Thomas*, 701 N.W.2d 523. Furthermore, to do so would violate each lead-poisoned child's Constitutional right to a remedy that was explicitly recognized by the Wisconsin Supreme Court in *Thomas.*

Based upon the Seventh Circuit's ruling in *Burton*, Defendants moved for summary judgment in all remaining risk-contribution cases. Defendants concede, however, that the appellate court's opinion in *Burton* reversed the jury's verdicts in those cases on a few, purely legal grounds. S-W Br. at 1. None of those rulings require summary judgement on the remaining Plaintiffs' claims. In fact, only one of those rulings is even pertinent to Defendants' current motions: the scope of Defendants' duty to warn.

As such, Plaintiffs previously requested the opportunity to take additional discovery on the issue of whether a duty to warn existed at the time of their injuries, and the Court granted Plaintiffs ninety days to "conduct discovery limited to the issue of whether the defendants knew of dangers presented by the product which were not known to consumers at the time of the injuries." Order Staying Non-Remanded Cases and Allowing Discovery, Aug. 24, 2021, Dkt. No. 1862, 07-cv-00303. Accordingly, Plaintiffs served additional discovery requests on Defendants, and Plaintiffs' experts, Dr. David Jacobs and David Rosner, have provided reports

---

[4] While the Wisconsin Supreme Court did not specifically address Defendants' duty to warn in *Thomas*, claims based upon the existence of such a duty were ultimately allowed to go to a jury. *Thomas*, 701 N.W.2d at n.2.

7

addressing the question of the public's general understanding of lead paint and the contaminated dust and soil it generates. *See* Ex. C, Expert Report of David E. Jacobs ("Jacobs Report"); Ex. M, Expert Report of David Rosner ("Rosner Report"). As demonstrated below, the evidence clearly establishes Defendants' duty to warn based upon their knowledge of the dangers associated with WLC-containing dust, which were not commonly known by consumers in the 1990s and 2000s.

## LEGAL STANDARD

Summary judgment is granted when "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jaburek v. Foxx*, 813 F.3d 626, 630-31 (7th Cir. 2016); *see also* Federal Rule of Civil Procedure ("Rule") 56. Disputes of material fact are those that create "a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Salima v. Scherwood S., Inc*. 38 F.3d 929, 931 (7th Cir. 1994) ("Where there are genuine disputes of material fact, resolution is capable only through trial, and summary judgment is, therefore, inappropriate."). The moving party has the burden of showing that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). The Court must draw "all inferences in the light most favorable to the non-moving party[.]" *Id.*

## ARGUMENT

Defendants assert that Plaintiffs cannot establish a warning defect under negligence because "a manufacturer … does not have a duty to warn about dangers that are … *so commonly known* that it can reasonably be assumed that users will be familiar with them." *E.g.,* S-W Br. at 8 (quoting WIS. JI-CIVIL § 3242) (emphasis added). Similarly, Defendants argue Plaintiffs

8

cannot establish a duty to warn under strict liability because "the widespread public awareness of the alleged danger [of lead] before the time of all Plaintiffs' exposure bars strict liability." *E.g., id*. at 11. As such, the crux of the issue on both negligence and strict liability is Plaintiffs' ability to establish Defendants had a duty to warn of unknown risks of lead paint. As Plaintiffs can, and will, establish Defendants were aware of "hidden dangers" of lead paint not contemplated by consumers at the time of their injuries, they were under a duty to warn of those dangers, and their failure to do so constitutes negligence and a defect under strict liability. As such, Plaintiffs respectfully request the Court deny Defendants' motions for summary judgement.

I.    **Defendants had a duty to warn of the hidden dangers of lead paint, including those of lead dust, in the 1990s, 2000s, and beyond.**

At the very least, the evidence below is sufficient to create a triable issue of fact with regard to when, *if ever,* the specific, hidden dangers posed by WLC-containing household dust became so commonly understood as to extinguish Defendants' duty to warn.

A.    **Defendants had a duty to warn of the specific nature of WLC's risks.**

Defendants do not cite to a single piece of evidence, line of testimony, or expert opinion supporting their fact-based argument that consumers in the 1990s and early 2000s were aware of the dangers of lead dust. *See* ARCO Br. at 2-5; S-W Br. at 5, 8-11. For that reason alone, their motions for summary judgment should fail.

It is true that in previously holding that the *Burton* plaintiffs' caregivers were aware of the general toxicity of lead, and that children should not eat paint chips, this Court opined that paint manufacturers issued product warnings, and that federal, state, and local governments began warning of the risks of lead-based paint in homes in the 1970s. *Burton v. Am. Cyanamid*, 334 F. Supp. 3d 949, 961 (E.D. Wis. 2018). The Court also pointed to the *Burton* plaintiffs' caregivers' deposition testimony for support that they knew, before the *Burton* plaintiffs' exposures to lead-

9

based paint, that children should not eat paint chips because of the risk of lead exposure. *Id.* Subsequently, the Court found judgement as a matter of law to be appropriate on Wave 2 Plaintiffs' negligent failure to warn claims based upon its prior holding that "by the time the plaintiffs suffered their alleged injuries, the dangers of WLC and lead in general were well known and WLC manufacturers and sellers had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in their paint, and of the various mechanisms by which that lead might be ingested." *Allen*, 527 F. Supp. 3d at 997.

The Court's prior analyses, however, were incomplete because they focused on consumers' knowledge of the *general* dangers of lead, and the ingestion of lead paint *chips*. They did not sufficiently consider the specific, hidden dangers presented by lead *dust*. Stat. Add. Facts ¶ 1, Exs. D, E, F, G, H; ¶ 4., Exs. D, I, J; ¶ 7, Ex. I; ¶¶ 89, Ex. D; and ¶ 10, Ex. K. Defendants' actual knowledge of these insidious hazards establishes a duty to warn Plaintiffs and their caregivers, and those similarly situated. *Id.* ¶ 1, Ex. D ; ¶ 7, Ex. I; ¶ 11, Ex. E; ¶ 12, Ex. F ¶ 23, Exs. G and H.

