# EXHIBIT 1
# Part 5
# Documents 158-168

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT P

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **GLENN BURTON, JR.,**<br>        Plaintiff, | **CASE NO. 07-CV-0303** |
| v. | |
| **AMERICAN CYANAMID CO.,** *et al,*<br>     Defendants. | |
| **RAVON OWENS,**<br>        Plaintiff, | **CASE NO. 07-CV-0441** |
| v. | |
| **AMERICAN CYANAMID CO.,** *et al,*<br>     Defendants. | |
| **CESAR SIFUENTES,**<br>        Plaintiff, | **CASE NO. 10-CV-0075** |
| v. | |
| **AMERICAN CYANAMID CO.,** *et al,*<br>     Defendants. | |
| **DIJONAE TRAMMELL,**<br>        Plaintiff, | **CASE NO. 14-CV-1423** |
| v. | |
| **AMERICAN CYANAMID CO.,** *et al,*<br>     Defendants. | |
| **MANIYA ALLEN, et al.,**<br>        Plaintiffs, | **CASE NO. 11-CV-0055** |
| v. | |
| **AMERICAN CYANAMID CO.,** *et al,*<br>     Defendants. | |
| **ERNEST GIBSON,**<br>        Plaintiff, | **CASE NO. 07-CV-0864** |
| v. | |

1

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

**DESIREE VALOE, et al.,**
    **Plaintiff,**

**CASE NO. 11-CV-0425**

v.

**AMERICAN CYANAMID CO.,** *et al,*
    **Defendants.**

### Expert Report of David E. Jacobs, PhD, CIH

#### Qualifications

I am one of the nation's authorities on childhood lead poisoning prevention and have published many papers in the peer-reviewed literature and elsewhere (see CV at Attachment A), including book chapters on lead toxicity,[1] exposure assessment[2] and the association between residential lead-based paint and childhood lead poisoning.[3]

I am a board-certified Industrial Hygienist and the principal author of the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing,[4] the first federal interagency strategy to eliminate childhood lead poisoning,[5] a national survey of lead-based paint in the nation's housing stock,[6] a complex analysis of studies of the relationship of dust lead and children's blood lead levels (that later became the scientific foundation for the EPA lead dust standards)[7] and

---

[1] Jacobs DE. Lead (Book Chapter) In: Patty's Toxicology, 6th Edition, Eds. Eula Bingham and Barbara Cohrssen, John Wiley and Sons (Accepted Nov 2011).

[2] Jacobs DE. Housing and Exposure to Lead (Book Chapter). IN: Braubach M, Jacobs DE, Ormandy D (eds). Environmental burden of disease associated with inadequate housing: A method guide to the quantification of health impacts of selected housing risks in the WHO European Region. World Health Organization (Europe). June 2011.

[3] Jacobs DE. Lead-Based Paint as a Major Source of Childhood Lead Poisoning: A Review of the Evidence in Lead In Paint, Soil and Dust: Health Risks, Exposure Studies, Control Measures and Quality Assurance, Michael E. Beard and S.D. Allen Iske, Eds, American Society for Testing and Materials, Philadelphia, p. 175-187, 1995.

[4] Jacobs DE, et al. HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, Department of Housing and Urban Development, Washington DC, 1995 (principal author)

[5] Jacobs DE, Matte TD, Moos LV, Nilles B, Rodman J. Eliminating Childhood Lead Poisoning: A Federal Strategy, President's Task Force on Children's Environmental Health Risks and Safety Risks, principal author, Washington DC (March 2000).

[6] Jacobs DE, Clickner RL, Zhou JL, Viet SM, Marker DA, Rogers JW, Zeldin DC, Broene P and W. Friedman. The Prevalence of Lead-Based Paint Hazards in U.S. Housing, Environ Health Perspect 110:A599-A606, Sept 13, 2002.

[7] Lanphear BP, Matte TD, Rogers J, Clickner RP, Dietz B, Bornschein RL, Succop P, Mahaffey KR, Dixon S, Galke W, Rabinowitz, Farfel M, Rohde C, Schwartz J, Ashley PJ, Jacobs DE. The Contribution of Lead-Contaminated House Dust and Residential Soil to Children's Blood Lead Levels: A Pooled Analysis of 12 Epidemiologic Studies, Env. Research, 79:51-68, 1998.

2

two reports to Congress.[89] I was appointed to expert panels on lead by the Centers for Disease Control and Prevention (CDC),[10] the Environmental Protection Agency[11] and the World Health Organization.[12]

I am presently employed as an Adjunct Associate Professor in the School of Public Health at the University of Illinois at Chicago; the Chief Scientist at the National Center for Healthy Housing; and a faculty associate at the Bloomberg School of Public Health at Johns Hopkins University. Previously, I served as the Director of the Office of Healthy Homes and Lead Hazard Control at the U.S. Department of Housing and Urban Development from 1995 – 2004, where I was responsible for setting national policy in lead poisoning prevention, research, public education, grants, technical assistance and other matters. I was previously the Deputy Director of the National Center for Lead Safe Housing and was a research scientist at the Georgia Institute of Technology, where among other duties I directed the EPA Southern Lead-Based Paint Training Consortium. I have overseen numerous lead-based paint inspections, risk assessments, abatement and hazard control operations, and have degrees in Environmental Engineering, Technology and Science Policy, Environmental Health and Political Science. I am also a licensed lead risk assessor in Illinois.

Each of the opinions that I offer is to a reasonable degree of scientific certainty in my primary field of expertise.

### Opinions

This report addresses the question of the public's general understanding of lead paint and the contaminated dust and soil it generates. In general, despite certain public health education and regulatory changes over the years, the public still does not fully grasp the dangers of residential lead paint nor the pathways of exposure. This was especially true in the mid-1990s to 2000's, as documented below. I also provide evidence that, although there were some general education efforts during that time, the intense education that provided detail on lead contaminated dust and paint chip ingestion occurred during case management and inspections after a child had already been poisoned in this time period.

As detailed below, various educational efforts were made in response to earlier promotional campaigns carried out by the industry before 1971 that recommended the use of lead paint, despite the industry's knowledge that lead paint was hazardous. Such earlier campaigns and the state of knowledge that lead paint was dangerous were cited in a recent 2014 California Court

---

[8] Jacobs DE, et al. Moving Toward a Lead-Safe America: A Report to the Congress of the United States, (principal author), US Department of Housing and Urban Development, Washington DC, February 1997

[9] Jacobs DE, Friedman W, Ashley PJ, McNairy M. The Healthy Homes Initiative: A Report to Congress, U.S. Dept Housing and Urban Development, Office of Lead Hazard Control, April 1999.

[10] National Childhood Lead Poisoning Prevention Advisory Committee, Centers for Disease Control and Prevention, ex-officio member 1995-2004

[11] Lead Dust Review Panel, Science Advisory Board (US EPA), 2010-2011

[12] Report on the WHO Technical Meeting On Quantifying Disease From Inadequate Housing, Bonn Germany, November 28-30, 2005, World Health Organization Regional Office for Europe, (contributing author), published April 2006

case[13] and documented by two historians who recounted the lead paint industry's various advertising and promotional activities.[14] The California judgment included a detailed abatement plan to be funded by the defendants, in which the Court provided for "the establishment of an administrative process to carry out inspections, abatement, **and education**" (emphasis added).[15] Even in 2014, the Court recognized the importance of education and improving the public's knowledge of lead paint and its hazards. Furthermore. lead paint public education remains an on-going activity, as described at the end of this report. As I explain below, the state of public knowledge justifies this ongoing educational effort order by the California court in 2014.

In most cases, local health departments, including Milwaukee's, during the 1990s and 2000s, were forced to take a "canary in the coal mines" triage approach, due to the fact that lead poisoning was at epidemic proportions. This "secondary prevention" approach meant conducting blood lead screening campaigns and then taking action, including education, after a child's blood lead level exceeded CDC trigger levels. In my capacity as director of HUD's lead poisoning prevention program from 1995-2004, I had the opportunity to work with many health departments around the country, including Milwaukee's, which received lead hazard control grants from HUD. In Milwaukee's case and in others across the country, although there were efforts to reach the public in general through mass media and other avenues, most of the targeted and most intense educational activity occurred almost exclusively after children had already been poisoned. This education activity was a standard feature of health department case management procedures. The standard of care was to conduct lead inspections and risk assessments to identify the specific pathway of exposure in the poisoned child's home and then provide educational activities targeted to those specific pathways and order remediation. Because most houses remained uninspected, public knowledge of lead paint, and in particular knowledge of specific pathways, was limited. In my experience, virtually all health departments provided educational materials as part of the post-exposure inspection process —further demonstrating the need to inform the public of the dangers of lead paint—including lead dust—throughout the 1990s and into the 2000s.

## Educational Efforts before 1990

Prior to 1990, most public education efforts on childhood lead poisoning revolved around the perception that the main problem was children who ate paint chips. The first federal lead paint law, the 1971 Lead-Based Paint Poisoning Prevention Act provided for local grants from the Department of Health Education and Welfare (now the Department of Health and Human Services) and stated:

[13] People v Atlantic Richfield Company, et al., Superior Court of California, County of Santa Clara, Case No. 1-00-CV-788657. Amended Statement of Decision, March 26, 2014.

[14] Markowitz and Rosner, Deceit and Denial. First Edition 2013. Univ of California Press

[15] People v Atlantic Richfield Company, et al., Superior Court of California, County of Santa Clara, Case No. 1-00-CV-788657. Amended Statement of Decision, p. 98

> A local program should include (1) **educational programs** intended to communicate the health danger and prevalence of lead-based paint poisoning among children of inner city areas to parents, educators and local health officials (emphasis added).[16]

In 1978, CDC's first statement on childhood lead poisoning was issued. It featured a recognition that screening was necessary until "removal" of lead from the environment could occur. The recommendations on screening, diagnosis, treatment, and follow-up of children with lead absorption and lead poisoning were all described in detail. But CDC also stated:

> The ultimate preventive goal is identification and removal of lead in the environment before it enters the child. Until this occurs, screening, diagnosis, treatment, and environmental management will continue to be necessary public health activities.[17]

The focus from CDC remained on medical treatment after exposure had already occurred (the "canary in the coal mine approach") and a simplistic "removal" of lead without a recognition of exposure pathways, especially lead-contaminated settled house dust, which later became an important component of public education on lead paint. (Canaries were sometimes used in coal mines to detect hazardous gases before miners succumbed, much as children's elevated blood lead levels were used to detect lead-based paint hazards).

In 1985, CDC highlighted the direct ingestion of lead paint, stating:

> Pica, the repeated ingestion of nonfood substances, has frequently been implicated in the etiology of lead toxicity in young children. In many cases, however, lead-paint ingestion is simply the result of the normal mouthing behavior of small children who live in lead-contaminated homes."[18]

The 1985 CDC statement also highlighted education: "The community and especially parents of preschool children who live in older, deteriorating neighborhoods **should be informed** at every available opportunity of the need to have children screened periodically for lead poisoning" (emphasis added).

The idea that it was ingestion of paint chips was also manifested by X-Rays of poisoned children's abdomen, which showed the presence of paint chips (Figure 1).[19] In this sense, paint chips were more "visible" than dust.

---

[16] 1971 Lead Based Paint Poisoning Prevention Act, Public Law 91-695, January 13, 1971 [HR 19172]

[17] CDC. Preventing lead poisoning in young children: a statement by the Center for Disease Control: April 1978. Atlanta, Georgia: Department of Health, Education, and Welfare, 1978. https://stacks.cdc.gov/view/cdc/11184

[18] Centers for Disease Control (now Centers for Disease Control and Prevention). Preventing Lead Poisoning in Young Children, A Statement by the Centers for Disease Control, January 1985

[19] McElvaine MD, DeUngria EG, Matte TD, Copley CG, Binder S. Prevalence of radiographic evidence of paint chip ingestion among children with moderate to severe lead poisoning, St. Louis, Missouri, 1989-90, Pediatrics 89:740-742 (1992).

**Figure 1. X-Ray of a Child's Stomach (The Arrows Point to Lead Paint Chips)**



### Emergence of Pathway Studies in the Late 1980s

The 1985 CDC statement began to acknowledge the importance of lead-contaminated house dust. This reflected advancement in scientific knowledge but should not be mistaken for awareness in the general population. By the mid-1980s, pathway studies revealed a more complicated but more precise picture of how most children were exposed to the dangers of lead paint; it was not only eating paint chips but exposure to invisible lead contaminated house dust.

One important example of pathway research from the mid-1980s that came to inform government policy based on science and educational messages from the mid-1980s is shown in Figure 2.[20]

**Figure 2. Pathways of lead exposure from paint to dust to blood lead.**

---

[20] Bornschein RL, Succop P, Kraft KM, Clark CS, Peace B, Hammond PB. Exterior surface dust lead, interior house dust lead and childhood lead exposure in an urban environment. In Hemphill DD (ed). Trace Substances in Environmental Health, 20. Proceedings of University of Missouri's 20th Annual Conference, June 1986. University of Missouri, Columbia, Missouri, 1987.



Structural Equations:                                                    $R^2$

$$Ln(PbB) = 1.276 + .152\ Ln\ (PbH) + .182\ Ln\ (PbD) \qquad .38$$
$$Ln(PbH) = -0.966 + .444\ Ln\ (PbD) \qquad\qquad\qquad .22$$
$$Ln(PbD) = 4.691 + .325\ Ln\ (XRFHAZ) + .268\ Ln\ (PbSS) \qquad .52$$

All coefficients are significant at $p<.05$; NS=Not Significant

Source: Bornschein et al. Exterior surface dust lead, interior house dust lead and childhood lead exposure in an urban environment. In: Trace Substances in Environmental Health II, 1986 A Symposium. Editor: DD Hemphill, University of Missouri, Columbia

In the figure, the solid and dotted lines show statistically significant and not significant (NS) exposure pathways, respectively. In this study, lead in paint was measured by XRF (X-ray fluorescence), lead in soil (PbS) was measured by chemical laboratory analysis, lead in settled house was measured by wipe sampling (PbD), the amount of lead dust on children's hand was also measured by wipe sampling (PbH) and finally lead in children's blood (PbB) was measured by venipuncture and subsequent laboratory analysis.

This study was confirmed by others[21] and showed that there was often no _direct_ relationship between lead in the paint and children's blood lead. These and other studies changed the prevailing view that only the content of lead in paint mattered and paint chip ingestion was the main route of exposure. It also affected the nature of public education on the subject, which strove to incorporate the often invisible lead-contaminated house dust and soil into messages to the public.

In short, the significant pathway of exposure was from paint and soil to interior settled lead house dust to lead dust on children's hands (from the inevitable contact with household surfaces), and then ingestion through normal hand-to-mouth contact and absorption into the blood stream where it attacked the nervous system and other organs. This overturned earlier studies from the 1970s that held only paint chip ingestion was a significant exposure pathway. However, this message was far more difficult to include in public education efforts, because it

---

[21] Lanphear BP, Matte TD, Rogers J, Clickner RP, Dietz B, Bornschein RL, Succop P, Mahaffey KR, Dixon S, Galke W, Rabinowitz M, Farfel M, Rohde C, Schwartz J, Ashley P, Jacobs DE. The contribution of lead-contaminated house dust and residential soil to children's blood lead levels. A pooled analysis of 12 epidemiologic studies. Environ Res. 1998 Oct;79(1):51-68. doi: 10.1006/enrs.1998.3859. PubMed PMID: 9756680.

7

involved not only deteriorated paint, but also small, settled dust particles that were generally not visible to the naked eye.

## The CDC 1991 Lead Poisoning Statement

Throughout the 1990s, virtually all health departments relied on the CDC 1991 lead poisoning statement, which stated: "All children with blood lead levels ≥ 15 µg/dL [micrograms of lead per deciliter of blood] should receive individual case management including nutritional and **educational** interventions." Although this statement also called for "community-wide environmental interventions and educational campaigns," this remained poorly defined. The focus in Milwaukee and elsewhere was on case management of children with higher blood lead levels. Indeed, the CDC 1991 statement said, "...there are several reasons for **not** attempting to do interventions directed at individual children to lower blood lead levels of 10-14 µg/dL" which meant there were inadequate resources[22] (emphasis added).