In *Thomas*, the Wisconsin Supreme Court noted the "more common" dangers of lead dust. 701 N.W.2d at 533 ("a child does not have to eat paint chips to become poisoned. It is more common for children to ingest dust and soil contaminated with lead from paint that either has flaked or chalked as it aged or has been otherwise disturbed during home maintenance or renovation."). In fact, this Court's ruling regarding the *Burton* plaintiffs' negligent failure to warn claims is at odds with the opinion's later recognition of the true, hidden dangers of Defendants' products (in its discussion of Defendants' duty to warn on strict liability):

> The parties agree that since Greek and Roman times, it has been common knowledge that lead is toxic if too much is ingested; thus if the only danger of WLC were that it is toxic when consumed directly, the manufacturer would be under no special duty to warn about the toxicity of lead so long as the purchaser knew that the product contained lead. However, the danger known to Sherwin-Williams was more extensive than mere toxicity. For example, Sherwin-Williams knew that the noxious

10

quality of lead paint "becomes serious in paint which disintegrates and is blown about by the wind." Would ordinary consumers purchasing paint containing WLC between 1910 and 1947 have contemplated the possibility that the paint would disintegrate and possibly distribute lead elsewhere in their homes?

*Burton*, 334 F. Supp. 3d at 961-62. That is still the crux of the issue in the remaining Plaintiffs' cases—would ordinary consumers in the 1990s have contemplated the specific risks associated with paint deterioration and the resulting lead dust? The evidence below demonstrates the answer is: No. At the very least, the question cannot be answered affirmatively *as a matter of law*.

Plaintiffs do not contest that society has known of the *general* danger of ingesting lead since antiquity. It is black letter law, however, that "a general warning is not necessarily adequate to warn of a specific danger." *Tanner v. Shoupe*, 596 N.W.2d 805 (Ct. App. 1999); *see also Kozlowski v. John E. Smith's Sons Co.*, 275 N.W.2d 915, 923 (Wis. 1979) (holding that it was a jury question whether a general warning to avoid excessive pressure was adequate to reveal the danger of an exploding safety ring at a high-pressure setting); *Schur v. Fox River Tractor Co*., 218 N.W. 2d 279, 283-85 (Wis. 1974) (the jury should determine whether the general warning on a piece of farm equipment was adequate to warn of the specific danger caused by the unusual placement of a lever that controlled the fan causing plaintiff's injury.). As such, the duty question cannot be answered by the fact that consumers generally knew that lead is poisonous— or even that they knew that eating paint chips is dangerous—when the evidence will establish Defendants knew of the specific, hidden dangers presented by invisible lead dust, and had no reason to believe that ordinary consumers would reasonably anticipate those dangers.

**B.     Defendants knew of the specific and unique dangers of lead dust.**

This litigation is and always has been focused on the hidden dangers of WLC, specifically including those presented by invisible household dust. Plaintiffs' experts have repeatedly opined that lead dust is the primary risk leading to lead poisoning in children of the Plaintiffs' generation. For

11

example, in his prior report, Plaintiffs' expert Dr. David Jacobs opined that the association between

"the presence of lead-based paint and lead-contaminated house dust and contaminated soil" is well-

established. Stat. Add. Facts ¶ 7, Ex. I. Plaintiffs' experts also testified at the *Burton* trial about the

specific dangers of lead dust. Specifically, Dr. Bruce Lanphear testified that he and his colleagues

"found that lead-contaminated house dust was *the major contributor*" of childhood lead poisoning.

*Id.* ¶ 8, Ex. D. In fact, Dr. Lanphear testified that "household dust *is the principal pathway* of

exposure." *Id.* at 598:25-599:3 (emphasis added). Dr. Jacobs further testified about the "paint

chip misconception"—explaining how people misconstrue the ingestion of paint chips with "the

more common mechanism through which the lead gets from the paint binder into the children's

bodies [which] is through [the] generation of dust," and opined that "instead *most of it* goes

through this dust and hand contact." *Id.* ¶ 24 at Ex. L (emphasis added).[5] The President's Task

Force evidence discussed at trial corroborates Plaintiffs' experts' testimony that the most

common source of lead exposure for children today is lead-based paint in older housing and the

lead-contaminated dust and soil. *Id.* ¶ 10, Ex. K.

Plaintiffs' experts also established—and will do so again—that Defendants have long

known of the risk of lead poisoning caused by dust. For example, Plaintiffs' expert public health

historian, David Rosner has submitted a report in Plaintiffs' cases specifically detailing the history

and evidence of Defendants' knowledge of the dangers of WLC-containing household dust. *See*

Ex. M, Rosner Report. In the *Burton* trial, Dr. Rosner testified that by 1904 the medical literature

warned of the risks associated with children's exposure to lead dust, and that due to the

identification of these risks associated with lead dust, Defendants had a "responsibility to know"

---

[5] Plaintiffs' expert, Dr. Markowitz, opined about the dangers of using wire brush, scraper, or blow torch on a painted surface—because it generated lead dust—but Defendants actually advocated the use of those tools on painted surfaces as late as the 1950s and 1960s. *Id.* ¶ 25, Ex. AA.

that their product was poisoning children "by 1920 at the latest." *Id.* ¶ 11, Ex. E. In fact, defense expert, Dr. Dunlavy, agreed that as of 1900, Defendants were generally aware of this poisonous quality when lead turns to dust. *Id.* ¶ 12, Ex. F.

Finally, ARCO has admitted that it "did not warn the ordinary Consumer about the risks or dangers of Lead Dust between 1900 and 2011," and Armstrong and DuPont have made the same admission for the periods during which they manufactured WLC. *See* Exs N, O, and P (ARCO's Resp. to Pls. Req. For Admis. No. 3; DuPont Resp. to Pls. Req. For Admis. No. 3, and Armstrong Resp. to Pls. Req. For Admis. No. 3). Sherwin-Williams denied Plaintiffs' request for admission on that issue—but refused to "review documents previously produced to Plaintiffs' counsel" or specifically identify *any* individual documents supporting its denial. *See* Ex. Q (Sherwin-Williams Resp. To Pls. Req. For Admis. No. 3).

### C. Plaintiffs and consumers did not contemplate the hidden risks of lead dust.

The evidence establishes a genuine issue of material fact regarding whether the dangers of lead paint deterioration, friction surfaces, and the presence of lead dust were known by Plaintiffs, their caregivers, and ordinary consumers at the time of the Plaintiffs' injuries.