## Title X of the 1992 Housing and Community Development Act

Congress reacted to the new pathway science in the late 1980s and the lack of awareness by passing Title X. Among its Findings was this statement:

> The Federal Government must take a leadership role in building the infrastructure -- **including an informed public,** State and local delivery systems, certified inspectors, contractors, and laboratories, trained workers..."[23] (emphasis added).

Title X also stated among its purposes: "to **educate the public** concerning the hazards and sources of lead-based paint poisoning and steps to reduce and eliminate such hazards..." (emphasis added).[24]

Title X's most important public education requirement was disclosure of information concerning lead upon transfer of residential property in Section 1018. The regulation implementing this law took effect in 1996 and is codified as a joint HUD/EPA regulation.[25] Among its requirements was the explicit disclosure not only of lead content in paint, but dust and soil as well (but only if that was already "known" because the rule did not mandate testing). Most houses still remained uninspected for lead problems, with the notable exception of homes with children who had already been poisoned.

In Title X, Congress specifically required exact warning language to be included in lease and sales contracts, a reflection of the need for education. The warning language said:

> Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to

---

[22] CDC. Preventing Lead Poisoning in Young Children, A Statement from the Centers for Disease Control, Oct 1991, p. 2

[23] Housing and Community Development Act of 1992. Title X. Public Law 102-550, Section 1002(8).

[24] Housing and Community Development Act of 1992. Title X. Public Law 102-550, Section 1003(7).

[25] 24 CFR Part 35 and 40 CFR Part 745.  Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead Based Paint Hazards in Housing. Federal Register / Vol. 61, No. 45, 9064
https://www.hud.gov/program_offices/healthy_homes/enforcement/disclosure

8

Case 2:11-cv-00055-LA   Filed 11/22/21   Page 8 of 22   Document 1109-3
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 10 of 91   Document 1-5

lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections **in the seller's possession** and notify the buyer of any **known** lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.[26]

Risk assessments include the measurement of lead in dust and soil, not only paint.



The disclosure rule also required that the buyer or renter receive an educational pamphlet, another recognition of the need for more education. The pamphlet stated: "Lead from paint, chips, **and dust** can pose serious health hazards" (emphasis added).[27] The pamphlet described in detail how paint is related to dust: "Lead dust can form when lead-based paint is scraped, sanded, or heated. Lead dust also forms when painted surfaces containing lead bump or rub together. Lead paint chips and dust can get on surfaces and objects that people touch. Settled lead dust can reenter the air when the home is vacuumed or swept, or when people walk through it." The pamphlet also described the issue of visibility this way: "Remember, lead from paint chips—which you can see—and lead dust—**which you may not be able to see**—both can be hazards" (emphasis added).



Title X also focused on renovation, repair and painting activities, all of which are known to release lead contaminated dust. Congress required another educational pamphlet to be provided for such activities. The requirement involves using only a Lead-Safe Certified firm approved by EPA or an EPA-authorized state program, the use of qualified trained individuals (Lead-Safe Certified renovators) who follow specific lead-safe work practices to prevent lead contamination and provision of a copy of EPA's lead hazard information pamphlet (Renovate Right). The renovation rule pamphlet requirement did not become fully effective until December 2008.[28]

---

[26] Lead warning statement. https://www.hud.gov/sites/documents/DOC_12343.PDF
[27] Protect your family from Lead, EPA, CPSC and HUD. https://www.epa.gov/sites/default/files/2020-04/documents/lead-in-your-home-portrait-color-2020-508.pdf
[28] 40 CFR Part 745. Subpart E—Residential Property Renovation. 63 FR 29919, June 1, 1998. §745.81   Effective dates. https://www.ecfr.gov/cgi-bin/retrieveECFR?gp=1&SID=79d9123c529d8f8ca792833afe6b664f&ty=HTML&h=L&n=pt40.31.745&r=PART#se40.34.745_181

9

**The Lead-Based Paint Awareness Survey**

The passage of Title X was accompanied by considerable press coverage, such as a Newsweek cover story in 1991.[29] Yet public knowledge was still considered by most in the field to be inadequate, which was supported by a survey.

In 1994, HUD contracted with the Census to design and conduct a household survey which would focus, among other things, on lead paint knowledge as a supplement to the Current Population Survey (CPS), which is a nationally representative survey.[30] This survey focused on the public's understanding of 5 questions about lead poisoning:

>   Does lead causes health problems for children;
>   Is eating paint chips a hazard?
>   Is lead paint found in older homes.
>   Does lead affect a child's ability to learn?
>   Does lead affect an unborn child?
>   Does lead paint produce a harmful dust?

The results for all respondents are shown in Table 1 below, reproduced from the original article. They show that, although 91 percent of respondents knew that lead paint produced health problems, and 90 percent thought eating paint chips caused problems, far fewer understood the importance of lead dust in the mid-1990s. For example, 44% of the respondents at the time did not know that lead paint produced dangerous dust.

TABLE 1.  Don't Know Rates

| Item | Percent Don't Know | N |
|---|---|---|
| Health problems | 9 | 4249 |
| Found in older homes | 18 | 8351 |
| Ability to learn | 25 | 11637 |
| Unborn children | 44 | 20628 |
| Dust | 44 | 20458 |
| Eating paint chips | 10 | 1545 |

---

[29] Newsweek. July 14, 1991 cover story

[30] How Do You Measure "Awareness"? Experiences With The Lead-Based Paint Survey. Susan Ciochetto, Bureau of the Census; Barbara A. Haley, U.S. Department of Housing and Urban Development. file:///C:/Users/DavidJacobs/Downloads/Howdoyoumeasureawareness.pdf

10

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT P

2

For those with less education, low-income and from Black families, awareness of the importance of lead dust was even lower. The authors state, "there seems to be higher don't know rates among respondents with lower income and…those who are not White."

In short, despite various educational efforts, almost half of the public did not grasp the importance of lead-contaminated house dust, which was the main route of exposure for most children in the mid-1990s. And there were large percentages who did not know that lead paint is found in older homes or affected the ability to learn.



These findings and others prompted HUD and other federal agencies to fund a variety of education programs, including funding for United Parents Against Lead and the Campaign for a Lead Safe America and Sesame Street from Public TV and other efforts.

## Other Historical Lead Education Efforts and Media Coverage

In 1991, Newsweek magazine published a cover story on lead paint, which contained the following regarding the Tackling family and public knowledge of lead paint:

"But this April, the Tacklings learned that much of what they and most Americans believed about lead poisoning was wrong. Test showed both Jessica and Nicholas had lead poisoning. They probably got it not from eating paint chips but from fine paint dust—stirred up in part by the renovations Bruce did to make the house just like new and the vacuuming Helene did to make it pristine…Most middle-class parents would have the same reaction as the Tacklings: denial and disbelief. Isn't lead poisoning something that happens only in the ghetto, where poor children eat flakes of paint?...But the CDC faces a dilemma: how to make people more aware of lead's hazard's without creating a stampede of hysterical parents. Health departments and medical labs could not now handle a surge in demand for blood tests…But most families won't take such dramatic steps, or for that matter, test their own children. The problem isn't a lack of money or legal expertise. They simply don't realize—or can't believe—that the dust on their windowsill might be quietly stealing part of their child's potential."[31]

Time magazine also published an important story underscoring the insidious nature of lead dust, and quoting John Rosen, a renowned pediatrician who had treated many lead poisoned children for decades:

"For many years public health officials assumed that most cases were the result of toddlers' eating the sweet-tasting chips and flakes. More recently, however, researchers

---

[31] Newsweek magazine. Lead And Your Kids" July 15, 1991

11

have recognized that dust from deteriorating paint, settling onto window-sills, furniture and carpets, poses a more pervasive threat. 'It's the teddy bear lying in the corner on the lead-laden dust that the children are touching,' says Rosen."[32]

Another article quoted a family that had attempted the removal of lead paint, highlighting the lack of knowledge about lead dust and how it can remain even when the paint that released it had been removed:

"We thought because the paint was gone, that all the lead was gone. This was our tragic mistake."[33]

In 1999, Senator Susan Collins is reported as stating: "[t]he bad news is that the U.S. is making insufficient progress in dealing with the major source of childhood lead poisoning today lead-based paint in older housing. Contrary to popular belief, it is the dust from deteriorating or disturbed lead paint, rather than paint chips, that is the primary source of lead poisoning."[34]

Shortly following a Congressional hearing in Lewiston Maine (at which I testified), an article titled, "Collins calls lead paint major hazard for kids" stated that:

"...parents and public health officials testified that the public often doesn't know enough about the danger and the ways to guard against it."[35]

Senators Collins and Reed and other witnesses made extensive remarks concerning public education on lead paint and lead dust at that hearing:

Educating homeowners, landlords, real estate agents and contractors about the hazards is another very important part of the solution. Fifty percent of Maine families with children with high blood lead levels had recently renovated their homes. They inadvertently created the dangerous dust from disturbed lead paint that affected their children...So there are things that we can do and one of the things we must do is get the word out—such as public education, public awareness—and that is critical and that is why, again, Senator Collins' hearing today is so absolutely important and typical of her service to the people of Maine. She is getting the word out.

Again, we emphasize screening and treating for the children, identifying and removing the sources of pollution, we should educate parents, landlords and the whole community. ¬I believe this is one issue where knowledge is very powerful. People do not want to see young children exposed to lead which affects their development and causes their health to deteriorate. They want to help out if they know what to do, and it is our job to give them information.

I want to thank you [parents] personally, both of you, for coming forward today and sharing your stories, sharing your experience. I am convinced that after people hear what

---

[32] Time magazine. Controlling a Childhood Menace, Feb. 25, 1991
[33] Family's dream house turns to poison 'nightmare'". Nov 16, 1999.
[34] Lead Poisoning: A Serious Threat To Our Children's Health And Development. Sept 18, 1999
[35] Bangor Daily News, Collins calls lead paint major hazard for kids. Bangor Daily News, Nov 16, 1999.

12

you went through, it will help raise public awareness and alert a lot of other parents. I am convinced that by sharing your personal experience, you are going to save many children across the State of Maine from going through what your children unfortunately have endured.

[From Parent's Testimony]: Finally, there is an undeniable need for general lead education. I cannot count how many times I have been asked: Was Sammy chewing the woodwork or did he eat paint chips? I feel there is a spreading myth that children get lead poisoning from eating paint chips. That is not the case and parents do not really know the truth and realities about lead poisoning and are being greatly misled. Section 1317(b) of the Lead Poisoning Control Act states that the need for, and I quote, "an Educational and publicity program to inform the general public, health care providers and other appropriate groups of the dangers, frequency and sources of lead poisoning..." I believe this initiative has not been carried out to its full potential. So I just do not understand since lead paint has been an issue since 1978 why we are only this far in awareness. And I am sorry if I mumbled and jumbled through this.

Senator COLLINS: You were very eloquent. I want to thank you both for your testimony. It is absolutely heartbreaking to hear what you have gone through. And I get the feeling that both of you blame yourselves to some extent. You really should not... I only became aware of this issue a year ago after some very close friends of mine in Bangor had their 3 children tested and found out, much to their shock, that each of their children had an elevated blood-lead level. And I think it is common that many of us have the misconception that you have encountered, thinking this was a problem of the past and that it had somehow been cured once we banned lead-based paint after 1978. Or we have the misconception, which is one I shared prior to getting into this issue, that the child was not eating paint chips so there was not a problem. Of course, in neither of your cases was it a problem with eating paint chips but, rather, with the insidious dust. Again, that reflects, and I am sure your realtor is horrified by what you have gone through now, that we need to have a much better public education campaign. We need to do a better job with pediatricians, we need to do a better job with contractors, with realtors, with parents. This lack of awareness is endangering the health of our children, and you really have played such an important role by coming forward today.[36]

The ignorance seemed to span the country. For example, in Denver, a paper quoted an employee of the local Northeast Denver Housing Center:

"We are so ignorant in our area on the fact of lead poisoning."[37]

At HUD, I had many meetings with then-Secretary Andrew Cuomo, who I recall was initially surprised about the importance of lead dust, but he did articulate its importance in a Chicago newspaper:

---

[36] Subcommittee on Public Health, US Senate Health, Education, Labor and Pensions Committee, November 15, 1999, Lewiston, Maine.

[37] Rocky Mountain News. March 21, 2000

13

" 'There are misconceptions about how you get lead poisoning,' [HUD Secretary Andrew Cuomo] said, adding that children do not eat it like they eat potato chips. 'Lead from door frames and windows is worn away and dust forms on the floor. Then a child picks up the dust on his or her hands and winds up ingesting the dust,' he said."[38]

A local housing department newsletter quoted a public health nurse:

"A lot of people think that kids have to eat lead paint chips to get lead poisoning, but they usually get it from inhaling or ingesting lead dust."[39]

In 2006, a local housing agency also discussed in a newspaper the problem that deteriorated paint was often regarded only as a minor cosmetic problem, not a health hazard:

""[The Department of Consumer and Regulatory Affairs] usually see[s] peeling paint as a cosmetic problem, not something that can damage a child's brain. If they do flag a property for paint problems, they usually tell the owner to scrape the paint, which can make the hazard worse...Education of the public is critical."[40]

Another common misunderstanding, even among physicians, was that the lead paint problem had already been solved. An article in a Wisconsin paper noted:

"As of 2000, the Madison Public Health Department was still trying to get the information out to doctors that lead poisoning is not something we don't need to worry about."[41]

Government agencies also worked hard to educate the public, beyond the disclosure and renovation regulations. For example, EPA issued a press release stating:

"Most of those children are poisoned by deteriorated lead-based paint and the contaminated soil and dust it generates...Particularly at-risk are families renovating older structures and low-income families living in dilapidated housing. Parents can unknowingly poison their children when they disrupt lead-based painted surfaces during renovations, for example."[42]

HUD had an extensive public education effort as well, publishing "HUD News" and "The Lead Post" and helping a Sesame Street pubic TV show address lead poisoning. These stated:

"Between 1992-2000 HUD spent $500 million on lead-safety—including money for community education and outreach. Everyday [HUD] help[s] people in our community learn more about lead...HUD spent $51 million in 1997, in part to "develop education

---

[38] Chicago Defender, Federal grants to aid victims of lead paint. Oct 30, 1999.
[39] Community Ink (A Newsletter of the City of Harrisburg – Department of Building and Housing Development). Family of Lead-Poisoned Child Gets Grant to Reduce Hazards. Fall 1999.
[40] Washingtonian magazine, August 2006. "Why is Lead Still Poisoning Our Children?" p. 123.-
[41] Capital Times. Lead Paint a Hurdle for Landlords; Regulations May Hurt Section 8. Oct 10, 2000 (Madison, WI)
[42] EPA "News Release" of 3/6/96

14

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT P

3

and outreach programs. The Sesame Street program included references to dust and renovations."[43]

During my time at HUD, I helped launch the "Campaign for a Lead Safe America," which began in 1997 with a White House Press Conference featuring Tipper Gore (the second lady), EPA Administrator Carol Browner, HUD Secretary Andrew Cuomo and Baltimore Mayor Kurt Schmoke and other high ranking officials and media personalities, including members of the Women's Basketball Association. The Campaign produced many documents, fliers and other educational materials, all emphasizing the importance of paint and the insidious and invisible nature of lead dust in home remodeling, maintenance, painting and disturbing lead paint, including the following from various documents:

- "Most people have the mistaken belief that children have to eat chips of paint to be poisoned. In fact, children usually are poisoned when they swallow dust that has been contaminated by lead from peeling or damaged lead paint. The lead-contaminated dust settles on floors and other surfaces, gets onto children's hands or toys and then in their mouths."
- "Most children are poisoned by lead-contaminated dust."
- "What you Should Know About Lead Paint and Home Improvement"
- "What you Should Know About Maintaining a Lead-Safe Rental Property"
- "What you Should Know About Hiring a Lead-Safe Painting or Remodeling Contractor"[44]

The Campaign also featured public service announcements, which targeting parents/consumers



Coping with Your Child's Diagnosis

of Lead Poisoning

and portraying them as saying: "We never imagined that dust from lead could poison our children." It also targeted tradespeople, warning "They [consumer clients] didn't know lead dust from old paint could poison their children...your clients may not know about the dangers of lead paint and dust." Targeted efforts were also devoted to rental property owners, portraying them as saying "I never realized the hazards of lead-contaminated dust." The Campaign released materials aimed at parents, such as "Make Your Home Lead-Safe" warning that most children are poisoned in their homes by invisible lead dust and the danger of doing remodeling without lead-safe work practices. The Campaign included many partners, such as

---

[43] HUD News, Oct 6, 2000 and The Lead Post, Winter 1997
[44] Lead Safe American Campaign Fliers and Materials, 1997

15

television networks, banks, home inspectors, national and local organizations and associations.[45]



In 1996, HUD worked with the State of Michigan and the United Parents Against Lead to reach parents and warn them about lead paint and lead dust. The pamphlet was used across the country and chapters of parents groups formed to help get the education message out.[46]

In 2000, Senator Jack Reed of Rhode Island launched National Lead Poisoning Prevention Week, which is the last week of October and has now reached international scope.[47] [48]

Many local jurisdictions have also conducted similar efforts, documented by numerous proclamations, and other materials.[49] In addition to printed materials, local educational efforts also provide products such as educational T-shirts, such as that shown in this picture.