#### 1. Evidence of Plaintiffs' and their caregivers' lack of knowledge.

As an initial matter, several Plaintiffs' and their caregivers' have supplied affidavits attesting to their lack of knowledge of the dangers of lead dust. *See id.* ¶ 3, Exs. R, S, T, U, V, W and X. And while case-specific discovery has not been taken in the vast majority of the Plaintiffs' cases, it is anticipated that the remaining Plaintiffs and caregivers will similarly testify—so, there should be no dispute as to what "the ultimate consumer (*i.e.*, the plaintiffs or their caregivers) knew" in these cases. *See Burton,* 994 F.3d at 823. As Defendants have submitted no evidence to the contrary in connection with their summary judgment motions, the inquiry may arguably stop at the Plaintiffs'

13

and their caregivers' knowledge of the risks, as the appellate court seemed to question whether Wisconsin law even requires the application of the "consumer contemplation" test, stating: "even if [the consumer contemplation] test was relevant to duty to warn, it focuses on ordinary consumers *in the plaintiffs' situation.*" *Id.*[6]

### 2. Evidence of the general public's lack of knowledge.

In this case, however, a duty to warn also exists under the consumer contemplation test. The evidence—including testimony from the WLC manufacturer defendants' own experts—establishes Defendants had *no reason to believe* the dangers presented by invisible lead dust "would be contemplated by any ordinary consumer who has ordinary knowledge which is common to the community." *Estate of Schilling v. Blount, Inc,* 449 N.W.2d 56, 59 (Wis. Ct. App. 1989). Therefore, Defendants had a duty to warn of the dangers known to them, but not known by consumers "in Plaintiffs' situation." *Burton*, 994 F.3d at 823.

### a. Evidence of consumer knowledge already adduced.

Defendants' own expert, John Sharpless, admitted that from 1900 to 1950 there was nothing in the public domain that would have informed parents or caregivers that their children could be poisoned by the dust from deteriorated residential paint. Stat. Add. Facts ¶15, Ex. Y. As Sharpless unequivocally admitted, "parents didn't know that" lead dust was a danger to their children. *Id.* ¶ 16. There is no testimony or evidence—none—that these risks later became common knowledge.

In fact, Defendants argued that there was not a single reference to invisible lead dust as a source or pathway for childhood lead poisoning until the 1970s. *Id*. ¶ 17, Exs. Z and AA. Defendants' expert, Dr. Peter English, testified that "the first time that house dust was mentioned

---

[6] The Wisconsin Supreme Court has been clear that all strict product liability cases are governed by the consumer contemplation test. *Horst v. Deere & Co.*, 769 N.W.2d 536, 555 (Wis. 2009).

*in the American medical literature* as a potential source of lead causing childhood lead poisoning" was not until 1974—and even then, he claimed it was a "new scientific idea" that the medical community had posited, and required more study. *Id.* ¶ 18, Ex. AB (emphasis added). Similarly, Dr. English proffers the following in his report: "[u]ntil the mid-1970's, however, there was no discussion among medical and public health authorities regarding household dust picked up by young children and carried to the mouth during their normal activities, or lead in the air, as significant childhood lead hazards. And it was not until the mid to late 1970's or early 1980's that medical and public health authorities viewed household dust or lead in the air as potentially significant childhood lead hazards." *Id.* ¶ 16, Ex. AC. Notwithstanding the proffered testimony of Defendants' experts, Plaintiffs successfully disputed that argument and established that the medical and scientific literature from decades earlier—along with Defendants' own internal documents—established the dangers of lead dust. Crucially, however, as Plaintiffs' expert David Rosner testified, those types of medical and scientific journal articles were not accessible to parents and other general consumers. *Id*, ¶ 20, Ex. E.

Defense expert Patrick Connor's testimony bolsters the dearth of publicly available information regarding the dangers of lead in household dust. He testified that even lead-based paint inspectors and environmental risk assessors were still "learning" about the issues related to lead paint deterioration *in the 1990s*, including "the hand-to-mouth interaction of a child, and [the fact that] they were ingesting lead and predominantly dust-related lead." *Id.* ¶ 21, Ex. AD. In fact, Mr. Connor testified that it was not until after Congress passed the Housing and Community Development Act of 1992 that the Environmental Protection Agency ("EPA") was tasked with defining the dangers from lead dust "so risk assessors would really know what

15

they're looking for"—and the EPA did not issue its final rules or definitions regarding these dangers *until 2001*. *Id*. at 3818:16-3819:16. *Id*. ¶ 22, Ex. AD.

Thus, Defendants' own experts' opinions and testimony—asserting a lack of available information about the dangers of lead dust—completely undermines any argument that the dangers of lead dust were commonly known to the *general public* at the time of Plaintiffs' injuries. Certainly, Defendants cannot credibly claim that the knowledge was so pervasive as to negate any question of fact on their duty to warn of these risks.

Finally, the knowledge of the ordinary consumer should be analyzed in light of Defendants' and the lead paint industry's efforts to misinform the public (through advertising and promotional activities) and otherwise hide the true dangers of lead and its various ingestion pathways. *Id* at ¶ 27, Ex. AE. If the alleged risks were so obvious to the ultimate consumers, then there would be no need for those efforts to obscure the dangers of lead dust. As Dr. Rosner testified, however, it was vital for the industry to keep the true dangers of lead unknown, as no parent would knowingly expose their child to the risk of lead poisoning. *Id.* at ¶28, Ex. AA.

> **b.    Dr. Jacobs' November 2021 Report and reliance documents provide additional evidence of a lack of consumer knowledge of the dangers of lead dust.**

In connection with the filing of this opposition brief, Dr. Jacobs has provided a report focusing on the question of the public's general understanding of lead paint and the contaminated dust and soil it generates. *See* Ex. C, Jacobs Report. Plaintiffs do not have the space herein to fully explore the opinions and support contained in that 21-page report, but instead highlight just some of the evidence supporting Dr. Jacobs' opinions, including his opinion that "despite certain public health education and regulatory changes over the years, the public still

16

does not fully grasp the dangers of residential lead paint nor the pathways of exposure. This was especially true in the mid-1990s to 2000's." *Id.* at 3.

This lack of consumer awareness—and need for additional education and warnings—is well documented. As recently as 2014, a court-ordered abatement plan required ongoing educational efforts based upon the lack of public knowledge of the hidden dangers of lead paint. *Id.* at 4 (citing *People v Atlantic Richfield Company, et al.,* Superior Court of California, County of Santa Clara, Case No. 1-00-CV-788657, Amended Statement of Decision at 98). Indeed, as Dr. Jacobs explains, virtually all health departments found it necessary to provide educational outreach about this hidden danger of lead paint throughout the 1990s and into the 2000s:

> Throughout the 1990s (and into the 2000s and today) federal, state, and local governments spent hundreds of millions of dollars in an effort to warn consumers/parents of the dangers of lead dust. This undeniably establishes a need for public education due to a lack of knowledge by the general public and that it was necessary.