### Current Lead Education Efforts

Education remains a requirement for many lead poisoning prevention government grants and activities because it is widely recognized that public awareness still is inadequate. For example, the nation's largest lead hazard control program at HUD explicitly asked in its Notice of Funding Availability about public education plans for applicants to:

"Describe how grassroots community-based non-profit organizations, including faith-based organizations, will be involved in your grant program's activities. These activities may include outreach, **community education**, marketing, program sustainability activities and lead-based paint inspections/risk assessments and lead hazard control work. If you [the grant applicant] do not describe strong engagement with external non-profit organizations…you will not receive full points." Later in the same application, HUD states: "You must describe how the intended **education** program(s) will be culturally sensitive, targeted, and linguistically appropriate and identify the means available to

---

[45] Lead Safe American Campaign Fliers and Materials, 1997

[46] Coping with your Child's Diagnosis. United Parents Against Lead and State of Michigan. 1996

[47] Senator Jack Reed Honored by National and Local Groups. Press Release, National Center for Healthy Housing. MARCH 21ST, 2014. Credited with "Rebooting" Federal Healthy Homes/Lead Poisoning Prevention Efforts at the Centers for Disease Control and Prevention https://nchh.org/2014/03/senator-jack-reed-honored-by-national-and-local-groups/

[48] IPEN 2018. International Lead Poisoning Prevention Week Of Action. October 21-27, 2018 https://ipen.org/sites/default/files/documents/ipen-lead-week-of-action-2018-v1_4.pdf

[49] See: Files

supply the educational materials in other languages common to the community"[50] (emphasis added).

CDC and EPA also have extensive on-going public education activities, reflecting the on-going need. Furthermore, the new California programs that will address lead paint hazards in homes that is funded by the defendant lead paint companies all have major public education components, which as previously noted above, the Court had specifically included in its abatement plan.

## State of Lead Poisoning Knowledge Held by the Caregivers of Plaintiffs

The general populations' state of unawareness as to the dangers of lead dust is mirrored in the limited knowledge of these hazards by parents and caregivers in the cases before this court. For example, in the cases tried in 2019, none of the caregivers understood the critical importance of lead contaminated house dust and some did not understand the importance of lead-contaminated paint chips. For example, Ravon Owens' mother testified:

> Q: Did you understand that it was not healthy for kids to eat paint chips whether they contained lead or anything else?
> A: No.
> Q: You did not know that?
> A: I didn't know that. No, I didn't.
> Q: Did you think it was okay for kids to eat paint chips, whether they contained lead or don't contain lead?
> A: No, I didn't.
> Q: You didn't think it was okay?
> A: No, I didn't.
> Q: Clearly, as someone who's in her late teens or 20s, you would have known that it's not healthy for kids to be putting paint in their mouth, right?
> A: Correct.
> Q: And is that why you would take a paint chip out of his hand, if you saw him with a paint chip in his hand?
> A: I took it out of his hand because I didn't think he should have been playing with it.
> Q: And why shouldn't he have been playing with it?
> A: I don't know. I didn't know back then.[51]

Glenn Burton's mother testified that she had no knowledge of lead until her child was poisoned:

> A: I had no knowledge of the effects of lead, because when your kid gets lead, they send you to like a lead poisoning class or something and they tell you things to look for in your kid's growth and behavior, you know, patterns.
> Q: This was when he first had his blood tested for lead you went to this class?
> A: Yeah, yeah.

---

[50] HUD Notice of Funding Availability for Lead Hazard Control Grant Program. 2017.
https://www.hud.gov/sites/documents/2017LBPHCNOFA.PDF
[51] Conley, Dashawna Dep., 185:22- 186:20, May 24, 2016.

Q: What did they tell you to look for?
A: Certain -- I don't remember all the stuff, but I know learning disabilities and something.[52]

Glenn Burton's father testified about eating paint but made no reference to lead dust, suggesting he had no knowledge of the main route of exposure for most children:

Q: Have you known all your life that it's bad to eat paint?
A: I know that it ain't good --
Q: All right.
A: -- to eat paint.
Q: It's pretty obvious, right?
A: Right. [53]

Cesar Sifuentes' father also did not appear to understand paint chips or lead contaminated dust issues, but also emphasized it was not a lack of parental care that was the problem. He testified:

Q: Before you moved into the apartment owned by Mr. Pacheco, okay, you knew that children should not eat paint chips.
A: No. I got here in '99. No, they didn't know yet.
Q: Isn't it common sense that children should not eat paint?
A: Well, I think so, yes, yes. It's not for lack of anyone taking care of them.[54]

There is also evidence that the city's inspectors and case management personnel in these cases provided lead educational materials in the course of their duties after the children were already poisoned. For example, the deposition of Adam Hartung, a city inspector in the Owens case states:

Q: And then Exhibit 4046 is the pamphlet that you brought with you titled Lead Poisoning, Protect Your Children; is that correct?
A: Yes.
Q: And to your recollection, this was the pamphlet that you would hand out to parents of children when you would conduct the lead inspection?
A: Yes. And I would go over this with the parents.[55]

Similarly, in the Burton case, the case management report of Mary Walker, a health department nurse (done after the elevated blood lead level has already been diagnosed) states: "Lead teach completed. Discussed and issued lead folder."[56] The "service date record" of 8/26/2002 also answers "Y" (yes) for all these metrics of the education:

[52] Burton Ruby Dep., 73:25-74:20. July 19, 2016.
[53] Burton, Sr., Glenn Dep., 80:1-7, May 18, 2016.
[54] Sifuentes, Reuben Dep., 69:20-70:9, June 9, 2016.
[55] Hartung, Adam Dep., 66:4-67:4, Nov 13, 2018.
[56] Burton G Med-0001155-0001170. 8/26/2002. Page 0001156.

Parent/caregiver has adequate knowledge of prevention and management of lead toxicity. Parent/caregiver verbalizes exposure sources, routes and effects of lead poisoning. Parent/caregiver verbalizes understanding and importance of high Ca [calcium], high Fe [iron], and low fat diet. Parent/caregiver verbalizes importance of frequent hand washing. Parent/caregiver demonstrates or verbalizes strategies to decrease lead exposures."[57] Again, on March 19, 2003 and June 18, 2003, the record states "completed" for "Goal 1. Lead Education.[58]

In the Sifuentes case, a health department staff person stated in her deposition:

> ...generally families were educated if their child was lead poisoned. I mean, we would have programs or health fairs where the general community was educated by, you know, having flyers and sheets of information generally instructing families... but if the child's lead level was elevated, that's when we came in and did the really detailed and did the follow-up visits and did the education on diet and made sure the parent got the child in for retesting and things like that.[59]

The deposition of the inspector in the Sifuentes case, Neil Rice, contains this exchange:

> Q: Would that indicate that either you or Alex reviewed what you found with the tenants?
> A: Yes.
> Q: And would that be the time where you would explain to the tenants, you have to clean up any paint chips, you should clean up any --
> A: Keep the wells clean. We'll vacuum them out for you today. Try to keep them clean until we get a contractor in to abate them.[60]

Affidavits from a sampling of various other Plaintiffs in the lead litigation further bolster my conclusions about the lack of awareness of the dangers presented by lead dust held by general population.

## Lead Dust and Blood Lead Levels

Paint lead levels and dust lead levels are known to be highly correlated with each other and with blood lead levels. For example, HUD's national lead paint survey shows that in homes with no lead paint, 95% had no dust hazards either. But in homes with deteriorated interior lead paint, 61% had dust lead hazards.[61]

Another study showed that the probability of blood lead levels exceeding 10 µg/dL (the level of concern CDC established in 1991) increases as floor dust lead levels increase. Specifically, that study showed the probability of an elevated blood lead level is below 1% for a low dust lead

---

[57] Burton G Med-0001155-0001170. 8/26/2002. Page 0001165.

[58] Burton G Med-0001155-0001170. Page 0001169.

[59] Frazier, Wanda Dep., 11:19-12:21, July 27, 2016.

[60] Rice, Neil, Dep., 112:10-19, May 31, 2016.

[61] Jacobs DE, Clickner RL, Zhou JL, Viet SM, Marker DA, Rogers JW, Zeldin DC, Broene P and W. Friedman. The Prevalence of Lead-Based Paint Hazards in U.S. Housing, Environ Health Perspect 110:A599-A606, Sept 13, 2002.

19

Case 2:11-cv-00055-LA    Filed 11/22/21   Page 19 of 22   Document 1109-3
Case 2:22-cv-00378-PP     Filed 03/25/22      Page 23 of 91     Document 1-5

level of 1.5 µg/ft² (micrograms of lead per square foot of surface area). But when floor dust lead levels increase to 40 µg/ft² the probability of an elevated blood lead level increases by a factor of ten (to 11.5%). At the 2012 CDC blood lead reference value of 5 µg/dL, the probability increases to an astonishing 51.8%.[62] In 2021, CDC reduced the blood lead reference value to 3.5 µg/dL,[63] which would make the probability even higher.

Another study showed that the probability of blood lead levels exceeding 10 µg/dL (the level of concern CDC established in 1991) increases as floor dust lead levels increase. Specifically, that study showed the probability of an elevated blood lead level is below 1% for a low dust lead level of 1.5 µg/ft² (micrograms of lead per square foot of surface area). But when floor dust lead levels increase to 40 µg/ft² the probability of an elevated blood lead level increases by a factor of ten (to 11.5%). At the 2012 CDC blood lead reference value of 5 µg/dL, the probability increases to an astonishing 51.8%.[64] In 2021, CDC reduced the blood lead reference value to 3.5 µg/dL,[65] which would make the probability even higher.

Together, these demonstrate the high degree of correlation between lead paint content, dust lead and blood lead.

## Conclusion

Lead paint problems still remain poorly understood by the public. There are likely many reasons for this. It may be that many believe the problem was solved in 1978 when lead was finally banned from new residential paint by the Consumer Product Safety Commission under orders from Congress. It is also likely that because most lead poisoning cases do not exhibit overt clinical symptoms and instead show more subtle but very large and significant neurodevelopmental and other effects, the public may not grasp its true significance. Parents may be unable to fully grasp the danger until their own children are poisoned and an inspection occurs showing specific lead paint hazards in their home.

In particular, the evidence shows that the main route of exposure, the ingestion of invisible lead-contaminated dust particles through normal hand-to-mouth activity, is not adequately grasped. Dust control involves difficult cleaning activities that remove dust one may not be able to see, which is a challenge for both parents and remediation contractors. Educational training providers

[62] Dixon SL, Gaitens JM, Jacobs DE, Strauss W, Nagaraja J, Pivetz T, Wilson JW, Ashley PJ. U.S. Children's Exposure to Residential Dust Lead, 1999-2004: II. The Contribution of Lead-contaminated Dust to Children's Blood Lead Levels, Env Health Perspect 117: 468-474 (2009)

[63] Perri Zeitz Ruckart, Robert L. Jones, Joseph G. Courtney, Tanya Telfair LeBlanc, Wilma Jackson, Mateusz P. Karwowski, Po-Yung Cheng, Paul Allwood, Erik R. Svendsen, Patrick N. Breysse. Update of the Blood Lead Reference Value — United States, 2021. Morbidity and Mortality Weekly Report. MMWR, October 29, 2021, Vol. 70, No. 4, 1509-1512

[64] Dixon SL, Gaitens JM, Jacobs DE, Strauss W, Nagaraja J, Pivetz T, Wilson JW, Ashley PJ. U.S. Children's Exposure to Residential Dust Lead, 1999-2004: II. The Contribution of Lead-contaminated Dust to Children's Blood Lead Levels, Env Health Perspect 117: 468-474 (2009)

[65] Perri Zeitz Ruckart, Robert L. Jones, Joseph G. Courtney, Tanya Telfair LeBlanc, Wilma Jackson, Mateusz P. Karwowski, Po-Yung Cheng, Paul Allwood, Erik R. Svendsen, Patrick N. Breysse. Update of the Blood Lead Reference Value — United States, 2021. Morbidity and Mortality Weekly Report. MMWR, October 29, 2021, Vol. 70, No. 4, 1509-1512

often use a lead dust training visualization kit, which I displayed to the jury in the Wisconsin cases during my testimony, to show how dust contamination may be hard to see.

Smaller particles are more easily absorbed through a child's digestive system. One study showed that there was "an inverse relationship" between particle size and lead absorption (the smaller the particle the higher the absorption). That study showed a five-fold increase of absorption as particle size decreased in paint.[66]

The evidence presented here shows that there were numerous news articles and publications to attempt to address the misconception that children get lead poisoned by eating paint chips, and the general lack of knowledge by consumers/parents of the dangers of lead dust. Throughout the 1990s (and into the 2000s and today) federal, state, and local governments spent hundreds of millions of dollars in an effort to warn consumers/parents of the dangers of lead dust. This undeniably establishes a need for public education due to a lack of knowledge by the general public and that it was necessary.

The federal government passed regulations in 1996 requiring landlords to warn people of the dangers of lead paint in housing. That alone should be sufficient to demonstrate that the dangers of lead paint were not so well known to the general public in the 1990s. This means that reasonable efforts by the industry to also warn about this risk were still needed. In fact, to this day property owners are required to warn tenants and buyers of the dangers of lead. If there was no need to do so, that would not be required.

The evidence also shows that the parents did not appear to grasp the importance of lead paint chips and also the importance of lead contaminated dust until after their children had already been poisoned.

The association between lead paint, lead dust and elevated blood lead levels has been researched extensively and is widely accepted within the scientific community. Yet the magnitude of the problem remains a major problem. HUD's most recent national survey shows that the number of homes with deteriorated lead paint actually increased by 4.6 million homes from 2005 to 2018 as the housing stock continues to age. 29 million homes still have a lead paint hazard in the form of deteriorated lead paint, or lead-contaminated house dust or bare lead-contaminated soil. 21.6% of African-American households live in a home with lead paint hazards and 23.6% of households in poverty live in such homes. And 22% of homes with a child under six years old have lead paint hazards.[67]

The belief that the hazards associated with lead paint and the contaminated dust and soil it generates was well understood by the public and especially by high-risk populations in the 1990s and later is not supported by the evidence.

Each of these opinions I hold to a reasonable degree of scientific certainty.

---

[66] Barltrop and Meek. Effect of Particle Size on Lead Absorption from the Gut. Archives of Environmental Health. July/August 1979. 280-285

[67] Presentation from HUD: Findings on Lead-Based Paint/Hazards from the American Healthy Homes Survey II CDC Lead Exposure and Prevention Advisory Committee Meeting. Peter Ashley. May 14, 2021

21

Dated this 18th day of November 2021.

_David E. Jacobs_

David E. Jacobs, Ph.D., CIH

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT Q

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GLENN BURTON, JR.,

Plaintiff,

Case No.: 07-CV-00303

RAVON OWENS,

Plaintiff,

Case No. 07-C-0441

CESAR SIFUENTES,

Plaintiff,

Case No. 10-C-0075

vs.

AMERICAN CYANAMID ET AL,

Defendants.