*Id.* at 4-5, 8. A jury may draw an inference about the ordinary consumers' lack of knowledge about the specific dangers of lead paint from the fact that local, state, and federal agencies—well into the 2000s and beyond—have found it necessary to spend significant resources on campaigns aimed at educating homeowners of the hidden dangers of household dust containing WLC. For example, in the late 1990s Dr. Jacobs took part in HUD's "Campaign for Lead Safe America" which featured public service announcements and education efforts targeting parents and consumers, recognizing their lack of knowledge of the dangers of lead. *Id*. at 15. Similarly, he worked with the State of Michigan and the United Parents Against Lead in 1996 to distribute materials to try to educate parents (across the country) about the dangers of lead dust. In fact, "National Lead Poisoning Prevention Week" was not launched until the year 2000, but has now "reached international scope." *Id.* at 16. These are just a few of the many governmental and private efforts

17

to bridge the knowledge gap that existed in the 1990s, continued into the 2000s, and arguably

exists to this day. *See id; see also* Stat. Add. Facts, ¶ 26, Exs. AF, AG, AH, AI, AJ, and AE.

In 1994, HUD conducted a household survey where 44% of the respondents *admitted* to

not knowing that lead paint produced dangerous dust; and the authors concluded that for lower

income families—such as those in Plaintiffs' situation—the awareness was even lower. *Id*. at 10.

Moreover, when Congress passed Title X of the 1992 Housing and Community Development

Act, it specifically recognized the need for the federal government to "take a leadership role" in

creating an "informed public," and one of the stated purposes of Title X was "to educate the

public concerning the hazards and sources of lead-based paint poisoning and steps to reduce and

eliminate such hazards." *Id*. at 8 (citing Housing and Community Development Act of 1992.

Title X. Public Law 102-550, Sections 1002(8) and 1003(7)). Those congressional statements

directly contradict Defendants' argument that these dangers were "so commonly known" that

there was no duty to warn of them. *E.g.*, S-W Br. at 8.

As Dr. Jacobs further opines: "[t]he federal government passed regulations in 1996

requiring landlords to warn people of the dangers of lead paint in housing. That alone should be

sufficient to demonstrate that the dangers of lead paint were not so well known to the general

public in the 1990s. This means that reasonable efforts by the industry to also warn about this

risk were still needed. In fact, to this day property owners are required to warn tenants and

buyers of the dangers of lead." *Id*. at 21; *see also id.* at 8-9 (citing 1992 Housing and Community

Development Act, Title X, Public Law 102-550). If the federal government imposes a duty on

landlords to warn consumers of the dangers of lead paint—including lead dust—surely the

manufacturers of the poisonous WLC product have a similar duty to warn.

18

While the passage of Title X and the educational efforts that followed certainly raised *some* awareness, the press and media coverage throughout the 1990s and into the 2000s evidences a general lack of public knowledge of the dangers of WLC-containing dust:

- July 1991 Newsweek article "Lead And Your Kids" discussing how what "most Americans believed about lead poisoning was wrong," and how, contrary to the public's misconception, the homeowners' children were "probably not [poisoned] from eating paint chips but from fine paint dust." Further stating: "But the CDC faces a dilemma: how to make people more aware of lead's hazard's without creating a stampede of hysterical parents. Health departments and medical labs could not now handle a surge in demand for blood tests…But most families won't take such dramatic steps, or for that matter, test their own children. The problem isn't a lack of money or legal expertise. They simply don't realize—or can't believe—that the dust on their windowsill might be quietly stealing part of their child's potential." *Id*. at 11;

- February 1991 Time Magazine article "Controlling a Childhood Menace" stating: "For many years public health officials assumed that most cases were the result of toddlers' eating the sweet-tasting chips and flakes. More recently, however, researchers have recognized that dust from deteriorating paint, settling onto window-sills, furniture and carpets, poses a more pervasive threat." *Id*. at 11-12;

- 1999 article "Family's dream house turns into a poison 'nightmare'" quoting homeowners as stating: "We thought because the paint was gone, that all the lead was gone. This was our tragic mistake." *Id*. at 12;

- May 2000 St. Louis Post-Dispatch article "Madison County Gets Grant to Clean Up Lead Hazard; Money Will Assist People Near EPA's Superfund Site' Program Began Two Years Ago" stating: "We have a lot of education to do to make sure parents understand lead poisoning." *Id*.;

- March 2000 Rocky Mountain News article "Much-needed repairs" quoting an employee of the local Northeast Denver Housing Center as stating: "We are so ignorant in our area on the fact of lead poisoning." *Id*. at 13;

- October 1999 Chicago-Defender article "Federal grants to aid victims of lead paint" stating: "There are misconceptions about how you get lead poisoning,' [HUD Secretary Cuomo] said, adding that children do not eat it like they eat potato chips. 'Lead from door frames and windows is worn away and dust forms on the floor. Then a child picks up the dust on his or her hands and winds up ingesting the dust,' he said." *Id.* at 13-14;

- 1999 City of Harrisburg newsletter quoting a public health nurse as stating: "A lot of people think that kids have to eat lead paint chips to get lead poisoning, but they usually get it from inhaling or ingesting lead dust." *Id*. at 14;

19

- November 1999 Bangor Daily News article "[Senator] Collins calls lead paint major hazard for kids" stating: "parents and public health officials testified that the public often doesn't know enough about the dangers and the ways to guard against it." *Id.* at 12;

- October 2000 Capital Times (Madison, WI) article "Lead Paint a Hurdle for Landlords; Regulations May Hurt Section 8" recognizing that even physicians were not aware of true dangers, stating: "As of 2000, the Madison Public Health Department was still trying to get the information out to doctors that lead poisoning is not something we don't need to worry about." *Id.* at 14; and

- August 2006 Washingtonian magazine article "Why is Lead Still Poisoning Our Children?" recognizing that even public housing agencies were not aware of the true dangers, stating: "The Department of Consumer and Regulatory Affairs] usually see[s] peeling paint as a cosmetic problem, not something that can damage a child's brain. If they do flag a property for paint problems, they usually tell the owner to scrape the paint, which can make the hazard worse…Education of the public is critical." *Id.*

The fact that news and media outlets consistently reported on the general public's—*i.e.*, the ordinary consumer's—lack of knowledge of the hidden dangers of WLC-containing household dust throughout the relevant time period demonstrates a triable question of fact on that issue.

Likewise, the press releases issued by regulatory bodies recognized the lack of public knowledge of the dangers of lead dust, and the need for further education and warning:

- October 2000 HUD News and 1997 "The Lead Post" recognizing the need for "education and outreach programs." *Id.* at 14-15;

- March 2006 EPA press release stating: "Parents can unknowingly poison their children when they disrupt lead-based painted surfaces during renovations."