## **RULE 26 EXPERT REPORT OF GERALD MARKOWITZ, PhD**

Gerald Markowitz is Distinguished Professor of History at John Jay College of
Criminal Justice and the Graduate Center, City University of New York and an adjunct
professor of Sociomedical Sciences at Columbia's Mailman School of Public Health. He
received his doctorate from the Department of History of the University of Wisconsin and
has been teaching at John Jay since 1970. He is the recipient of numerous grants from
private and federal agencies, including the Milbank Memorial Fund, National Endowment
for the Humanities and the National Science Foundation. He has been awarded the
Viseltear Prize for Outstanding Work in the History of the Public Health from the

American Public Health Association in 2000. His *Curriculum Vitae* is attached as Exhibit A.

Dr. Markowitz is an expert on the history of lead, lead poisoning, and the historical manufacture, promotion and sale of lead pigments and lead paints. He relies on his education, training, publications and review of the literature and internal documents for each Defendant and their trade associations for the opinions in this report. Each opinion is held to a reasonable degree of historical certainty.

## Opinion 1: Each of the Defendants Manufactured, Marketed, Promoted and Sold White Lead Carbonate both Nationally and in Wisconsin.

### A. Sherwin-Williams

The Sherwin-Williams Company was incorporated in 1884. Sherwin-Williams manufactured white lead carbonate from 1910 until 1947. Its predecessor corporations, Acme White Lead [1920] and Detroit White Lead [1917], produced white lead for use in paints in the 1800's. Sherwin-Williams sold its white lead carbonate to consumers as white lead in oil and included in prepared paint products. In addition to Sherwin-Williams branded paints, Sherwin-Williams also acquired and sold prepared paints with Lead through other companies it acquired, including Calumet Paint Company [1888], Lewis Berger & Sons [1905], , Martin-Senour Company [1917], Hemingway & Company [1919], Lowe Brothers [1929], John T. Lucas [1929], WW Lawrence [1929], Peninsular Paint & Varnish [1930], The Lincoln Paint and Color Company [1930] and Bredell Paint Company [1930].[1] Lowe Brothers had a subsidiary, Wisconsin Paint and Supply Company, located in Green Bay that was established in 1927 and distributed Lowe Brothers products. On

---

[1] N17929

January 31, 1936 Lowe Brothers bought Wisconsin Paint and Supply Company.[2]  Ozark Smelting & Refining [1916] sold Lead and products containing Lead.

In addition to using its own White Lead in its consumer products, Sherwin-Williams had approved the following suppliers to provide it with additional requirements of White Lead:  National Lead, Carter White Lead (National Lead); Eagle Picher; Anaconda; John R. MacGregor; Glidden; and DuPont.[3] Sherwin-Williams never identified or otherwise distinguished between the suppliers of the White Lead carbonate contained in its consumer products.[4]  Although Sherwin-Williams claims it ceased producing white lead in 1947,[5] Sherwin-Williams continued to sell white lead and leaded paints to consumers and professionals. After 1947, it bought its white lead requirements primarily from National Lead, from whom it had obtained white lead in the past.[6]

Sherwin-Williams promoted its Lead nationally both individually and in conjunction with organizations of which it was a member.  Sherwin-Williams was a member of the LIA from 1928 until its resignation in 1947. Sherwin-Williams was a Class A member of the NPVLA from 1933 until 1978.  At various times from 1933 until 1978 Sherwin-Williams was represented on the Executive Committee and from 1958 through 1978 was represented on the Board of Directors.

---

[2] N46220, N46223, N46222

[3] N15807, N15822, N15823, N15824, N15825, N13519

[4] October 28, 2016 deposition of Colleen Dunlavy @ 145

[5] N4453, N25419, N11831, N12876

[6] N15850, N15853, N16051, N16052, N15844, N13525, N13559, N13521, N13519, N13518, N13516, N13515, N13514, 13513, N13511, N13510, N13508, N13507, N13502, N13501, N13538, N13495, N13492, N13488, N13487, N13536, N13535, N13481, N13480, N13534, N13533

For practically as long as Sherwin-Williams has been in business, it has had traveling salesmen whose territories included Wisconsin.[7] Sherwin-Williams had agents and dealers in Wisconsin beginning in 1901. They were located in Omro, Hartford, La Crosse, Clintonville, Florence, Antigo, La Valle, Melrose, Milwaukee, Eau Claire, Dartford, Menomee Falls, Campbellsport, Green Bay, Appleton, Manitowac, Oshkosh, Richfield, Red Granite, Slinger, Waupaca, Waupun, Marion , Van Dyne, Berlin, and Sheboygan.[8]

Sherwin-Williams sponsored the "Metropolitan Opera Auditions of the Air" which were broadcast over station WTMJ in Milwaukee. It claimed that "[e]ach year this program has become more and more important because of the work it is accomplishing entirely aside from its commercial value. Thus it differs greatly from the average radio program but builds tremendous good will for Sherwin-Williams products and Sherwin-Williams dealers."[9]

---

[7] N18316, N18317, N23475, N23476, N23477, N23478, N23479, N23481, N23484, N23485, N23486, N23487, N23492, N23493, N23494, N23500, N23504 N23505, N23506, N23509, N23511, N23512, N23533, N23534, N23535, N23538, N23540, N23542, N23553, N23554, N23555, N23556, N23557, N23558, N23559, N23560, N23561, N23562, N23563, N23564, N23565, N23566, N23568, N23604, N23608, N23609, N23610, N23611, N23612, N23613, N23614, N23615, N23619, N23626, N23635, N46235, N46239, N46241, N46242, N46243, N46244, N46245, N46246, N46303.
[8] N14239, N17954, N17955, N17956, N17957, N17958, N17959, N17960, N17961, N17962, N17963, N17964, N18083, N18121, N23357, N23360, N23528, N23666, N23678, N23686, N23700, N23703, N23709, N23729, N23732, N23733, N23734, N23754, N43236, N43240, N46257
[9] N46253

Sherwin-Williams had corporate owned stores in several Wisconsin cities including Antigo [1961][10], Appleton [1954][11], Ashland [1958][12], Baraboo [1958][13], Beaver Dam [1956][14], Beloit [1955][15], Chippewa Falls [1961][16], Eau Claire [1955][17], Fond du Lac [1955][18], Green Bay [various][19], Janesville [1949][20], Kenosha [1954][21], La Crosse [1956][22], Madison [1954][23], Manitowoc [1956][24], Marinette [1955][25], Menomonee Falls [1968][26], Monroe [1960][27], Moses Lake [1962][28], Oshkosh [1948][29], Plymouth [1966][30], Portage [1958][31], Racine [1961][32], Rhinelander [1958][33], Sheboygan [1955][34], Stevens

---

[10] N25142
[11] N24298
[12] N24366
[13] N25087
[14] N25633
[15] N24307, N24312, N24316
[16] N25157
[17] N24318
[18] N24315, N24320
[19] N25177, N24331
[20] N17790
[21] N24298
[22] N25633
[23] N24299
[24] N24343, N25072
[25] N24299; N24318
[26] N25624
[27] N25117
[28] N25179
[29] N23724
[30] N17790
[31] N24365
[32] N25140
[33] N25070, N25077
[34] N24307

Point [1954][35], Superior [1957][36], Watertown [1956][37], Waukesha [1956][38], Wausau [1957][39], West Allis [1961][40], and Wilmar [1967][41].

Sherwin-Williams opened a warehouse in Milwaukee in 1930 and started opening stores in 1927 and continued adding additional stores.[42]

In 1938, Lowe Brothers had district sub warehouses[43] in Eau Claire, Green Bay, Kenosha, La Crosse, Milwaukee, Oshkosh, Racine, Sheboygan, and Superior. Lowe Brothers had a retail store in Green Bay [1938][44].

Acme White Lead & Color Works had a store in Milwaukee [1968][45].

Sherwin-Williams' documents show shipments of white lead into Milwaukee. In 1929-1930, 52,387 ½ pounds of ODP white lead in oil were shipped into Milwaukee.[46] In 1930-1931, 36,809 ½ pounds of white lead in oil, 21,100 pounds of soft paste lead, 3,950 pounds of Zilo[47], and 250 pounds of soft paste Zilo were shipped into Milwaukee.[48] In 1931-1932, 22,976 pounds of white lead-in-oil, 2 9,450 pounds of soft paste lead, 2800 pounds of Zilo, and 200 pounds of soft Zilo were shipped into Milwaukee.[49] In 1932-1933,

---

[35] N24299
[36] N24348, N24350
[37] N24339
[38] N24332
[39] N24354
[40] N25150
[41] N17791
[42] N25406, N17931, N24316, N24320, N17793, N25135, N17795, N17790, N24298, N25101, N25104, N25108, N25622, N24352, N24360, N24344, N24361, N16545, N23404, N17794, N17796, N17797, N17798
[43] N17942
[44] N17942, N18121, N43236
[45] N25625
[46] N17143
[47] N15945
[48] N17663
[49] N15942

14,984 pounds of white lead-in-oil, 17,150 pounds of soft paste lead and 425 pounds of Zilo were shipped into Milwaukee.[50]

Additional evidence of Sherwin-Williams and its' affiliated companies presence in Milwaukee can be found in the various telephone and business directories from Milwaukee and advertisements and analyses found in the local newspapers.[51]

## ARCO

Atlantic Richfield is the successor to International Smelting & Refining and Anaconda Lead Products. International Smelting & Refining was incorporated in 1909.[52] Anaconda Lead Products Company was incorporated in 1919.[53]    These companies produced, marketed, promoted and sold their own white lead carbonate between 1919 and 1946.

In 1914, Anaconda Copper & Mining Company acquired the assets of International Smelting & Refining. In 1936, Anaconda Lead Products Company was dissolved and its assets and properties were taken over by International Smelting & Refining and its manufacturing process continued. The Federal Trade Commission at page 3736 of the record found that "The principal officers of respondents Anaconda and International have always been the same, and it is apparent from the record that respondent International and the former Anaconda Lead Products Company were in fact mere operating divisions of respondent Anaconda, with no substantial separate identity of their own. All of the acts of respondent International, of Anaconda Lead Products Company, and of Anaconda Sales

---

[50] N17545
[51] See Exhibit D.
[52] N11079
[53] N13316

Company referred to in these findings were for and in behalf of respondent Anaconda and such acts will hereafter be treated as the acts of respondent Anaconda."

Anaconda began producing white lead in 1919. Prior to 1936, dry white lead and white lead in oil were produced by Anaconda Lead Products Company, a subsidiary of Anaconda, and were sold and distributed in commerce by Anaconda Lead Products Company and Anaconda Sales Company, another wholly-owned and controlled Anaconda subsidiary. From 1936 to the fall of 1946, lead pigments produced by International were sold and distributed by Anaconda Sales Company. Various predecessors were members of the LIA from 1928 until 1971. Anaconda Sales Co. was a Class B member of the NPVLA from 1933 until 1944.

Anaconda Lead Products acknowledged Sherwin-Williams as a direct competitor and Sherwin-Williams was "obviously interested in shutting down the White Lead Plant [of Anaconda] if possible."[54]

ARCO's predecessors sold white lead carbonate to Sherwin-Williams (Acme White Lead) and various customers in Wisconsin. Among the customers in Wisconsin were A.G. Nelson Co, F.D. Hayes, Buffham's Inc., Bogital Decorating Co., Decorators Supply House, Frank Gill Co., Gordon Lumber & Supply, Milton Hardware, Mr. Horeb Hardware, Sauer Paint & Wallpaper, Venestra Lumber & Supply Co., State Street Hardware, and Green County Lumber Company.[55] Green County Lumber Company and Sauer Paint & Wallpaper carried consigned stocks of white lead in oil.[56] Wm. F. Zummach

---

[54] N10838
[55] N10146, N10158, N10209, N10825, N10827, N10852, N10855, N10857, N10860, N15830, N51411, N51412, N51413, N51414, N13524, N13538, N13484, N13480, N13479
[56] N51411

was the Wisconsin state distributor of white lead products.[57]   In addition, ARCO's predecessors sold white lead carbonate to various paint manufacturers that had a presence in Milwaukee.   Among these companies are Ault & Wiborg Varnish Works, Barrett Varnish, Berry Bothers, Carbolineum Wood Preserving, Certainteed Products, Colonial Works, Consolidated Paint Co., Cook Paint & Varnish; Detroit Graphite, Devoe & Reynolds., E.I. DuPont de Nemours Co., Glidden Co., A.C. Horn, Jamestown Wood Finishing Co., Mautz Paint & Varnish Co., McGuire Woodlock Paint Co., O'Neil Duro Co., Passanno-Hutcheon Co., Phelan Faust Paint Co., Pittsburgh Plate Glass, Pratt & Lambert, Sherwin-Williams Co., Standard Varnish Works Products, Valspar Paints & Varnishes and Wm. F. Zummach.[58]

Additional evidence of ARCO's presence in Milwaukee can be found in the various telephone and business directories from Milwaukee and advertisements and analyses found in the local newspapers.[59]

### DuPont

DuPont was founded in 1802. DuPont claims that it manufactured white lead carbonate from 1917 until 1924. DuPont, however, is listed as a producer in the Minerals Yearbook as late as 1931, and arguably as late as 1932. DuPont sold white lead carbonate to Sherwin-Williams [Acme White Lead].[60]   DuPont and National Lead entered into a contract, beginning in 1924, wherein DuPont supplied pig lead, raw linseed, oil, turpentine and containers to National Lead and National Lead converted the pig lead into white lead

---

[57] N10158

[58] N10142, N10146, N10148, N10158, N10823, N10825, N10827, N10852, N10855, N11013, N11014, N11168, N11169, N11170, N12838, N51350, N51411, N51413

[59] See Exhibit D.

[60] N13519

9

Case 2:11-cv-00055-LA   Filed 11/22/21   Page 10 of 67   Document 1109-8
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 36 of 91   Document 1-5

carbonate, dry and in oil, and shipped it back to DuPont. The contract states that National Lead would mix and grind the white lead "in accordance with [DuPont's] specifications."[61] This arrangement continued until at least 1948 according to James Matthews.[62] The testimony of James C. Burrows taken in the Lewis case establishes that DuPont owned the lead and other material at all stages.[63] DuPont was a member of the LIA from 1947 until its resignation on December 1, 1958. DuPont rejoined the LIA in 1962 and continued as a member until 1982. Du Pont was a Class A member of the NPVLA from 1933 through 1978. DuPont also became a Class B member in 1944 and maintained dual Class status through 1978. DuPont had representatives on the Executive Committee of the NPVLA from 1933 through 1978 and on the Board of Directors from 1958 through 1978.

In its 1918 <u>Advertising Survey</u>, DuPont noted that Wisconsin had a combined circulation of 496,443 general magazines and various papers and that a 100 foot Harrison sign was located in Milwaukee. Only sixteen states even had DuPont signs.[64] John Pritzlaff Hardware, was a distributor for DuPont's products within the State of Wisconsin. Pritzlaff Hardware was considered within the Chicago Territory.[65] DuPont had a salesman from its Chicago office that covered Wisconsin and the Upper Peninsula of Michigan in at least 1925.[66] The Chicago branch office sold trade sale products including white lead in

---

[61] N3187. <u>See also</u> N3183, N3190, N3192, N3195, N3196, N49675, N50827
[62] June 6, 2002 deposition of James Matthews at 27.
[63] September 21, 2004 deposition of James Burrows at 149-150
[64] N50848
[65] N50765
[66] N50817

oil.[67]     No later than 1946, DuPont had a warehouse in Milwaukee for its trade sale products.[68]

Additional evidence of DuPont's presence in Milwaukee can be found in the various telephone and business directories from Milwaukee and advertisements and analyses found in the local newspapers.[69]

### Armstrong

John R. MacGregor Lead Co. was founded in 1937 by John R. MacGregor and E.R. T. Armstrong. In 1941, MacGregor Lead became a wholly-owned subsidiary of Armstrong Paint & Varnish. MacGregor Lead produced white lead from 1937 until it was sold in 1971. MacGregor Lead supplied the white lead to Armstrong for manufacturing Armstrong's coatings. Armstrong sold Armstrong White Lead and Armstrong Paste White as exterior white paste paints.[70] Armstrong's Mixed Paint also contained white lead carbonate.[71] MacGregor sold its Scotch Laddie White Lead to Elliott Paints & Varnish which used it in the manufacture of its "Elliott's 100% Pure Lead-Zinc Paste Paint."[72] Armstrong made a paint comparable to Scotch Laddie for Ace Hardware stores.[73] MacGregor Lead also sold white lead to paint manufacturers such as Enterprise Paint Company and Premier Paint Company.[74] Joseph Kelly, an executive with Armstrong Trade Sales division of Elliott Paint Company, testified that Milwaukee was one of the geographical areas where a large

---

[67] N49863

[68] N51377

[69] See Exhibit D.