At a Congressional hearing in 1999, senators, experts (including Dr. Jacobs), and poisoned children's parents discussed the public's lack of knowledge of the hidden dangers of lead dust, and the vital need to educate parents and consumers about those specific dangers, stating:

- "Educating homeowners, landlords, real estate agents and contractors about the hazards is another very important part of the solution. Fifty percent of Maine families with children with high blood lead levels had recently renovated their homes. They inadvertently created the dangerous dust from disturbed lead paint that affected their children."

- "So there are things that we can do and one of the things we must do is get the word out—such as public education, public awareness—and that is critical and that is why, again, Senator Collins' hearing today is so absolutely important and typical of her service to the people of Maine. She is getting the word out."

- "People do not want to see young children exposed to lead which affects their development and causes their health to deteriorate. They want to help out if they know what to do, and it is our job to give them information."

- "I am convinced that after people hear what you went through, it will help raise public awareness and alert a lot of other parents."

- [From Parent's Testimony]: "Finally, there is an undeniable need for general lead education. I cannot count how many times I have been asked: Was Sammy chewing the woodwork or did he eat paint chips? I feel there is a spreading myth that children get lead poisoning from eating paint chips. That is not the case and parents do not really know the truth and realities about lead poisoning and are being greatly misled…. So I just do not understand since lead paint has been an issue since 1978 why we are only this far in awareness."

- "And I think it is common that many of us have the misconception that you have encountered, thinking this was a problem of the past and that it had somehow been cured once we banned lead-based paint after 1978. Or we have the misconception, which is one I shared prior to getting into this issue, that the child was not eating paint chips so there was not a problem. Of course, in neither of your cases was it a problem with eating paint chips but, rather, with the insidious dust."

*Id*. at 12-13 (citing Subcommittee on Public Health, US Senate Health, Education, Labor and Pensions Committee, November 15, 1999, Lewiston, Maine). If the dangers associated with lead dust were so well-known at the time of Plaintiffs' injuries that manufacturers had no duty to warn of them, then there would have been no need for all of these efforts.

### c.     Defendants' recent document production demonstrates consumers in the 1990s/2000s were unaware of the dangers of lead dust.

On November 4, 2021, Defendants served their responses to Plaintiffs' discovery requests on the issue of consumer knowledge.[7] The documents Defendants produced in connection with

---

[7] Plaintiffs' First Set of Interlocking Requests for Admission and Requests for Production Per the Court's Decision and Order Signed August 24, 2021.

those responses further demonstrate the dangers of WLC-containing dust were not so well-known

in the 1990s and early 2000s as to extinguish Defendants' duty to warn of those dangers, such as:

- December 2005, Milwaukee Journal Sentinel article stating: "Ignorance. Some parents say they didn't know much about lead poisoning or didn't pay attention until their children were diagnosed." *See* Ex. AK;

- October 1999 article "Rural Residents' Knowledge of Lead Poisoning Prevention" stating: "Lead poisoning is preventable and exposures to children can decrease when community members are aware of the ramifications of lead poisoning and are knowledgeable about prevention strategies. However, without an understanding of these prevention strategies and ramifications, parents, grandparents, and others will not have the basis to even contemplate changing behaviors and reducing lead exposures." *See* Ex. AL;

- August 1999, NPCA letter stating: "To effectively prevent lead poisoning, testing must be coupled with community education and controlling lead hazards in at-risk housing." *See* Ex. AM;

- December 1998 article "What Do Parents Know About Lead Poisoning" stating: "Parents do not have much knowledge of ways to prevent childhood lead poisoning." *See* Ex. AN;

- July 1997 article "Caregivers' Knowledge and Perceptions of Preventing Childhood Lead Poisoning" stating: "Nevertheless, results suggest that even caregivers of children in high-risk areas do not mention lead poisoning as a health concern. About 61% of the sample identified eating paint chips as a cause of lead poisoning, whereas only 15% identified lead paint dust as a source of lead poisoning. Approximately 49% of the caregivers reported that they "never" or only "sometimes" perform recommended prevention activities. The Philadelphia Department of Public Health used these findings to review and modify education and outreach to prevent lead poisoning." *See* Ex. AO;

- March 1996, CBS This Morning: "Most of us have no idea how to tell if there is lead paint in our homes, or what to do about it." … "We think the public has a right to know. We think with information, people can make good decisions to protect the health of their children." *See* Ex. AP;

- January 1995 AIHA "Is Lead a Problem in My Home?" stating: "Unfortunately, practical advice to parents on how to protect themselves and their children has not been widely available." *See* Ex. AQ;

- April 1997 - brochures aimed at educating parents on how to protect their children from lead. *See* Ex. AR;

22

- 1998 Environmental Protection Agency Fact Sheet: "Recognizing that many families might be unaware that their homes might contain lead-based paint, section 406(a) of TSCA directed EPA to publish, after notice and comment, a lead hazard information pamphlet providing comprehensive information to the general public on lead-based paint in housing, the risks of exposure, and the precautions for avoiding exposure." *See* Ex. AS; and

- July 1991 article "Lead and Your Kids" stating: "They simply don't realize—or can't believe—that the dust on their windowsill might be quietly stealing part of their child's potential." *See* Ex. AT.

Defendants' own documents therefore establish an issue of fact as to the ordinary consumer's knowledge of the dangers of WLC-containing household dust in the 1990s and 2000s. The closest Defendants come to supporting their assertion that parent-consumers were aware of the hidden dangers of lead is to vaguely assert "[t]here were paint industry warnings from at least 1955, and government warnings from the 1970s, 1980s, and 1990s, disclosing the dangers of lead paint long before the plaintiffs were allegedly exposed to white lead carbonate." ARCO Br. at 5 (*citing Burton*, 994 F.3d at 808-09). But that argument fails for two reasons: (1) the referenced paint industry warnings did not disclose the dangers of *lead dust*; and (2) even if they had, the fact that a warning is given does not establish public awareness of those dangers. Defendants cite to no authority for the idea that, once a danger is disclosed in some form, there is no longer a duty to warn consumers.

Based upon the 1999 Wisconsin Supreme Court decision in *Peace v. Northwestern Nat'l Ins. Co.*, 596 N.W.2d 429, 447 (Wis. 1999), Sherwin-Williams takes the remarkable position that Wisconsin law "does not permit" this Court to find that the specific, hidden dangers of lead dust were *not* commonly known. S-W Br. at 9. But Sherwin-Williams' quotation of *Peace* misconstrues both the Wisconsin Supreme Court's language and its meaning. *Id.* When the Wisconsin Supreme Court stated "[b]y the mid-1980s, recognition of the problem was widespread," it was referring to the more general problem of "lead poisoning in the home and

23

workplace and the role of lead-based paint"—not specifically the dangers of WLC-containing

dust at issue here. *Peace*, 596 N.W.2d at 447. In fact, the court specifically stated that it was not

providing a "history of the evolving awareness" of the lead paint "problem." *Id*. Likewise,

Sherwin-Williams' citation to *Antwaun A. v. Heritage Mut. Ins. Co.*, 596 N.W.2d 456, 463 (Wis.