[70] N4883, N4889

[71] N23218

[72] N4546

[73] April 17, 1973 deposition of Wayne Wilkins @ pp. 8 - 10

[74] April 17, 1973 deposition of Eugene Mack @ p. 24

volume of Scotch Laddie paint was sold. [March 23, 1973 deposition of Joseph J. Kelly @ p. 135]. Mr. Kelly also testified that professional painters were the largest volume of purchasers of Scotch Laddie and the home owner volume was negligible. [March 23, 1973 deposition of Joseph J. Kelly @ p. 65].

Additional evidence of Armstrong/MacGregor's presence in Milwaukee can be found in the various telephone and business directories from Milwaukee and advertisements and analyses found in the local newspapers.[75]

MacGregor Lead was a member of the LIA from 1940 until 1972 and of the NPVLA from 1940 until 1973. Armstrong Paint & Varnish was also a member of the NPVLA.[76]

**American Cyanamid**

American Cyanamid was incorporated in Maine on July 22, 1907. In 1971, Cyanamid purchased the John R. MacGregor Lead Co. from Armstrong[77] and continued the production of white lead. American Cyanamid supplied white lead carbonate to Armstrong for use in paints.[78] American Cyanamid projected sales of white lead carbonate to Armstrong for use in paint at least through 1976.[79] Cyanamid was also a member of the LIA in 1972 and the NPVLA from 1933 until 1977.

---

[75] See Exhibit D.
[76] N48313
[77] N8712
[78] N8722
[79] N8823

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT Q

2

Evidence of American Cyanamid's presence in Milwaukee can be found in the various telephone and business directories from Milwaukee and advertisements and analyses found in the local newspapers.[80]

## Opinion 2: Each of the Defendants was a member of at least one Industry Trade Association. Those associations engaged in joint promotion campaigns for White Lead Carbonate that failed to warn consumers and parents about the dangers of White Lead Carbonate to Children

### A. National Paint Varnish & Lacquer Association

The National Paint, Varnish & Lacquer Association can trace its roots back to 1888 when it was formed as the National Paint, Oil & Varnish Association, Inc. In 1933 the American Paint & Varnish Manufacturers Association[81] and the National Paint, Oil, & Varnish Association merged to form the National Paint, Varnish & Lacquer Association, Inc. which was incorporated on December 1, 1933. The articles of incorporation state that one purpose of the NPVLA was "to safeguard the interests of the public."[82] There were various classes of membership. Class A members were manufacturers of paint, varnishes, etc. and Class B members were manufacturers of materials used in connection with the manufacture or application of paints, varnishes, etc. Class A members were entitled to one vote at the Association meetings.

---

[80] See Exhibit D.

[81] The American Paint & Varnish Manufacturers Association was created by the merger of the Paint Manufacturers Association, which was formerly known as the Paint Grinders Association, and the National Varnish Manufacturers Association [N51401 and www.paint.org]

[82] N42655

There was a local NPVLA association, located in Milwaukee, Wisconsin. At various times, Sherwin-Williams[83], American Cyanamid[84], and DuPont[85] were members of the local association.

## B. Lead Industries Association

The Lead Industries Association [LIA] was founded in November, 1928.[86] It was incorporated under the laws of the State of New York for non-profit associations in 1961 and its name became Lead Industries Association, Inc. [87] "In 1928, at the instigation of the late Clinton H. Crane, then president of St. Joseph Lead Company, and with the cooperation of other leaders in the lead industry, ten lead producing and consuming companies in the United States and Canada subscribed equally to an underwriting fund to finance establishment of a trade association for the lead industry . . ."[88] The LIA was formed as a vertical organization because: "Being a vertical organization of producers and consumers, it has been able to attack many problems without fear of following a course that would be detrimental to any segment of the industry."[89] "The wisdom of forming a vertical association has been proved many times in subsequent years. The complexities of modern business make it difficult to divorce the best interest of any one branch of an industry from

---

[83] N42653, N42654, N42655, N42656, N42657, N42658, N42659, N42660, N42661, N42663, N42664, N42665, N42666, N42667, N42668, N42669, N42670, N42671, N42715, N42716, N42717, N42720, N42721, N42722, N42723, N42724, N42725, N42727, N42728, N42729, N43992, N43993
[84] N42659, N42661, N42662, N42663, N42664, N42665, N42669, N42670, N42671, N42674, N42675, N42720, N42721, N42724, N42725
[85] N42659, N42661, N42662, N42663, N42664, N42665, N42669, N42671, N42720, N42721, N42722, N42724, N42725, N43992
[86] N2391
[87] N1749
[88] N237
[89] N2405

any other branch. There is rarely something that is harmful to a part of one industry that is not harmful to other parts of the same industry in the long run. The same may be said of things that benefit a part of the industry."[90]

The stated purposes of the LIA were:

- To collect and publish statistical information relating to the production, distribution, marketing, consumption and use of lead and lead products;

- To disseminate accurate information regarding lead products and how they best may be used;

- To develop methods for the improvement of the welfare of those engaged in the lead industries, or in the use of its product; and for such other purposes as, from time to time, may be of benefit to the lead industries.

- In general to promote the serviceability of the lead industries to the community at large. [91]

One of the principal objects of the LIA was to "combat substitution of inferior articles for lead."[92] This purpose is repeated in numerous documents. For example: "One of the major purposes for which it [LIA] was formed was to safeguard lead from substitution by other materials."[93]

The lead industry, mainly through the LIA, funded research on Lead. However, it was noted by some in the industry that the research was not well-defined or worthwhile. For example, Dr. Willard Machle, of Ethyl Corporation, stated: "It is the observer's [Machle] opinion that Lead Industries Association suffers from lack of good medical advice to assist them in defining their problems, carrying out a research program, and

---

[90] N44
[91] N590
[92] N570
[93] N603

translation of results into practices and information for dissemination."[94]  Dr. Robert Kehoe

went further in a letter to Ethyl Corporation stating:  ". . . Lead Industries Association is

apparently willing and anxious to continue their investigations at Harvard University.  Now

Felix and Joe Aub and some others would not like me any better for saying so, but the

money they have thus far invested at Harvard has gone down a rat hole.  Practically the

entire work of this group has been demonstrated to be inaccurate, the fundamental

conclusions have been shown to be unsound, and actually the work introduced confusion

rather than clarity in an important matter."[95]

The LIA was conducting health and safety work for the benefit of the lead industry:

"Directly or indirectly, the intent of all our health and safety work is to be of service to

industry."[96]  As the LIA pointed out:  "As time goes on our health and safety work more

and more demonstrates its value in protecting our markets and avoiding governmental

regulations onerous to our industry."[97]  The LIA also pointed out: "I hope you will agree

with me that our health and safety activities are not just an altruistic public service.  They

can also mean just as much in dollars and cents to you as any market or product

development or research program can."[98]

In the November 1940 issue of <u>Lead</u> magazine there is an article about a low income

housing development had been completed in West Allis, Wisconsin.  All of the homes were

---

[94] N18424
[95] N18422
[96] N225
[97] N645
[98] N227

16

painted with white lead. Hawley Wilbur of the Wilbur Lumber Company was involved in the financing and handling of the project.[99]

Also in 1940, it was reported to the members supporting the White Lead Promotion Program that the field representative had visited Kenosha, Wisconsin which was a "lucky town" for him and he found a "number of lead users among the painters."[100]

At the May 18, 1941 meeting of the White Lead Division, at which John R. MacGregor was present, it was reported that the Educational Service Division had placed Paint Study Cabinets and Instruction Units in 196 high school and college vocational agriculture departments in Wisconsin and that Painting Instruction Units, teaching supplies, trainee's reference books and film strips had been placed in Veterans On-Farm Training Programs in Wisconsin.[101]

The Lead Industries Association had a promotional film, The Lead Matrix. It was reported in March 1966 that a TV station in Milwaukee might be showing the movie and then it was reported that it was shown on TV station WISC in Milwaukee during June 1966.[102]

## Opinion 3:    Defendants, individually and through their industry associations, promoted lead for use without warning of the hazards of Lead to Children

Through their advertisements and promotions, these defendants created a market for white lead, promoting and reinforcing the perception that no paint was as good, or as sanitary, as Lead paints. These advertisements and promotions, conducted individually and through the LIA and the NPVLA, did not warn consumers of the dangers of using Lead

---

[99] N899
[100] N2880
[101] N2924
[102] N3467, N3435

paint in homes despite the fact that each Defendant knew or should have known of those dangers. Furthermore, these advertisements and promotions increased the demand, and consequently the use, of Lead in residential settings.

**Sherwin-Williams**

Although in 1900 Sherwin-Williams had recognized internally that lead in paint is a "deadly cumulative poison,"[103] and in 1904 had told its agents that lead paint was hazardous to the inhabitants of houses,[104] it did not warn the public or consumers of those dangers. Instead, in 1922 the company advocated using lead-based paint on children's toys in its publication, "The Home Painting Manual," which stated that "[s]ome of the more elaborate toys -- rocking horses, wagons, etc., may be brightened up now and then with a little S-W Family Paint, SWP . . . as desired."[105] These paints contained significant amounts of Lead.

Between 1923 and 1928, Sherwin-Williams, in advertisements in the Saturday Evening Post, and other national and regional magazines, recommended using white lead-based "SWP House Paint" and "S-W Family Paint" on interior surfaces including walls, woodwork, doors, and ceilings, and on toys.[106] These advertisements did not contain any warnings to the public or consumers about the dangers of such use of Lead paints.

Sherwin-Williams continued to advertise and promote paints contining Lead for residential use without alerting or warning the public or consumers of the dangers of Lead. The February 1927 edition of Chameleon boasted that Sherwin-Williams had placed

---

[103] N23541
[104] N3624
[105] N23045
[106] N55, N23660, N29215, N46331, N46529

"[n]inety-nine advertisements in the nation's lead magazines and farm papers – each two pages, making 198 pages in all – every page in colors – either two or four – going into more than 20,000,000 homes – with a total number of individual impressions of more than 65,000,000."[107] The same year, Sherwin-Williams, in its training material, said "TODAY MORE SWP IS SOLD THAN ANY OTHER PREPARED PAINT PRODUCED BY ANY OTHER MANUFACTURER ANYWHERE IN THE WORLD."[108] This training material also notes that SWP is for use on exterior and interior surfaces of buildings.

From at least 1936 until the 1940s, Sherwin-Williams advertised its Enameloid paint for use on toys.[109] This paint contained 2% white lead in 1936.[110] Yet in 1930, the LIA assured the public that there was no lead in paint used on toys, and, by letter dated May 2, 1935, Sherwin-Williams itself assured Dr. Ella Oppenheimer of the U.S. Children's Bureau that toy enamels "generally contain only non-poisonous pigments."[111]

Although Dr. McCord, in 1937, had explicitly warned Sherwin-Williams of the hazards of white lead to children[112], Sherwin-Williams sold white lead paint for interior use as late as the 1950s. In 1937, Sherwin-Williams sold ODP White Lead for interior use.[113] In the 1930s, Sherwin-Williams promoted its SWP House Paint for interior use, which

---

[107] N46272

[108] N49738

[109] N19, N10794

[110] N18385

[111] N16356. It was well-known, by this date, that even small amounts of lead could poison a child. For example, the LIA discussed, at its Board of Directors meeting on December 12, 1930, the November 20, 1930 article in the United States Daily stating that "small amounts of lead which may cause only chronic lead poisoning in an older person may be of sufficient quantity to cause acute poisoning, leading to death, in an infant." N16357

[112] N15949

[113] N4362

contained "enormous quantities of white lead."[114]  In 1939 it promoted the use of SWP House Paint for interior use.[115]  In 1941, Sherwin-Williams provided instructions for using its white lead pigment on "interior walls and woodwork."[116]  Sherwin-Williams' ZILO pigment, sold for interior use in 1941, contained 75% white lead.[117]  During the 1940s, at least seven of Sherwin-Williams' Family Paints, sold for interior and exterior use, were formulated with white lead.

In 1940, Sherwin-Williams stipulated that its advertisements "created a public demand for its products throughout all of the states of the United States and in the District of Columbia. . ."[118]

Sherwin-Williams bragged that it had "the finest and best" Dealer organization in the industry. It was Sherwin-Williams plan "to work with our Dealers in every way to supply vigorous and positive merchandising, advertising and selling plans which will enable our Dealer to maintain their undeniable leadership in paint merchandising in their respective communities."[119]

As late as December 1954, Sherwin-Williams sold "House Paint" that contained 28% white lead and bore the label "For Exterior or Interior Use."[120]

In additional to advertising in national publications distributed in Wisconsin, including The Painter and Decorator, Better Homes and Gardens, Collier's Magazine, and

---

[114] Id.
[115] N141
[116] N40030
[117] N4040, N4374
[118] N17929
[119] N46253
[120] N18384, N18726, N18727 N18728

The Saturday Evening Post, Sherwin-Williams also advertised in Wisconsin Agriculturist.[121]

**DuPont**

DuPont similarly advertised and promoted Lead for residential use without warning of its dangers. In 1918, DuPont initiated a $1,500,000 national promotion campaign, which it characterized as "colossal." It declared that it "intend[ed] to make [its newly acquired lead paint line] the most sought after in the country. The campaign would involve advertising in 36 national magazines and various farm papers, including Wisconsin Farmer.[122]

Before 1920, paint reached the consumer through stores served by wholesalers. Improved roads lead to the development of large marketing centers. Department stores and some chain stores started selling paints and small chains of paint stores, some of whom manufactured their own paints, started springing up. These forced some large manufacturers to establish their own stores. Up to this time, most of DuPont's sales were made to retailers through wholesalers. This method of selling was expensive and did not help in getting the leading accounts because they "were usually tied up by one of the older manufacturers of long association."[123]

DuPont brought all of its trade sale products under the DuPont name and trademark in 1923. [124] To break down resistance and to bring about an appreciation of DuPont and its products, DuPont advertised to the consumer.[125] The first national advertisement of this

---

[121] N69, N29215, N46331
[122] N50848
[123] N43223
[124] N50760
[125] N43223

21

Case 2:11-cv-00055-LA     Filed 11/22/21     Page 22 of 67     Document 1109-8
Case 2:22-cv-00378-PP     Filed 03/25/22     Page 49 of 91     Document 1-5

newly branded "DuPont Line of Paints and Varnishes" appeared in the Saturday Evening Post on February 24, 1923. "Following this, there was a series of two page advertisements featuring full size packages of the leading items, and a tie-in with the dealer, which was the real beginning of the Trade Sales Department's growth."[126] As time went on, DuPont made progress and began to eliminate the wholesaler as unnecessary in their chain of distribution.[127]

In a 1923 memo, DuPont acknowledged "[t]he bulk of all contracting painter business today is handled through dealers" and "[e]very new agent established is an outlet to painters in that community." DuPont decided to concentrate on the "dealer-consumer market" rather than the "master painter market" because it was the easiest market to cover; the least sales resistance is encountered; it provides greater volume and more diversity.[128]

DuPont promoted its white lead for interior and exterior use.[129] DuPont offered an Architectural Service Bureau that would work "in close cooperation with the painting contractor, the agent, the distributor and the home owner in the development of wood finishes and in specifying the paints and varnishes for all exterior and interior purposes." In this same document DuPont recommended white lead in oil for interior and exterior use.[130]

Between 1930 and 1946, the number of DuPont stores went from 5 to 52. During the next few years a number of novel and modern merchandising ideas were introduced to stimulate sales, such as the famous "Paint Parade" featuring paint specials with attractive