1999), for the language "by 1989, the dangers of lead paint in residential housing … [were]

extensively known" also misconstrues the court's holding. S-W Br. at 9. *Antwuan A.* did not

even discuss lead poisoning from WLC-containing dust from deteriorated residential paint—let

alone discuss consumer awareness of that hidden danger—but instead focused on the landlord's

knowledge of the dangers of "peeling or chipping paint." *Antwaun A.*, 596 N.W.2d at 464.

In short, there is no evidence—zero—demonstrating consumers at the time of Plaintiffs'

injuries contemplated the hidden dangers associated with lead dust. The fact that consumers

knew, generally, that lead is poisonous is not enough to conclude as a matter of law that ordinary

consumers had knowledge of the specific, more common, but less perceivable mechanism of

poisoning: dust exposure. Whether the dangers associated with household dust containing WLC

from Defendants' products were "so commonly known" as to negate the duty to warn is a

question of fact that should not be taken away from the jury.

## II.   Because Defendants had a duty to warn, summary judgment is not available on Plaintiffs' negligent failure to warn claims, and the Court should revisit its ruling in the Wave 2 cases.

Plaintiffs recognize that pursuant to the appellate court's opinion in *Burton* they must show

a "defect" to proceed on a negligence claim in these product liability cases. *Burton*, 994 F.3d at

818-19. Plaintiffs alleged a warning defect, but the Court issued summary judgment on the Wave 2

Plaintiffs' negligence theory based upon its finding that Defendants did not owe a duty to warn

Plaintiffs or their caregivers of any hidden, or unknown, dangers associated with Defendants' lead

24

paint. *Allen*, 527 F. Supp. 3d at 997. Based upon the evidence discussed above—establishing a duty to warn Plaintiffs, their caregivers, and those similarly situated, of the dangers of invisible, toxic household dust containing WLC derived from painted friction surfaces—summary judgment is not appropriate on the remaining Plaintiffs' negligent failure to warn claims.

Moreover, based upon this same evidence, Wave 2 Plaintiffs request that the Court reconsider its ruling with regard to their negligent failure to warn claims under Federal Rule of Civil Procedure 54(b), which provides: "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."[8] The facts supporting Defendants' duty to warn of the hidden dangers of lead dust justify relief from the Court's summary judgment ruling.

### III. Summary judgment is not appropriate on Plaintiffs' strict liability claims because Defendants' WLC is unreasonably dangerous.

As stated above, and as Defendants recognize, Wisconsin applies the "consumer contemplation test" to determine whether a product is "unreasonably" dangerous under its strict liability law. S-W Br. at 10 (*citing Horst v. Deere & Co*., 769 N.W.2d 536, 543 (Wis. 2009). Under the consumer contemplation test, the applicable question is whether the alleged danger "would be contemplated by any ordinary consumer who has ordinary knowledge which is common to the community." *Estate of Schilling*, 449 N.W.2d at 59. As demonstrated in Section I, ample evidence demonstrates ordinary consumers in Plaintiffs' situation were unaware of the dangers of household dust containing WLC derived from painted friction surfaces. Defendants have

---

[8] In the alternative, Plaintiffs request reconsideration under any other Rule or theory deemed appropriate by the Court given the procedural posture of the cases.

25

thus far submitted no evidence to the contrary, and therefore, summary judgment is not available on Plaintiffs' strict liability claims.

**IV.     Neither "law of the case" nor "issue preclusion" require judgment as a matter of law.**

Contrary to Defendants' insistence, neither "law of the case" nor "issue preclusion" prevent this Court from considering whether they had a duty to warn. *E.g.,* S-W Br. at 6. The remaining Plaintiffs cannot be denied their day in court.

As this Court recognized: "the remaining plaintiffs have not had an opportunity to conduct discovery into this issue, and I am very reluctant to deny them that opportunity." Order of Aug. 24, 2021, Dkt. No. 1862, 07-cv-00303. In fact, the Seventh Circuit has explicitly held that each plaintiff must be afforded an opportunity to prove his or her own case—including the opportunity to put forth evidence regarding consumer knowledge:

> This decision does not foreclose the possibility that other plaintiffs might prevail on a strict liability claim against the tobacco industry. Another record in another case might be different. Another plaintiff might marshal better evidence that the haze of the tobacco companies' propaganda obscured whatever health hazards were known to the average consumer. We explicitly reject the tobacco industry's invitation to declare that cigarettes are not unreasonably dangerous.

*v. Phillip Morris, Inc.*, 216 F.3d 596, 603 (7th Cir. 2000). Here, Plaintiffs have submitted additional evidence and expert opinions supporting their argument that consumers in the 1990s and 2000s were not aware of the hidden dangers associated with WLC contained in household dust. That evidence must be fully and independently weighed on Defendants' motions for summary judgment.

Sherwin-Williams is wrong when it asserts: "[u]nder the Seventh Circuit's analysis, widespread knowledge of that danger by the 1990s precludes as a matter of law every Plaintiff from satisfying essential elements of his or her claims." S-W Br. at 1-2. First, the Seventh Circuit made no such determination and conducted no such "analysis." It merely referenced—without

26

review or analysis—this Court's prior ruling regarding the *Burton* Plaintiffs' negligent failure to

warn claims, and in light of this Court's prior finding of fact, held that a "identical" duty analysis

would require the same result under both claims:

> For these reasons, the court legally erred in finding that the defendants had a duty
> to warn for purposes of strict liability after ruling at summary judgment that they
> had no duty to warn the plaintiffs on their negligence claims. The plaintiffs have
> not appealed the court's ruling that the defendants had no duty to warn for
> purposes of the negligence claims. This ruling compels judgment as a matter of
> law for Sherwin-Williams and Armstrong on the strict liability claims.