---

[126] N50760
[127] N43223
[128] N50783
[129] N3153
[130] N50788

consumer broadsides for local distribution. "Millions of these broadsides were sold to the dealers on a 50-50 basis, and not only stimulated consumer interest but really created new alert dealer sales effort."[131]

### Armstrong

John R. MacGregor Lead Company claimed is was "a corroder of pure pig lead and manufacturer of Scotch Laddie Pure White Lead in Oil and other White Lead Paints, of which Scotch Laddie Titanized Pure White Lead Paint is a leading favorite." That its methods of processing lead and manufacturing paints guaranteed paint products that were unexcelled for service and performance. The Scotch Laddie label was a label in which you could place complete trust. John R. MacGregor, founder of the company, had "been a paint man for his entire lifetime" and was "recognized as an authority on paint of all types and White Lead Paints in particular."[132]

MacGregor Lead Co. promoted its Scotch Laddie paints and primers as being richer in white lead which guaranteed extra durability, smoother application and amazing whiteness and having superior quality and big value. Advertisements appeared in The Reader's Digest, Better Homes & Gardens, House & Garden Remodeling Guide, Better Homes & Gardens Home Improvement Ideas, and House Beautiful's Building Manual during 1964.[133] Many of these magazines were circulated in Wisconsin. MacGregor used a Consumer Guide Report in advertisements that stated "this paint (pure white lead paint)

---

[131] N43223
[132] N51403
[133] N51404

if used exclusively, remains best for homeowners wishing to allow long intervals – longer than the durability of any other white or tinted paint – to elapse between jobs."[134]

**ARCO**

International Smelting & Refining recognized the necessity of promoting white lead in order to "increase the consumption of pig lead in a market where the lead does not return."[135] Mr. Case attached the LIA's justification for the white lead promotion campaign which noted that white lead is "constantly subject to attack from the health standpoint" and the campaign "would help offset the constant threat of anti-lead legislation and propaganda."[136]

Anaconda advertised its white lead in American Paint Journal, Paint and Varnish Production Manager, Drugs, Oil and Paints, Painter & Decorator, National Painter's Magazine, and Paint, Oil and Chemical Review.[137] Anaconda acknowledged that white lead-in-oil is paint and it "was a very useful paint."[138] Anaconda also promoted its White Lead-In-Oil as paint, for exterior and interior use.[139] It recommended using white lead "no matter what kind of job you have . . . ."[140] None of these advertisements or promotions contained warnings about the dangers of the use of Lead in residential settings. These

---

[134] N51406

[135] N63

[136] N29

[137] N43710, N123, N32, N121

[138] N47441, Deposition of Joseph Kalt taken April 6, 2006.

[139] N135, N51416, N51417, N51349

[140] N116. Other Anaconda advertisements are N32, N34, N107, N110, N112, N113, N115, N118, N119, N120, N122, N123, N125 N126, N127, N128, N129 N130, N134, N138, N172, N173, N174, N178, N10005, N10006, N10007, N10008, N10009, N10010, N10011, N10012, N10013, N10014, N10015, N10016, N10017, N10018, N10019, N10020, N10021, N10022, N10023, N10024, N10025, N10026, N10027, N10028, N10029, N1030, N10031, N11187, N11188, N11189.

**FILED**
**03-02-2022**
**George L. Christenson**
**Clerk of Circuit Court**
**2021CV003276**

# EXHIBIT Q

3

advertisements appeared in national publications that were circulated in Wisconsin, including The Painter and Decorator.

## American Cyanamid

American Cyanamid advertised its pigments in national publications that were circulated in Wisconsin, including The Saturday Evening Post. None of these advertisements or promotions contained warnings about the dangers of the use of Lead in residential settings.

## The Lead Industries Association

### General promotion

The LIA engaged in an affirmative promotional campaign to increase the use of Lead in paints and coatings; none of these promotional campaigns contained warnings about the dangers of using Lead in residential settings. The campaign was launched at a time when the LIA and its members perceived a decline in the use and desirability of Lead as a pigment in paints and coatings. It was also at a time when each of the defendants actually knew of should have known because of the abundant available literature, of the serious health consequences to children of exposure to Lead. Through the LIA, the Defendants launched successful advertising and promotional campaigns stressing the advantages of using Lead, creating a false aura of safety surrounding their products. From 1928 until the mid-1950s, through books, magazines, salespersons, technical assistance, special campaigns, scientific conferences, and labeling recommendations, the LIA and the lead industry Defendants promoted the use of lead pigments for interior, domestic use.

In November, 1930, the LIA began publication of "Lead" magazine, which was to provide painters, among others, with "new and old uses of lead." In 1931, circulation was

about 16,000,[141] rising to 32,000 in 1941[142] and to 50,000 in 1956.[143] Lead was a success: "Hardly an issue goes out but what results in a stimulation of inquiry from architects, plumbers and others."[144]

In 1931 the Lead Industries Association produced a book, Useful Information about Lead, which suggested that the "prospective paint user" would be well advised to use paints containing a high percentage of lead, "the higher the better." In a section entitled, "White Lead in Paint," it stated that "well painted buildings, both inside and out, go hand in hand with improved sanitation." The book included no warnings of the dangers of lead, despite the fact it was produced "to disseminate accurate information about lead products and how they best may be used."[145]

The LIA aggressively promoted lead-based paint for interior and exterior application into the 1950s. For example, in the LIA's publication, LEAD, dozens of articles were published promoting lead-based paint for all interior domestic applications:

- November 1930 -- "This is illustrated by the fact that both houses are painted with pure white lead and oil inside and out."[146]

- January 1933 -- "Painting Interiors with White Lead for Efficiency"[147]

- May 1933 -- "White Lead Interior Keep Singer Building Paint Costs Low"[148]

- January 1934 -- "White Lead Paint Essential to Fine Decoration"[149]

---

[141] N576
[142] N2945
[143] N637
[144] N2395
[145] N31
[146] N761
[147] N778
[148] N783
[149] N792

- July 1935 -- "Interior and Exterior Always Painted with Pure White Lead"[150]

- January 1936 -- "Specifications Call for White Lead for Both Exterior and Interior Painting"[151]

- January 1938 -- "White Lead Paint Economical for Interiors"[152]

- January 1942 -- "Beauty, Variability Plus Economy with White Lead Stencilled Walls"[153]

- June 1944 -- "Pure white lead paint, mixed on the job, is being used throughout"[154]

- December 1944 -- "Pure White Lead Paint Stencil Decoration Practical Wall Treatment for Public Rooms"[155]

Many LIA advertisements were directed specifically toward encouraging the use of lead paint in the interiors of "low-cost homes."  The September 1941 issue recounted how the entire town of Boys Town, Nebraska, created to house homeless, abandoned boys, was painted with white lead, noting particularly the beautiful white lead paint job on the interior of the new chapel.[156] The November 1939 issue contained an article about the new home built with U.S.D.A. assistance for "Willis and Julia Thurman, Negro small land owners in Elmore County, Alabama," and their children, at a cost of $690.50, in which "all painting was done with white lead and oil, similar to the practice of the Farm Security Administration."[157]  During World War II, the LIA crowed about the construction of a

---

[150] N832

[151] N835

[152] N885

[153] N910

[154] N945

[155] N953. For other examples of promotions, for interior use, found in LEAD, see N789, N827, N828, N830, N866, N867, N874, N875, N879, N880, N881, N882, N883, N888, N895, N896, N905, N907, N909, N911, N927, N930, N942, N960, N982, N1222

[156] N147

[157] N883

Bridgeport, Connecticut housing project by the Federal Works Agency, "Painted Inside and Out with White Lead."[158] In July 1939, under the headline, <u>Successful Low-Cost Homes Benefit With White Lead</u>, the LIA quoted a developer with approval as saying, "A sure sign of wise low cost home building is the fact the 'we use pure white lead on all our work,'" and went on to remark on the interior and exterior use of white lead in the tiny house pictured.[159]

Not only was lead-based paint promoted for interior applications in private homes, the LIA also promoted it for interior use in public buildings[160], including schools[161]; churches[162]; hospitals[163]; and apartment buildings[164].

The LIA ran the same or similar articles as advertisements in magazines such as <u>American Painter and Decorator</u> and <u>Architectural Forum</u>. In the February 1940 issue of <u>American Painter</u>, the LIA claimed that it was advertising "to millions of homeowners every month."[165]

In 1941, the LIA published a book entitled <u>Painting Farm Buildings and Equipment</u>, which recommended white lead for domestic interiors, provided handy formulas for "home-mixed interior paint," and suggested that lower walls be painted with darker colors of lead paint so that finger marks of small children would be less visible. This book sold more

---

[158] N912
[159] N881. <u>See</u> <u>also</u>, <u>e.g.</u>, N144, N879, N882
[160] N898, N912, N913, N925
[161] N914
[162] N900, N908
[163] N21
[164] N897
[165] N18373

than 100,000 copies.[166]  In 1949, the LIA republished <u>Painting Farm Buildings and Equipment</u>.[167]

The LIA saw its promotional work as an important antidote to the negative publicity that lead was receiving in the national press: "The problem of how to obtain a better press for our products is indeed a troublesome one.  Our promotional work and  especially our national advertising helps to build up good-will for our metal and in the long run will share in dispelling anxiety about its use.  In any event the problem remains serious for our industry. Hardly a day passes but what this office has to devote some attention to lead poisoning."[168]

In 1942, the LIA published a booklet entitled, "What to Expect From White Lead Paint," in which it promoted the use of white lead for both interior and exterior surfaces, suggesting that for "interior wood, plaster and wall board," 40 pounds of white lead should be mixed with lead mixing or reducing oil to produce enough paint to cover 1000 square feet of surface.[169]

Continuing to promote white lead for both exteriors as well as interiors, in 1952 the LIA published <u>Lead in Modern Industry</u>.  It stated:

> [W]hite lead ... has practically no undesirable qualities to nullify its advantages . . . . [T]he profitable application of white lead is not confined to exterior use.  Pure white lead paints can be utilized to advantage for interior decoration, particularly in public and traditional buildings....[170]

---

[166] N44, N124
[167] N44
[168] N2401
[169] N51402
[170] N142

While promoting lead for interior use, this book acknowledged that lead poisoning could occur when lead gained "entrance into the human system in measurable quantity either through inhalation of vapors and dusts or ingestion of lead compounds introduced into the mouth on the fingers . . . ." It maintained that "ingestion is by far the less important [danger] and is most often associated with children chewing on objects coated with paints containing lead." The chapter allayed readers' fears by claiming that "since most inside paints and paints used by manufacturers on children's furniture and toys contained no lead, a hazard usually exists only if children are allowed to chew outside painted surfaces, like porch railings, or if parents inadvertently repaint furniture with outside house paint."[171]   The LIA's simultaneous promotion of lead paint for interiors demonstrated the falsity of this statement.

In December 1952, the LIA decided to "discontinue all activities of the Association relating to the promotion of white lead in house paints." It transferred funds to red lead activities. "It was apparently felt that the economic obstacles faced by white lead pigments nullify whatever technical advantages these pigments enjoy and thus further expenditures of money by the Association are not justified."[172]

Nevertheless, even after this, and at least until 1962, the LIA continued to distribute Lead in Modern Industry, in which it advocated the use of white lead for interiors.[173]

---

[171] Id.
[172] N2930
[173] N1117

In 1952, John R. MacGregor, ignoring the hundreds of reports of childhood lead poisoning each year, predicted that the LIA's "advertising of white lead advantages will undoubtedly help the trend . . . to the increased use of white lead."[174]

Notwithstanding repeated statements over the years that it no longer produced white lead paint for interior use, the industry continued to sell white lead paints that were applied on interiors, either because they were specified for interior use or because they contained no labels warning that interior use could cause lead poisoning.

### Forest Products – Better Paint Campaign

Believing that "[t]here is a definite relation between the use of white lead and the use of lumber in construction," in 1934 the LIA initiated a "Forest Products -- Better Paint Campaign." This Campaign was funded by LIA members including Sherwin-Williams and IS&R/Anaconda.

The premise for the Forest Products -- Better Paint Campaign was reported in the June 5, 1934 Report of the Secretary for the Lead Industries Association:

> White lead is at present the most important outlet for pig lead metal. There is a definite relation between the use of white lead and the use of lumber in construction. The more lumber used, the more white lead should be marketed. The lumber industry has suffered from some of the inferior and cheap paints used in painting homes and other structures made of wood, as it has discouraged the construction of wood homes. In an effort to correct this situation, the Lead Industries Association is supporting a campaign entitled the Forest Products – Better Paint Campaign, supported through a separate fund to which the white lead manufacturers and the mining companies have contributed.[175]

---

[174] N3304
[175] N2395

The progress of the Forest Products -- Better Paint campaign was reported through the LIA Secretary's Report. The first progress report on the campaign is found in the September 25, 1934 Report:

> Forest Products – Better Paint Campaign – This Campaign was begun the first of 1934 and has continued, without interruption, being supported by four white lead manufacturing companies and the mining companies. . . . The members supporting the program have been supplied with periodic reports of progress . . . Even though the campaign is only about nine months old, it promises to be a useful means of cooperating with a large and influential group of lumber manufactures in the marketing of both products. [176]

The following year, the LIA reported again on the success of the program. In the minutes of the LIA annual meeting held on June 13, 1935 it is reported that "Already there are signs that some manufacturers of patently low-grade leadless paint, who have been cultivating the lumber outlet, are changing their formulae to include lead."[177] A few months later, the LIA board of directors was told at the October 1, 1935 meeting that:

> Forest Products -- Better Paint Campaign – This Campaign has recently also received the endorsement of the Southern Cypress Association so that it now possesses the support of practically all the important lumber associations in the United States. The best evidence of its progress is the fact that the prepared paint industry is trying to find a common ground in which it can also cooperate with the lumber companies and ourselves in accomplishing the objectives of the Forest Products – Better Paint Campaign. . . . Many lumber yards are putting white lead on their retail shelves where they never sold it before and some leadless paints, formerly sold as a high quality product, are now including lead. The campaign recommends either white lead in oil or the highest grade prepared paint.[178]

---

[176] N592
[177] N23
[178] N599

Similar success was reported for the following years as well. In a letter containing the Secretary's Report sent to all LIA members on February 19, 1936 it was reported that "Forest Products – Better Paint Campaign – During its second year, the Forest Products – Better Paint Campaign continued to arouse intense interest among lumber groups of the importance of good paint on good lumber. . . Evidence reaches us that not only is the distribution of white lead in oil growing in lumber yards, but many yards formerly handling prepared paint of questionable quality are now stocking superior merchandise. . . . Results from the Campaign should accrue to us, as they apparently have, from the use of more white lead in oil paste paint or dry white lead in prepared paint."[179]

A 1937 article on the Campaign in Lead featured a picture of the nursery of a model house, part of a traveling display that the LIA had sent around the country.[180]

In 1937, it was reported at the LIA board of directors meeting that:

> We discussed many problems affecting the use of lumber and paint in industry and I am pleased to report that the meeting was most successful in bringing about a close cooperation between the groups at interest.
>
> The Southern Pine Association is interested in the use of painting instruction labels on its drop siding and we anticipate that other manufacturers of drop siding, particularly in the northwest, made of Douglas Fir, will follow suit. This will add millions of additional circulars calling attention to the advisability of using nothing but white lead in oil, or the highest grade prepared paint on lumber.
>
> We are cooperating with the Red Cedar Shingle Bureau in furnishing a small part of a film telling the story of red cedar shingles. Our part has been to supply the painting portion of the film, which, of course, will emphasize the desirability of using white lead in oil or high-grade prepared paint on cedar

---

[179] N1773
[180] N2395, N865

> shingles. At no expense to us, the Red Cedar Shingle Bureau is going to exhibit the moving picture film all over the United States.[181]

Then at the board of directors meeting held on December 21, 1937 a short update

was contained within the minutes:

> Lumber Products-Better Paint Campaign – Here, also, a detailed report has been furnished each Director and nothing need be added to the statements made. Although it is not possible to fix accurately the benefits to the members of the Association, received directly from the Campaign, I believe that the use of white lead can not help but be benefited either as straight white lead or a constituent of high-grade paint. Moreover, individual lumber manufacturing associations, which publish handbooks and pamphlets on their products, now include reference to white lead as well as prepared paint, whereas, prior to the work of our Campaign, no mention had been made of the pigment. [182]