*Burton*, 994 F.3d at 823. There is no ruling "as a matter of law" where the appellate court has not

reviewed or determined a particular issue. *See Overseas Shipholding Group, Inc. v. Skinner,* 767

F. Supp. 287, 296 (D.C.D.C. 1991) ("In the case in which the mandate of the appellate court does

not address a particular issue, the appellate judgment, on this issue, does not establish the law of

the case, and on appeal from the judgment entered after remand, it may be reviewed by the

appellate court.").[9] As such, the Seventh Circuit made no factual or legal ruling in *Burton* that

would preclude the Plaintiffs' failure to warn claims. Second, even if the Sevent Circuit had

made such a determination in *Burton*, that holding was based upon the facts and arguments

presented on appeal—and it has no relevance to this Court's determination of whether a genuine

issue of material fact exists *in these Plaintiffs' cases*. Third, as stated above, neither this Court's

nor the Seventh Circuit's opinion focused on the specific, hidden dangers of WLC-containing

dust. And fourth, even if there had been a ruling directly on point, that finding of fact would not

---

[9] The *Burton* Plaintiffs' negligent failure to warn claims were not addressed by the Seventh Circuit on
appeal because the *Burton* Plaintiffs had neither reason nor obligation to raise them—they had won their
cases. *Schering Corp. v. Ill. Antibiotics Co.*, 89 F.3d 357, 358 (7th Cir. 1996) ("the failure of an appellee
to have raised all possible alternative grounds for affirming the district court's decision, unlike an
appellant's failure to raise all possible grounds for reversal, should not operate as a waiver. The bringing
of possible alternative grounds for affirmance is a privilege rather than a duty.").

prevent the remaining Plaintiffs from presenting their own, additional evidence regarding

consumer knowledge. *Insolia*, 216 F.3d at 603.

A.    **"Law of the case" does not bar Plaintiffs' failure to warn claims.**

As an initial matter, Sherwin-Williams is wrong when it argues that the "law of the case"

doctrine could have any bearing on the *non*-Wave 2 Plaintiffs' claims. S-W Br. at 6. As the

Supreme Court has held, "the [law of the case] doctrine posits that when a court decides upon a

rule of law, that decision should continue to govern the same issues in subsequent stages *in*

*the same case*." *Arizona v. California*, 460 U.S. 605, 607 (1983). The claims brought by the *non*-

Wave 2 Plaintiffs are not "in the same case" as the Wave 2 Plaintiffs. *See Insolia*, 216 F.3d at

603. The fact that more than one Plaintiff was included on a caption does not negate the fact that

each Plaintiff is bringing individual claims and cases. Just as each Plaintiff must establish his or her

own claims at trial, the Court's rulings in the Wave 2 Plaintiffs' cases have no binding effect on the

other, remaining Plaintiffs' claims. Sherwin-Williams cites no law supporting its argument to the

contrary. S-W Br. at 6.[10]

Furthermore, the law of the case doctrine does not prevent this Court from reconsidering

its rulings on the Wave 2 Plaintiffs' failure to warn claims. *Id.* ("Law of the case directs a court's

discretion, it does not limit the tribunal's power."); *Payne v. Churchich*, 161 F.3d 1030, 1046

(7th Cir. 1998) ("a court has the power to revisit prior decisions of its own or of a coordinate

court in any circumstance"). Courts regularly reconsider prior rulings where the facts or

circumstances have changed. Therefore, the Court's Wave 2 summary judgement ruling—issued

---

[10] Neither of the two cases Sherwin-Williams cites supports the argument that the law of the case doctrine can be used to apply a ruling from one party's case to a subsequent, or different party's claims. S-W Br. at 6-7 (citing *Urologix, Inc. v. ProstaLund AB*, 256 F. Supp. 2d 911, 914 (E.D. Wis. 2003), and *McCormick v. Excel Corp.*, 413 F. Supp. 2d 967, 970 (E.D. Wis. 2006)).

28

earlier this year, prior the Seventh Circuit's ruling in *Burton,* and prior to the Plaintiffs'

supplementation of the evidence regarding consumer knowledge—does not serve as law of the

case as to the Wave 2 Plaintiffs' failure to warn should the Court determine it to be erroneous.

*See e.g.*, *Starcon Intern, Inc. v. International Brotherhood of Boilermakers*, 540 F.3d 276, 278

(7th Cir. 2006).[11] Here, the appellate court's directives in *Burton*, as well as the facts discussed

herein (relating to the unknown dangers of lead dust), warrant reexamination of the duty to warn,

and correspondingly, reconsideration of the Wave 2 Plaintiffs' negligent failure to warn claims.

> ### B.     "Issue preclusion" does not prevent Plaintiffs' failure to warn claims.

Likewise, issue preclusion cannot serve to defeat the claims of Plaintiffs who have yet to

have their day in court. *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) ("A person who was not

a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and

issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up

against the "deep-rooted historic tradition that everyone should have his own day in court.");

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for

a judgment to be binding on a litigant who ... has never had an opportunity to be heard.");

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 321, 322 n.8 (1977) (explaining

the "elementary" legal principle that a person who was not a party to a prior lawsuit cannot be

bound by its result); *Hansberry v. Lee*, 311 U.S. 32, 40 (1940) ("[O]ne is not bound by a

judgment . ... in a litigation in which he is not designated as a party . . ..."). Tellingly, Sherwin-

Williams does not cite a single case where issue preclusion was applied to defeat the claim of a

---

[11] Even where law of the case is applicable, "the law-of-the-case doctrine may yield if an intervening change
in the law, *or some other special circumstance*, warrants reexamining the claim." *Carmody v. Bd. of Trs. of
the Univ. of Ill.*, 893 F.3d 397, 408 (7th Cir. 2018) (emphasis added).

plaintiff who was not a party in the earlier trial or proceeding.[12] Even if issue preclusion were

available, its application here would not comport with the principals of fundamental fairness.[13]

## V.    Atlantic Richfield is not entitled to summary on its "additional" predecessor liability and component manufacturer arguments

ARCO claims it is entitled to summary judgment on Plaintiffs' strict liability failure to

warn claims on the additional ground that its predecessors only sold WLC as a component part

for use by third-party paint manufacturers and that none of its predecessors "manufactured

paint." ARCO Br. at 5. According to ARCO, there was no factual dispute during the *Burton* trial

because (1) one of Plaintiffs' experts testified that "ARCO never made prepared paint products,"

and (2) Plaintiffs' counsel stated during closing argument that "ARCO didn't make these ready

mixed paints that you've heard about with Sherwin-Williams and DuPont and Armstrong, the

MacGregor Company." *Id*. at 5-6. ARCO takes the above quoted trial testimony out of context,

however, and wrongfully conflates the terms "ready mixed paints" and "prepared paints" with

white lead-in-oil which is a finished residential paint product to which the retail customer must

add additional linseed oil, turpentine, and drier before applying the paint. As evidenced below,

ARCO's argument fails when one considers the undisputable fact that ARCO's predecessors

referred to Anaconda white lead-in-oil as a "paint" in its retail marketing materials directed at

homeowners. While the Plaintiffs do not dispute that Anaconda's dry white lead and white lead-

in-oil were also sold in bulk as component parts to some third-party paint manufacturers,

---

[12] In the only case Sherwin-Williams cites, *In re Est. of Rille ex rel. Rille*, 728 N.W.2d 693, 702-03 (Wis. 2007), both the party asserting issue preclusion and the party against whom it was asserted were parties to the prior proceeding.