Additional success and work by the campaign was reported at the 1938 annual

meeting:

> Miscellaneous – It has been disturbing to observe numerous attacks made upon white lead by a few competitive paint products, illustrating the divergent points of view existing between some prepared paint manufacturers and the producers of white lead.
>
> From our early experience with the Lumber Products-Better Paint Campaign, we know that at least one manufacturer of low-grade paint, who had gone so far as to make bitter attacks on our product, quickly changed his formula and incorporated white lead in his paint, after the Campaign was launched, and the attacks ceased abruptly. Perhaps there is a lesson in this episode. [183]

---

[181] N608
[182] N616
[183] N2397

In the report summarizing the activities of the LIA in 1938 that was attached to the

minutes of the board of directors meeting held on January 24, 1939, an extensive report on

the campaign was given:

> Lumber Products -- Better Paint Campaign – A detailed review of the work of the campaign was provided each subscriber to this special program. A summary, as follows, of the definite results attributable to this campaign may be helpful:     Lumber Products-Better Paint Campaign – Summary of certain tangible benefits accruing to the white lead industry. a. All the principal producers of soft and hard lumber in the United States, such as redwood, cypress, cedar, pine and others, specify white lead or high-grade prepared paint which contains white lead. At their own expense, estimated at $6,000 per year, they print and distribute painting instruction leaflets (2,000,000 copies).     b. The Douglas Fir Plywood Association recommends the use of white lead exclusively. It has printed 40,000 leaflets, in color, at a cost of $2,000 and distributed them to every architect in the United States, as well as others. They have also donated two trailers to our campaign at a cost of $1500. c. The Red Cedar Shingle Bureau, representing 93 per cent of the industry, recognizes white lead in oil exclusively in its advertising and features white lead in oil in its Centigrade model homes. Ten of its field men promote the use of white lead in connection with their own activities through motion pictures, without cost to us.     d. The Southern Pine Association features white lead in its architectural and engineering manual.     e. Aluminum priming has been eliminated from the literature of the regional lumber associations. f. Over 20,000 retail lumber yards are giving us cooperation in selling only first quality paint and dispensing with the sale of cheap paint. g. White lead has been placed in several thousand lumber yards that never handled it before. Although we have no definite figures, our white lead producing members tell us that their sales to lumber yards have increased substantially. h. A prominent prepared paint company in Milwaukee, as a result of the Campaign, is producing a 100 per cent white lead content prepared paint, white and in five colors, and in gallon and half-gallon cans. i. Some paint companies have increased the lead content of their paint. The Paraffine Companies in San Francisco, one of the largest paint manufacturers in the United States, which viciously attacked white lead for years

35

and turned out a leadless product, now carries 60 per cent white lead in its outside paint. j. I believe the influence of the lumber industry was one of the reasons why the National Paint, Varnish and Lacquer Association has recently passed a resolution advocating the printing of paint formulas on the containers of prepared paints.     k. The Western Pine Association, at the San Francisco Fair, will paint its model home inside and out with white lead and publicize this specification.     l. The sash and door manufacturers are preparing to spend $18,000 next year to print 20,000,000 labels to be affixed to nearly all the sash and doors in the United States, featuring the use of white lead and high-grade prepared paint. m. Several agricultural extension services of universities are revising their farm manuals and recommending white lead in the text.     n. If the campaign continues in 1939 on the same basis as in 1938 the lumber industry's expenditures in cooperation with the campaign will more than match our own.

Similar results have accrued to manufacturers of high-grade prepared paint and as the highest grade prepared paints contain lead, the white lead industry has profited in that direction also. [184]

The above information was given almost verbatim to the members at the annual meeting held on May 16, 1939.[185]

Such reports continued at the Board of Directors meetings in 1940[186], 1941[187], and 1942[188]. These documents evidence the success of the Lumber Products - Better Paint campaign in increasing the use of white lead in paints.

### White Lead Promotion Campaign

In 1938 the LIA, recognizing the declining sales of white lead, began its White Lead Promotion Campaign, the single largest activity undertaken by the LIA up until that date

---

[184] N581
[185] N2399
[186] N584
[187] N595
[188] N2384

36

Case 2:11-cv-00055-LA   Filed 11/22/21   Page 37 of 67   Document 1109-8
Case 2:22-cv-00378-PP   Filed 03/25/22   Page 65 of 91   Document 1-5

FILED
03-02-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

# EXHIBIT Q

4

The LIA described the campaign as follows: "It is not just an advertising campaign but a well-founded promotional drive utilizing, in addition to general consumer and farm magazine advertising, trade paper advertising, organized publicity, field work and other means to arrive at the objective – the sale of more white lead."[189]  The LIA wrote, "This campaign by showing the importance of white lead to industry would help offset the constant threat of anti-lead legislation and propaganda."[190]  The Campaign continued, with an interruption, until 1952, spending more than a million dollars to promote white lead paint.  IS&R/Anaconda and MacGregor contributed to the White Lead Promotion campaign.  Sherwin-Williams participated in the Campaign in the post-war years.[191]

The justification for the campaign was outlined in a "Confidential - Not for Publication" bulletin sent to the members supporting the white lead promotion campaign on February 20, 1939:

> Reasons for undertaking a trade promotion effort on behalf of white lead are as follows: white is the most important market for the product of the lead miner; white lead consumption has been declining . . . . because white lead has been displaced in part by cheap substitute low-grade paints containing chalk, barites, sand and other adulterants, and because white lead receives intensive attack from the advertising of prepared paint companies who stress the greater convenience of using prepared paint, often containing only small amounts of white lead, and who do little or nothing to encourage craftsmanship, the backbone of fine paint work.  White lead is being promoted nationally by only one company in face of competition from a great number of competitive prepared paint manufacturers.  White lead remains the finest paint pigment known to science and to commerce today.  White lead is used in paste form as the sole constituent of paint, or as an ingredient of prepared paints (generally in minor amounts) . . . .  White lead will

---

[189] N2888
[190] N63 and attachment N29
[191] N2917, N2914

> continue to lose its position in the paint industry unless some effort is devised to offset competitive attacks and to acquaint the public widely with the merits of the product; white lead is also constantly subject to attack from the health standpoint.
>
> It is proposed to correct the situation and to capitalize on the traditionally excellent reputation of white lead paint by cooperatively engaging in a promotional campaign, including various forms of sales promotion, with the objective of not only arresting the downward tendency, but increasing the consumption of white lead. [192]

The lead industry wanted to promote white lead for use in paint because:

> White lead finds its widest outlet in paint manufacture and although other applications of pig lead, such as storage battery manufacture, or cable covering, may consume larger tonnage, the white lead industry is the most important outlet of the lead miner because lead is given permanent disposition and cannot be reclaimed economically.[1]

In fact, if one looks at the Minerals Yearbooks, it is easy to see that the paint industry was the largest consumer of white lead carbonate. Between 1929 and 1974, 1,978,598 tons of white lead were used in paint compared to 52,465 tons used in ceramics and 200,180 tons used in all other products.

The importance of the White Lead Promotion Campaign was outlined in the report of the secretary given at the June 6, 1940 annual meeting of the LIA[193]:

> White Lead Promotion Program. The largest single activity since the founding of the Association eleven years ago is its white lead promotion program, an important nation-wide effort to increase the consumption of white lead in the United States and to combat the substitution of inferior pigments for white lead.

---

[192] N64
[1] N741
[193] N2400; See also  N582

The campaign begins its second year with many intricate problems of organization and coordination solved, and with interest in the progress and support of the work growing. It will be a long hard struggle to regain the ground that has been lost over the last seventeen years but with the unexcelled merit of the product as a basis, and with the inspiring example of unanimity set by our mining, smelting and manufacturing members in the first year of the campaign as a background, I am confident of the ultimate satisfying outcome.

One beneficial result of our campaign is the good will it is building up for lead in general. I have always felt that the cultivation of good will for our metal and publicity about the indispensable work it does for mankind is something that lead needs more than other common metals because lead in many forms is constantly under attack on account of its toxic qualities. Our campaign helps to meet this issue.

One of the most interesting results of the campaign has been the growing tendency of paint manufacturers to add a product to their line consisting of 100% prepared white lead paint, in colors. This important step overcomes the barrier of inconvenience which has placed white lead paint at a competitive disadvantage.

It is also noteworthy that attacks on white lead, which was one of the reasons for undertaking our campaign, have declined greatly and that more articles of national interest, specifically endorsing white lead, have appeared in the press during the last year than for any period to my recollection. Moreover, government and other specifications are giving increasing recognition to white lead. [194]

In that vein, the LIA published several pamphlets and periodicals extolling the virtues of lead pigment in paint starting in the 1930s, including a magazine called LEAD, which had a circulation as high as 80,000. The media selected to carry the white lead promotion campaign advertising for 1939 and into the 1940s include Better Homes & Garden, Saturday Evening Post, Colliers, and American Home. Each of these publications

---

[194] N2400

were circulated in Wisconsin.  The total promotion media, including trade papers and farm papers, had a total circulation of 12,100,540.[195]

Like the Forest Products-Better Paint Campaign, the White Lead Promotion Campaign was successful in increasing the use of Lead in paints and coatings.  In an August 15, 1939 bulletin sent to the supporting members, the LIA reported:

> One of the significant developments of the White Lead Promotion Program is the fact that several important manufacturers of prepared paint have begun the manufacture of white lead in colors, ready for the brush.  While lead heretofore had only been generally available in paste form, white exclusively, but there is an opportunity for prepared paint manufacturers to market the white lead paint in ready-mixed form in colors ready for the brush. . .
>
> *****
>
> The prepared paint companies known to us that are now turning out a white lead paint, or are prepared to produce it in the future are as follows:
>
>      Patek Bros, Inc.        Milwaukee
>
> We estimate that the prepared paint companies listed above will furnish an outlet of some 3,000 dealers through the east and middle west.[196]

Other prepared paint companies listed in this memo also sold paint in Wisconsin, including Hooker Glass & Paint, Passanno-Hutcheon Co. and Phelan-Faust Paint Co.

Similarly, in the minutes of the September 27, 1939 advisory committee meeting there is another progress report on the campaign touting its success:

> The Secretary reported the campaign as steadily gathering momentum in the six months it had been underway, but that it was too early to measure its effects.

---

[195] N3002
[196] N2996

> The Secretary reported that magazine publicity for white
> lead appeared so much greater than it had been prior to our
> campaign.  Some of the articles were supplied by the
> Association.  While not directly responsible for others, the
> campaign, added to the advertising of members, was
> probably one reason for the increasing editorial
> consideration given white lead.[197]

Other favorable reports on the success of the campaign were reported later that year
and in following years.  In 1939, it was reported that "[t]his campaign has been well and
generally supported by our industry.  As you know, the mining and smelting interests are
quite generally represented, and we are very hopeful as we enter the second year of the
campaign, that before long we will be able to report that the white lead interests are 100%
represented. . . . Mr. Cornell asked which of the various activities conducted under the
White Lead advertising and promotional campaign was considered most valuable.  Mr.
Peters answered by saying undoubtedly consumer advertising, and pointed out some results
which had been immediately felt, such as a growing tendency among some mixed paint
companies to make 100 per cent white lead paint in colors."[198]

That same year, the LIA noted that:

> [I]t may be a coincidence, but it is noteworthy that white lead
> has been receiving increasingly favorable comment by
> editorial writers and government publications since our
> Campaign began. . . . Our White Lead Campaign is also
> timely in endeavoring to reverse the tendency which has
> been apparent in late years among many paint
> manufacturers, to use as little white lead as possible in their
> formulations.  (White lead being the most expensive of the
> common pigments, competition makes it attractive for the
> paint manufacturer to use as little of it as he can.)  One
> important paint manufacturer in 1939 cut the white lead
> content of his outside paint.  I have since learned that the
> white lead content of his product has been increased.

----

[197] N2937
[198] N2941

> Another paint manufacturer who has been featuring a
> completely leadless outside paint has now added lead to it.
> Our campaign helps to raise the quality of house paint sold
> in the United States.[199]

The advertising itself was subject to review and approval by a committee of the LIA. Advertising appeared in the following general readership magazines: <u>Saturday Evening Post</u>, <u>Colliers</u>, <u>Better Homes and Gardens</u>, <u>American Home</u>, <u>Country Gentleman</u>, and <u>Successful Farming</u>. Total circulation of these magazines was put at 13,881,000, and it was estimated that 67,570,526 separate messages would be carried.[200] The LIA also placed at least 35 articles about white lead in the first two years in <u>Painter and Decorator</u>, the official publication of the Brotherhood of Painters, Decorators and Paperhangers of America, and other trade publications. In the campaign's first two years, the LIA released 91 columns of "Home Owner's Forum" to 800 newspapers and 11 "House of the Month" features to 500 newspapers. The LIA also helped to write the Iowa State College Circular, "Selecting and Applying Paints," with 110,000 copies distributed in the first two years. One hundred thousand leaflets and broadsides were sent to stores, stockholders and employees. The LIA mailed 50,000 copies of its promotional booklet, "What to Expect from Lead Paint," and 35,000 copies of the leaflet "How Lumber and Paint Keep Your Home Always in Style. Wormser made clear that white lead was being promoted for use in interiors, a promotion which the LIA believed to be successful.[201]

By 1940, Wormser reported to the LIA members on the positive results of its campaign, which was needed, he said, because lead "is constantly under attack on account

---

[199] Id.
[200] N2945, N4449
[201] N2935

of its toxic qualities." He told of the "growing tendency of paint manufacturers to add a product to their line consisting of 100% prepared white lead paint in colors . . .It is also noteworthy that attacks on white lead, which was one of the reasons for undertaking our campaign, have declined greatly. . . "[202]

> As a result of the LIA's efforts, mixed paint companies and white lead paint companies began to manufacture white lead paint in ready-to-use form and it sold well.[203] White lead was made available in more and more colors in prepared paint form. "Mixed paint manufacturers -- who three years ago showed little respect for white lead -- now show a change of attitude and a willingness to increase their use of white lead pigment under pressure of defense shortages. Many of them definitely favor the Lead Industries campaign."[204]

In 1941, the LIA reported that a "large amount of work was performed on this program during the second year, including not only consumer and trade paper advertising but also work in the field with agricultural agencies, federal government bureaus, journeyman painters and lumber groups that should benefit the industry for years to come. . . . The campaign has grown in influence. One has only to examine literature published editorially by leading magazines such as Better Homes & Gardens, Successful Farming, Nation's Agriculture and others to realize that the campaign is influencing editorial thinking about paint in the direction of procuring an improved product for the public." [205] Later that same year, the LIA reported that the "white lead industry is now so active that it

---

[202] N2400
[203] N2945
[204] Id.
[205] N595

can not fill the demand.  If more pig lead were available, the amount of white lead sold

would be greatly increased."[206]

Again, in 1941 the LIA commented that the White Lead Promotion Campaign:

> . . . has given our industry prestige that is priceless and has
> helped all the lead promotion work in other fields.  It has
> made it easier for us to procure highly desirable publicity in
> important channels and has strengthened the hand of many
> technologists who have prepared reports of their work who
> have concluded with a high regard for white lead.  I refer
> particularly to University professors and Government
> Agencies. . . . There are many straws to indicate that the
> campaign has helped the lead industry and the white lead
> producers in particular, making their job of marketing white
> lead easier.  It has also helped the position of our industry in
> Washington.[207]

In an April 1942 bulletin to the members supporting the white lead promotion campaign,

there is further explanation of the field visits to the different states.  This document shows

us:

> Municipalities, Counties, States, Institutions – During the
> past year, a special representative of the Association
> expanded his contacts among municipal, county, state and
> institutional authorities to ascertain painting practices and
> offer advice and assistance as to the revision of
> specifications when deemed necessary to improve the
> position of white lead.  To date, this representative has made
> numerous visits in the following states and in addition
> attends, whenever possible, meetings and conventions of
> school officials, real estate operators and other groups who
> specify and buy large quantities of paint . . . Wisconsin.[208]

The White Lead Promotion Campaign continued until the United States'

involvement in World War II began to affect the availability of Lead for use in paints and

---

[206] N596, N2401
[207] N2945
[208] N2898

FILED
03-04-2022
George L. Christenson
Clerk of Circuit Court
2021CV003276

STATE OF WISCONSIN    :    CIRCUIT COURT    :    MILWAUKEE COUNTY

_____

ARRIEONA BEAL,

    Plaintiff,

                vs.                  Case No. 21-CV-003276

                                Case Code 30107

ARMSTRONG CONTAINERS, INC.; E. I.       JURY TRIAL DEMANDED
DUPONT DE NEMOURS & COMPANY; THE
ATLANTIC RICHFIELD COMPANY; THE
SHERWIN-WILLIAMS COMPANY; HATTIE
AND JERRY MITCHELL;

    Defendants.