[13] Wisconsin permits nonmutual offensive collateral estoppel *only* in cases in which issue preclusion would meet a "fundamental fairness" standard. *Michelle T. v. Crozier,* N.W.2d 327, 331 (Wis. 1993). The factors permitting the exceptional relief of nonmutual offensive collateral estoppel clearly cannot be met here—and Defendants do not even attempt to make such an argument.

ARCO's predecessors' marketing establishes at least some of Anaconda's white lead-in-oil was, in fact, marketed directly to homeowners as finished residential paint products at the retail level.

For example, during the summer of 1938, ARCO's predecessor, IS&R, produced a full-page advertisement for its white lead-in-oil and captioned it: "*For better, more durable paint,* ANACONDA WHITE LEAD." Declaration of Fidelma Fitzpatrick, Ex. AU at 18. The first paragraph of the advertisement stated:

> Today as always, _white lead paint_ is regarded as best for exterior gloss and interior flat uses. Furthermore, at today's low prices [Summer 1938] _white lead costs no more per gallon than most other paints_. But of more importance, no paint serves at less cost per square foot per year than white lead. White lead covers better, goes farther, and spreads faster. This means fewer gallons and fewer hours on the job. Lasting longer, washing well, wearing evenly, white lead leaves a smooth surface for repainting. *Id*. (emphasis added).

The advertisement concluded as follows:

> Homes painted with Anaconda White Lead *do* look fresh longer. And for interior flat paints, the extreme whiteness of Anaconda White Lead makes possible cleaner, purer tints – particularly important when you want the full beauty of delicate pastel shades. Thoroughly ground in the finest linseed oil, it is available through leading paint jobbers and dealers. *Id*.

In another marketing brochure entitled "*The Story of* ANACONDA ELECTROLYTIC WHITE LEAD," ARCO's predecessor, IS&R, also explicitly marketed its white lead-in-oil directly to homeowners as follows:

> Its true white color permits cleaner tints that are strikingly brilliant. The pure white base, to which the tint is added, does not have the slightly muddy cast that is present in ordinary lead. Anaconda Lead-In-Oil weathers by a slow chalking process. It produces a film that will last for years and one that washes itself clean as it ages. Inside or out, Anaconda White Lead surpasses as a decorative medium, yet costs no more. Employ a good painter. He knows the different woods and how to treat the surface before applying paint. Then insist that he use Anaconda White Lead-in-Oil. _Anaconda White Lead-in-Oil is sold by leading paint and hardware stores and lumber yards_. When you select paint, be sure to specify Anaconda.

Fidelma Fitzpatrick, Ex. AV at PNYC00000021 (emphasis added)

A third example of the marketing of Anaconda White Lead-in-Oil by ARCO's predecessor, ALPC, was a brochure entitled "ANACONDA LEAD-IN-OIL COLOR FORMULAS" in which ALPC provided detailed mixing instructions to residential paint consumers who, unlike master painters, did not "know how to prepare good lead paints." The brochure provided the residential paint consumer with instructions for the proportions of additional linseed oil, turpentine and drier to be added to its Anaconda white lead-in-oil paste. Fidelma Fitzpatrick, Ex. AW.

In a fourth example, the evidentiary record from the FTC case contains the sworn testimony of the sales manager for ARCO's predecessor, Frank H. Hurless, dated September 16, 1947. He testified that ALPC and IS&R sold Anaconda white lead-in-oil at the retail level in Wisconsin through unique written consignment contracts prepared especially for retail sales in that state. Fidelma Fitzpatrick, Ex. AX at pp.1869-70. In an advertisement published in the Madison Capitol Times on May 15, 1939, a retail paint and wallpaper dealer, Economy Wallpaper Company, advertised Anaconda White lead along with a variety of other brands of paint directly to the consuming public as opposed to a component part for use by paint manufacturers. Fidelma Fitzpatrick, Ex. AY.

In sum, Plaintiffs do not dispute that some of the white lead-in-oil manufactured and marketed by ARCO's predecessor was sold at an industrial level to other paint manufacturers for use as a component pigment in their pre-mixed paints. The bottom-line, however, that ARCO cannot dispute that its predecessors also marketed Anaconda brand white lead-in-oil directly to homeowners as a finished residential paint product available at the retail level. Therefore, ARCO is not entitled to summary judgment on Plaintiffs' strict liability failure to warn claims.

## **CONCLUSION**

For the reasons set forth above, this Court should enter an Order: (1) denying summary judgment on the remaining Plaintiffs' negligence strict liability failure to warn claims; and (2) reconsidering its decision on Wave 2 Plaintiffs' negligence failure to warn claims.

Dated this 22nd day of November 2021                    Respectfully submitted,

**/s/ Fidelma Fitzpatrick**
Fidelma L. Fitzpatrick, Esq.
Robert J. McConnell, Esq.
MOTLEY RICE, LLC
55 Cedar Street, Suite 100
Providence, RI 02903
Telephone: 401-457-7700
Facsimile: 401-457-7708
ffitzpatrick@motleyrice.com
bmcconnell@motleyrice.com

Edward A. Wallace, Esq.
Wallace Legal Group LLC
111 West Jackson Blvd., Suite 1700
Chicago, IL 60604
eaw@wallacelegalgroupllc.com

Neil T. Leifer, Esq.
NEIL T. LEIFER, LLC
20 Marion Street, Apt. 2
Brookline, MA 02446
Telephone: (616) 429-4892
n.leifer@ntllaw.com

Victor C. Harding, Esq.
WARSHAFSKY,
ROTTER,TARNOFF & BLOCH
839 N. Jefferson Street, Suite 300
Milwaukee, WI 53202
Telephone: (414) 276-4970
vich@warshafsky.com

Peter G. Earle, Esq.

LAW OFFICES OF PETER EARLE
839 N. Jefferson Street, Suite 300
Milwaukee, WI 53202
Telephone: (414) 276-1076
peter@earle-law.com

*Attorneys for Plaintiffs*