_____

## DEFENDANT ARMSTRONG CONTAINERS, INC.'S
## AMENDED ANSWER AND DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

_____

    COMES NOW Defendant Armstrong Containers, Inc. ("Armstrong"), by and through its undersigned counsel, and submits its Amended Answer and Defenses to Plaintiff's Amended Complaint, showing as follows:

### ANSWER

    1.    Armstrong responds that because Plaintiff's original complaint was not directed at Armstrong, the allegations therein require no response. To the extent a response is deemed required, Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Plaintiff's original complaint, incorporated by reference into Paragraph 1 of the Amended Complaint, denies that Plaintiff ingested white lead carbonate pigments manufactured by Armstrong's alleged predecessor, the MacGregor Lead Company ("MacGregor"), denies that Plaintiff was injured by ingesting white lead carbonate pigments,

denies that it is liable to Plaintiff, and asserts that defendants Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff.

## I. PARTIES

2.      Paragraph 2 sets forth a legal conclusion to which no response is required.  To the extent a response is deemed required, Armstrong admits that Plaintiff purports to file this action pursuant to the risk contribution theory as applied by the Wisconsin Supreme Court in *Thomas v. Mallett*, 2005 WI 129, and pursuant to *Antwuan A. v. Heritage Mutual Insurance Company*, 229 Wis. 2d 44 (WI 1999). Armstrong denies all other allegations contained in Paragraph 2 of the Amended Complaint.

3.      Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's residency, residential history, citizenship and medical history contained in Paragraph 3 of the Amended Complaint. Armstrong denies all other allegations contained in Paragraph 3 of the Amended Complaint.

4.      Armstrong admits that it is being sued in this action as the alleged successor-in-interest to the John R. MacGregor Lead Co. or the MacGregor Lead Company, but denies that it is the successor-in-interest to either of those companies. Armstrong admits that it is incorporated under the laws of the state of Delaware and that its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Armstrong denies that it has and does substantial business in the City and County of Milwaukee, State of Wisconsin, and denies all other allegations contained in Paragraph 4 of the Amended Complaint.

5.      The allegations contained in Paragraph 5 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong

- 2 -

states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Amended Complaint.

6.      The allegations contained in Paragraph 6 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Amended Complaint.

7.      The allegations contained in Paragraph 7 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Amended Complaint.

8.      With respect to the allegations contained in Paragraph 8 of the Amended Complaint that are directed toward Armstrong, Armstrong denies these allegations. With respect to the allegations contained in Paragraph 8 of the Amended Complaint that are directed toward the other defendants, Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong states that it is without knowledge or information sufficient to form a belief as to the truth of these allegations.

9.      The allegations contained in Paragraph 9 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong states that it is without knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 9 of the Amended Complaint. Armstrong further states that defendants Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff.

## II. THE FACTS

10.     Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Amended Complaint.

11.     Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Amended Complaint.

12.     Armstrong denies the allegations contained in Paragraph 12 of the Amended Complaint.

13.     Armstrong denies the allegations contained in Paragraph 13 of the Amended Complaint.

14.     Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Amended Complaint.

15.     Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of the Amended Complaint.

16.     The allegations contained in Paragraph 16 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Amended Complaint. However, Armstrong asserts that the potential risks of deteriorated lead-based paints, including household lead dust, were publicly

- 4 -

available and commonly known before Plaintiff's alleged exposure, and further asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff.

17.    The allegations contained in Paragraph 17 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Amended Complaint, except to assert that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff.

18.    Armstrong denies the allegations contained in Paragraph 18 of the Amended Complaint.

19.    Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Amended Complaint.

20.    Armstrong denies the allegations contained in Paragraph 20 of the Amended Complaint.

21.    Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Amended Complaint.

22.    Armstrong is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Amended Complaint.

23.    Armstrong denies the allegations contained in Paragraph 23 of the Amended Complaint, including all subparts thereof.

24.    Armstrong denies the allegations contained in Paragraph 24 of the Amended Complaint.

25.     Armstrong denies the allegations contained in Paragraph 25 of the Amended Complaint.

26.     Armstrong denies the allegations contained in Paragraph 26 of the Amended Complaint.

27.     Armstrong denies the allegations contained in Paragraph 27 of the Amended Complaint.

28.     Armstrong denies the allegations contained in Paragraph 28 of the Amended Complaint.

29.     Armstrong denies the allegations contained in Paragraph 29 of the Amended Complaint.

30.     Armstrong denies the allegations contained in Paragraph 30 of the Amended Complaint.

31.     Armstrong denies the allegations contained in Paragraph 31 of the Amended Complaint, including all subparts thereof.

32.     The first sentence of Paragraph 32 sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, Armstrong states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Amended Complaint. Armstrong denies the remaining allegations contained in Paragraph 32 of the Amended Complaint.

33.     Armstrong denies the allegations contained in Paragraph 33 of the Amended Complaint.

- 6 -

34.    Armstrong denies the allegations contained in Paragraph 34 of the Amended Complaint.

35.    Armstrong denies the allegations contained in Paragraph 35 of the Amended Complaint.

36.    Armstrong denies the allegations contained in Paragraph 36 of the Amended Complaint.

## FIRST CAUSE OF ACTION
### Negligence of the Landlords

37.    The allegations contained in Paragraph 37 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff, denies that Plaintiff ingested white lead carbonate pigments manufactured by MacGregor, denies that Plaintiff was injured by ingesting white lead carbonate pigments, and otherwise states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the Amended Complaint.

38.    The allegations contained in Paragraph 38 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff, denies that Plaintiff ingested white lead carbonate pigments manufactured by MacGregor, denies that Plaintiff was injured by ingesting white lead carbonate pigments, and otherwise states that it is without

knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 of the Amended Complaint.

39.     The allegations contained in Paragraph 39 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff, denies that Plaintiff ingested white lead carbonate pigments manufactured by MacGregor, denies that Plaintiff was injured by ingesting white lead carbonate pigments, and otherwise states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 of the Amended Complaint.

40.     The allegations contained in Paragraph 40 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff, denies that Plaintiff ingested white lead carbonate pigments manufactured by MacGregor, denies that Plaintiff was injured by ingesting white lead carbonate pigments, and otherwise states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 of the Amended Complaint.

41.     The allegations contained in Paragraph 41 of the Amended Complaint are not directed toward Armstrong and thus Armstrong has no obligation to respond to them. To the extent it is deemed that Armstrong does have an obligation to respond to those allegations, Armstrong asserts that Hattie and Jerry Mitchell are responsible for any liability owed to Plaintiff, denies that

- 8 -

Plaintiff ingested white lead carbonate pigments manufactured by MacGregor, denies that Plaintiff was injured by ingesting white lead carbonate pigments, and otherwise states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 of the Amended Complaint.

<u>**SECOND CAUSE OF ACTION**</u>
**General Negligence Liability of the Industry Defendants**

42.     Armstrong hereby incorporates by reference its responses to the foregoing paragraphs 1–41 of the Amended Complaint above as if fully set forth herein verbatim.

43.     Armstrong denies the allegations contained in Paragraph 43 of the Amended Complaint.

44.     Armstrong denies the allegations contained in Paragraph 44 of the Amended Complaint.

45.     Paragraph 45 sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, it is hereby denied.

46.     Paragraph 46 sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, it is hereby denied.

47.     Armstrong denies the allegations contained in Paragraph 47 of the Amended Complaint.

48.     Armstrong denies the allegations contained in Paragraph 48 of the Amended Complaint.

## THIRD CAUSE OF ACTION
### Strict Liability Failure to Warn of the Industry Defendants

49.     Armstrong hereby incorporates by reference its responses to Paragraphs 1–48 of the Amended Complaint above as if fully set forth herein verbatim.

50.     Armstrong denies the allegations contained in Paragraph 50 of the Amended Complaint.

51.     Armstrong denies the allegations contained in Paragraph 51 of the Amended Complaint.

52.     Armstrong denies the allegations contained in Paragraph 52 of the Amended Complaint.

53.     Armstrong denies the allegations contained in Paragraph 53 of the Amended Complaint.

## FOURTH CAUSE OF ACTION
### Negligent Failure to Warn of the Industry Defendants

54.     Armstrong hereby incorporates by reference its responses to Paragraphs 1–53 of the Amended Complaint above as if fully set forth herein verbatim.

55.     Armstrong denies the allegations contained in Paragraph 55 of the Amended Complaint.

56.     Armstrong denies the allegations contained in Paragraph 56 of the Amended Complaint.

57.     Paragraph 57 of the Amended Complaint sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, it is hereby denied.

58.     Armstrong denies the allegations contained in Paragraph 58 of the Amended Complaint, including all subparts thereof.

59.     Armstrong denies the allegations contained in Paragraph 59 of the Amended Complaint.

Armstrong hereby denies any allegations contained in the Complaint not specifically responded to above. Armstrong denies that Plaintiff is entitled to any of the relief requested in her *ad damnum* clause, including all subparts thereof.

## DEFENSES

Armstrong sets forth the following affirmative and other defenses. Armstrong does not intend hereby to assume the burden of proof with respect to those matters as to which, pursuant to law, Plaintiff bears the burden.

### FIRST DEFENSE

The Amended Complaint fails to state a claim upon which relief can be granted against Armstrong.

### SECOND DEFENSE

Plaintiff's claims are barred in whole or in part by the applicable statute of limitations and/or statute of repose, including but not limited to limitations on liability set forth in Wis. Stat. §§ 895.046 and 895.047.

### THIRD DEFENSE

Plaintiff's alleged damages were caused in whole or in part by misuse of lead-based paint by persons for whose conduct neither Armstrong nor its alleged predecessor is responsible.

- 11 -

## FOURTH DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrines of contributory negligence and/or comparative fault.

## FIFTH DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff expressly and impliedly assumed the risk of Plaintiff's alleged damages.

## SIXTH DEFENSE

Plaintiff's alleged injuries and damages, if any, were caused in whole or in part by acts or omissions of the Plaintiff or third parties (including without limitation, the lessors, property managers, and owners of Plaintiff's premises; governmental authorities having the responsibility to inspect and take action with respect to the safety of those premises; and Plaintiff's legal representatives, caregivers, and custodians) over whom or which Armstrong had no control, and such acts or omissions were intervening and superseding causes of Plaintiff's alleged injuries and damages.

## SEVENTH DEFENSE

Plaintiff's claims are barred in whole or in part by Plaintiff's failure to mitigate damages.

## EIGHTH DEFENSE

Paint pigments that the alleged predecessor of Armstrong may have sold were sold in bulk to sophisticated buyers who were at least as knowledgeable as Armstrong's alleged predecessor with respect to any alleged hazards relating to lead-based paint, and Armstrong's alleged predecessor discharged any duty to warn to those buyers.

- 12 -

## NINTH DEFENSE

Armstrong denies that it is liable to any other party for damages based on contribution and/or indemnification and/or any other basis.

## TENTH DEFENSE

The Court lacks personal jurisdiction over Armstrong.

## ELEVENTH DEFENSE

Armstrong is not a proper party to some or all of the claims asserted.

## TWELFTH DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff has failed to join parties indispensable to a just adjudication of this lawsuit.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred in whole or in part by the equitable doctrines of unclean hands, laches, waiver and/or estoppel.

## FOURTEENTH DEFENSE

The toxicity of lead and the potential risk of harm from ingesting paint containing white lead carbonate pigments, which were never intended to be ingested, were known, open and obvious and therefore required no warning.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred in whole or in part to the extent Plaintiff has released, settled, entered into an accord and satisfaction or otherwise compromised Plaintiff's claims. See, e.g., Pierringer v. Hogan, 124 N.W.2d 106, 21 Wis. 2d 182 (1963).

- 13 -

**SIXTEENTH DEFENSE**

If Plaintiff has sustained injuries or losses as alleged in the Amended Complaint, such injuries or losses resulted from Plaintiff's pre-existing and/or unrelated medical, genetic and/or environmental conditions, diseases, or illnesses, subsequent medical conditions or natural courses of conditions for which Armstrong is not responsible.

**SEVENTEENTH DEFENSE**

Venue in this case may be improper and inconvenient as to Armstrong.

**EIGHTEENTH DEFENSE**

Plaintiff's claims are barred under Section 4, *et. seq.*, of the Restatement (Third) of Torts: Products Liability.

**NINETEENTH DEFENSE**

Plaintiff impermissibly directs certain allegations toward the "Defendants" and "Industry Defendants" collectively, precluding Armstrong from assessing which allegations are directed toward it.

**TWENTIETH DEFENSE**

Armstrong did not and does not manufacture, sell, market or distribute the subject paint pigment that is the basis of the Amended Complaint. Plaintiff's claims are barred, in whole or in part, because no product manufactured by Armstrong or its alleged predecessor reasonably could have contributed to Plaintiff's actual injuries or reasonably could have contributed to the risk of injury to Plaintiff.

### TWENTY-FIRST DEFENSE

Plaintiff's claims violate Armstrong's due process rights protected under the Fifth and Fourteenth Amendments to the United States Constitution, Article 1, Section 1 of the Wisconsin Constitution and Wisconsin common law.

### TWENTY-SECOND DEFENSE

Plaintiff's strict liability claim fails because lead is intrinsic to the product at issue, and therefore the product could not have been designed without lead.

### TWENTY-THIRD DEFENSE

Plaintiff's claims are barred pursuant to Wis. Stat. §§ 895.046 and 895.047.

### TWENTY-FOURTH DEFENSE

Plaintiff's claims fail because of the substantial change in the condition of the product from the time of sale to the time of alleged injury.

### TWENTY-FIFTH DEFENSE

Plaintiff's alleged injuries or damages were caused, in whole or in part, by the negligent acts or omissions of Hattie and Jerry Mitchell.

### TWENTY-SIXTH DEFENSE

Plaintiff's alleged injuries or damages were caused, in whole or in part, by the negligent acts or omissions of Plaintiff's caregivers, including, but not limited to, Darnell and Elinda Beal.

### TWENTY-SEVENTH DEFENSE

The product that allegedly caused injury to Plaintiff was not manufactured or sold by Armstrong or its alleged predecessor.

### TWENTY-EIGHTH DEFENSE

Armstrong and its alleged predecessor MacGregor had no duty to warn about the potential risk of harm from ingesting paint containing white lead carbonate pigments after MacGregor ceased manufacturing white lead carbonate pigments.

### TWENTY-NINTH DEFENSE

Armstrong incorporates herein by reference each and every applicable defense permitted by law and pleaded by any other defendant in this case.

### THIRTIETH DEFENSE

Armstrong reserves the right to amend this answer to set forth any and all other defenses presently existing or that may be learned through discovery and/or further proceedings herein.

**WHEREFORE**, Armstrong demands judgment dismissing the Amended Complaint, on the merits, with costs and disbursements and such other relief as may be just or equitable.

Trial by a jury of 12 of all issues properly triable to a jury is hereby demanded.

Dated at Milwaukee, Wisconsin this 4th day of March, 2022.

**BASCOM, BUDISH & CEMAN, S.C.**


By: _/s/ Timothy A. Bascom_
    Timothy A. Bascom, Esq.
    Bar No. 1010017
    W193N10975 Kleinmann Drive
    Germantown, WI 53022

- 16 -

Of Counsel:

**MORRIS MANNING & MARTIN, LLP**

Robert P. Alpert
Jeffrey K. Douglass
Eric A. Larson
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, Georgia 30326-1044

**Attorneys for Defendant Armstrong
Containers, Inc.**